# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 17-51014 |
| | § | |
| **KNIGHT ENERGY HOLDINGS, LLC,** *et al.*, | § | **(Jointly Administered)** |
| | § | |
| | § | **(Chapter 11)** |
| Debtors.[1] | § | |

## MOTION TO AUTHORIZE THE DEBTORS TO ASSUME THE RESTRUCTURING SUPPORT AGREEMENT

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), file this *Motion to Authorize the Debtors to Assume the Restructuring Support Agreement* (the "Motion") and in support respectfully submit the following:

### JURISDICTION AND PROCEDURAL BACKGROUND

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

2. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3. On August 8, 2017 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy cases (the "Cases"). The Debtors

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Knight Energy Holdings, LLC (1930) (Case No. 17-51014); Knight Oil Tools, LLC (2667) (Case No. 17-51015); Knight Manufacturing, LLC (0600) (Case No. 17-51016); KDCC, LLC, f/k/a Knight Well Services, LLC (4156) (Case No. 17-51017); Tri-Drill, LLC (4957) (Case No. 17-51018); Advanced Safety & Training Management, LLC, (0510) (Case No. 17-51019); Knight Security, LLC (0923) (Case No. 17-51020); Knight Information Systems, LLC (0000) (Case No. 17-51021); El Caballero Ranch, Inc. (7345) (Case No. 17-51022); Rayne Properties, LLC (0000) (Case No. 17-51023); Knight Aviation, LLC (3329) (Case No. 17-51024); Knight Research & Development, LLC (3760) (Case No. 17-51025); Knight Family Enterprises, LLC (7190) (Case No. 17-51026); HMC Leasing, LLC (0814) (Case No. 17-51027) and HMC Investments, LLC (0000) (Case No. 17-51029). The Debtors' service address is 2272 SE Evangeline Thruway, Lafayette, Louisiana 70508 other than Knight Manufacturing, LLC and Advanced Safety & Training Management, LLC. Knight Manufacturing, LLC's service address is 2810-A Melancon Road, Broussard, Louisiana 70518 and Advanced Safety & Training Management, LLC's service address is 1042 Forum Drive, Broussard, Louisiana 70518.

{00359063-1}
US 5165258v.10

1

continue to operate and manage their businesses as debtors-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

4.     As of the date hereof, an official committee of unsecured creditors has not been appointed in the Cases.  Further, no trustee or examiner has been requested or appointed in any of the Cases.

5.     On August 10, 2017, the Court entered an *Interim Order Authorizing the Debtors to Employ and Retain (I) Opportune LLP as Crisis Managers and (II) Gary L. Pittman as Chief Restructuring Officer and Certain Additional Personnel, in Each Instance Nunc Pro Tunc to the Petition Date* [Docket No. 64].

## BACKGROUND

6.     Information regarding the Debtors and these cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these cases, is set forth in the *Statement of Background Information and Declaration in Support of Debtors' Chapter 11 Petitions and First-Day Motions* [Docket No. 27] (the "First Day Declaration"), filed on the Petition Date and incorporated herein by reference.

7.     On August 8, 2017, the Debtors and each of the Consenting Holders (which Consenting Holders together directly or indirectly own 100% of the equity interests of the Debtors) executed the Restructuring Support Agreement (as defined below).

## INTRODUCTION

8.     The Restructuring Support Agreement is the Debtors' roadmap to a successful and comprehensive restructuring that will enable the Debtors to emerge from chapter 11 with a substantially deleveraged balance sheet and as a stronger, revitalized enterprise.

9.     The Debtors, together with their advisors, have carefully considered all alternatives to deleverage their capital structure and enhance financial flexibility. Within the Debtors' complex capital structure, the indebtedness and other obligations owed to the Lenders[2] under the Senior Credit Facility represent the Debtors' single largest funded debtholder constituency by far and the Debtors "fulcrum" security. For this reason, and given its present financial condition, the Debtors have limited prospects to consummate any reorganization without the support of the Consenting Lenders and their agreed treatment set forth in the Term Sheet. Accordingly, the Debtors proactively engaged the Consenting Lenders in extensive, arm's-length negotiations and ultimately reached agreement on the terms of a restructuring transaction that would right-size their balance sheet and best position their go-forward operations for long-term success. This agreement is memorialized through the Restructuring Support Agreement.

10.     The Restructuring Support Agreement creates the framework for a chapter 11 plan of reorganization that will substantially reduce the Debtors' prepetition funded debt obligations and the Debtors' interest burden. Importantly, the Restructuring Support Agreement provides a mechanism to resolve on a consensual basis over $200[3] million of senior secured claims against the Debtors and substantially deleverages the Debtors' balance sheets. Moreover, the Restructuring Support Agreement contains milestones which provide for an approximately four-month timeline for the Debtors to consummate their proposed restructuring, thereby minimizing damage to the business and minimizing administrative expenses and maximizing recoveries for the Debtors' stakeholders. Accordingly, assumption of the

---

[2] Capitalized terms used but not otherwise defined herein are used as defined in the Restructuring Support Agreement, including the Term Sheet. In the event of any conflict between the terms of this Motion and the Restructuring Support Agreement, the terms of the Restructuring Support Agreement shall control.

[3] Including interest and fees, etc.

{00359063-1}                                                    3
US 5165258v.10

Restructuring Support Agreement will provide important structure and stability to the chapter 11 process and establish a framework for the Debtors to negotiate and consummate the plan with their key constituencies.

11. The Debtors entered into the Restructuring Support Agreement only after an extensive review process. The Debtors determined that the terms of the Restructuring Support Agreement represent the best transaction available and will maximize value to all stakeholders. At the same time, however, the Restructuring Support Agreement contains a robust "fiduciary out" which enables the Debtors to terminate their obligations under the Restructuring Support Agreement if continued performance under the Restructuring Support Agreement would be inconsistent with the exercise of their fiduciary duty obligations.

12. Therefore, the Debtors submit that they have satisfied the business judgment standard applicable to assumption of the Restructuring Support Agreement and respectfully request that this Court enter the Order authorizing the Debtors to assume the Restructuring Support Agreement.

## THE RESTRUCTURING SUPPORT AGREEMENT AND TERM SHEET

### A. The Material Terms of the Term Sheet and the Plan

13. The Term Sheet attached to the Restructuring Support Agreement contains the following material terms:

- each holder of a Senior Secured Credit Facility Claim will receive its *pro rata* share of the (i) First Lien Equity Distribution and (ii) First Lien Takeback Notes issued on the Effective Date by Reorganized Knight to the Lenders (collectively, the "First Lien Distribution") on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders;

- each holder of an allowed DIP Financing claim shall receive, in full satisfaction of its allowed DIP Financing claim payment in full in cash from the proceeds of the First Lien Revolver to be entered into on the

Effective Date, or a dollar-for-dollar exchange for obligations under the First Lien Revolver;

- each holder of an allowed JPM Loan Claim will receive repayment from the net sale proceeds or conveyance of certain non-core property, will retain the liens securing the JPM Loans on any unsold collateral, and will restructure or replace the JPM Loans in full or in part with a JPM Takeback Loan on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders;

- each holder of an allowed Iberia Loan Claim will receive repayment from the net sale proceeds or conveyance of certain non-core property, will retain the liens securing the Iberia Loans on any unsold collateral, and will restructure or replace the Iberia Loans in full or in part with an Iberia Takeback Loan on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders;

- each holder of an allowed priority tax claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code;

- each holder of an allowed priority claim (other than a priority tax claim or administrative claim) shall receive either: (a) cash equal to the full allowed amount of its claim or (b) payments over time as permitted under the Bankruptcy Code or (c) such other treatment as may otherwise be agreed to by such holder and the Debtors with the consent of the Majority Consenting Lenders;

- each holder of an allowed secured claim, other than: (i) a priority tax claim, (ii) a Senior Credit Facility Secured Claim, (iii) a JPM Loan Claim, and (iv) an Iberia Loan Claim, shall receive, at the Debtors' election and with the consent of the Majority Consenting Lenders, either: (a) reinstatement of such holder's claim, (b) the return or abandonment of the collateral securing such claim to such holder, or (c) such other treatment as may otherwise be agreed to by such holder and the Debtors with the consent of the Majority Consenting Lenders;

- except to the extent that a holder of an Allowed Mineral Contractor Claim agrees to a less favorable treatment, each holder of an Allowed Mineral Contractor Claim shall receive cash in an amount equal to such allowed claim on the later of: (i) the Effective Date, or (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed claim;

- each holder of an allowed Convenience Class Claim shall receive cash in an amount equal to the lesser of (a) their allowed claim, and (b) $1,000;

- each holder (including, for the avoidance of doubt, holders of First Lien Deficiency Claim) of an allowed non-priority unsecured claim other than an allowed Convenience Class Claim (the "GUC Holders") shall receive their *pro rata* share from the $1,000,000 GUC Fund; *provided, however*

that if the GUC Holders vote as a class to confirm the Plan, then (i) the holders of the First Lien Deficiency Claim shall forego their right to receive any recovery from the GUC Fund on account of their First Lien Deficiency Claim, and (ii) the First Lien Deficiency Claim shall be excluded from the calculation of the *pro rata* recoveries of the other GUC Holders from the GUC Fund. For the avoidance of doubt, the First Lien Deficiency Claim shall be classified as general unsecured claims and the holders thereof shall be GUC Holders permitted to vote such claims to accept or reject the Plan;

- in consideration for the entry into the New Leases, the Related Party Transaction Resolutions, the Releases, and the other compromises and settlements described in the Term Sheet, the Consenting Holders will receive a distribution (the "Comprehensive Settlement Distribution") of: (i) 20% of the New Equity Interests in Reorganized Knight on the Effective Date (the "New Equity Settlement Amount") (subject to dilution by the MIP); (ii) two classes of 5-year warrants (or other equity equivalents) of Reorganized Knight equity interests that entitles the holders to: (a) 7% of Reorganized Knight equity interests with an exercise price equivalent to a $120 million equity valuation ("Warrant Tranche 1"), and (b) 6% of Reorganized Knight equity interests with an exercise price equivalent to a $175.0 million equity valuation ("Warrant Tranche 2" and together with Warrant Tranche 1, the "Warrants") (subject to dilution by the MIP);

- Intercompany Claims shall, in a tax and business efficient manner, be reinstated, compromised, or cancelled at the option of the Debtors and with the consent of the Majority Consenting Lenders; and

- the Plan will provide for: (a) a discharge of claims against the Debtors (the "Discharge"), (b) customary releases of certain claims and causes of action held by the Debtors and their estates (the "Debtor Releases") and certain third parties (the "Third Party Releases" and together with the Debtor Releases, the "Releases") against the Released Parties (as defined in the Term Sheet); (c) the exculpation of certain Restructuring Support Parties (the "Exculpations"); and (d) an injunction barring prosecution of such discharged, released, and exculpated claims and causes of action (the "Injunction"), in each case (a)-(d) to the fullest extent permitted by law and on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders. Under no circumstances shall any Non-Consenting Holder receive the benefit of the Releases, Exculpations, or the Injunction.

14. The Term Sheet also contains certain provisions pertaining to the governance of Reorganized Knight, including a provision related to the composition of the post-Effective Date board of directors and a provision dictating the terms of a management incentive plan (the "MIP").

**B. The Material Terms of the Restructuring Support Agreement**

15. The Restructuring Support Agreement establishes certain deadlines (the "Milestones") intended to facilitate the expeditious resolution of the Cases, for the benefit of the Debtors' estates and creditors. The Milestones provide that the Debtors shall implement the Restructuring on the following timeline:

- on the Petition Date or within two (2) days thereafter, the Debtors shall file with the Bankruptcy Court (i) a motion seeking entry of the Interim Cash Collateral/DIP Financing Order and the Final Cash Collateral/DIP Financing Order; and (ii) the RSA Assumption Motion;

- on or before September 1, 2017, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) a motion (the "Disclosure Statement and Solicitation Motion") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "Confirmation Hearing");

- prior to the Petition Date or within two (2) days thereafter the Debtors shall have listed for sale the real property located at 2288 E. County Rd. 30-A, Santa Rosa Beach, FL (the "Seaside Property"), (ii)   the real property located at the SE Corner of Interstate Hwy. 40 and N. Cimarron Rd., Oklahoma City, OK (the "Oklahoma City Property"); and (iii)  the real property located at 507 Park Road, Frierson, LA (the "Frierson Property" and together with the Oklahoma City Property, the "Non-Core Iberia Collateral"), in each case on terms acceptable to the Debtors and the Majority Consenting Lenders.  The Non-Core Iberia Collateral and the Seaside Property are together referred to in the Restructuring Support Agreement as the "Marketed Properties";

- no later than August 14, 2017, the Bankruptcy Court shall have entered the Interim Cash Collateral/DIP Financing Order;

- no later than September 1, 2017, the Bankruptcy Court shall have entered the Final Cash Collateral/DIP Financing Order;

- no later than October 23, 2017 (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five (5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Debtors shall have commenced solicitation on the Plan by mailing solicitation materials to the creditors and equity interest holders eligible to vote on the Plan;

- no later than October 23, 2017, the Bankruptcy Court shall have entered an order authorizing the assumption of the Restructuring Support Agreement (the "RSA Assumption Order," substantially in the form attached hereto);

- no later than December 5, 2017, the Bankruptcy Court shall have commenced the Confirmation Hearing;

- no later than December 8, 2017, the Bankruptcy Court shall have entered the Confirmation Order; and

- no later than December 23, 2017, the Effective Date shall have occurred.

16. Failure to meet a Milestone results in a termination right for the Majority Consenting Lenders. The Restructuring Support Agreement sets forth additional events that may trigger the termination of the Restructuring Support Agreement. For the sake of brevity, each termination event is not described in detail herein, however such termination events generally mandate that the Debtors comply with the terms of the Restructuring Support Agreement, meet each Milestone, diligently pursue confirmation and consummation of the Plan and the documentation necessary to consummate the transactions contemplated by the Restructuring Support Agreement, and that the Debtors' Cases are not converted or dismissed.

17. Importantly, the Restructuring Support Agreement provides that the Debtors may terminate in certain circumstances when the Board determines that proceeding with the restructuring would be inconsistent with the exercise of its fiduciary duties. *See* Restructuring Support Agreement at § 6(c)(iii).

**RELIEF REQUESTED**

18. By this Motion, the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A**, (a) authorizing the Debtors to assume the Restructuring Support Agreement, dated as of August 8, 2017, by and among the Debtors, the Consenting Lenders, the Administrative Agent, and the Consenting Holders, a copy of which is attached hereto as **Exhibit B** (together with all exhibits and schedules attached thereto, including the plan term

sheet (the "Term Sheet"); and as may be amended, supplemented, or modified from time to time in accordance with its terms, the "Restructuring Support Agreement"); (b) modifying the automatic stay provided in section 362 of the Bankruptcy Code to the extent necessary to permit the relief requested in this Motion; and (c) granting related relief.

## BASIS FOR RELIEF

### A. Assumption of the Restructuring Support Agreement is a Proper Exercise of the Debtors' Business Judgment.

19. Section 365(a) of the Bankruptcy Code provides that a debtor in possession, "subject to the court's approval, may assume or reject an executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts reviewing a debtor's decision to assume or reject an executory contract or unexpired lease apply a business judgment standard. *See In re Pisces Energy, LLC*, 2009 WL 7227880 (KKB) (Bankr. S.D. TX. 2009) (to determine whether a debtors' decision to assume an executory contract is supported by valid business justification, "[c]ourts apply the business judgment test, which requires a showing that the proposed course of action will be advantageous to the estate and the decision be based on sound business judgment."); *In re Armstrong World Indus.*, 348 B.R. 136, 162 (D. Del. 2006) (explaining that courts defer to a debtor's business judgment to reject a contract under 11 U.S.C. § 365(a)); *In re Federated Dep't. Stores, Inc.*, 131 B.R. 808, 811 (S.D. Ohio 1991) ("Courts traditionally have applied the business judgment standard in determining whether to authorize the rejection of executory contracts and unexpired leases"). Debtors are allowed considerable discretion in determining whether to assume or reject an executory contract. *See In re Continental Airlines Corp.*, 57 B.R. 845, 851 (Bankr. S.D. TX. 1985) (stating that, in the absence of a showing of bad faith or an abuse of business discretion, the Debtors' business judgment will not be altered); *see also In re Trans World Airlines, Inc.*, 261 B.R. 103, 121 (Bankr. D. Del. 2001) ("A debtor's

decision to reject an executory contract must be summarily affirmed unless it is the product of bad faith, or whim or caprice").

20.     Once "the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Computer Sales Int'l, Inc. v. Fed. Mogul (In re Fed. Mogul Global, Inc.)*, 293 B.R. 124, 126 (Bankr. D. Del 2003) (explaining that under the business judgment standard, a court should defer to debtor's contract rejection, "unless that decision is the product of bad faith or a gross abuse of discretion."). Rather, there is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009); *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002) (holding that "the debtor can reasonably take . . . a business risk if in its sound business judgment, it is worth the risk").

21.     Indeed, the business judgment standard "embodies the deference that is accorded to managerial decisions of a board of directors." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003). Accordingly, so long as a debtor exercises "reasonable" business judgment, a court should approve the proposed assumption or rejection. *See, e.g.*, *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *In re Mkt. Square Inn, Inc.*, 978 F. 2d 116, 121 (3d. Cir. 1992) (the "resolution of [the] issue of assumption or rejection will be a matter of business judgment by the bankruptcy court).

22.     The Debtors' assumption of the Restructuring Support Agreement is an exercise of their sound business judgment.  Absent the Lenders' consent, the Debtors face a contentious and costly chapter 11 process, to the detriment of their estates and creditors.  As summarized above and in the First Day Declaration, entry into and assumption of the Restructuring Support Agreement enables the Debtors to consummate the massive deleveraging of their capital structure and establishes the framework for the Plan that maximizes the value of the Debtors' enterprise for the benefit of all of the Debtors' stakeholders.

23.     The Restructuring Support Agreement is the product of extensive, arms-length negotiations between the Debtors, the Consenting Holders, and the Consenting Lenders, each in consultation with their respective legal counsel and financial advisors.  Entry into the Restructuring Support Agreement was in the best interests of the Debtors, and the Debtors therefore agreed to enter into the Restructuring Support Agreement.  By assuming the Restructuring Support Agreement, the Debtors will ensure that the Restructuring Support Agreement is enforceable against each party thereto, thus securing the benefit of the bargain the Debtors negotiated before the commencement of the Cases.  Furthermore, failure to assume the Restructuring Support Agreement may result in the termination of the Restructuring Support Agreement, undermining the Debtors' agreement with this critical creditor constituency and result in a default under the debtor in possession financing which is sustaining the business operations during these Cases.

24.     Courts have approved similar relief specifically with respect to prepetition restructuring support agreements under similar circumstances. *See*, *e.g.*, *In re Port Aggregates, Inc.*, No. 14-51580 (RS) (Bankr. W.D.L.A. June, 9, 2015); *In re CHC Grp. Ltd.*, No. 16-31854 (BJH) (Bankr. N.D. Tex. Mar. 3, 2017); *In re CSMG Techs., Inc.*, No. 14-31320 (HDH) (Bankr.

N.D. Tex. Apr. 29, 2014); *In re Magnum Hunter Resources Corp., et al.*, No. 15-12533 (KG) (Bankr. D. Del. Feb. 9, 2016); *In re New Gulf Resources, LLC*, *et al*., No. 15-12566 (BLS) (Bankr. D. Del. Feb. 4, 2016); *In re Hercules Offshore, Inc.*, *et al.*, No. 15-11685 (KJC) (Bankr. D. Del. Aug. 24, 2015); *In re Milagro Holdings, LLC*, *et al.*, No. 15-11520 (KG) (Bankr. D. Del. Aug. 17, 2015).

25. Based on the foregoing, the Debtors respectfully submit that they have exercised reasonable business judgment in deciding to assume the Restructuring Support Agreement. Accordingly, the Debtors request that the Court authorize the Debtors to assume the Restructuring Support Agreement.

**B. Limited Waiver of the Automatic Stay to Effectuate the Relief Requested Herein Is Appropriate.**

26. Section 362(a) of the Bankruptcy Code operates to stay:

> [T]he commencement or continuation, including the issuance or employment of process of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title or to receive a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1). Section 362, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1).

27. To the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, the Debtors seek authorization under section 362(d) to vacate and modify such provisions to effectuate all of the terms and provisions of the Restructuring Support Agreement including permitting the Parties to exercise all rights and remedies under the Restructuring Support Agreement in accordance with its terms, including providing notice of termination by any party pursuant to the Restructuring Support Agreement. For the reasons

described herein, the Debtors believe this relief is appropriate in the context of assuming the Restructuring Support Agreement.

## **WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)**

28.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **NO PRIOR REQUEST**

29.     No prior motion for the relief requested herein has been made to this Court or any other court.

## **PRAYER**

The Debtors respectfully request that the Court enter the Order, substantially in the form attached hereto as **Exhibit A**, and grant such other and further relief to which the Debtors may be justly entitled.

Dated: August 11, 2017

Respectfully submitted,

_/s/   William H. Patrick, III_
William H. Patrick, III (LA #10359)
Tristan E. Manthey (LA #24539)
Cherie D. Nobles (LA #30476)
**Heller, Draper, Patrick, Horn & Dabney, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: 504.299.3300
Facsimile:  504.299.3399
Email: wpatrick@hellerdraper.com
Email: tmanthey@hellerdraper.com
Email: cnobles@hellerdraper.com

**COUNSEL FOR DEBTORS**

**<u>EXHIBIT A</u>**

**PROPOSED ORDER**

{00359063-1}

US 5165258v.10

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE DIVISION**

| | | |
|---|---|---|
| In re: | § | **Case No. 17-51014** |
| | § | |
| **KNIGHT ENERGY HOLDINGS, LLC,** *et* | § | **(Jointly Administered)** |
| *al.,* | § | |
| | § | **(Chapter 11)** |
| Debtors.[1] | § | |

**ORDER AUTHORIZING THE DEBTORS TO ASSUME THE RESTRUCTURING**
**SUPPORT AGREEMENT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Knight Energy Holdings, LLC (1930) (Case No. 17-51014); Knight Oil Tools, LLC (2667) (Case No. 17-51015); Knight Manufacturing, LLC (0600) (Case No. 17-51016); KDCC, LLC, f/k/a Knight Well Services, LLC (4156) (Case No. 17-51017); Tri-Drill, LLC (4957) (Case No. 17-51018); Advanced Safety & Training Management, LLC, (0510) (Case No. 17-51019); Knight Security, LLC (0923) (Case No. 17-51020); Knight Information Systems, LLC (0000) (Case No. 17-51021); El Caballero Ranch, Inc. (7345) (Case No. 17-51022); Rayne Properties, LLC (0000) (Case No. 17-51023); Knight Aviation, LLC (3329) (Case No. 17-51024); Knight Research & Development, LLC (3760) (Case No. 17-51025); Knight Family Enterprises, LLC (7190) (Case No. 17-51026); HMC Leasing, LLC (0814) (Case No. 17-51027) and HMC Investments, LLC (0000) (Case No. 17-51029). The Debtors' service address is 2272 SE Evangeline Thruway, Lafayette, Louisiana 70508 other than Knight Manufacturing, LLC and Advanced Safety & Training Management, LLC. Knight Manufacturing, LLC's service address is 2810-A Melancon Road, Broussard, Louisiana 70518 and Advanced Safety & Training Management, LLC's service address is 1042 Forum Drive, Broussard, Louisiana 70518.

{00359063-1}1

US 5165258v.10

On [_____], 2017, the Court considered the Motion[2] filed by the above-referenced debtors and debtors-in-possession (collectively, the "Debtors") for entry of an order (the "Order"). The Court finds that (a) it has jurisdiction over the matters raised in the Motion pursuant to 28 U.S.C. § 1334(b), (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), (c) the relief requested in the Motion is in the best interests of the Debtors and their respective estates, creditors, and equity security holders, (d) proper and adequate notice of the Motion and hearing thereon has been given and that no other or further notice is necessary, (e) assumption of the Restructuring Support Agreement is a sound exercise of the Debtors' business judgment, and (f) good and sufficient cause exists for the granting of the relief requested in the Motion after having given due deliberation upon the Motion and all of the proceedings had before the Court in connection with the Motion. Therefore, it is

**ORDERED** that the Debtors are authorized to assume the Restructuring Support Agreement in its entirety and, effective as of the date of entry of this Order, the Restructuring Support Agreement is hereby assumed pursuant to section 365(a) of the Bankruptcy Code. It is further

**ORDERED** that the Debtors are authorized to enter into amendments to the Restructuring Support Agreement, from time to time as necessary, subject to the terms and conditions set forth in the Restructuring Support Agreement and without further order of the Court. It is further

**ORDERED** that to the extent the automatic stay provisions of section 362 of the Bankruptcy Code would otherwise apply, such provisions are vacated and modified to effectuate all of the terms and provisions of the Restructuring Support Agreement including

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Motion.

{00359063-1}2

US 5165258v.10

permitting the Parties (as defined therein) to exercise all rights and remedies under the Restructuring Support Agreement in accordance with its terms, including providing notice of termination by any party pursuant to the Restructuring Support Agreement.  It is further

      **ORDERED** that the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.  It is further

      **ORDERED** that notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon entry of this Order.  It is further

      **ORDERED** that the Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

###

Prepared and submitted by:

*/s/ William H. Patrick, III*
William H. Patrick, III (LA #10359)
Tristan E. Manthey (LA #24539)
Cherie D. Nobles (LA #30476)
**Heller, Draper, Patrick, Horn & Dabney, L.L.C.**
650 Poydras Street, Suite 2500
New Orleans, Louisiana 70130
Telephone: 504.299.3300
Facsimile:  504.299.3399
Email: wpatrick@hellerdraper.com
Email: tmanthey@hellerdraper.com
Email: cnobles@hellerdraper.com

***Counsel for Debtors***

{00359063-1}3

US 5165258v.10

## EXHIBIT B

**RESTRUCTURING SUPPORT AGREEMENT**

{00359063-1}
US 5165258v.10

**PRIVILEGED AND CONFIDENTIAL**
**PROVIDED AS PART OF SETTLEMENT DISCUSSIONS**
**SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE**
**AND ALL BANKRUPTCY AND STATE LAW EQUIVALENTS**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE OF THIS AGREEMENT ON THE TERMS AND CONDITIONS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "***Agreement***"), dated as of August 8, 2017, is entered into by and among (i) Knight Energy Holdings, LLC ("***Holdings***"), (ii) HMC Leasing, LLC ("***Leasing***"), (iii) Knight Family Enterprises LLC ("***Enterprises***"), (iv) the undersigned subsidiary borrowers and guarantors party hereto (the "***Subsidiary Borrowers/Guarantors***" and together with Holdings, Leasing, and Enterprises, the "***Company***"), (v) certain of the lenders (collectively, the "***Lenders***", and each undersigned Lender in such capacity as a Lender, together with their respective successors and permitted assigns and any subsequent Lender that becomes party hereto in accordance with the terms hereof, the "***Consenting Lenders***") party to that certain Credit Agreement dated June 26, 2013, as amended, restated and modified from time to time, pursuant to which the Lenders have extended loans and other financial accommodations (collectively, the "***Loans***") to the Company (the "***Senior Credit Facility***") and administered by Cantor Fitzgerald Securities (successor to Wells Fargo Bank, National Association), as the administrative agent thereunder (together with any successor agent, the "***Administrative Agent***"), (vi) the Administrative Agent, and (vii) the record and beneficial owners of certain of the issued and outstanding equity interests in Holdings, Leasing, and Enterprises each of whom are signatories hereto (collectively, the "***Consenting Holders***"). The Company, each Consenting Lender, the Consenting Holders, the Administrative Agent, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein collectively as the "***Parties***" and individually as a "***Party***".

**WHEREAS**, the Parties have agreed to a restructuring of the Company (the "***Restructuring***") that will be implemented through a pre-negotiated plan of reorganization (the "***Plan***") of the Company following the filing of a voluntary petition for relief under

1

Chapter 11 of Title 11 of the United States Code that would be filed by the Company in its capacity as a debtor and debtor in possession in connection with the commencement of cases (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Western District of Louisiana, Lafayette Division (the "**Bankruptcy Court**"). The Restructuring will be consummated in accordance with the terms and conditions reflected in the term sheet attached hereto on <u>Exhibit A</u> (the "**Term Sheet**," including any schedules and exhibits attached thereto, and as may be amended or modified from time to time in accordance with <u>Section 9</u> hereof). The Term Sheet is the product of arm's length good faith discussions between the Parties as advised by their respective professionals;

**WHEREAS**, as of the date hereof, the Consenting Lenders hold, in the aggregate, more than 87% of the aggregate outstanding obligations under the Senior Credit Facility;

**WHEREAS,** as of the date hereof, the Consenting Holders hold the equity interests in Holdings, Leasing, and Enterprises indicated in <u>Exhibit C</u> attached hereto;

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment in respect of the matters discussed in the Term Sheet and hereunder and during the pendency of this Agreement and desire not to support any restructuring, reorganization, or sale of any of the Company entities or their respective assets (or any plan or proposal in respect of the same) that does not achieve or implement the Restructuring, as contemplated herein, except as provided herein;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     <u>**Certain Definitions.**</u>

As used in this Agreement, the following terms have the following meanings:

(a)     "**Closing**" means the substantial consummation of the Plan.

(b)     "**Definitive Documentation**" means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated by the Term Sheet to effect the Plan and that are otherwise necessary or desirable to implement, or otherwise relate to the Restructuring, including, as applicable and without limitation:

(i)     the Plan;

(ii)     the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, all of which are

2

incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time (the "***Plan Supplement***") (including, without limitation, documents identifying the managers, officers, and directors of the reorganized Company, the governance documents for the reorganized Company, and any equity interest holders' agreements with respect to the reorganized Company);

(iii)    the confirmation order with respect to the Plan (the "***Confirmation Order***");

(iv)    the related disclosure statement (and all exhibits and schedules thereto) with respect to the Plan (the "***Disclosure Statement***");

(v)    the solicitation materials with respect to the Plan (collectively, the "***Solicitation Materials***");

(vi)    an order authorizing the assumption of this Agreement (the "***RSA Assumption Order***");

(vii)    (A) the interim order authorizing use of cash collateral and providing for debtor-in-possession financing (the "***Interim Cash Collateral/DIP Financing Order***") and (B) the final order authorizing use of cash collateral and debtor-in-possession financing (the "***Final Cash Collateral/DIP Financing Order***" and, together with the Interim Cash Collateral/DIP Financing Order, the "***Cash Collateral/DIP Financing Orders***");

(viii)    the "***DIP Financing***" as defined in the Term Sheet;

(ix)    the motions seeking approval of each of the above;

(x)    the "***First Lien Takeback Notes***" as defined in the Term Sheet;

(xi)    the "***JPM Takeback Loans***" as defined in the Term Sheet;

(xii)    the "***Iberia Takeback Loans***" as defined in the Term Sheet;

(xiii)    the "***Revolver***" as defined in the Term Sheet;

(xiv)    the "***New First Lien Facility***" as defined in the Term Sheet;

(xv)    "***Warrant Tranche 1***" as defined in the Term Sheet;

(xvi)    "***Warrant Tranche 2***" as defined in the Term Sheet;

3

(xvii) all documents necessary to effect the "*Sales*", the "*Repayments*", the "*Replacement Loans*", and the "*New Leases*", each as defined in the Term Sheet;

(xviii) any required extension or amendment of other existing mortgages or secured indebtedness, organizational documents, investor related agreements or other related documents necessary to effect the Restructuring or to execute the Definitive Documentation listed in clauses (i)-(xvii),

which Definitive Documentation identified in clauses (i)-(xviii) will, after the Restructuring Support Effective Date, remain subject to negotiation and preparation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all material respects with this Agreement and the Term Sheet and shall otherwise be in form and substance satisfactory to the Company, the Majority Consenting Lenders, and the Consenting Holders (to the extent such document directly and materially affects them), in all respects, in accordance with Section 7 hereof.

(c)     "*Iberia*" means IberiaBank

(d)     "*JPM*" means JP Morgan Chase Bank, N.A

(e)     "*Lender Claims*" means any and all claims arising under the Senior Credit Facility.

(f)     "*Majority Consenting Lenders*" shall mean any Consenting Lender or group of Consenting Lenders holding greater than 50% of the aggregate principal amount of Loans then outstanding under the Senior Credit Facility.

(g)     "*Material Adverse Effect*" means the occurrence of an event, other than as a result of the filing of the Chapter 11 Cases, that (i) causes significant asset or property damage, a material decline in the value of the Company's assets, property, or businesses, or a significant reduction in the Company's revenue base, or (ii) is likely to have a material adverse effect on the Company's financial condition, business, performance or operations, taken as a whole.

(h)     "*Restructuring Support Effective Date*" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company, (ii) each of the Consenting Holders, and (iii) the Consenting Lenders who together constitute the Majority Consenting Lenders.

(i)     "*Restructuring Support Period*" means the period commencing on the Restructuring Support Effective Date and ending on the earlier of the (i) date

4

on which this Agreement is terminated in accordance with <u>Section 6</u> hereof, and (ii) the effective date of the Plan (the "***Effective Date***").

## 2.    <u>Term Sheet.</u>

The Term Sheet is expressly incorporated herein by reference and made part of this Agreement as if fully set forth herein. The Term Sheet sets forth the material terms and conditions for the Plan; <u>provided</u>, <u>however</u>, the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistency between the Term Sheet and this Agreement, this Agreement shall control.

## 3.    <u>Agreements of the Consenting Lenders.</u>

(a)    <u>Agreement to Support</u>. Each of the Consenting Lenders agrees, for the duration of the Restructuring Support Period, to support the Restructuring and to take all reasonable actions necessary or reasonably requested by the Company to consummate the Restructuring, in a timely manner. Subject to the terms and conditions hereof, for the duration of the Restructuring Support Period, each Consenting Lender irrevocably agrees to, at the request of the Company, support any of the Company's motions in bankruptcy implementing this Agreement and Restructuring, including the use of cash collateral, request for DIP Financing, employment of professionals and other first day motions.

(b)    <u>Voting</u>. Each Consenting Lender agrees that, for the duration of the Restructuring Support Period, such Consenting Lender, so long as its vote has been properly solicited pursuant to Sections 1125(g) and 1126 of the Bankruptcy Code, shall:

(i)    (A) timely vote or cause to be voted each of its Lender Claims to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with Sections 1125(g) and 1126 of the Bankruptcy Code, (B) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); <u>provided</u>, <u>however</u>, that such vote may, upon written notice to the Company and the other Parties, be revoked (and, upon such revocation, deemed void *ab initio*) by any Consenting Lender at any time following termination of this Agreement, (C) timely vote (or cause to be voted) its Lender Claims against, and shall not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or its assets other

5

than the Plan, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede the solicitation of votes on the Plan, approval of the Disclosure Statement, and the confirmation and consummation of the Plan, and (D) not opt-out of the releases under the Plan; and

(ii)  support and take all reasonable actions necessary or reasonably requested by the Company to facilitate the solicitation of votes on the Plan, approval of the Disclosure Statement, and confirmation and consummation of the Plan (it being understood that the Consenting Lenders shall not be required to incur any material costs, expense or liability in connection therewith).

(c)  <u>Transfers</u>. Each Consenting Lender agrees that, for the duration of the Restructuring Support Period, such Consenting Lender shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (other than ordinary course pledges and/or swaps) (each, a "***Transfer***"), directly or indirectly, in whole or in part, any of the Loans or Lender Claims or any option thereon or any right or interest therein or any other claims against in the Company (including grant any proxies, enter into a voting agreement with other holder of Loans or other claims against the Company), unless the transferee thereof either (i) is a Consenting Lender or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Lender and to be bound by all of the terms of this Agreement applicable to Consenting Lenders (including with respect to any and all claims it already may hold against the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as <u>Exhibit B</u> (a "***Joinder Agreement***"), and delivering an executed copy thereof within two (2) business days of such execution, to (A) Heller, Draper, Patrick, Horn & Dabney LLC ("***Heller Draper***"), as counsel to the Company, (B) Vinson & Elkins LLP ("***V&E***"), as counsel to certain of the Consenting Lenders, and (C) Shipman & Goodwin LLP ("***Shipman***"), as counsel to the Administrative Agent, in which event (x) the transferee (including the Consenting Lender transferee, if applicable) shall be deemed to be a Consenting Lender hereunder to the extent of such transferred rights and obligations and (y) the transferor, solely with respect to the Loans or Lender Claims that were transferred, shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations. Each Consenting Lender agrees that any Transfer of any Lender Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Lender shall have the right to enforce the voiding of such Transfer. Notwithstanding the foregoing, the Administrative Agent shall have no obligation to monitor any Lender's compliance with the foregoing condition, and may assume without inquiry that any assignment of Loans that has been presented to it is in compliance with the terms of this Agreement (to the extent applicable).

6

(d) <u>Additional Lender Claims</u>. To the extent any Consenting Lender acquires additional Lender Claims or other claims, then, in each case, each such Consenting Lender shall promptly notify Heller Draper and V&E, and each such Consenting Lender agrees that such Lender Claims or other claims shall be subject to this Agreement, and that, for the duration of the Restructuring Support Period, it shall vote (or cause to be voted) such Lender Claims (to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with <u>Sections 3(a)</u> and <u>3(b)</u> hereof.

(e) <u>No-Action by Consenting Lenders</u>. Each of the Consenting Lenders agrees, for the duration of the Restructuring Support Period, not to take any action (or encourage or instruct any other party, including the Administrative Agent to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Senior Credit Facility that would be triggered as a result of the execution of this Agreement, the commencement of the Chapter 11 Cases, or the undertaking by the Company to implement the Restructuring through the Chapter 11 Cases.

(f) <u>DIP Financing.</u> Clearlake Capital Partners IV Finance, L.P. agrees to provide the DIP Financing in accordance with the Term Sheet and to support any motion by the Company seeking the use of cash collateral and/or DIP Financing in form and substance acceptable to the Consenting Lenders and the Company *provided that* such motions shall not conflict with the terms and conditions of this Agreement or the Term Sheet.

(g) <u>Material Negotiations/Agreements</u>. Each of the Consenting Lenders agrees not to enter into any material negotiations or agreements with any of the Company's creditors (other than JPM, Iberia, and other Lenders) without providing notice to the Company via its counsel.

## 4. **Agreements of the Company.**

(a) <u>Affirmative Covenants</u>. The Company agrees that, for the duration of the Restructuring Support Period, the Company shall, and shall cause each of its direct and indirect subsidiaries to (and the Consenting Holders shall cause the Company to), directly or indirectly, do the following:

(i) as provided in and otherwise subject to this Section 4, implement the Restructuring on the following timeline (each deadline, a "***Milestone***"):

(A) no later than August 8, 2017, the Company shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court (such deadline, the "***Outside Petition Date***" and the actual date of such filing, the "***Petition Date***");

7

(B)     on the Petition Date or within two (2) days thereafter, the Company shall file with the Bankruptcy Court (i) a motion seeking entry of the Interim Cash Collateral/DIP Financing Order and the Final Cash Collateral/DIP Financing Order; and (ii) the RSA Assumption Motion;

(C)     on or before September 1, 2017, the Company shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***");

(D)     prior to the Petition Date or within two (2) days thereafter the Company shall have listed for sale the real property located at 2288 E. County Rd. 30-A, Santa Rosa Beach, FL (the "***Seaside Property***"), (ii)   the real property located at the SE Corner of Interstate Hwy. 40 and N. Cimarron Rd., Oklahoma City, OK (the "***Oklahoma City Property***"); and (iii)  the real property located at 507 Park Road, Frierson, LA (the "***Frierson Property***" and together with the Oklahoma City Property, the "Non-Core ***Iberia Collateral***"), in each case on terms acceptable to the Company and the Majority Consenting Lenders.  The Non-Core Iberia Collateral and the Seaside Property are together referred to herein as the "***Marketed Properties***";

(E)     no later than August 14, 2017, the Bankruptcy Court shall have entered the Interim Cash Collateral/DIP Financing Order;

(F)     no later than September 1, 2017, the Bankruptcy Court shall have entered the Final Cash Collateral/DIP Financing Order;

(G)     no later than October 23, 2017 (i) the Bankruptcy Court shall have entered an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion; and (ii) no later than five (5) business days after entry of the order approving the Disclosure Statement and Solicitation Motion, the Company shall have commenced solicitation on the Plan by mailing solicitation materials to the creditors and equity interest holders eligible to vote on the Plan;

8

(H)     no later than October 23, 2017, the Bankruptcy Court shall have entered an order authorizing the assumption of this Agreement (the "**RSA Assumption Order**");

(I)     no later than December 5, 2017, the Bankruptcy Court shall have commenced the Confirmation Hearing;

(J)     no later than December 8, 2017, the Bankruptcy Court shall have entered the Confirmation Order; and

(K)     no later than December 23, 2017, the Effective Date shall have occurred.

The Company may extend a Milestone with the express prior written consent of the Majority Consenting Lenders.

(ii)     distribute all Definitive Documentation to the legal and financial advisors for the Consenting Lenders and afford reasonable opportunity to comment and review in advance of any filing thereof, use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring embodied in the Plan or other Definitive Documentation, and not take any action that is inconsistent with, or is intended or is likely to interfere with, consummation of the Restructuring in accordance with the Milestones;

(iii)     subject to Section 4(b), continue to operate its businesses in the ordinary course of business consistent with past practices immediately prior to the Petition Date and taking into account the impact of the filing of Chapter 11 petitions for relief under the Bankruptcy Code, and confer with the Majority Consenting Lenders and their representatives, as reasonably requested, to report on material operational matters and the general status of ongoing operations. Notwithstanding the generality of the foregoing, the Company shall, except as expressly contemplated by this Agreement or with the prior written consent of the Majority Consenting Lenders and, subject to applicable bankruptcy law, use commercially reasonable efforts consistent with the Restructuring to, (a) continue to operate its businesses in compliance with all applicable laws, rules and regulations in all material respects, (b) preserve the relationships with the current customers, distributors, suppliers, vendors and others having business dealings with the Company, (c) maintain its physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (d) not take any action, or omit to take any action, the intent of which is to cause the termination of its current officers other than a termination for cause (in accordance with the definition of "Cause" in any applicable contract or agreement) or if the failure to do so would be

9

inconsistent with the exercise of applicable fiduciary duties, (e) perform all obligations required to be performed by the Company under any assumed executory contracts or unexpired leases, (f) maintain its books and records on a basis consistent in all material respects with prior practice, (g) bill for products sold or services rendered and pay accounts payable in a manner consistent in all material respects with past practices immediately prior to the Petition Date and taking into account the impact of the filing of Chapter 11 petitions for relief under the Bankruptcy Code, (h) maintain all insurance policies required, or suitable replacements therefor, in full force and effect throughout the Restructuring Support Period, (i) provide the Consenting Lenders with updated monthly financial information concerning the Company, (j) not encumber nor enter into any material new leases (other than the New Leases contemplated in the Term Sheet), licenses or other use or occupancy agreements for real property or any part thereof, (k) timely pay any and all required fees and taxes with respect to patents (if any), patent applications (if any), any trademark applications and any registered trademarks, and (l) not enter into any agreement with any labor union or labor organization, including but not limited to any collective bargaining agreement, except as required by applicable law; and

(iv)    (A) support and take all reasonable actions necessary or reasonably requested by the Majority Consenting Lenders to facilitate the solicitation, confirmation and consummation of the Plan and the transactions contemplated thereby,

(B)    not take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede entry of the RSA Assumption Order, the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan, and

(C)    support the mutual release and exculpation provisions contained in the Term Sheet and the Plan;

(v)    [Reserved];

(vi)    provide draft copies of all "first day" motions or applications and other documents the Company intends to file with the Bankruptcy Court to V&E as soon as reasonably practicable prior to the date when the Company intends to file such document and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court. The Company will use reasonable efforts to provide draft copies of all other material pleadings the Company intends to file with the Bankruptcy Court to V&E within a reasonable time prior to filing such pleading to the extent practicable and shall consult in good faith

10

with such counsel regarding the form and substance of any such proposed pleading;

(vii)    maintain their good standing under the laws of the state in which they are incorporated or organized;

(viii)    timely file with the Bankruptcy Court a formal written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases or (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(ix)    [Reserved];

(x)    provide to the Administrative Agent, the Consenting Lenders and/or their respective advisors, upon reasonable advance notice to the Company (but without prejudice to the attorney-client privilege or attorney work product doctrine), (A) reasonable access (without any material disruption to the conduct of the Company's business) during normal business hours to the Company's books, records and facilities, (B) reasonable access to the respective management and advisors of the Company for the purposes of evaluating the Company's business plans and participating in the planning process with respect to the consummation of the transactions contemplated by the Plan, (C) timely and specific responses to all reasonable diligence requests, and (D) information with respect to all material executory contracts and unexpired leases of the Company for the purposes of concluding, in consultation with the Company and its advisors, which executory contracts and unexpired leases the Company intends to assume, assume and assign or reject in the Chapter 11 Cases;

(xi)    convene a call on Tuesday of each week during the Restructuring Support Period with the Administrative Agent, the Consenting Lenders and their respective advisors, which calls will include the Company's management and financial and legal advisors; provided, however, to the extent such call is missed or needs to be rescheduled by the Company, the Company shall have until the immediate Friday thereafter to convene the call;

(xii)    in the event that the Company (including all subsidiaries and representatives) receives a written proposal or offer (binding or nonbinding) with respect to any transaction that would if consummated constitute a plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of

11

the Company or its assets other than the Plan, provide written notice thereof and a copy of such proposal or offer to the Consenting Lenders (subject to an appropriate confidentiality agreement) within three (3) business days following receipt of such offer;

(xiii)    provide prompt written notice to the Consenting Lenders between the date hereof and the Effective Date (unless notice is already provided to the Consenting Lenders) of (A) the occurrence, or failure to occur, of any event that, to the Company's knowledge, would be likely to cause (1) any representation or warranty of the Company contained in this Agreement to be untrue or inaccurate in any material respect, (2) any covenant of any of the Company contained in this Agreement not to be satisfied in any material respect or (3) any condition precedent required by the Plan, the Term Sheet, or this Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) receipt of any written notice from any governmental body in connection with this Agreement or the transactions contemplated by the Restructuring, (D) receipt of any written notice of any proceeding commenced, or, to the knowledge of the Company, threatened against the Company, relating to or involving or otherwise affecting in any material respect the transactions contemplated by the Restructuring, and (E) any failure of the Company to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(xiv)    from the proceeds of the First Lien Revolver and/or the DIP Financing, and subject to any required Bankruptcy Court order, unless otherwise agreed by the Company and the applicable firm, to pay in cash upon receipt of invoices, all documented fees and expenses of the Administrative Agent and the Consenting Lenders including those of legal counsel and financial advisors, including, without limitation, with respect to pre-petition and post-petition services in connection with the Restructuring, the evaluation, negotiation and implementation of the proposed Restructuring, and all costs and out-of-pocket expenses, in each case then due, outstanding, which after the Petition Date shall be payable from the proceeds of cash collateral or any DIP Financing as may be provided by order of the Bankruptcy Court;

(xv)    promptly notify the other Parties in writing following the receipt in writing of any notice of any governmental or third party complaints, litigation, investigations or hearings (or communications indicating that the same may be contemplated or threatened), in any such case which would reasonably be anticipated to have a Material Adverse Effect; and

12

(xvi)   support and take all commercially reasonable best efforts necessary to facilitate the sale of the Marketed Properties at the highest possible price in accordance with this Agreement.

(b)   <u>Negative Covenants</u>. The Company agrees that, for the duration of the Restructuring Support Period, the Company shall not, without prior written consent of the Majority Consenting Lenders, do or permit to occur any of the following:

(i)   amend or modify (other than technical, non-substantive modifications, which changes shall not in any event be adverse to the Consenting Lenders) the Term Sheet or the Plan;

(ii)   withdraw or revoke the Term Sheet or the Plan or publicly announce its intention not to pursue the Restructuring;

(iii)   file any motion or pleading or other Definitive Documentation with the Bankruptcy Court (including any modifications or amendments thereof) that, in whole or in part, is not consistent in any material respect with this Agreement, the Term Sheet or the Plan;

(iv)   move for an order from the Bankruptcy Court authorizing or directing the assumption or rejection of a material executory contract (including, without limitation, any employment agreement or employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;

(v)   directly assert or support any assertion by any third party that, prior to issuing any termination notice pursuant to <u>Section 6(a)</u>, the Majority Consenting Lenders shall be required to obtain relief from the automatic stay under section 362 of the Bankruptcy Code (and hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice);

(vi)   issue, sell, pledge, dispose of or encumber any additional shares of, or any options, warrants, conversion privileges or rights of any kind to acquire any shares of, any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(vii)   amend or propose to amend its respective certificate or articles of incorporation, bylaws or comparable organizational documents;

(viii)   except as contemplated by the Term Sheet or the Plan, split, combine or reclassify any outstanding shares of its capital stock or other

13

equity interests, or declare, set aside or pay any dividend or other distribution payable in cash, stock, property or otherwise with respect to any of its equity interests;

(ix)    redeem, purchase or acquire or offer to acquire any of its equity interests, including, without limitation, capital stock, limited liability company interests or partnership interests;

(x)    acquire or divest (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) (A) any corporation, partnership, limited liability company, joint venture or other business organization or division or (B) assets of the Company, other than in the ordinary course of business consistent with past practices and in no event in excess of $100,000, individually or in aggregate;

(xi)    incur any capital expenditures other than in the ordinary course of business and in amounts consistent with historical business practices;

(xii)    incur or suffer to exist any indebtedness, other than indebtedness (1) existing and outstanding on the Petition Date, (2) authorized by "first day orders" entered by the Bankruptcy Court, (3) authorized by any Cash Collateral/DIP Financing Order, or (4) authorized under the DIP Financing, in each case (2)-(4) as reasonably acceptable to the Majority Consenting Lenders;

(xiii)    incur or suffer to exist any liens or security interests other than choate or inchoate liens or security interests existing and outstanding immediately prior to the Petition Date or arising in the ordinary course of the Debtors' business;

(xiv)    enter into any commitment or agreement with respect to debtor-in-possession financing or the use of cash collateral other than the DIP Financing;

(xv)    enter into any employment agreements, collective bargaining agreements or employee benefit plans, or materially modify any existing employment agreements, collective bargaining agreements or benefit plans;

(xvi)    hire any executive or employee whose total annual compensation is greater than $100,000 or increase the compensation for any executive or employee whose total annual compensation is greater than $100,000 without the express consent of the Majority Consenting Lenders; or

14

(xvii)   allow or settle claims or any pending litigation not otherwise insured under the Company's insurance policies and paid for by the Company's applicable insurance carrier for more than $50,000 per claim individually, or $200,000 in the aggregate without the express consent of the Majority Consenting Lenders.

(c)      Automatic Stay. The Company acknowledges and agrees and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code (and the Company hereby waives, to the greatest extent possible, the applicability of the automatic stay to the giving of such notice).

## 5.    **Agreements of the Consenting Holders.**

(a)      Each of the Consenting Holders agrees, for the duration of the Restructuring Support Period, (A) to support and take all reasonable actions necessary or reasonably requested by the Majority Consenting Lenders to facilitate the filing of the Chapter 11 Cases, the solicitation, confirmation, and consummation the Plan and the transactions contemplated thereby and herein in accordance with the Milestones, (B) not to take any action that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede, as necessary, the filing of the Chapter 11 Cases, the entry of the RSA Assumption Order, the approval of the Disclosure Statement, the solicitation of votes on the Plan, and the confirmation and consummation of the Plan, and (C)  to support the mutual release and exculpation provisions contained in the Term Sheet and the Plan and not opt out of the same.

(b)      Each of the Consenting Holders agrees, if entitled to vote under the Plan,  (i) to timely vote or cause to be voted each of its equity interests or claims (and any equity interests and claims as to which it holds a proxy) to accept the Plan by delivering its duly executed and completed ballot or ballots, as applicable, accepting the Plan on a timely basis following commencement of the solicitation of acceptances of the Plan in accordance with Sections 1125(g) and 1126 of the Bankruptcy Code, (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); (iii) timely vote (or cause to be voted) its equity interests or claims against, and shall not directly or indirectly, through any person or entity, seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing or prosecution of, any plan, plan proposal, restructuring proposal, offer of dissolution, winding up, liquidation, sale or disposition, reorganization, merger or restructuring of the Company or its assets other than the Plan, or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay or impede entry of the RSA Assumption Order, the solicitation of votes on

15

the Plan, approval of the Disclosure Statement, the confirmation and consummation of the Plan, and (iv) not opt-out of and to support all releases under the Plan.

(c)     Each Consenting Holder agrees that, for the duration of the Restructuring Support Period, such Consenting Holder shall not Transfer directly or indirectly, in whole or in part, any equity interests, claims, or any option thereon or any right or interest therein or any other claims against or equity interests in the Company (including grant any proxies, deposit any equity interests or any claims against or interests in the Company into a voting trust or entry into a voting agreement with respect to any such equity interests or any other claims against or interests in the Company) and that any Transfer in breach of this Section 5(c) shall be void *ab initio*.

## 6.     <u>Termination of Agreement.</u>

(a)     This Agreement shall terminate upon the receipt of written notice, delivered in accordance with <u>Section 19</u> hereof, from the Majority Consenting Lenders to the other Parties hereto at any time after the occurrence of any Majority Consenting Lenders Termination Event (defined below). In addition, this Agreement shall terminate upon the receipt of written notice, delivered in accordance with <u>Section 19</u> hereof, from the Company to the other Parties hereto at any time after the occurrence of any Company Termination Event (defined below). Notwithstanding the foregoing, no Party shall have the right to terminate this Agreement pursuant to this Section 6(a) if such Party is at such time in material breach of any provision of this Agreement.

(b)     A "<u>Majority Consenting Lenders Termination Event</u>" shall mean any of the following:

(i)     the breach by the Company or any Consenting Holder of (a) any affirmative or negative covenant contained in this Agreement or (b) any other obligations of the Company or any Consenting Holder set forth in this Agreement, and, in either respect, such breach remains uncured for a period of five (5) business days following the receipt by the Company and the Consenting Holders of notice pursuant to <u>Section 6(a)</u> of this Agreement;

(ii)     any representation or warranty in this Agreement made by the Company or any Consenting Holder shall have been untrue in any material respect when made or shall have become untrue in any material respect, and such breach remains uncured for a period of five (5) business days following the Company's receipt of notice pursuant to <u>Section 6(a)</u> of this Agreement;

16

(iii)    any material term or condition of any of the Definitive Documentation shall be (whether due to an order of the Bankruptcy Court or otherwise) different and adverse to the Consenting Lenders than as contemplated by the Term Sheet and the Plan, and such event remains unremedied for a period of five (5) business days following the Company's receipt of notice pursuant to Section 6(a) of this Agreement;

(iv)    except as explicitly permitted under this Agreement or arising in the ordinary course of the Debtors' business, the Company shall have (A) incurred any indebtedness, (B) leased, mortgaged, pledged, granted a lien on or disposed of any of its properties or assets or (C) declared, set aside or paid any dividends on, or made any other distributions in respect of, any of the capital stock of the Company;

(v)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan, and either (A) such ruling, judgment or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

(vi)    the Company shall fail to satisfy any Milestone unless such Milestone is extended in accordance with Section 4;

(vii)    the occurrence of any event, change, effect, occurrence, development, circumstance or change of fact that has or would reasonably be expected to have a Material Adverse Effect;

(viii)    the Bankruptcy Court enters an order shortening or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization;

(ix)    the Bankruptcy Court grants relief terminating, annulling or modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any assets or property of the Company having an aggregate fair market value in excess of $25,000 in the aggregate unless such claim is covered by insurance;

(x)    the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of a material executory contract (including any employment agreement, severance agreement or other employee benefit plan) or unexpired lease other than in accordance with the Term Sheet or the Plan;

17

(xi)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(xii)    the Majority Consenting Lenders reasonably determine that that the aggregate amount of the Initial Restructuring Claim Advance (as defined in the Term Sheet) and the Secondary Restructuring Claim Advance (as defined in the Term Sheet) will exceed $18.0 million as of the Effective Date;

(xiii)    authorization is granted to the Company to pay an aggregate amount in excess of $2,863,342 on account of prepetition claims under critical vendor, Section 503(b)(9) of the Bankruptcy Code, any mineral lien contractor statutes or similar orders by the Bankruptcy Court;

(xiv)    from and after the execution of the DIP Financing, the breach by the Company or any Consenting Holder of (a) any affirmative or negative covenant contained in the DIP Financing, (b) any other material obligations of the Company or any Consenting Holder set forth in the DIP Financing, (c) the occurrence of an event of default under the Cash Collateral/DIP Financing Orders, or (d) the occurrence of the 363 Sale Proceedings Initiation Date (as defined in the Cash Collateral/DIP Financing Orders); or

(xv)    the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Term Sheet.

(c)    A "Company Termination Event" shall mean any of the following:

(i)    the breach by any of the Consenting Lenders that are initial signatories hereto of any of the representations, warranties or covenants of such Consenting Lenders set forth in this Agreement to the extent such breach would have a material adverse impact on the consummation of the transactions contemplated by the Plan, and which breach remains uncured for a period of ten (10) business days after the receipt by the applicable Consenting Lender from the Company of written notice of such breach;

(ii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Plan, and such ruling, judgment or order has not been not stayed, reversed or vacated within fifteen (15) calendar days after such issuance;

18

(iii)     following the Petition Date, the board of directors or board of managers, as applicable, of the Company determines, after receiving legal advice from counsel and consultation with its financial advisors, and considering that this Agreement and the Restructuring anticipated herein which upon consummation would resolve on a consensual basis over $203 million of senior secured claims against the Company, provide for payment in full of JPM's and Iberia's secured claims, provide for payment in full of all priority and administrative claims, and a substantial deleveraging of the Company's balance sheets, that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties (such a determination, a "*Fiduciary Out*") and provides notice thereof to the Majority Consenting Lenders in accordance with Section 19;

(iv)     the Bankruptcy Court enters an order over the objection of the Company (A) converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, or (B) dismissing any of the Chapter 11 Cases.

(d)     Mutual Termination. This Agreement may be terminated by mutual agreement of the Company and the Majority Consenting Lenders upon the receipt of written notice delivered in accordance with Section 19 hereof.

(e)     Effect of Termination. Upon the termination of this Agreement in accordance with this Section 6, and except as provided in Section 13 herein, this Agreement shall forthwith become void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its obligations, commitments, and undertakings under this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions (subject to the automatic stay under Section 362 of the Bankruptcy Code) that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the Senior Credit Facility and any ancillary documents or agreements thereto; provided, however, that in no event shall any such termination relieve a Party hereto from liability for its breach or nonperformance of its obligations hereunder prior to the date of such termination. Upon any such termination of this Agreement, each Consenting Lender may, upon written notice to the Company and the other Parties, revoke its vote or any consents given by such Consenting Lender prior to such termination, whereupon any such vote or consent shall be deemed, for all purposes, to be null and void *ab initio* and shall not be considered or otherwise used in any manner by the Parties in connection with this Agreement. If this Agreement has been terminated in accordance with the terms of this Agreement at a time when permission of the Bankruptcy Court shall be required for a Consenting Lender to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Company and the Consenting Holders shall not oppose any attempt by such Consenting Lender to change or withdraw (or cause to

19

change or withdraw) such vote at such time, subject to all remedies available to the Company at law, equity, or otherwise, including those remedies set forth in Section 12 of this Agreement. The Consenting Lenders shall have no liability to the Company, any Consenting Holder, or to any other Consenting Lender in respect of any termination of this Agreement in accordance with the terms of Section 6(b).

(f)     This Agreement and the Term Sheet are part of a proposed compromise and settlement of a dispute among the Parties. If the transactions contemplated herein are not consummated following the occurrence of the Termination Date, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence (whether federal or state), this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

**7.     Definitive Documentation; Good Faith Cooperation; Further Assurances.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, implementation and consummation of the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documentation. Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the Parties hereto to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings and voting any claims against or equity interests in the Company in favor of the Restructuring (provided, however, that no Consenting Lender shall be required to incur any material cost, expense or liability in connection therewith unless, in the case of any such cost or expense, funds are advanced by the Company, subject to Bankruptcy Court approval (if necessary)) from proceeds of debtor in possession financing, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**8.     Representations and Warranties.**

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Lender becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and, subject to Bankruptcy Court approval, if required, (a) carry out the transactions contemplated hereby and perform its

20

obligations contemplated hereunder; and (b) the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery and performance by such Party of this Agreement does not and will not violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(iii)     the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body; and

(iv)     this Agreement is a legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(b)     The Company represents and warrants it has all requisite corporate, partnership, limited liability company or similar authority to file the Chapter 11 Cases prepare, propose and, subject to Bankruptcy Court approval, conduct solicitation in respect of the Plan, consummate the Restructuring under the terms contemplated hereunder; and that the filing of the Chapter 11 Cases, the preparation and solicitation of the Plan, and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part and have been determined by the board or similar governing body of directors of the Company based upon all facts and circumstances (including the evaluation of alternatives to the Restructuring) to be consistent with their fiduciary obligations and in the best interests of each respective entity, their respective creditors and other parties in interest, and the Company as a whole.

(c)     Each of the Consenting Holders severally (and not jointly) represents and warrants that, (i) as of the date hereof, such Consenting Holder, (1) is the record or beneficial owner, and has good and marketable title to equity interests in, (2) is the beneficial owner of the aggregate principal amount of financial indebtedness of, (3) is the holder of all other claims and liabilities with respect owing from, in the case of items (1)-(3) with respect to Holdings, Leasing, Enterprises, or any other Company entity each as set forth opposite such person's name on <u>Exhibit C</u>, free and clear of any and all liens, claims, security interests, proxies, voting trusts or agreements, options, rights, understandings or

21

arrangements or any other encumbrances whatsoever on title, transfer, or exercise of any rights of the Consenting Holders in respect of such shares; (ii) does not own, of record or beneficially, (1) any shares of capital stock of Holdings, Leasing, Enterprises, or any other Company entity (or rights to acquire any such shares), (2) any financial indebtedness (or rights to acquire such indebtedness), or (3) any other claim or equity interest in any Company entity, other than as set forth on Exhibit C hereto; and (iii) has the sole right to vote, sole power of disposition, sole power to issue instructions with respect to the matters set forth herein, sole power to demand appraisal rights and sole power to agree to all of the matters set forth in this Agreement, in each case with respect or all of such shares, indebtedness, or other claims of interests with no material limitations, qualifications or restrictions on such rights, subject to the terms of this Agreement.

(d)      The Consenting Holders jointly and severally represent and warrant that the Consenting Holders, Holdings, Leasing, and Enterprises together collectively hold directly or indirectly 100% of all equity interests in the various Subsidiary Borrowers/Guarantors.

(e)      Each of the Consenting Lenders severally (and not jointly) represents and warrants that, (i) as of the date hereof, such Consenting Lender is the holder of the aggregate principal amount of the indebtedness due under the Senior Credit Facility as set forth opposite such entity's name on Exhibit D; and (ii) does not own, of record or beneficially, any shares of capital stock of Holdings, Leasing, Enterprises, or any other Company entity (or rights to acquire any such shares).

**9.      Amendments and Waivers.**

This Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended or supplemented except in a writing signed by the Company and the Majority Consenting Lenders.

**10.      Effectiveness.**

This Agreement shall become effective and binding on the Parties on the Restructuring Support Effective Date, and not before such date; provided, however, that signature pages executed by Consenting Lenders shall be delivered to (a) other Consenting Lenders, (b) the Company, V&E, and Shipman.

**11.      GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY

ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE BOROUGH OF MANHATTAN, THE CITY OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING CONSENT TO JURISDICTION, FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASES, EACH OF THE PARTIES AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF THE BANKRUPTCY COURT.

### 12. **Specific Performance/Remedies.**

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything that may be expressed or implied in this Agreement, each of the Parties hereto covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, manager, officer, employee, general or limited partner or equity holder of any Consenting Lender, the Administrative Agent, or of any affiliate or assignee thereof, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future director, manager, officer, employee, general or limited partner, member, or equity holder of any Consenting Lender, the Administrative Agent, or of any affiliate or assignee thereof, as such for any obligation of any Consenting Lender or the Administrative Agent under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

23

13. **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 6 hereof, the agreements and obligations of the Parties in this Section 13, the proviso set forth in Section 3(b)(i)(B) hereof, and Sections 6(e), 6(f), 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, and 23 hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

14. **Headings.**

The headings of the Sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

15. **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided, however, that nothing contained in this Section 15 shall be deemed to permit Transfers of the Loans or claims arising under the Loans other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or circumstance, shall be held invalid or unenforceable in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible. The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several except as otherwise expressly provided herein.

16. **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.

17. **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto (and including the Term Sheet), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof.

18. **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by facsimile or other electronic medium, which shall be deemed to be an original for the purposes of this paragraph.

19. **Notices.**

All notices hereunder shall be deemed given if in writing and delivered by hand, electronic mail or by facsimile during standard business hours (from 8:00 a.m. to 6:00 p.m., Central Time) at the place of receipt at the addresses and facsimile numbers set forth on the signature pages hereof, with a copy to each person identified thereon as well as:

1) If such notice is sent to the Company, with a copy to:

Heller, Draper, Patrick, Horn & Dabney, LLC
650 Poydras Street, Suite 2500
New Orleans, LA 701300
Attention:  William H. Patrick III
(wpatrick@hellerdraper.com)
-and-
Tristan Manthey
(tmanthey@hellerdraper.com)

2) If such notice is sent to the Consenting Holders, in each case with a copy to the individual identified on the signature page of such Consenting Holder;

25

3) If such notice is sent to a Consenting Lender, or a transferee thereof, with copies to:

Vinson & Elkins LLP
1001 Fannin Street
Houston, TX 77002
Attention:  W. Matthew Strock
                  (mstrock@velaw.com)

-and-

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, TX 75201-2975
Attention:  Paul E. Heath
                  (pheath@velaw.com)

-and-

                  Brad Foxman
                  (bfoxman@velaw.com)

4) If such notice is sent to the Administrative Agent, with copies to:

Cantor Fitzgerald Securities
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Attention:  Niles Horning
                  (nhorning@cantor.com)

-and-

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
Attention:  Nathan Z. Plotkin
                  (nplotkin@goodwin.com)

-and-

                  Kathleen LaManna
                  (klamanna@goodwin.com)

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral or machine confirmation of transmission.

20. **Reservation of Rights; No Admission.**

Nothing contained herein shall (i) limit (A) the ability of any Consenting Lender to consult with other Consenting Lenders, the Administrative Agent, or the Company, or (B) the rights of any Consenting Lender or the Administrative Agent under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as such consultation or appearance is consistent with such Consenting Lender's obligations hereunder or under the terms and conditions of the Plan and are not for the purpose of hindering, delaying or preventing the confirmation or consummation of the Plan in accordance with this Agreement; (ii) limit the ability of any Consenting Lender or the Administrative Agent to sell or enter into any transactions in connection with the Loans or any other claims against or interests in the Company, subject to the terms of Section 3(c) and Section 3(d) hereof; or (iii) except as otherwise provided herein, limit the rights of any Consenting Lender or the Administrative Agent under the Senior Credit Facility, or any agreements executed in connection with the Senior Credit Facility or constitute a waiver or amendment of any provision of the Senior Credit Facility, or any agreements executed in connection with the Senior Credit Facility, subject to the terms of <u>Section 3(a)</u> or <u>(e)</u> hereof, or waive, limit, or impair any liens and security interests arising under or related to the Senior Credit Facility in any property of the Company.

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in any bankruptcy case filed by the Company or any of its affiliates and subsidiaries. This Agreement and the Term Sheet are part of a proposed compromise and settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement. This Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

21. **No Further Consideration**

It is hereby acknowledged by the Parties that no payment or additional consideration shall be due or paid to the Consenting Holders for their agreement to vote in

27

accordance with and otherwise comply with the terms and conditions of this Agreement other than the obligations of the other Parties hereunder.

### 22. No Solicitation; Representation by Counsel; Adequate Information.

This Agreement is not and shall not be deemed to be a solicitation for votes in favor of the Plan in the Chapter 11 Cases. The acceptances of the Consenting Lenders and the Consenting Holders with respect to the Plan will not be solicited until such Consenting Lenders and the Consenting Holders have received the Disclosure Statement and related ballots and solicitation materials, each as subsequently approved by the Bankruptcy Court.

Each Party acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation or acceptance of a Chapter 11 plan of reorganization or an offering of securities, each Consenting Lender and each Consenting Holder acknowledges and agrees and represents to the Company that it is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act of 1933 or a registered investment advisor under the Investment Advisors Act of 1940. Any offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

### 23. Independent Due Diligence and Decision Making.

Each Party hereby confirms that it is (a) a sophisticated party with respect to the matters that are the subject of this Agreement, (b) has had the opportunity to be represented and advised by legal counsel in connection with this Agreement, (c) has adequate information concerning the matters that are the subject of this Agreement, and (d) has independently and without reliance upon any other Party hereto, or any of their affiliates, or any officer, employee, agent or representative thereof, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that it has relied upon each other Party's express representations, warranties, and covenants in this Agreement, which it enters, or as to which it acknowledges and agrees voluntarily and of its own choice and not under coercion or duress.

### 24. Concerning the Administrative Agent.

The Parties hereby acknowledge that Cantor Fitzgerald Securities, in its capacity as Administrative Agent, is executing this Agreement solely in its capacity as Administrative Agent pursuant to the direction of the majority lenders under the Senior Credit Facility, and

28

not in its individual or corporate capacity. The Administrative Agent shall have the right to withdraw from this Agreement: (a) upon the occurrence of a Majority Consenting Lenders Termination Event, (b) upon receipt of direction from majority lenders under the Senior Credit Facility to terminate this Agreement (it being understood that such direction may constitute a Company Termination Event hereunder), or (c) upon the Administrative Agent's determination that its participation under this Agreement has or will expose it to liability for which indemnity or security satisfactory to the Administrative Agent (in its sole discretion) has not been provided.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

29

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**KNIGHT ENERGY HOLDINGS, LLC**

By: _Kelley Knight Sobiesk_

Name: Kelley Knight Sobiesk
Title: Member, Director

Notice Address:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: cgriffin@knightoiltools.com
Attention: Cole J. Griffin

**HMC LEASING, LLC**

By: _Kelley Knight Sobiesk_

Name: Kelley Knight Sobiesk
Title: Member

Notice Address:

HMC Leasing, LLC
Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: cgriffin@knightoiltools.com
Attention: Cole J. Griffin

**HMC INVESTMENTS, LLC**

By: _____

Name: Kelley Knight Sobiesk
Title: Authorized Representative of HMC Leasing, LLC, Sole Member

Notice Address:

HMC Investments, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: cgriffin@knightoiltools.com
Attention: Cole J. Griffin

**KNIGHT FAMILY ENTERPRISES, LLC**

By: _____

Name: Kelley Knight Sobiesk
Title: Member, Manager

Notice Address:

Knight Family Enterprises, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: cgriffin@knightoiltools.com
Attention: Cole J. Griffin

With a copy to:

1313 West Pinhook Road
Lafayette, La 70503
Fax: (337) 232-9867
E-mail: whkaufman@ohllc.com
Attention: William H. L. Kaufman

ADVANCED SAFETY AND TRAINING MANAGEMENT LLC

EL CABALLERO RANCH INC.

KNIGHT AVIATION LLC

KNIGHT INFORMATION SYSTEMS LLC

KNIGHT MANUFACTURING LLC

KNIGHT OIL TOOLS LLC

KNIGHT SECURITY LLC

KDDC, LLC f/k/a KNIGHT WELL SERVICES LLC

RAYNE PROPERTIES LLC

TRI DRILL LLC

KNIGHT RESEARCH & DEVELOPMENT LLC

By: _____

Name: Kelley Knight Sobiesk
Title: Authorized Representative of Knight Energy Holdings, LLC, Sole Member

Notice Address:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: cgriffin@knightoiltools.com
Attention: Cole J. Griffin

**Kelly Knight Sobiesk**
As a Consenting Holder,

By: _[signature]_
Name: Kelley K. Sobiesk

Notice Address:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law;
         along@gamb.law;
Attention: Samuel E. Masur;
         Armistead M. Long

**Bryan R. Knight**
As a Consenting Holder,

By: _____
Name: Bryan R. Knight

<u>Notice Address</u>:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: bknight@knightoiltools.com
Attention: Bryan R. Knight

With copies to:

Gary J. Haynes
Attorney at Law
1013 W University Ave
Lafayette, LA 70506
E-mail: gary.haynes@lusfiber.net
Attention: Gary Haynes

**Ann R. Knight**
As a Consenting Holder,

By: _Kelley Knight Sobiesk_

Name: Kelley Knight Sobiesk, Duly Authorized Agent
       and Attorney in Fact for Ann R. Knight

Notice Address:
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: aknight@knightoiltools.com
Attention: Ann Knight

With copies to:

Breaux and Stelly Law Firm LLC
413 Travis St., Ste 100
Lafayette, LA 70503
Fax: (337) 233-4443
E-mail: jean@breauxstelly.com
Attention: Jean Breaux Jr.

**Kelley Knight Sobiesk 2010 Trust 1**
As a Consenting Holder,

_Kelley Knight Sobiesk_
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

Notice Address:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**Kelley Knight Sobiesk 2010 Trust 1**
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

<u>Notice Address:</u>

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**Mark E. Knight 2010 Trust 1**
As a Consenting Holder,

_(signature)_

Kelly K. Sobiesk, Co-Trustee

---

Bryan R. Knight, Co-Trustee

<u>Notice Address</u>:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**Mark E. Knight 2010 Trust 1**
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

<u>Notice Address:</u>

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**Bryan R. Knight 2010 Trust 1**
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee


_____
Bryan R. Knight, Co-Trustee

Notice Address:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: bknight@knightoiltools.com
Attention: Bryan R. Knight

With copies to:

Gary J. Haynes
Attorney at Law
1013 W University Ave
Lafayette, LA 70506
E-mail: gary.haynes@lusfiber.net
Attention: Gary Haynes

**Bryan R. Knight 2010 Trust 1**
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

Notice Address:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: bknight@knightoiltools.com
Attention: Bryan R. Knight

With copies to:

Gary J. Haynes
Attorney at Law
1013 W University Ave
Lafayette, LA 70506
E-mail: gary.haynes@lusfiber.net
Attention: Gary Haynes

**MEK 2012 Family Trust No. 1**:

As a Consenting Holder,

_Kelley Knight Sobiesk_

Kelly K. Sobiesk, Co-Trustee

_____

Bryan R. Knight, Co-Trustee

Notice Address:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**MEK 2012 Family Trust No. 1**:
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

<u>Notice Address</u>:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**BRK 2012 Family Trust No. 1:**
As a Consenting Holder,

Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

Notice Address:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: bknight@knightoiltools.com
Attention: Bryan R. Knight

With copies to:

Gary J. Haynes
Attorney at Law
1013 W University Ave
Lafayette, LA 70506
E-mail: gary.haynes@lusfiber.net
Attention: Gary Haynes

**BRK 2012 Family Trust No. 1:**
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

Notice Address:

Knight Energy Holdings, LLC
2727 SE Evangeline Thruway
Lafayette, La 70508-2205
Fax: 337 233 0438
E-mail: bknight@knightoiltools.com
Attention: Bryan R. Knight

With copies to:

Gary J. Haynes
Attorney at Law
1013 W University Ave
Lafayette, LA 70506
E-mail: gary.haynes@lusfiber.net
Attention: Gary Haynes

**KKS 2012 Family Trust No. 1:**
As a Consenting Holder,

_[signature: Kelley Knight Sobiesk]_

Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

Notice Address:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**KKS 2012 Family Trust No. 1:**
As a Consenting Holder,

_____
Kelly K. Sobiesk, Co-Trustee

_____
Bryan R. Knight, Co-Trustee

Notice Address:

3402 Amherst Street
Houston, Texas 77005
Fax:
E-mail: ksobiesk@gmail.com
Attention: Kelley K Sobiesk

With copies to:

Gordon Arta Montgomery Barnett
McCollam Duplantis & Eagan, LLC
400 E Kaliste Saloom Rd., Ste 4200
Lafayette, LA 70508
Fax: 337.237.3451
E-mail: smasur@gamb.law; along@gamb.law;
Attention: Samuel E. Masur; Armistead M. Long

**CLEARLAKE CAPITAL PARTNERS IV FINANCE, L.P.**

As a Consenting Lender,

By: Clearlake Capital Partners IV GP, L.P, its general partner
By: Clearlake Capital Partners, LLC, its general partner

By: _____
Name: JOSÉ E. FELICIANO
Title: CO - PRESIDENT

Notice Address:

Clearlake Capital Group, L.P.
233 Wilshire Blvd, Suite 800
Santa Monica, CA 90401
Fax: (310) 400-8801
E-mail: josé@clearlake.com
Attention: José Feliciano

**CANTOR FITZGERALD SECURITIES**

As the Administrative Agent and as a Consenting Lender,

By: _____

Name:
Title:

James Bond
Chief Operating Officer

Notice Address:

Cantor Fitzgerald Securities
1801 N. Military Trail, Suite 202
Boca Raton, FL 33431
Fax: (646) 219-1180
E-mail: nhorning@cantor.com
Attention: Nils Horning

[Knight Energy - Restructuring Support Agreement]

**EXHIBIT A**

**TERM SHEET**

A-1

**PRIVILEGED AND CONFIDENTIAL**
**PROVIDED AS PART OF SETTLEMENT DISCUSSIONS**
**SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE**
**AND ALL BANKRUPTCY AND STATE LAW EQUIVALENTS**

**THIS TERM SHEET (THE "TERM SHEET") IS FOR DISCUSSION PURPOSES ONLY AND SHALL NOT BE CONSTRUED AS (I) AN OFFER CAPABLE OF ACCEPTANCE, (II) A BINDING AGREEMENT OF ANY KIND, (III) A COMMITMENT TO ENTER INTO, OR OFFER TO ENTER INTO, ANY AGREEMENT OR (IV) AN AGREEMENT TO FILE ANY CHAPTER 11 PLAN OF REORGANIZATION OR DISCLOSURE STATEMENT OR CONSUMMATE ANY TRANSACTION OR TO VOTE FOR OR OTHERWISE SUPPORT ANY PLAN OF REORGANIZATION. THIS TERM SHEET IS A SETTLEMENT COMMUNICATION AND DOES NOT REFLECT THE VIEWS OF ANY PARTY AS TO THE VALUATION OF THE DEBTORS OR THEIR RESPECTIVE PROPERTY.**

---

### KNIGHT ENERGY HOLDINGS, LLC
### RESTRUCTURING TERM SHEET

---

This Term Sheet is issued in connection with and subject to that certain Restructuring Support Agreement (the "**RSA**"),[1] regarding Knight Energy Holdings, LLC ("**Holdings**"), HMC Leasing, LLC ("**Leasing**"), Knight Family Enterprises LLC ("**Enterprises**"), and the subsidiary borrowers and guarantors party thereto (the "**Subsidiary Borrowers/Guarantors,**" and together with Holdings, Leasing, and Enterprises, the "**Debtors**") and the filing by the Debtors of voluntary petitions for relief (the "**Chapter 11 Cases**") under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") through which certain outstanding claims against and equity interests in the Debtors will be restructured through a plan of reorganization on the terms and subject to the conditions set forth in and under the provisions of the RSA, this Term Sheet, and the Definitive Documentation. This Term Sheet is not a complete list of all the terms and conditions of the restructuring transaction contemplated herein which are to be contained in the Definitive Documentation, and the Term Sheet shall not constitute an offer to sell or buy, nor the solicitation of an offer to sell or buy any of the securities referred to herein or the solicitation of acceptances of a chapter 11 plan. Any such offer or solicitation shall only be made in compliance with all applicable laws and the Bankruptcy Code. Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable Definitive Documentation materially consistent herewith. In the event of an inconsistency between this Term Sheet and the Definitive Documentation, the provisions of such Definitive Documentation shall govern. This Term Sheet is proffered in the nature of a compromise and settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and other rules (whether federal or state) of similar import.

*THIS TERM SHEET IS BEING PROVIDED AS PART OF A PROPOSED COMPREHENSIVE RESTRUCTURING TRANSACTION, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING. THE STATEMENTS CONTAINED HEREIN ARE PROTECTED BY FRE 408, AND NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS*

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the RSA.

| **TERMS AND CONDITIONS OF THE RESTRUCTURING TRANSACTION** | |
|---|---|
| **Debtors** | Holdings; Knight Oil Tools, LLC; Knight Manufacturing, LLC; KDCC, LLC (f/k/a Knight Well Services, LLC); Tri-Drill, LLC; Advanced Safety and Training Management, LLC; Knight Information Systems, L.L.C.; Leasing; Enterprises; Knight Aviation, L.L.C.; Rayne Properties, L.L.C.; EL Caballero Ranch, Inc.; HMC Investments, LLC; Knight Security, LLC; and Knight Research & Development, LLC. |
| **Summary** | The Debtors will file the Chapter 11 Cases under which certain claims against and equity interests in the Debtors shall be restructured (the "***Restructuring***") through a joint pre-negotiated chapter 11 plan of reorganization (the "***Plan***") on the terms and subject to the conditions set forth in the RSA, this Term Sheet and the Definitive Documentation and otherwise on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders. |
| | The Restructuring will be supported by the Debtors, the Lenders (as defined below) party to the RSA (the "***Consenting Lenders***"), the Administrative Agent (as defined below), and certain holders of equity interests in Holdings, Leasing, and Enterprises (the "***Consenting Holders***," and together with all other parties to the RSA, the "***Restructuring Support Parties***"). |
| **Current Capital Structure** | The current capital structure of the Debtors is comprised as follows: |
| | (a) Indebtedness and other obligations under that certain Credit Agreement (as amended, restated, and modified, "***Senior Credit Facility***"), dated June 26, 2013, among the Borrowers, the various financial institutions that are or may become a party thereto (the "***Lenders***"), and Cantor Fitzgerald Securities, as the Administrative Agent ("***Administrative Agent***") and as a Lender. The Senior Credit Facility is secured by a first priority lien on substantially all of the assets and property of the Borrowers and the Guarantors (each as defined in the Senior Credit Facility) save for certain real property that secures the loans of the Mortgage Holders (as defined below). As of August 7, 2017, the aggregate principal amount outstanding under the Senior Credit Facility, including outstanding letters of credit, is at least $180.6 million. |
| | (b) Indebtedness under: (i) those certain secured consumer loans ("***JPM Loan 1***") and (ii) those certain secured commercial loans ("***JPM Loan 2***" and together with JPM Loan 1, the "***JPM Loans***"), each with JP Morgan Chase Bank, N.A. ("***JPM***") as lender and Enterprises and Leasing as borrowers which are secured by certain real property collateral. The JPM Loan 2 is also guaranteed by Holdings. As of June 30, 2017, the aggregate principal amount outstanding under the JPM Loans is approximately $8,565,622.58. |
| | (c) Indebtedness under that certain secured mortgage loan (the "***Iberia Loan***") with IberiaBank ("***Iberia***" and together with JPM, the "***Mortgage*** |

| | |
|---|---|
| | *Holders*"), as lender and Leasing as borrower which is secured by certain real property collateral. The Iberia Loan is also guaranteed by Holdings. As of June 30, 2017, the aggregate principal amount outstanding under the Iberia Loan is approximately $11,183,036. |
| | (d) Existing membership interests in Holdings including (i) 119,364.42 units of Class A Units ("***Class A Units***"), and (ii) 1,026,787 of Class B Units (the "***Class B Units***", and together with the Class A Units, the "***Holdings Membership Interests***"); |
| | (e) Existing membership interests in each of Enterprises and Leasing (the "***Affiliate Membership Interests***", and together with the Holdings Membership Interests, the "***Membership Interests***"). |
| **Restructuring Elements** | The Plan will be accomplished through, among other transactions, the following: |
| | (a) The establishment of the New First Lien Credit Facility (including the First Lien Takeback Notes and the First Lien Revolver) and the advance of funds under the First Lien Revolver as described below. |
| | (b) The creation of Reorganized Knight (including the New Board of Directors), the consolidation of the other Reorganized Debtors thereunder (including without limitation, Reorganized Enterprises and Reorganized Leasing), and the issuance of the New Equity Interests in Reorganized Knight as described below. |
| | (c) The distribution of the First Lien Equity Distribution and the First Lien Takeback Notes Distribution to the Lenders as described below (collectively, the "***First Lien Distribution***"). |
| | (d) On terms acceptable to the Debtors and the Majority Consenting Lenders: (i) the sale of certain non-core assets or property securing loans held by the Mortgage Holders (the "***Sales***") either before or after the Effective Date, (ii) the repayment in full or in part of the JPM Loans and the Iberia Loan from the net sale proceeds or conveyance of such non-core property (the "***Repayments***"), and (iii) the restructure or replacement of the JPM Loans in full or in part with a new loan (the "***JPM Takeback Loan***") and the Iberia Loan with a new loan (the "***Iberia Takeback Loan***" and together with the JPM Takeback Loan, the "***Replacement Loans***") on terms acceptable to the Debtors and the Majority Consenting Lenders. |
| | (e) The establishment of a $1,000,000 fund (the "***GUC Fund***") to provide for *pro rata* payments in full and final satisfaction of all allowed general unsecured claims (which may include the unsecured deficiency claim held by the Lenders under the Senior Credit Facility (the "***First Lien Deficiency Claim***")) on the terms outlined below. |
| | (f) The full and final satisfaction of all allowed claims arising from the provision of goods or services which are secured by perfected and nonavoidable statutory liens on the mineral interests of customers of the Debtors (the "***Mineral Contractor Claims***") in a manner and on terms and conditions acceptable to the Majority Consenting Lenders as described below. |
| | (g) The resolution of all allowed Other Claims on terms and conditions acceptable to the Majority Consenting Lenders as described below. |
| | (h) The distribution of the Comprehensive Settlement Distribution to the |

A-4

| | |
|---|---|
| | Consenting Holders as described below. |
| | Items (a) – (h) above will be accomplished via the Plan. |
| **New First Lien Credit Facility** | On the Effective Date, as defined herein, the New First Lien Credit Facility will be established to provide for the First Lien Takeback Notes and the First Lien Revolver. |
| | The New First Lien Credit Facility (including both the First Lien Takeback Notes and the First Lien Revolver on a *pari passu* basis) will be: |
| | (i) joint and several obligations of Reorganized Knight and all other Reorganized Debtors; and |
| | (ii) secured on a first priority basis by liens on and security interests in substantially all of the assets and property of Reorganized Knight and all other Reorganized Debtors; |
| | *subject to* (a) *ad valorem* taxes for the current year, (b) existing *ad valorem* tax liens and (c) the first priority liens held by JPM and Iberia on certain real property owned by Enterprises and Leasing presently securing the JPM Loans and the Iberia Loan (and on those assets and property, a second priority lien and security interest in such property on terms acceptable to the Debtors and the Majority Consenting Lenders). |
| **First Lien Takeback Notes** | The new first lien secured notes (the "***First Lien Takeback Notes***") shall be issued on the Effective Date by Reorganized Knight to the Lenders *pro rata* in proportion to the aggregate principal amount of their Loans then outstanding under the Senior Credit Facility (the "***First Lien Takeback Notes Distribution***") with the following key terms: |
| | • Aggregate principal amount on the Effective Date: $25.5 million plus an amount equal to the Incremental First Lien Amount (as defined below) if and when funded; |
| | • Maturity date 5 years from the Effective Date; |
| | • Interest of 8.5% annual rate (whether paid in cash or PIK); |
| | • PIK Interest at Reorganized Knight's option, until the date 3 years from the Effective Date, interest may be paid through issuance of additional First Lien Takeback Notes; and |
| | • No amortization shall be required until after the date falling 3 years from the Effective Date. |
| | The First Lien Takeback Notes shall include such additional terms and conditions as required by the Majority Consenting Lenders (with the consent of the Debtors). |
| **First Lien Revolver** | On the Effective Date, certain Consenting Lenders will provide up to $30 million in new debt financing (the "***First Lien Revolver***") via a long-term revolving credit facility to fund (a) the payment of allowed claims and other amounts that are required to be paid under the Plan and (b) the working capital needs of Reorganized Knight and the other Reorganized Debtors. |
| | The First Lien Revolver shall (a) have maturity and interest payment terms identical to those of the First Lien Takeback Notes; (b) require each draw to be in an amount of at least $1.0 million and funded after 3 business days' notice; and (c) include such additional terms and conditions as required by the Majority Consenting Lenders (with the consent of the Debtors). |

A-5

| | |
|---|---|
| **Initial First Lien Revolver Draw** | The Reorganized Debtors will be permitted to draw an initial amount of up to $18 million on the First Lien Revolver to be used for: (i) repayment in full of the DIP Financing, (ii) payment in full of any allowed and outstanding property and ad valorem taxes for years prior to 2017, (iii) payment of any allowed secured claims (other than the Senior Credit Facility Claim, the JPM Loan Claim, and the Iberia Loan Claim) that are payable in cash under the Plan, (iv) payment of professional fees and costs associated with the Restructuring including (but not limited to) professional fees and costs advanced by the Majority Consenting Lenders on behalf of the Debtors, professional fees and costs payable under the Plan on account of the JPM Loan Claim and the Iberia Loan Claim, and the allowed professional fees and costs of the Debtors and any official committee, (v) payment of allowed administrative claims (including, without limitation, claims under Bankruptcy Code § 503(b)(9)), priority tax claims, and other priority claims, (vi) payment of allowed cure claims required to be paid as a condition to assumption of contracts under Bankruptcy Code § 365 and Allowed Mineral Contractor Claims, and (vii) funding of the Convenience Class Claim Fund and (as defined below) the GUC Fund (such advance collectively, the "***Initial Restructuring Claim Advance***"). |
| | Subsequent to the Initial Restructuring Claim Advance, the Reorganized Debtors may pay allowed claims of the types described in (iii) through (vi) of the definition of Initial Restructuring Claim Advance either from free cash flow or by subsequent advances under the First Lien Revolver; provided that any and all such payments shall be deemed to be an advance under the First Lien Revolver (such advances, the "***Secondary Restructuring Claim Advance***"). To the extent the advances under the DIP Financing, the Initial Restructuring Claim Advance and the Secondary Restructuring Claim Advance are used to pay any allowed priority tax claim for sales, use, or excise taxes for any tax years prior to 2017, an amount equal to the sum of such payments multiplied by 1.8 shall be added to the aggregate principal amount of the First Lien Takeback Notes (such excess amount, the "***Incremental First Lien Advance***"). |
| | All professional fees and costs of counsel and advisors to the Agent and the Consenting Lenders or other expenses and costs advanced by any of the Consenting Lenders on behalf of the Debtors to the extent outstanding on the Effective Date shall be deemed advanced under the First Lien Revolver but shall not be included in calculating the amount of the Initial Restructuring Claim Advance and the Secondary Restructuring Claim Advance. |
| **DIP Financing** | Certain of the Consenting Lenders shall provide debtor-in-possession financing ("***DIP Financing***") to accomplish the Restructuring on the terms and conditions of the DIP Financing Agreement attached hereto as **Exhibit A**. |
| | Drawings under the DIP Financing to fund the allowed fees and expenses of legal counsel and financial advisors to the Debtors and any official committee shall not exceed $4.625 million (the "***Incremental Costs Cap***") without the consent of the Majority Consenting Lenders. |
| | The Consenting Lenders shall consent to and support any motion by the Debtors seeking the use of cash collateral and /or DIP Financing in form and |

A-6

| | |
|---|---|
| | substance acceptable to the Majority Consenting Lenders and the Debtors *provided that* such motions shall not conflict with the terms of the RSA or this Term Sheet. |
| | The DIP Financing and the interim and final orders of the Bankruptcy Court providing for the DIP Financing and the use of cash collateral shall be in form and substance satisfactory to the Debtors and the Majority Consenting Lenders (the "***DIP Financing Orders***").  The DIP Financing Orders shall provide adequate protection in the form of customary carveouts and adequate protection payments for the Mortgage Holders acceptable to the Majority Consenting Lenders. |
| | On the Effective Date, the DIP Financing shall be paid in full from the proceeds of the First Lien Revolver or through a dollar-for-dollar exchange for obligations under the First Lien Revolver. |
| **Establishment of Reorganized Knight** | On the Effective Date, new membership interests (the "***New Equity Interests***") in either (a) a newly established holding company, or (b) one of the reorganized Debtors (the "***Reorganized Debtors***") (in either case (a) or (b), such entity "***Reorganized Knight***") shall be issued by Reorganized Knight. |
| **Existing Membership Interests** | In accordance with the "Tax Considerations" identified below in this Term Sheet, the Debtors shall be consolidated under Reorganized Knight and the Membership Interests shall be cancelled and extinguished or retained by Reorganized Knight or the other Reorganized Debtors as necessary to effect the Tax Considerations. |
| **New Board** | On the Effective Date, the organizational documents of the Debtors shall be amended as necessary to give effect to the Restructuring and the organization documents of Reorganized Knight and the other Reorganized Debtors (the "***New Organizational Documents***") will be executed. |
| | Under the New Organizational Documents, all persons holding New Equity Interests (and all persons to whom such parties may sell or distribute their equity interests in the future and all persons who purchase or acquire equity interests from Reorganized Knight in future transactions) shall be required to become parties to an operating agreement or shareholders agreement, as applicable, in each case providing for: (a) the number of board members; (b) the ability to designate board members; (c) a drag-along right in favor of the Majority Consenting Lenders; (d) the requirement that if the Majority Consenting Lenders transfers more than 30% of aggregate New Equity Interests in Reorganized Knight, then other New Equity Interest holders shall have a tag-along right; and (e) other standard provisions to be negotiated in good faith between the Majority Consenting Lenders and the Consenting Holders (with customary exceptions). |
| | The Board of Directors (the "***New Board***") of Reorganized Knight shall initially have 5 members, with appointment as follows: (i) four New Board members appointed by the Majority Consenting Lenders and (ii) one family member of the Consenting Holders or such family member's designee to be agreed upon by the Consenting Holders and the Majority Consenting Lenders shall serve as a New Board member and as Chairman Emeritus of Reorganized Knight. |
| | In addition to the New Board members, one family member of the Consenting Holders or such family member's designee to be agreed upon by the |

| | Consenting Holders and the Majority Consenting Lenders shall serve as an observer of the New Board. |
|---|---|
| **Initial Distribution of New Equity Interests** | 100% of the New Equity Interests shall be distributed to the Lenders under the Senior Credit Facility *pro rata* in proportion to the aggregate principal amount of their Loans outstanding under the Senior Credit Facility (the "***First Lien Equity Distribution***") subject to dilution by (i) the Comprehensive Settlement Distribution, and (ii) the MIP. |
| **Comprehensive Settlement Distribution** | In consideration for the entry into the New Leases, the Related Party Transaction Resolutions, the Releases (each as defined below), and the other compromises and settlements described herein, the Consenting Holders will receive a distribution (the "***Comprehensive Settlement Distribution***") of: (i) 20% of the New Equity Interests in Reorganized Knight on the Effective Date (the "***New Equity Settlement Amount***") (subject to dilution by the MIP); (ii) two classes of 5-year warrants (or other equity equivalents) of Reorganized Knight equity interests that entitles the holders  to: (a) 7% of Reorganized Knight equity interests with an exercise price equivalent to a $120 million equity valuation ("***Warrant Tranche 1***"), and (b) 6% of Reorganized Knight equity interests with an exercise price equivalent to a $175.0 million equity valuation ("***Warrant Tranche 2***" and together with Warrant Tranche 1, the "***Warrants***") (subject to dilution by the MIP). |
| | The Warrants will be exercisable on a cashless basis and as otherwise provided in the Warrants, including upon an appropriate change-of-control transaction. |
| **Additional New Equity Interests Considerations** | The New Equity Interests and the Warrants will be subject to dilution by the MIP as well as any future equity interest issuances by Reorganized Knight. Additional terms and restrictions of the New Equity Interests and Warrants will be reasonably acceptable to the Majority Consenting Lenders. |
| **Management** | Prior to the Effective Date, the Majority Consenting Lenders will negotiate the terms and conditions of new or amended and restated employment agreements with the new management of Reorganized Knight (the "***New Management***"), the forms of which shall be included in the Plan Supplement. |
| **Management Incentive Plan** | Six percent (6%) of the New Equity Interests in Reorganized Knight will be reserved for a management incentive plan (the "***MIP***"), with the form, vesting and allocation of the MIP to members of the New Management to be determined by the New Board of Directors, following the Effective Date, with consultation rights for the Chairman Emeritus.  New Equity Interests allocated pursuant to the MIP will be subject to dilution by further allocations under the MIP as well as any future equity interest issuances by Reorganized Knight. |
| **Sales, Repayments, and/or Replacement Loans; Resolution of Other Secured Debt** | **Sales.** The Debtors shall market for sale the following non-core real property securing loans made by the Mortgage Holders: |
| | (i)   real property located at 2288 E. County Rd. 30-A, Santa Rosa Beach, FL (the "***Seaside Property***") securing JPM Loans; |
| | (ii)  real property located at the SE Corner of Interstate Hwy. 40 and N. Cimarron Rd., Oklahoma City, OK (the "***Oklahoma City Property***") securing the Iberia Loan; |
| | (iv)  real property located at 507 Park Road, Frierson, LA (the "***Frierson Property***") securing the Iberia Loan; |

A-8

| | |
|---|---|
| | in each case such sales shall be on terms acceptable to the Debtors and the Majority Consenting Lenders.<br><br>**Repayments.** The proceeds from the Sales (net of all customary closing costs), whether such Sales are consummated before or after the Effective Date, shall be used to effect the Repayments by repaying certain indebtedness held by the Mortgage Holders on terms and subject to conditions acceptable to the Debtors and the Majority Consenting Lenders.<br><br>**Replacement Loans**. The JPM Loans and the Iberia Loan shall be restructured and/or replaced with the JPM Takeback Loan and the Iberia Takeback Loan, each of which shall continue to be secured by their existing first priority liens on those unsold assets and property of the Debtors that secured the respective JPM Loans and the Iberia Loan prepetition.<br><br>The final terms and conditions of the Sales, the Repayments, and the Replacement Loans shall in each case be in a manner and on terms and in such amounts acceptable to the Debtors and the Majority Consenting Lenders.<br><br>Any other existing and potential secured claims against the Debtors will be resolved in a manner and on terms and in such amounts acceptable to the Majority Consenting Lenders and the Debtors. |
| **Resolution of Other Claims** | Debtors shall discharge any other existing and potential claims against the Debtors (the "***Other Claims***"), including, but not limited to claims (if any) arising out of the winding down or other disposition of Knight Resources and Knight International in each case in a manner and on terms and in such amounts acceptable to the Majority Consenting Lenders and the Debtors. |
| **Third Party Approvals** | The Debtors shall secure any third party approvals, including those required by any government or regulatory authority. |
| **Continued Presence** | Reorganized Knight shall continue to have a substantial presence in Lafayette, Louisiana at its present campus (or at any successor campus in Lafayette, Louisiana) and continue to use the "Knight" name in its present and any future business combinations as long as the Majority Consenting Lenders are majority equity interest holders in Reorganized Knight. |
| **Comprehensive Settlement** | The Plan will provide for a comprehensive resolution of issues and disputes with the Consenting Holders (the "***Comprehensive Settlement***") that includes:<br><br>A. Entry into five (5) year leases (the "***New Leases***") on mutually agreeable terms (including the amount of rent) for certain to be agreed upon operating locations currently owned or affiliated with the family members of certain Consenting Holders (excluding properties owned by Leasing and Enterprises) subject to the Majority Consenting Lenders' discussion with management about long term plans and updated diligence on the performance of those facilities.<br><br>B. Resolution on terms acceptable to the Debtors, the Consenting Holders, and the Majority Consenting Lenders of any other related |

| | |
|---|---|
| | party transactions or claims (the "***Related Party Transaction Resolutions***"). |
| | C. The grant of the Debtor Releases, Third-Party Releases, Exculpations, and Injunctions under the Plan as outlined in this Term Sheet, which shall be subject in all respects to the consummation of the Restructuring on terms satisfactory to the Restructuring Support Parties. |
| **Plan as a Bankruptcy Rule 9019 Settlement of All Issues** | The Debtors and the Restructuring Support Parties acknowledge and agree that the Plan (including the Comprehensive Settlement) shall be treated as a compromise and settlement pursuant to Bankruptcy Rule 9019 (the "***9019 Settlement***") of various issues, controversies, and disputes. The Plan shall be deemed a motion to approve the 9019 Settlement. To the extent that the Plan is not approved, the issues, controversies, and disputes listed above, among others, may be the subject of litigation between and/or among the Restructuring Support Parties, among others, and nothing in this Term Sheet, the RSA, the Plan, the Disclosure Statement, or the Definitive Documentation (or any settlement negotiations) may be used by any party as evidence (or otherwise) with regard thereto, including, without limitation, with regard to the strengths or weaknesses of any of the various parties' positions, arguments, or claims. To that end, to the extent that the Plan is not approved or the RSA is terminated, this Term Sheet shall be deemed null and void and of no further force and effect. |
| **Treatment of Certain Claims and Interests under the Plan – DIP Financing Claims** | On the Effective Date, in full and final satisfaction of each allowed DIP Financing claim, each holder thereof shall receive, in full satisfaction of its allowed DIP Financing claim payment in full in cash from the proceeds of the First Lien Revolver, or a dollar-for-dollar exchange for obligations under the First Lien Revolver. |
| **Treatment of Certain Claims and Interests under the Plan – Priority Tax Claims** | Except to the extent that a holder of an allowed priority tax claim and the Debtor against which such allowed priority tax claim is asserted agree to less favorable treatment for such holder, each holder of an allowed priority tax claim shall receive, in full and final satisfaction of its allowed claim, treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Treatment of Certain Claims and Interests under the Plan - Other Priority Claims** | Each holder of an allowed priority claim (other than a priority tax claim or administrative claim) shall receive either: (a) cash equal to the full allowed amount of its claim or (b) payments over time as permitted under the Bankruptcy Code or (c) such other treatment as may otherwise be agreed to by such holder and the Debtors with the consent of the Majority Consenting Lenders. |
| **Treatment of Certain Claims and Interests under the Plan – JPM Loan Claims** | For all Debtors, subject to the Sales and the Repayments, the Replacement Loans will be implemented on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders. |
| **Treatment of Certain Claims and Interests under the Plan – Iberia Loan Claims** | For all Debtors, subject to the Sales and the Repayments, the Replacement Loans will be implemented on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders. |
| **Treatment of Certain** | In respect of their secured claims, on the Effective Date, each holder of an |

A-10

| | |
|---|---|
| **Claims and Interests under the Plan - Other Secured Claims** | allowed secured claim, other than: (i) a priority tax claim, (ii) a secured claim under the Senior Credit Facility (a "***Senior Credit Facility Secured Claim***"), (iii) a JPM Loan Claim, and (iv) a Iberia Loan Claim, shall receive, at the Debtors' election and with the consent of the Majority Consenting Lenders, either: (a) reinstatement of such holder's claim, (b) the return or abandonment of the collateral securing such claim to such holder, or (c) such other treatment as may otherwise be agreed to by such holder and the Debtors with the consent of the Majority Consenting Lenders. |
| **Treatment of Certain Claims and Interests under the Plan - Senior Credit Facility Secured Claims** | Each Holder of a Senior Credit Facility Secured Claim shall receive their respective share of the First Lien Distribution on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders. |
| **Treatment of Certain Claims and Interests under the Plan - Mineral Contractor Claims** | Except to the extent that a holder of an allowed Mineral Contractor Claim (each such claim an "***Allowed Mineral Contractor Claim***") agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Mineral Contractor Claim, to the extent not already satisfied pursuant to a prior order of the Bankruptcy Court, each holder of an Allowed Mineral Contractor Claim shall receive cash in an amount equal to such allowed claim on the later of: |
| | (i)      the Effective Date; or |
| | (ii)     the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such allowed claim. |
| | The Debtors and the Majority Consenting Lenders shall identify all Allowed Mineral Contractor Claims prior to the Effective Date. |
| **Treatment of Certain Claims and Interests under the Plan - Convenience Class** | In full and final satisfaction, compromise, settlement, release, and discharge of their claims, each holder of an allowed general unsecured claim in an amount of $1,000 or less, or who elects to reduce their allowed claim to $1,000 (each such claim, a "***Convenience Class Claim***"), shall receive cash in an amount equal to the lesser of (a) their allowed claim, and (b) $1,000. On the Effective Date, funds shall be set aside to pay the allowed Convenience Class Claims (such funds, the "***Convenience Class Claim Fund***"). |
| | The Convenience Class shall not be a voting class for the purposes of Plan confirmation. |
| **Treatment of Certain Claims and Interests under the Plan - General Unsecured Claims** | In full and final satisfaction, compromise, settlement, release, and discharge of their claims, each holder (including, for the avoidance of doubt, holders of First Lien Deficiency Claim) of an allowed non-priority unsecured claim other than an allowed Convenience Class Claim (the "***GUC Holders***") shall receive their *pro rata* share from the GUC Fund; *provided, however* that if the GUC Holders vote as a class to confirm the Plan, then (i) the holders of the First Lien Deficiency Claim shall forego their right to receive any recovery from the GUC Fund on account of their First Lien Deficiency Claim, and (ii) the First Lien Deficiency Claim shall be excluded from the calculation of the *pro rata* recoveries of the other GUC Holders from the GUC Fund. For the avoidance of doubt, the First Lien Deficiency Claim shall be classified as general unsecured claims and the holders thereof shall |

| | |
|---|---|
| | be GUC Holders permitted to vote such claims to accept or reject the Plan. |
| **Treatment of Certain Claims and Interests under the Plan - Equity Interests** | All Membership Interests in Holdings, Enterprises, and Leasing shall, in a tax efficient manner, be cancelled and extinguished and holders of such equity interests shall not receive or retain any property or assets on account of such interests. For the avoidance of doubt, the Comprehensive Settlement Distribution shall not be on account of any equity interests held in the Debtors. |
| **Treatment of Certain Claims and Interests under the Plan - Intercompany Claims** | Intercompany Claims shall, in a tax and business efficient manner, be reinstated, compromised, or cancelled at the option of the Debtors and with the consent of the Majority Consenting Lenders. |
| **Treatment of Certain Claims and Interests under the Plan - Intercompany Interests** | Intercompany Interests shall, in a tax and business efficient manner, be reinstated, compromised, or cancelled at the option of the Debtors and with the consent of the Majority Consenting Lenders. |
| **Restructuring Timeline** | The Restructuring described herein will take place in accordance with the Milestones set forth in Section 4 of the RSA. |
| **Motions and Other Bankruptcy Court Filings** | All motions and other filings in the Chapter 11 Cases including any proposed orders shall be in form and substance reasonably acceptable to the Debtors and the Majority Consenting Lenders. Notwithstanding the foregoing, the order confirming the Plan (the "*Confirmation Order*") and the DIP Financing Orders shall be in form and substance acceptable to the Debtors and the Majority Consenting Lenders. |
| **Discharge, Release, Exculpation, and Injunctions** | The Plan will provide for: (a) a discharge of claims against the Debtors (the "*Discharge*"), (b) customary releases of certain claims and causes of action held by the Debtors and their estates (the "*Debtor Releases*") and certain third parties (the "*Third Party Releases*" and together with the Debtor Releases, the "*Releases*") against the Released Parties; (c) the exculpation of certain Restructuring Support Parties (the "*Exculpations*"); and (d) an injunction barring prosecution of such discharged, released, and exculpated claims and causes of action (the "*Injunction*"), in each case (a)-(d) to the fullest extent permitted by law and on terms and conditions acceptable to the Debtors and the Majority Consenting Lenders. Under no circumstances shall any Non-Consenting Holder receive the benefit of the Releases, Exculpations, or the Injunction.<br><br>"*Released Party*" means collectively, and in each case in its capacity as such: (a) the Debtors and the Reorganized Debtors; (b) the Consenting Holders and such Consenting Holders' family members and Entities under such family members' exclusive ownership or control; (c) the Consenting Lenders; (d) the New First Lien Credit Facility Lenders; (e) the New First Lien Credit Facility Agent; (f) the Senior Credit Facility Administrative Agent; (g) each DIP Financing Lender; (h) the DIP Financing Administrative Agent; and (i) with respect to each of the foregoing entities in clauses (b) through (h), such Entity and its current and former affiliates in all capacities, and all their respective current and former direct and indirect equityholders, members, partners, subsidiaries, affiliates, portfolio companies, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, |

A-12

| | |
|---|---|
| | accountants, investment bankers, consultants, agents, and other representatives (including their respective equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives) *provided however* that no Non-Released Party shall be a Released Party.<br><br>"*Non-Released Parties*" means any (a) former officers and directors of the Debtors who are not Consenting Holders, (b) any non-Debtor affiliates or subsidiaries of the Debtors, (c) any Non-Consenting Holder, (d) Non-Consenting Holder's descendants and Entities under such Non-Consenting Holder's or its descendants' exclusive ownership or control, and (e) any Released Party that objects, denies consent, or in any way attempts to impede the execution of the RSA, the filing of the Cases, or the filing and consummation of the Plan that (x) is a Debtor, or (y) with respect to any Debtor, satisfies clause (i) of the definition of Released Party.<br><br>"*Non-Consenting Holder*" means any equity interest holder of Holdings, Enterprises, or Leasing who (a) has not executed the RSA as a Consenting Holder, or (b) has ever breached its obligations as a Consenting Holder under the RSA prior to the Effective Date. |
| **Claims of the Debtors** | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue causes of action, other than any causes of action subject to the Debtor Releases, Third-Party Releases, the Exculpations, or the Injunctions granted under the Plan as outlined in the Term Sheet.<br><br>Prior to consummation of the Plan, the Debtors shall not settle, compromise, or discharge any cause of action outside the ordinary course of busness that is not agreed to be released pursuant to this Term Sheet without the consent of the Majority Consenting Lenders. |
| **Additional Plan Provisions and Documentation** | The Plan shall contain other customary provisions for Chapter 11 plans of this type. The Plan and all supporting and implementing documentation (including all briefs and other pleadings filed in support thereof, all documents filed as part of the Plan Supplement, the Definitive Documentation, and the Confirmation Order) shall be in form and substance acceptable to the Debtors, the Consenting Holders (to the extent such documents directly and materially affects them), and the Majority Consenting Lenders. |
| **Tax Considerations; Business Plan** | The Consenting Holders and the Majority Consenting Lenders may, at their option, review and analyze the proposed tax and corporate structure of the Reorganized Debtors for tax and corporate efficiencies as part of the Restructuring and such Restructuring will contain such terms reasonably acceptable to the Majority Consenting Lenders and the Consenting Holders to ensure such tax and corporate efficiencies. The Debtors shall work with the Majority Consenting Lenders and the Consenting Holders to structure the Restructuring and the transactions contemplated herein so as to maximize the tax benefits and avoid any negative tax consequences to the Majority Consenting Lenders, the Reorganized Debtors, and the Consenting Holders. |
| **Executory Contracts** | The Debtors may not assume, assume and assign, or reject executory |

A-13

| | |
|---|---|
| **and Unexpired Leases** | contracts or unexpired leases without the prior written consent of the Majority Consenting Lenders and, to the extent required, approved by the Bankruptcy Court. |
| **Conditions Precedent to Consummation of the Plan** | Closing and implementation of the Plan shall be subject to the satisfaction, at or prior to the Effective Date, of the following conditions precedent and the satisfaction of such other conditions precedent agreed upon by the Majority Consenting Lenders and the Debtors or established pursuant to an order of the Bankruptcy Court: |

(a) Consummation of items (a) – (h) under the heading "Restructuring Elements" under the terms of this Term Sheet;

(b) Negotiation, execution and delivery of the Definitive Documentation with respect to the Restructuring, each in form and substance acceptable to the Majority Consenting Lenders, the Consenting Holders (to the extent such documents directly and materially affect them), and the Debtors, and otherwise consistent with the terms and conditions described in this Term Sheet;

(c) The payment in full, in cash, of all invoices for reasonable and documented fees and expenses incurred prior to the Effective Date in connection with the Restructuring and described under "Expenses" below, regardless of whether such fees and expenses were incurred prior to execution of the RSA or thereafter;

(d) There shall exist no material breach of any of the undertakings, representations, warranties or covenants of any party set forth in the RSA that would have a material adverse effect on the Debtors or the consummation of the Restructuring;

(e) By the Effective Date, to the extent necessary, any required third party or governmental approvals or consents shall have been obtained;

(f) No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring, the RSA or any of the definitive documentation contemplated thereby;

(g) The RSA shall not have been terminated or be subject to termination and no motion to reject or terminate the RSA shall be pending, or, if terminated, has been reinstated;

(h) Reorganized Knight and the other Reorganized Debtors shall have assumed all executory contracts and unexpired leases necessary or useful to the operation of the businesses of the Debtors (unless otherwise agreed to by the Majority Consenting Lenders);

(i) the Confirmation Order shall have been entered, and the Confirmation Order shall have become a final order that is not stayed and the time for appeal has expired (this condition shall be waivable by the Majority Consenting Lenders in their discretion) ; and

(j) all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and

A-14

| | |
|---|---|
| | all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain or prevent such transactions; |
| | (k) the disposition, liquidation, or winding down of Knight Resources, LLC, Knight International LLC, Knight Dutch Holdings LLC. and Knight International Acquisitions, LLC in a manner and on terms and conditions acceptable the Majority Consenting Lenders and the Debtors; and |
| | (l) the Majority Consenting Lenders reasonably determine that the aggregate amount of the Initial Restructuring Claim Advance and the Secondary Restructuring Claim Advance will not exceed $18 million. |
| **Effective Date** | The "*Effective Date*" shall be the date on which all the transactions described in this Term Sheet are consummated and the effective date under the Plan. |
| **Expenses** | The Debtors shall pay all reasonable documented fees and expenses incurred in connection with the Restructuring of the advisors and counsels to the Administrative Agent and the Consenting Lenders or any other expenses advanced by any of the Consenting Lenders on behalf of the Debtors in accordance with the terms of the RSA from the proceeds of the DIP Financing or the First Lien Revolver. Documented fees and expenses including those of legal counsel and financial advisors incurred by (a) the Debtors (subject to the Incremental Costs Cap under the DIP Financing) in connection with the evaluation, negotiation and implementation of the proposed Restructuring and (b) the Administrative Agent and the Consenting Lenders in connection with the evaluation, negotiation and implementation of the proposed Restructuring shall be paid from the First Lien Revolver or any DIP Financing; *provided, however*, that such fees and expenses of the Debtors, the Administrative Agent and the Consenting Lenders may be paid during the course of such proceeding from the proceeds of cash collateral or any DIP Financing as may be provided by order of the Court. |
| **Governing Law and Forum** | The Term Sheet and RSA shall be governed by the laws of the State of New York and the parties agree to exclusive New York jurisdiction. Notwithstanding the preceding sentence, upon the commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with the RSA. |
| **Other Provisions** | Other provisions of the Restructuring shall be reasonably acceptable to the Majority Consenting Lenders, the Consenting Holders (to the extent such other provisions directly and materially affect them), and the Debtors; provided that no provision in the Restructuring may be materially inconsistent with the terms in this Term Sheet. |

**<u>TERM SHEET</u>**
**<u>EXHIBIT A</u>**

(TS-A-1)

**SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of August 9, 2017**

**Among**

**KNIGHT ENERGY HOLDINGS, LLC,**
**KNIGHT OIL TOOLS, LLC,**
**KNIGHT MANUFACTURING, LLC,**
**KDCC, LLC,**
**TRI-DRILL, LLC,**
**ADVANCED SAFETY AND TRAINING MANAGEMENT, LLC,**
**KNIGHT INFORMATION SYSTEMS, L.L.C.,**
**HMC LEASING, LLC,**
**KNIGHT FAMILY ENTERPRISES, L.L.C.,**
**KNIGHT AVIATION, L.L.C.,**
**RAYNE PROPERTIES, L.L.C.,**
**EL CABALLERO RANCH, INC.,**
**HMC INVESTMENTS, L.L.C.,**
**KNIGHT SECURITY, LLC and**
**KNIGHT RESEARCH & DEVELOPMENT, LLC,**
**Debtors-in-Possession under Chapter 11 of the Bankruptcy Code,**

**as Borrowers,**

**CANTOR FITZGERALD SECURITIES,**

**as Administrative Agent,**

**and**

**THE LENDERS NAMED HEREIN**

**as Lenders**

**$10,000,000**

ARTICLE 1 DEFINITIONS AND ACCOUNTING TERMS ................................................................ 2
    Section 1.1    Certain Defined Terms ................................................................................ 2
    Section 1.2    Computation of Time Periods ................................................................... 18
    Section 1.3    Accounting Terms; Changes in GAAP ................................................... 18
    Section 1.4    [Reserved] .................................................................................................. 19
    Section 1.5    Miscellaneous ........................................................................................... 19

ARTICLE 2 CREDIT FACILITIES .............................................................................................. 19
    Section 2.1    Commitments ............................................................................................ 19
    Section 2.2    [Reserved] .................................................................................................. 20
    Section 2.3    Advances ................................................................................................... 20
    Section 2.4    Prepayments .............................................................................................. 22
    Section 2.5    Repayment ................................................................................................ 22
    Section 2.6    Fees ........................................................................................................... 22
    Section 2.7    Interest ...................................................................................................... 22
    Section 2.8    [Reserved] .................................................................................................. 23
    Section 2.9    [Reserved] .................................................................................................. 23
    Section 2.10    Increased Costs ......................................................................................... 23
    Section 2.11    Payments and Computations .................................................................... 24
    Section 2.12    Taxes ........................................................................................................ 25
    Section 2.13    Mitigation Obligations; Replacement of Lenders .................................... 28
    Section 2.14    Defaulting Lender ..................................................................................... 30
    Section 2.15    [Reserved] .................................................................................................. 30
    Section 2.16    Status of Obligations; Perfection and Priority of Security Interests ......... 30
    Section 2.17    Carve-Out ................................................................................................. 31
    Section 2.18    Conversion to Exit Facility ....................................................................... 31

ARTICLE 3 CONDITIONS OF LENDING ................................................................................... 32
    Section 3.1    Conditions Precedent to Initial Borrowing .............................................. 32
    Section 3.2    Conditions Precedent to the Second Funding Availability Period ............ 34
    Section 3.3    Conditions Precedent to the Third Funding Availability Period ............... 35
    Section 3.4    Pre-Petition Date Property Tax Loans ...................................................... 36
    Section 3.5    Determinations Under Sections 3.1, 3.2, 3.3 and 3.4. ............................... 37

ARTICLE 4 REPRESENTATIONS AND WARRANTIES ............................................................... 37
    Section 4.1    Organization ............................................................................................. 37
    Section 4.2    Authorization ............................................................................................ 37
    Section 4.3    Enforceability ........................................................................................... 37
    Section 4.4    Financial Condition .................................................................................. 38
    Section 4.5    Ownership and Liens; Real Property ........................................................ 38
    Section 4.6    True and Complete Disclosure ................................................................. 38
    Section 4.7    Litigation .................................................................................................. 38
    Section 4.8    Compliance with Agreements .................................................................. 38
    Section 4.9    Benefit Plans ............................................................................................. 39
    Section 4.10    Environmental Condition ......................................................................... 39
    Section 4.11    Subsidiaries ............................................................................................... 40
    Section 4.12    Investment Company Act ......................................................................... 40
    Section 4.13    Taxes ........................................................................................................ 40
    Section 4.14    Permits, Licenses, etc ............................................................................... 40
    Section 4.15    Use of Proceeds ........................................................................................ 40

| Section 4.16 | Condition of Property; Casualties | 41 |
| Section 4.17 | Insurance | 41 |
| Section 4.18 | [Reserved] | 41 |
| Section 4.19 | Foreign Assets Control Regulations, etc. | 41 |
| Section 4.20 | Compliance with Laws | 42 |
| Section 4.21 | [Reserved] | 42 |
| Section 4.22 | Budgets and Forward-Looking Statements | 42 |
| Section 4.23 | Orders | 42 |

ARTICLE 5 AFFIRMATIVE COVENANTS ........................................................43

| Section 5.1 | Organization | 43 |
| Section 5.2 | Reporting | 43 |
| Section 5.3 | Insurance | 46 |
| Section 5.4 | Compliance with Laws | 47 |
| Section 5.5 | Taxes | 47 |
| Section 5.6 | [Reserved] | 47 |
| Section 5.7 | Security | 47 |
| Section 5.8 | [Reserved] | 47 |
| Section 5.9 | Records; Inspection | 47 |
| Section 5.10 | Maintenance and Operation of Property | 47 |
| Section 5.11 | [Reserved] | 47 |
| Section 5.12 | [Reserved] | 48 |
| Section 5.13 | Material Contracts | 48 |
| Section 5.14 | Further Assurances | 48 |
| Section 5.15 | Bankruptcy Filings | 48 |
| Section 5.16 | [Reserved] | 48 |
| Section 5.17 | Cash Management | 48 |
| Section 5.18 | First and Second Day Orders | 48 |

ARTICLE 6 NEGATIVE COVENANTS ..............................................................49

| Section 6.1 | Debt | 49 |
| Section 6.2 | Liens | 49 |
| Section 6.3 | Investments | 51 |
| Section 6.4 | Acquisitions | 51 |
| Section 6.5 | Agreements Restricting Liens | 51 |
| Section 6.6 | Use of Proceeds | 51 |
| Section 6.7 | Corporate Actions; Accounting Changes | 52 |
| Section 6.8 | Sale of Assets | 52 |
| Section 6.9 | Restricted Payments | 52 |
| Section 6.10 | Affiliate Transactions | 53 |
| Section 6.11 | Line of Business | 53 |
| Section 6.12 | Hazardous Materials | 53 |
| Section 6.13 | Compliance with ERISA | 53 |
| Section 6.14 | Sale and Leaseback Transactions | 54 |
| Section 6.15 | [Reserved] | 54 |
| Section 6.16 | [Reserved] | 54 |
| Section 6.17 | [Reserved] | 54 |
| Section 6.18 | Budged Variance and Capital Expenditures | 54 |
| Section 6.19 | [Reserved] | 55 |
| Section 6.20 | [Reserved] | 55 |
| Section 6.21 | Operating Leases | 55 |

Section 6.22    Prepayment of Certain Debt and Other Obligations ..................................... 55
Section 6.23    Contracts and Leases ................................................................................. 55
Section 6.24    Additional Bankruptcy Matters ................................................................. 55

ARTICLE 7 DEFAULT AND REMEDIES ........................................................................ 55
Section 7.1     Events of Default ....................................................................................... 55
Section 7.2     Optional Acceleration of Maturity ............................................................ 58
Section 7.3     [Reserved] .................................................................................................. 59
Section 7.4     Set-off ........................................................................................................ 59
Section 7.5     Remedies Cumulative, No Waiver ............................................................. 60
Section 7.6     Application of Payments ........................................................................... 60

ARTICLE 8 THE ADMINISTRATIVE AGENT ............................................................... 61
Section 8.1     Appointment and Authority ....................................................................... 61
Section 8.2     Rights as a Lender ..................................................................................... 61
Section 8.3     Exculpatory Provisions ............................................................................. 61
Section 8.4     Reliance by Administrative Agent ............................................................ 62
Section 8.5     Delegation of Duties .................................................................................. 63
Section 8.6     Resignation of Administrative Agent ........................................................ 63
Section 8.7     Non-Reliance on Administrative Agent and Other Lenders ....................... 64
Section 8.8     [Reserved] .................................................................................................. 64
Section 8.9     Indemnification .......................................................................................... 64
Section 8.10    Administrative Agent May File Proofs of Claim ....................................... 65
Section 8.11    Collateral and Guaranty Matters ............................................................... 65
Section 8.12    Credit Bidding ........................................................................................... 66

ARTICLE 9 MISCELLANEOUS ...................................................................................... 67
Section 9.1     Costs and Expenses ................................................................................... 67
Section 9.2     Indemnification; Waiver of Damages ........................................................ 67
Section 9.3     Waivers and Amendments .......................................................................... 68
Section 9.4     Severability ................................................................................................ 69
Section 9.5     Survival of Representations and Obligations ............................................. 69
Section 9.6     Binding Effect ............................................................................................ 70
Section 9.7     Successors and Assigns .............................................................................. 70
Section 9.8     Confidentiality ........................................................................................... 73
Section 9.9     Notices, Etc. ............................................................................................... 74
Section 9.10    Usury Not Intended .................................................................................... 75
Section 9.11    Usury Recapture ........................................................................................ 75
Section 9.12    Payments Set Aside .................................................................................... 76
Section 9.13    Governing Law; Service of Process .......................................................... 76
Section 9.14    Submission to Jurisdiction ......................................................................... 76
Section 9.15    Electronic Execution of Assignments ....................................................... 76
Section 9.16    Execution in Counterparts ......................................................................... 77
Section 9.17    Waiver of Jury ........................................................................................... 77
Section 9.18    USA Patriot Act ......................................................................................... 77
Section 9.19    [Reserved] .................................................................................................. 77
Section 9.20    No Fiduciary Duty ...................................................................................... 77
Section 9.21    [Reserved] .................................................................................................. 77
Section 9.22    Multiple Borrowers .................................................................................... 77
Section 9.23    Integration .................................................................................................. 79

SCHEDULES:

Annex I            –    Commitments, Contact Information
Schedule 1.1(a)    –        Existing Equity Holders
Schedule 4.1       –        Organizational Information
Schedule 4.11      –        Subsidiaries

EXHIBITS:

Exhibit A      –    Form of Assignment and Acceptance
Exhibit B      –    Form of Guaranty
Exhibit C      –    Form of Interim DIP Order
Exhibit E      –    Form of Notice of Borrowing
Exhibit F-1    –    Form of U.S. Tax Compliance Certificate
Exhibit F-2    –    Form of U.S. Tax Compliance Certificate
Exhibit F-3    –    Form of U.S. Tax Compliance Certificate
Exhibit F-4    –    Form of U.S. Tax Compliance Certificate
Exhibit G      –    Form of DIP Budget

# CREDIT AGREEMENT

This SENIOR SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of August 9, 2017 (the "Agreement") is among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders (as defined below) and Cantor Fitzgerald Securities, as Administrative Agent (as defined below) for the Lenders.

WHEREAS, on August 8, 2017 (the "Petition Date"), the Borrowers (in such capacity, together with each new Guarantor pursuant to Section 5.14, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (as defined below) in the Bankruptcy Court (as defined below);

WHEREAS, the Borrowers have requested that Lenders provide them with a non-amortizing senior secured multi-draw term loan credit facility in an aggregate principal amount not to exceed $10,000,000 (the "DIP Facility") to be used during the Cases (as defined below) for general corporate purposes and working capital of the Borrowers during the Cases (i) with an aggregate principal amount of up to $6,000,000 to be available for borrowing during the Initial Funding Availability Period (as defined below), (ii) with an additional aggregate principal amount of up to $1,000,000 to be available for borrowing during the Second Funding Availability Period (as defined below) and (iii) the remainder to be made available during the Third Funding Availability Period (as defined below), in each case, subject to the terms set out herein (including the DIP Budget (as defined below) covenant set forth in Section 6.18), in the other Credit Documents (as defined below) and in the DIP Order (as defined below);

WHEREAS the Guarantors (as defined below) have agreed to guarantee the Obligations (as defined below) of Borrowers hereunder and Borrowers and each Guarantor have agreed to secure all of the Obligations hereunder by granting to the Administrative Agent, for the benefit of the Secured Parties (as defined below), a Lien (as defined below) on substantially all of their Properties on the terms set forth in the DIP Order; and

WHEREAS, pursuant to the terms of the DIP Order, all Obligations will be secured by valid perfected Liens on substantially all of each Borrower's and each Guarantor's Properties, having the priorities set forth in the DIP Order.

In consideration of the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

# ARTICLE 1
## DEFINITIONS AND ACCOUNTING TERMS

Section 1.1    Certain Defined Terms.  The following terms shall have the following meanings (unless otherwise indicated, such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"Acceptable Plan of Reorganization" means a Plan of Reorganization that provides for the payment in full in cash of the Obligations under the Credit Documents or conversion thereof into the Exit Facility upon the effective date of such Acceptable Plan of Reorganization and is otherwise in form and substance acceptable to the Majority Lenders.

"Acquisition" means the purchase by any Restricted Entity of any business, division or enterprise, including the purchase of associated Properties or operations or the Equity Interests of a Person and for the avoidance of doubt, excludes purchases of equipment only with no other tangible or intangible property associated with such equipment purchase unless such purchase of equipment involves all or substantially all the Properties of the seller.

"Administrative Agent" means Cantor Fitzgerald Securities in its capacity as administrative agent and collateral agent for the Lenders pursuant to Article 8 and any successor agent pursuant to Section 8.6.

"Administrative Questionnaire" means an Administrative Questionnaire in a form approved by the Administrative Agent.

"Advance" means any advance by a Lender to the Borrowers as a part of a Borrowing, including the Loans.

"Advanced Safety" has the meaning given to such term in the preamble hereto.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person or any Subsidiary of such Person.  The term "control" (including the terms "controlled by" or "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership, by contract or otherwise.

"Agent Parties" has the meaning given to such term in Section 9.9(b)(ii).

"Agreement" means this Senior Secured Debtor-in-Possession Credit Agreement among the Borrowers, the Lenders and the Administrative Agent.

"Applicable Rate" means a percentage per annum equal to 8.50%.

"Approved Fund" means any Person (other than a natural person (or any holding company, investment vehicle, or trust owned and operated for the primary benefit of a natural person)) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Sale" means any Disposition by any Restricted Entity to any Person other than another Credit Party.

"Assignment and Acceptance" means an assignment and acceptance executed by a Lender and an Eligible Assignee and accepted by the Administrative Agent, in substantially the same form as Exhibit A or any other form approved by the Administrative Agent.

"Availability Period" means each of the Initial Availability Period, the Second Funding Availability Period and the Third Funding Availability Period.

"Avoidance Actions" means claims and causes of action under sections 502(d), 544, 545, 547, 548, 550, and 553 of the Bankruptcy Code or any other similar state law.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy".

"Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Louisiana, Lafayette Division or any other court having jurisdiction over the Cases from time to time.

"Borrower" or "Borrowers" has the meaning given to such term in the preamble hereto.

"Borrower Representative" has the meaning given to such term in Section 9.22(f).

"Borrowing" means a borrowing consisting of simultaneous Advances made by each Lender pursuant to Section 2.1(a) and (b).

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Legal Requirements of, or are in fact closed in, Louisiana or in New York.

"Capital Expenditures" means, for any Person and period of its determination, without duplication, the aggregate of all expenditures and costs (whether paid in cash or accrued as liabilities during that period and including that portion of payments under Capital Leases that are capitalized on the balance sheet of such Person) of such Person during such period that, in conformity with GAAP, are required to be included in or reflected by the property, plant, or equipment or similar fixed asset accounts reflected in the balance sheet of such Person.

"Capital Leases" means, for any Person, any lease of any Property by such Person as lessee which would, in accordance with GAAP, be required to be classified and accounted for as a capital lease on the balance sheet of such Person.

"Carve-Out" has the meaning given to such term in the DIP Order.

"Cases" means the voluntary cases of the Debtors filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Cash Management Order" means the Bankruptcy Court order, in form and substance satisfactory to the Majority Lenders, relating to the Debtors' cash management system and bank accounts.

"Casualty Event" means the damage, destruction or condemnation, including by process of eminent domain or any transfer or disposition of Property in lieu of condemnation, as the case may be, of Property of any Person or any of its Subsidiaries.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 *et seq.*), as amended, together with any analogous state and local

counterparts or equivalents, and all rules and regulations and requirements thereunder in each case as now or hereafter in effect.

"Change in Control" means, in each case other than pursuant to an Acceptable Plan of Reorganization, the occurrence of any of the following events:

(a)     any Borrower ceases to directly or indirectly own 100% of the Equity Interests in any of its respective Subsidiaries; or

(b)     the Permitted Holders cease to own, either directly or indirectly, the greater of (i) the Controlling Percentage and (ii) 51% of the Voting Securities of each of Holdings, Knight Family or HMC Leasing.

"Change in Law" means the occurrence, after the date of this Agreement (or with respect to any Lender, if later, the date on which such Lender becomes a Lender), of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued

"Chosen Courts" has the meaning given to such term in Section 9.14.

"Closing Date" means August 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended, and the regulations and published interpretations thereof.

"Collateral" means, collectively, all real, personal, and mixed Property (including Equity Interests and following entry of the Final DIP Order, the proceeds of Avoidance Actions) of the Debtors' respective estates in the Cases, including, without limitation, all inventory, accounts receivable, general intangibles, contracts, chattel paper, owned real estate, real property leaseholds, governmental approvals, licenses and permits, fixtures, machinery, equipment, goods, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property and the products and proceeds of all of the foregoing.

"Commitments" means the Initial Funding Commitments, the Second Funding Commitments and the Third Funding Commitments, each subject to the conditions set forth herein.  The amount of each Lender's Commitment as of the Closing Date is set forth on Annex I and the aggregate amount of the Commitments as of the Closing Date is $10,000,000 (before giving effect to the Loans made on the Closing Date).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications" has the meaning given to such term in Section 9.9(b)(ii).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Controlled Group" means all members of a controlled group of corporations and all businesses (whether or not incorporated) under common control which, together with any Borrower or any Subsidiary, are treated as a single employer under Section 414 of the Code.

"Controlling Percentage" means, with respect to any Person, the percentage of the outstanding Voting Securities (including any options, warrants or similar rights to purchase such Equity Interest) of such Person having ordinary voting power which gives the direct or indirect holder of such Voting Securities the power to elect a majority of the board of directors (or other applicable governing body), or directors having the right to cast a majority of the votes of the board of directors (or other applicable governing body) of such Person.

"Credit Bid" means to submit a bid at a public or private sale in connection with the purchase of all or any portion of the Collateral, in which any of the Obligations owing to the Lenders under this Agreement are used and applied as a credit on account of the purchase price.

"Credit Documents" means this Agreement, the Notes, the DIP Order, the Guaranties, the Notices of Borrowing, the DIP Agency Fee Letter, and each other agreement, instrument or document executed at any time in connection with this Agreement.

"Credit Parties" means the Borrowers and the Guarantors.

"Debt" means, for any Person, without duplication: (a) indebtedness of such Person for borrowed money, including the face amount of any letters of credit supporting the repayment of indebtedness for borrowed money issued for the account of such Person; (b) to the extent not covered under clause (a) above, obligations under letters of credit and agreements relating to the issuance of letters of credit or acceptance financing, including letters of credit; (c) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, or upon which interest payments are customarily made; (d) obligations of such Person under conditional sale or other title retention agreements relating to any Properties purchased by such Person (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business); (e) obligations of such Person to pay the deferred purchase price of Property or services (including, without limitation, any contingent obligations or other similar obligations associated with such purchase, and including obligations that are non-recourse to the credit of such Person but are secured by the Properties of such Person); (f) obligations of such Person as lessee under Capital Leases and obligations of such Person in respect of Synthetic Leases; (g) obligations of such Person under any Hedging Arrangement; (h) all obligations of such Person to mandatorily purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person on a date certain or upon the occurrence of certain events or conditions; (i) the Debt of any partnership or unincorporated joint venture in which such Person is a general partner or a joint venturer, but only to the extent to which there is recourse to such Person for the payment of such Debt; (j) obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) of such Person to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, indebtedness or obligations of others of the kinds referred to in clauses (a) through (i) above; (k) indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above secured by any Lien on or in respect of any Property of such Person, and (l) all liabilities of such Person in respect of unfunded vested benefits under any Plan.

"Debtor Relief Laws" means (a) the Bankruptcy Code, and (b) all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement,

receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"Debtors" has the meaning given to such term in the recitals hereto.

"Default" means (a) an Event of Default or (b) any event or condition which with notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means a per annum rate equal to 2.00% plus the Applicable Rate.

"Defaulting Lender" means any Lender that (a) has failed to (i) fund all or any portion of its Advances within two Business Days of the date such Advances were required to be funded hereunder, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower Representative or the Administrative Agent in writing, or has made a public statement to the effect, that it does not intend to comply with its funding obligations hereunder or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower Representative, to confirm in writing to the Administrative Agent and the Borrower Representative that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower Representative in form and substance satisfactory to the Administrative Agent and the Borrower Representative), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or Properties, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its Properties or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower Representative and each Lender.

"DIP Agency Fee" has the meaning given to such term in Section 2.6(c).

"DIP Agency Fee Letter" means that certain fee letter between the Borrowers and the Administrative Agent, dated as of the Closing Date.

"DIP Budget" means (a) initially, the Initial DIP Budget and (b) thereafter, the DIP Budget most recently delivered pursuant to Section 5.2(s) and approved by the Majority Lenders.

"DIP Facility" has the meaning given to such term in the recitals hereto.

"DIP Order" means the Interim DIP Order and, upon entry thereof, the Final DIP Order.

"Disclosure Statement" has the meaning given to such term in the Restructuring Support Agreement.

"Discretionary Tax Loans" means Advances and Loans made under Section 2.1(b).

"Disposition" means any sale, lease, transfer, assignment, conveyance or other disposition of any Property; "Dispose" or similar terms shall have correlative meanings.

"Dollars" and "$" means lawful money of the United States of America.

"Domestic Subsidiary" means, with respect to any Borrower, any of its Subsidiaries that (a) is incorporated or organized under the laws of the United States, any State thereof or the District of Columbia, (b) could provide a guarantee without any material adverse federal income tax consequence of such Borrower (by constituting an investment of earnings in United States property under Section 956 (or any successor provision) of the Code, triggering an increase in the gross income of such Borrower pursuant to Section 951 (or a successor provision) of the Code without corresponding credits or other offsets), or (c) is disregarded for tax purposes.

"EBITDA" means, for any period of determination, an amount equal to (a) consolidated net income, plus (b) the sum of the following to the extent deducted from consolidated net income: (1) interest expense; (2) taxes; (3) depreciation; and (4) amortization, in each case as determined in accordance with GAAP.

"El Caballero" has the meaning given to such term in the preamble hereto.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 9.7(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 9.7(b)(iii)).

"Environment" or "Environmental" has the meaning given to such term in 42 U.S.C. 9601(8) (1988).

"Environmental Claim" means any third party (including any governmental agency and employees) action, lawsuit, claim, demand, regulatory action or proceeding, order, decree, consent agreement or written notice of potential or actual responsibility or violation (including claims or proceedings under the Occupational Safety and Health Acts or similar Legal Requirements relating to health or safety of employees) that seeks to impose liability under any Environmental Law.

"Environmental Law" means all federal, state, and local laws, rules, regulations, ordinances, orders, decisions, agreements, and other Legal Requirements, including common law theories, now or hereafter in effect and relating to, or in connection with the Environment, health, or safety, including without limitation CERCLA, relating to (a) pollution, contamination, injury, destruction, loss, protection, cleanup, reclamation or restoration of the air, surface water, groundwater, land surface or subsurface strata, or other natural resources; (b) solid, gaseous or liquid waste generation, treatment, processing, recycling, reclamation, cleanup, storage, disposal or transportation; (c) exposure to Hazardous Substances, Hazardous Waste, other pollutants, contaminants, hazardous, medical infections, or toxic substances, materials or wastes; (d) the safety or health of employees; or (e) the manufacture, processing, handling, transportation, distribution in commerce, use, storage or disposal of hazardous, medical infections, or toxic substances, materials or wastes.

"Environmental Permit" means any permit, license, order, approval, registration or other authorization under Environmental Law.

"Equity Interest" means with respect to any Person, any shares, interests, participation, or other equivalents (however designated) of corporate stock, membership interests or partnership interests (or any other ownership interests) of such Person.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" has the meaning given to such term in Section 7.1.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in an Advance or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Advance or Commitment (other than pursuant to an assignment request by any Borrower under Section 2.13 or reallocation pursuant to Section 2.14) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.12, additional amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.12(g), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Equity Holder" means each holder of Equity Interests of Holdings, HMC Leasing and Knight Family.

"Exit Credit Agreement" means the credit agreement for the Exit Facility of the reorganized Debtors and consistent in form and substance with the terms of the Restructuring Support Agreement or otherwise approved by the Majority Lenders.

"Exit Facility" means the revolving credit facility under the Exit Credit Agreement.

"Exit Lenders" means the Lenders as defined in the Exit Credit Agreement.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Code Section 1471(b)(1).

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day immediately succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to the Administrative Agent (in its individual capacity) on such day on such transactions as determined by the Administrative Agent.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System or any of its successors.

"Final DIP Order" means the final order of the Bankruptcy Court authorizing and approving the Debtors' entry into and performance under this Agreement on a final basis, including the granting of the Liens and superpriority claims in respect of this Agreement in favor of the Administrative Agent and the Secured Parties, in form and substance acceptable to the Administrative Agent at the direction of the Majority Lenders.

"Financial Statements" means, for any period, the consolidated financial statements of the Borrowers and their respective Subsidiaries, including statements of income, retained earnings, changes in equity and cash flow for such period as well as a balance sheet as of the end of such period, all prepared in accordance with GAAP.

"First Day Orders" means all orders entered or to be entered by the Bankruptcy Court granting the relief requested in the motions filed with the Bankruptcy Court on the Petition Date or within two days of the Petition Date or based on motions filed on or about the Petition Date, which shall each be in form and substance satisfactory to the Majority Lenders.

"Foreign Lender" means, with respect to the Borrowers, any Lender that is organized under the laws of a jurisdiction other than that in which any Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means the United States of America generally accepted accounting principles as in effect from time to time, applied on a basis consistent with the requirements of Section 1.3.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantors" means each Debtor and any Person that now or hereafter executes a Guaranty, including each Subsidiary that becomes a guarantor of all or a portion of the Obligations and which has entered into either a joinder agreement substantially in the form attached to the Guaranty or a new Guaranty; provided that, no Foreign Subsidiary shall be a Guarantor.

"Guaranty" means a Guaranty Agreement executed in substantially the same form as Exhibit B.

"Hazardous Substance" means any substance or material identified as such pursuant to CERCLA and those regulated under any other Environmental Law, including without limitation pollutants, contaminants, petroleum, petroleum products, radionuclides, and radioactive materials.

"Hazardous Waste" means any substance or material regulated or designated as such pursuant to any Environmental Law, including without limitation, pollutants, contaminants, flammable substances and materials, explosives, radioactive materials, oil, petroleum and petroleum products, chemical liquids and solids, polychlorinated biphenyls, asbestos, toxic substances, and similar substances and materials.

"Hedging Arrangement" means a hedge, call, swap, collar, floor, cap, option, forward sale or purchase or other contract or similar arrangement (including any obligations to purchase or sell any commodity or security at a future date for a specific price) which is entered into to reduce or eliminate or otherwise protect against the risk of fluctuations in prices or rates, including interest rates, foreign exchange rates, commodity prices and securities prices.

"HMC Investments" has the meaning given to such term in the preamble hereto.

"HMC Leasing" has the meaning given to such term in the preamble hereto.

"HMC Leasing/Iberia Deposit Accounts" means the deposit accounts held by HMC Leasing with IberiaBank which are required under the HMC Leasing/Iberia Loan Documents.

"HMC Leasing/Iberia Loan Documents" means the documents evidencing the loan from IberiaBank to HMC Leasing, dated March 28, 2011 in the original principal amount of $19,491,000, and all documents related thereto with respect to collateral thereunder.

"Holdings" has the meaning given to such term in the preamble hereto.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning given to such term in Section 9.2(a).

"Initial Borrowing" means the initial borrowing of Loans on the Closing Date.

"Initial DIP Budget" has the meaning given to such term in Section 3.1(o).

"Initial Funding Availability Period" means the period beginning on the Closing Date and ending on the Termination Date.

"Initial Funding Commitment" means, as to each Lender, its commitment to make a Loan to the Borrowers under the Initial Borrowing on the Closing Date (before giving effect to the Loans made on the Closing Date) pursuant to Section 2.1(a)(i), and "Initial Funding Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Initial Funding Commitment as of the Closing Date is as set forth opposite such Lender's name on Annex I. The aggregate amount of the Initial Funding Commitments on the Closing Date is $6,000,000.

"Interim DIP Order" means the order of the Bankruptcy Court in substantially the form attached hereto as Exhibit C and otherwise in form and substance satisfactory to the Majority Lenders.

"Inventory" means, as to any Person, at any date of determination thereof, all items of such Person constituting "inventory" under the Uniform Commercial Code.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, guarantee (by guaranty or other

arrangement) or assumption of Debt of, or purchase or other acquisition of any other Debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of Properties of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"JPM/Knight Family Loan Documents" means the documents evidencing those certain secured consumer loans and secured commercial loans from JPMorgan Chase Bank, N.A. to Leasing and Knight Family, respectively, and all documents related thereto with respect to the respective collateral thereunder.

"Junior Lien" has the meaning given to such term in Section 2.16(c).

"Knight Aviation" has the meaning given to such term in the preamble hereto.

"Knight Family" has the meaning given to such term in the preamble hereto.

"Knight Information" has the meaning given to such term in the preamble hereto.

"Knight Manufacturing" has the meaning given to such term in the preamble hereto.

"Knight R&D" has the meaning given to such term in the preamble hereto.

"Knight Security" has the meaning given to such term in the preamble hereto.

"KOT" has the meaning given to such term in the preamble hereto.

"KWS" has the meaning given to such term in the preamble hereto.

"Legal Requirement" means any law, statute, ordinance, decree, code, act, requirement, order, judgment, rule, regulation (or official interpretation of any of the foregoing) of, and the terms of any license or permit issued by, any Governmental Authority, including, but not limited to, Regulations T, U and X, whether now or hereafter in effect.

"Lender Parties" means Lenders and the Administrative Agent.

"Lenders" means the Persons listed on the signature pages hereto as Lenders, and any other Person that shall have become a Lender hereto pursuant to an Assignment and Acceptance, but in any event, excluding any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"Lender Superpriority Claim" has the meaning given to such term in Section 2.16(a).

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower Representative and the Administrative Agent.

"Lien" means any mortgage, lien, pledge, charge, deed of trust, security interest, or encumbrance to secure or provide for the payment of any obligation of any Person, whether arising by contract, operation of law, or otherwise (including the interest of a vendor or lessor under any conditional sale agreement, Capital Lease, or other title retention agreement).

"Liquid Investments" means (a) readily marketable direct full faith and credit obligations of the United States of America or obligations unconditionally guaranteed by the full faith and credit of the United States of America; (b) commercial paper issued by (i) any Lender or any Affiliate of any Lender or (ii) any commercial banking institutions or corporations rated at least P-1 by Moody's or A-1 by S&P; (c) certificates of deposit, time deposits, and bankers' acceptances issued by (i) any of the Lenders or (ii) any other commercial banking institution which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $250,000,000 and rated Aa by Moody's or AA by S&P; (d) repurchase agreements which are entered into with any of the Lenders or any major money center banks included in the commercial banking institutions described in clause (c) and which are secured by readily marketable direct full faith and credit obligations of the government of the United States of America or any agency thereof; (e) investments in any money market fund which holds investments substantially of the type described in the foregoing clauses (a) through (d); (f) readily and immediately available cash held in any money market account maintained with any Lender; provided that, such money market accounts and the funds therein shall be unencumbered and free and clear of all Liens and other third party rights other than a Lien in favor of the Administrative Agent; and (g) other investments approved by the Majority Lenders.  All the Liquid Investments described in clauses (a) through (d) above shall have maturities of not more than 365 days from the date of issue.

"Loan" means any advance to or for the benefit of the Borrowers pursuant to this Agreement.

"Loan Disbursement Account" means, with respect to the Borrowers, an account at [_____] Bank in the name of certain Borrower(s).

"Loan Limit" means, with respect to any Borrowing, the maximum amount of Loans required by the Borrowers, together with cash on hand, to operate the business of the Borrowers and their Subsidiaries for the subsequent four-week period in accordance with the DIP Budget, after giving effect to the Permitted Variances (but excluding any proceeds of Discretionary Tax Loans).

"Majority Lenders" means (a) other than as provided in clause (b) below, two or more Lenders holding greater than 50% of the aggregate outstanding principal amount of the Advances and outstanding Commitments and (b) at any time when there is only one Lender, such Lender.

"Material Adverse Change" means a material adverse change in, or a material adverse effect on, (a) the business, financial condition, properties, or results of operations of the Borrowers and their respective Subsidiaries, taken as a whole; (b) the validity or enforceability of this Agreement or any of the other Credit Documents; (c) any Credit Party's ability to perform its obligations under this Agreement, any Note, the Guaranties or any other Credit Document; or (d) any right or remedy of any Secured Party under any Credit Document.

"Maximum Rate" means the maximum nonusurious interest rate under applicable law.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto which is a nationally recognized statistical rating organization.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Borrower or any member of the Controlled Group is making or accruing an obligation to make contributions.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (i) requires the approval of all affected Lenders in accordance with the terms of Section 9.3 and (ii) has been approved by the Majority Lenders.

"<u>Non-Defaulting Lender</u>" means any Lender that is not a Defaulting Lender at such time.

"<u>Notes</u>" means a promissory note of the Borrowers payable to the order of a Lender in the amount of such Lender's Commitment, in accordance with Section 2.1(d).

"<u>Notice</u>" has the meaning given to such term in <u>Section 9.9(b)(iii)</u>.

"<u>Notice of Borrowing</u>" means a Notice of Borrowing signed by the Borrower Representative in substantially the same form as <u>Exhibit E</u>.

"<u>Obligations</u>" means all principal, interest (including post-petition interest), fees, reimbursements, indemnifications, and other amounts now or hereafter owed by any of the Credit Parties to the Lenders or the Administrative Agent under this Agreement and the other Credit Documents, including, any increases, extensions, and rearrangements of those obligations under any amendments, supplements, and other modifications of the Credit Documents.

"<u>OFAC</u>" has the meaning given to such term in <u>Section 4.19(b)</u>.

"<u>Other Borrower Obligations</u>" has the meaning given to such term in <u>Section 9.22(a)</u>.

"<u>Other Connection Taxes</u>" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Advance or Credit Document).

"<u>Other Taxes</u>" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to <u>Section 2.13</u>).

"<u>Participant</u>" has the meaning given to such term in clause (d) of <u>Section 9.7</u>.

"<u>Participant Register</u>" has the meaning given to such term in clause (d) of <u>Section 9.7</u>.

"<u>Patriot Act</u>" means the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"<u>Permitted Debt</u>" has the meaning given to such term in <u>Section 6.1</u>.

"<u>Permitted Holder</u>" means, individually, (a) Mark Knight, (b) Bryan Knight, (c) Kelley Knight Sobiesk, (d) Ann Knight, (e) the Mark E. Knight 2010 Trust No. 1, (f) the Bryan R. Knight 2010 Trust No. 1, (g) the Kelley Knight Sobiesk 2010 Trust No. 1, (h) the KKS 2012 Family Trust No. 1, (i) the MEK 2012 Family Trust No. 1, (j) the BRK 2012 Family Trust No. 1, (k) the Mark Knight Family 2012 Trust No 1, (l) any direct descendant of any of the individuals in (a)-(c) or successor to any of the trusts in (e)-(k) and (m) Holdings.

"<u>Permitted Iberia Debt</u>" means all Debt owed by HMC Leasing to IberiaBank as of the Petition Date pursuant to the HMC Leasing/Iberia Loan Documents.

"<u>Permitted Investments</u>" has the meaning given to such term in <u>Section 6.3</u>.

"<u>Permitted JPMorgan Debt</u>" means all Debt owed by Leasing or Knight Family, as applicable, to JPMorgan Chase Bank, N.A. as of the Petition Date pursuant to the JPM/Knight Family Loan Documents.

"<u>Permitted Liens</u>" has the meaning given to such term in <u>Section 6.2</u>.

"<u>Person</u>" means an individual, partnership, corporation (including a business trust), joint stock company, trust, limited liability company, limited liability partnership, unincorporated association, joint venture, Governmental Authority, or other entity, or a government or any political subdivision or agency thereof, or any trustee, receiver, custodian, or similar official.

"<u>Petition Date</u>" has the meaning given to such term in the recitals hereto.

"<u>Plan</u>" means an employee benefit plan (other than a Multiemployer Plan) maintained for employees of any Restricted Entity or any member of the Controlled Group and covered by Title IV of ERISA or subject to the minimum funding standards under Section 412 of the Code.

"<u>Plan of Reorganization</u>" means a plan of reorganization or plan of liquidation in any or all of the Cases.

"<u>Platform</u>" has the meaning given to such term in <u>Section 9.9(b)(i)</u>.

"<u>Prepetition Credit Agreement</u>" means that certain Credit Agreement dated as of June 26, 2013, by and among certain of the Borrowers, Cantor Fitzgerald Securities (successor to Wells Fargo Bank, National Association), as administrative agent, the issuing lender party thereto, the swing line lender party thereto and the financial institutions from time to time party thereto, as lenders, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Prepetition Payment</u>" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of prepetition Debt or any trade payables or other prepetition claims against any Debtor.

"<u>Primed Liens</u>" has the meaning given to such term in <u>Section 2.16(d)</u>.

"<u>Priming Lien</u>" has the meaning given to such term in <u>Section 2.16(d)</u>.

"<u>Professional Fee Escrow</u>" has the meaning given to such term in the DIP Order.

"<u>Pro Rata Share</u>" means, at any time with respect to any Lender, (i) the ratio (expressed as a percentage) of such Lender's Loans and outstanding Commitment at such time to the aggregate Loans and outstanding Commitments at such time, or (ii) if all of the Commitments have been terminated, the ratio (expressed as a percentage) of such Lender's aggregate outstanding Loans at such time to the total aggregate outstanding Loans at such time.

"<u>Property</u>" means, as to any Person, any property or assets (whether real, personal, or mixed, tangible or intangible), including all estate "property" within the meaning of Section 541 of the Bankruptcy Code, of such Person.

17-51014 - #87  File 08/11/17  Enter 08/11/17 16:36:13  Main Document  Pg 102 of 216

"Rayne Properties" has the meaning given to such term in the preamble hereto.

"Recipient" means (a) the Administrative Agent and (b) any Lender, as applicable.

"Register" has the meaning given to such term in Section 9.7(c).

"Regulations T, U, and X" means Regulations T, U, and X of the Federal Reserve Board, as each is from time to time in effect, and all official rulings and interpretations thereunder or thereof. Each of Regulations T, U, or X may be referred to individually as Regulation T, Regulation U, or Regulation X herein.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, and advisors of such Person and of such Person's Affiliates, and each of their respective heirs, successors and assigns.

"Release" has the meaning given to such term in CERCLA or under any other Environmental Law.

"Removal Effective Date" has the meaning given to such term in Section 8.6(b).

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA (other than any such event not subject to the provision for 30-day notice to the PBGC under the regulations issued under such section).

"Resignation Effective Date" has the meaning given to such term in Section 8.6(a).

"Response" has the meaning given to such term in CERCLA or under any other Environmental Law.

"Responsible Officer" means (a) with respect to any Person that is a corporation, such Person's Chief Executive Officer, President, Chief Financial Officer, Chief Operating Officer, or Vice President, (b) with respect to any Person that is a limited liability company, if such Person has officers, then such Person's Chief Executive Officer, President, Chief Financial Officer, Vice President, and if such Person is managed by members, then a Responsible Officer of such Person's managing member, and if such Person is managed by managers, then a manager (if such manager is an individual) or a Responsible Officer of such manager (if such manager is an entity), and (c) with respect to any Person that is a general partnership, limited partnership or a limited liability partnership, the Responsible Officer of such Person's general partner or partners.

"Restricted Entity" means (a) each Credit Party and (b) each Subsidiary.

"Restricted Payment" means, with respect to any Person, (a) any direct or indirect dividend or distribution (whether in cash, securities or other Property) or any direct or indirect payment of any kind or character (whether in cash, securities or other Property) made in connection with the Equity Interests of such Person, including those dividends, distributions and payments made in consideration for or otherwise in connection with any retirement, purchase, redemption or other acquisition of any Equity Interest of such Person, or of any options, warrants or rights to purchase or acquire any such Equity Interest of such Person or (b) principal or interest payments (in cash, Property or otherwise) on, or redemptions of, subordinated debt of such Person.

"Restructuring Support Agreement" means the Restructuring Support Agreement dated August 8, 2017 by and among the Debtors, Cantor Fitzgerald Securities, as the administrative agent under the

Prepetition Credit Agreement, certain of the lenders under the Prepetition Credit Agreement, and the other parties party thereto, as amended in accordance with the terms thereof.

"S&P" means Standard & Poor's Rating Agency Group, a division of McGraw-Hill Companies, Inc., or any successor thereof which is a national credit rating organization.

"Same Day Funds" means with respect to disbursements and payments in Dollars, immediately available funds.

"Sanctions" has the meaning given to such term in Section 4.19(b).

"SEC" means, the United States Securities and Exchange Commission, or any Governmental Authority succeeding to the functions of such Commission.

"Second Funding Availability Date" means the initial date on which the conditions specified in Section 3.2 are satisfied or waived in accordance with Section 3.2.

"Second Funding Availability Period" means the period beginning on the Second Funding Availability Date and ending the Termination Date.

"Second Funding Commitment" means the commitment of a Lender on the terms set forth herein to make or otherwise fund any Loan pursuant to Section 2.1(a)(ii), and "Second Funding Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Second Funding Commitment is set forth opposite such Lender's name on Annex I, or, if such Lender's Second Funding Commitment has been assigned, in the applicable Assignment and Acceptance Agreement, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the Second Funding Commitments as of the Closing Date is $1,000,000.

"Secured Parties" means the Administrative Agent and the Lenders.

"Subsidiary" means, with respect to any Person (the "holder") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the holder in the holder's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity, a majority of whose outstanding Voting Securities shall at any time be owned by the holder or one more Subsidiaries of the holder. Unless expressly provided otherwise, all references herein and in any other Credit Document to any "Subsidiary" or "Subsidiaries" means any Subsidiary or Subsidiaries of any Borrower.

"Swap Termination Value" means, in respect of any one or more Hedging Arrangements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Arrangements, (a) for any date on or after the date such Hedging Arrangements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Arrangements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Arrangements (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing product where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease under GAAP.

"<u>Tax Group</u>" has the meaning given to such term in <u>Section 4.13</u> of this Agreement.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Termination Date</u>" means the earliest to occur of (a) January 31, 2018, (b) August 10, 2017, if the Bankruptcy Court shall not have entered the Interim DIP Order by the end of such date, (c) September 1, 2017, if the Bankruptcy Court shall not have entered the Final DIP Order by the end of such date, (d) the effective date of the Acceptable Plan of Reorganization that is confirmed pursuant to an order entered by the Bankruptcy Court in the Cases, (e) the consummation of a sale of all or substantially all of the Properties of the Debtors pursuant to Section 363 of the Bankruptcy Code and (f) the acceleration of the Loans and the termination of the Commitments in accordance with the terms of this Agreement.

"<u>Termination Event</u>" means (a) a Reportable Event with respect to a Plan, (b) the withdrawal of any Borrower or any member of the Controlled Group from a Plan during a plan year in which it was a "substantial employer" as defined in Section 4001(a)(2) of ERISA, (c) the filing of a notice of intent to terminate a Plan or the treatment of a Plan amendment as a termination under Section 4041(c) of ERISA, (d) the institution of proceedings to terminate a Plan by the PBGC or (e) any other event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"<u>Testing Date</u>" means the second Business Day of every other week occurring after the Closing Date, commencing on August 22, 2017.

"<u>Testing Period</u>" has the meaning given to such term in in the definition of "Variance Report".

"<u>Third Funding Availability Date</u>" means the initial date on which the conditions specified in <u>Section 3.3</u> are satisfied or waived in accordance with <u>Section 3.3</u>.

"<u>Third Funding Availability Period</u>" means the period beginning on the Third Funding Availability Date and ending on the Termination Date.

"<u>Third Funding Commitment</u>" means the commitment of a Lender on the terms set forth herein to make or otherwise fund any Loan pursuant to <u>Section 2.1(a)(iii)</u>, and "<u>Third Funding Commitments</u>" means such commitments of all Lenders in the aggregate. The amount of each Lender's Third Funding Commitment is set forth opposite such Lender's name on <u>Annex I</u>, or, if such Lender's Third Funding Commitment has been assigned, in the applicable Assignment and Acceptance Agreement, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the Third Funding Commitments as of the Closing Date is $3,000,000.

"<u>Trade Date</u>" has the meaning given to such term in <u>Section 9.7(b)(i)(B)</u>.

"<u>Tri-Drill</u>" has the meaning given to such term in the preamble hereto.

"<u>Uniform Commercial Code</u>" means the Uniform Commercial Code, as may be amended and as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the attachment, perfection or priority of, or remedies with respect to, the Administrative Agent's or any Secured Party's Lien on any Collateral.

"<u>U.S. Person</u>" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

17-51014 - #87   File 08/11/17   Enter 08/11/17 16:36:13   Main Document   Pg 105 of 216

"<u>U.S. Tax Compliance Certificate</u>" has the meaning given to such term in paragraph (g) of <u>Section 2.12</u>.

"<u>Variance Report</u>" means a variance report, in form and substance satisfactory to the Majority Lenders, detailing the following:

(a)     the receipts of the Borrowers and their Subsidiaries on a line item basis during the two-week period prior to the week of the Testing Date (the "<u>Testing Period</u>"), and the disbursements made by the Borrowers and their Subsidiaries on a line item basis during such Testing Period; and

(b)     any variance (whether plus or minus and expressed as a percentage) (i) between the receipts of the Borrowers and their Subsidiaries during such Testing Period against the receipts set forth in the DIP Budget during such Testing Period, in each case on a line item-by-line item basis and (ii) between the disbursements made by the Borrowers and their Subsidiaries during such Testing Period against the disbursements set forth in the DIP Budget during such Testing Period, in each case on a line item-by-line item basis.

"<u>Voting Securities</u>" means (a) with respect to any corporation, capital stock of the corporation having general voting power under ordinary circumstances to elect directors of such corporation (irrespective of whether at the time stock of any other class or classes shall have or might have special voting power or rights by reason of the happening of any contingency), (b) with respect to any partnership, any partnership interest or other ownership interest having general voting power to elect the general partner or other management of the partnership or other Person, and (c) with respect to any limited liability company, membership certificates or interests having general voting power under ordinary circumstances to elect managers or directors of such limited liability company.

"<u>Withholding Agent</u>" means any Credit Party and the Administrative Agent.

Section 1.2     <u>Computation of Time Periods</u>.  In this Agreement and in the other Credit Documents in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding".

Section 1.3     <u>Accounting Terms; Changes in GAAP</u>.

(a)     All accounting terms not specifically defined in this Agreement shall be construed in accordance with GAAP, applied on a consistent basis with those applied in the preparation of audited financial statements referred to <u>Section 4.4</u>.

(b)     Unless otherwise indicated, all financial statements of the Borrowers, all calculations for compliance with covenants in this Agreement and all calculations of any amounts to be calculated under the definitions in <u>Section 1.1</u> shall be based upon the consolidated accounts of the Borrowers and their respective Subsidiaries in accordance with GAAP and consistent with the principles of consolidation applied in preparing the Borrowers' audited Financial Statements referred to in <u>Section 4.4.</u>

(c)     If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and either the Borrower Representative or the Majority Lenders shall so request, the Administrative Agent, the Lenders and the Borrowers shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Majority Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrowers shall provide to the Administrative Agent and the Lenders financial statements and

other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

Section 1.4    [Reserved].

Section 1.5    Miscellaneous.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Credit Document, shall be construed to refer to such Credit Document in its entirety and not to any particular provision thereof, (d) all references in a Credit Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Credit Document in which such references appear, (e) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

## ARTICLE 2
## CREDIT FACILITIES

Section 2.1    Commitments.

(a)    Commitment.  Upon the terms and conditions contained in this Agreement and the DIP Order and relying on the representations and warranties contained in this Agreement, (i) subject to satisfaction of the conditions precedent set forth in Section 3.1, each Lender severally, but not jointly, agrees to make Loans to the Borrowers during the Initial Funding Availability Period in an amount not to exceed its Initial Funding Commitment, (ii) subject to satisfaction of the conditions precedent set forth in Section 3.2, each Lender severally, but not jointly, agrees to make Loans to the Borrowers during the Second Funding Availability Period in an amount not to exceed its Second Funding Commitment plus any unused portion of the Initial Funding Commitment, and (iii) subject to satisfaction of the conditions precedent set forth in Section 3.3, each Lender severally, but not jointly, agrees to make Loans to the Borrowers during the Third Funding Availability Period in an amount not to exceed its Third Funding Commitment plus any unused portion of the Initial Funding Commitment and any unused portion of the Second Funding Commitment; provided, however, that, in each case, (A) the aggregate principal balance of the Loans made during any Availability Period shall not exceed at any time the Commitment for such Availability Period (plus any unused portion of the Commitments for prior Availability Period(s)) and (B) no Borrowing shall exceed the applicable Loan Limit for such Borrowing.

(b)    Pre-Petition Date Property Tax Loans. Upon the terms and conditions contained in this Agreement and the DIP Order and relying on the representations and warranties contained in this Agreement, subject to the satisfaction of the conditions precedent set forth in Section 3.4, the Lenders severally, but not jointly, may agree in their sole discretion to make Loans to the Borrowers to be used by

the Borrowers for the sole purpose of making payments in respect of pre-Petition Date property and ad valorem tax amounts, which amount of Loans made under this Section 2.1(b) shall be determined by the Lenders in their sole discretion but not to exceed $4,500,000 in the aggregate. All advances under this Section 2.01(b) shall constitute Advances and Loans under this Agreement.

(c)      Reduction of the Commitments.

(i)      Upon the making of any Loan during the Initial Funding Availability Period by any Lender, the Initial Funding Commitment of such Lender shall be automatically and permanently reduced by the amount of such Loan.

(ii)      Upon the making of any Loan during the Second Funding Availability Period by any Lender, any remaining unused portion of the Initial Funding Commitment and then the Second Funding Commitment of such Lender shall be automatically and permanently reduced by the amount of such Loan.

(iii)      Upon the making of any Loan during the Third Funding Availability Period by any Lender, any remaining unused portion of the Initial Funding Commitment, then any remaining unused portion of the Second Funding Commitment and finally the Third Funding Commitment of such Lender shall be automatically and permanently reduced by the amount of such Loan.

(iv)      The Commitments of all Lenders shall automatically and permanently be terminated and reduced to zero ($0) on the Termination Date.

(d)      Evidence of Debt.  The Advances made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and the Lenders shall be conclusive absent manifest error of the amount of the Advances made by such Lenders to the Borrowers and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender to the Borrower Representative made through the Administrative Agent, the Borrowers shall execute and deliver to such Lender (through the Administrative Agent) a promissory note which shall evidence such Lender's Advances to the Borrowers in addition to such accounts or records.  Each Lender may attach schedules to such Notes and endorse thereon the date, amount, and maturity of its Advances and payments with respect thereto.  In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any Lender  in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(e)      [Reserved].

Section 2.2      [Reserved].

Section 2.3      Advances.

(a)      Notice.  Each Borrowing shall be made pursuant to the applicable Notice of Borrowing given to Administrative Agent not later than 11:00 a.m. (Central time) on the third Business Day before the date of the proposed Borrowing, by the Borrower Representative to the Administrative Agent, which

shall give to each Lender prompt notice of such proposed Borrowing, by facsimile or other electronic means. Each Notice of Borrowing shall be by facsimile or other electronic means, confirmed promptly by the Borrower Representative with a hard copy (other than with respect to notice sent by facsimile), specifying (i) the requested date of such Borrowing, (ii) the aggregate amount of such Borrowing, (iii) the Loan Limit as of the requested date of such Borrowing and (iv) compliance with the certifications set forth in <u>Section 3.1</u>, <u>Section 3.2</u>, <u>Section 3.3</u> or <u>Section 3.4</u> (as applicable). Subject to the immediately subsequent sentence in the event of only one Lender hereunder, each Lender shall, before 12:00 noon (Central time) on the date of such Borrowing, make available for the account of its applicable Lending Office to the Administrative Agent at its address referred to in <u>Section 9.9</u>, or such other location as the Administrative Agent may specify by notice to the Lenders, in Same Day Funds, such Lender's pro rata share of such Borrowing. After the Administrative Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in <u>Article 3</u>, the Administrative Agent will (or, if there is only one Lender hereunder and such Lender elects to make Advances directly to the Borrowers, such Lender may) make such funds available to the Loan Disbursement Account as directed by the Borrower Representative in the Notice of Borrowing. Each Borrowing shall be in an aggregate amount not less than $500,000 and in integral multiples of $100,000 in excess thereof, and in each case shall consist of Advances made by the Lenders ratably according to their respective Pro Rata Shares.

(b) <u>[Reserved]</u>.

(c) <u>[Reserved]</u>.

(d) <u>Notices Irrevocable</u>. Each Notice of Borrowing delivered by the Borrower Representative hereunder shall be irrevocable and binding on the Borrowers.

(e) <u>Funding by Lenders; Administrative Agent Reliance</u>. Unless the Administrative Agent shall have received notice from a Lender before the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's applicable Pro Rata Share of any Borrowing, the Administrative Agent may assume that such Lender has made its applicable Pro Rata Share of such Borrowing available to the Administrative Agent on the date of such Borrowing in accordance with <u>Section 2.3(a)</u>, and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount. If and to the extent that such Lender shall not have so made its applicable Pro Rata Share of such Borrowing available to the Administrative Agent, such Lender and the Borrowers severally agree to immediately repay to the Administrative Agent on demand such corresponding amount, together with interest on such amount, for each day from the date such amount is made available to the Borrowers until the date such amount is repaid to the Administrative Agent, at (i) in the case of the Borrowers, the interest rate applicable on such day to Advances comprising such Borrowing and (ii) in the case of such Lender, the lesser of (A) the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (B) the Maximum Rate. If such Lender shall repay to the Administrative Agent such corresponding amount and interest as provided above, such corresponding amount so repaid shall constitute such Lender's Advance as part of such Borrowing for purposes of this Agreement even though not made on the same day as the other Advances comprising such Borrowing.

(f) <u>Payments by Borrowers; Presumptions by Administrative Agent</u>. Unless the Administrative Agent shall have received notice from the Borrower Representative prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such

payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the lesser of (i) the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation and (ii) the Maximum Rate.

(g)     [Reserved].

Section 2.4     Prepayments.

(a)     Right to Prepay; Ratable Prepayment.  The Borrowers shall have the right to prepay any principal amount of any Advance as provided in this Section 2.4 and all notices given pursuant to this Section 2.4 shall be irrevocable and binding upon the Borrowers.  Each payment of any Advance pursuant to this Section 2.4 shall be made in a manner such that all Advances comprising part of the same Borrowing are paid in whole or ratably in part other than Advances owing to a Defaulting Lender as provided in Section 2.14.

(b)     Optional.  The Borrowers may elect to prepay any of the Advances without penalty or premium after giving by 11:00 a.m. (Central time) at least three Business Days' prior written notice to the Administrative Agent stating the proposed date and aggregate principal amount of such prepayment.  If any such notice is given, the Borrowers shall prepay Advances comprising part of the same Borrowing in whole or ratably in part in an aggregate principal amount equal to the amount specified in such notice, together with accrued interest to the date of such prepayment on the principal amount prepaid.

(c)     [Reserved].

(d)     [Reserved].

Section 2.5     Repayment.

(a)     [Reserved].

(b)     Loans.  The Borrowers shall pay to the Administrative Agent for the ratable benefit of each Lender the aggregate outstanding principal amount of the Loans on the Termination Date.

(c)     No Reborrowing.  Loans prepaid or repaid may not be reborrowed.

Section 2.6     Fees.

(a)     [Reserved].

(b)     [Reserved].

(c)     Administrative Agent Fee.  The Borrowers agree to pay the fees to the Administrative Agent as set forth in the DIP Agency Fee Letter (the "DIP Agency Fee"), which DIP Agency Fee shall be fully earned, due and payable on the Closing Date.

Section 2.7     Interest.

(a)     Advances.  Each Advance shall bear interest at the Applicable Rate.  The Borrowers shall pay to Administrative Agent for the ratable account of each Lender all accrued but unpaid interest on such Lender's Advances, monthly on the first day of each calendar month, and on the Termination Date, as

applicable, the payment in each instance to be the amount of interest which has accrued and remains unpaid with respect to the Advances.

(b)     [Reserved].

(c)     [Reserved].

(d)     [Reserved].

(e)     Default Rate.  Notwithstanding the foregoing, upon the occurrence and during the continuance of any Event of Default, all Obligations shall bear interest, after as well as before judgment, at the Default Rate.  Interest accrued pursuant to this Section 2.7(e) and all interest accrued but unpaid on or after the Termination Date, as applicable, shall be due and payable on demand.

Section 2.8     [Reserved].

Section 2.9     [Reserved].

Section 2.10     Increased Costs.

(a)     Increased Costs Generally.  If any Change in Law shall:

(i)     impose, modify, or deem applicable any reserve, special deposit, compulsory loan, insurance charge, or similar requirement against Properties of, deposits with or for the account of, or credit extended or participated in by, financial institutions generally, including any Lender (or its applicable Lending Office);

(ii)     subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(iii)     [Reserved]; or

(iv)     impose on financial institutions generally, including any Lender (or its applicable Lending Office) or on the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Advances made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender (or its applicable Lending Office) or such other Recipient of making, continuing or maintaining any loan or of maintaining its obligation to make or accept and purchase any such loan, or to reduce the amount of any sum received or receivable by such Lender (or its applicable Lending Office) or such other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such other Recipient, the Borrowers will pay to such Lender within three Business Days after written demand made by such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)     Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of financial institutions generally, including such Lender's holding company or

any corporation controlling such Lender, if any, as a consequence of this Agreement, the Commitments of such Lender or the Advances made by such Lender to a level below that which such Lender, the corporation controlling such Lender, or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies, the policies of the corporation controlling such Lender, and the policies of such Lender's holding company with respect to capital adequacy), then from time to time within three Business Days after written demand by such, as the case may be, the Borrowers shall pay to such Lender, such additional amount or amounts as will compensate such Lender, the corporation controlling such Lender, or such Lender's or holding company for any such reduction suffered.

(c)     Mitigation.  Each Lender shall promptly notify the Borrowers and the Administrative Agent of any event of which it has knowledge, occurring after the Closing Date, which will entitle such Lender to compensation pursuant to this Section 2.10 and will designate a different Lending Office if such designation will avoid the need for, or reduce the amount of, such compensation and will not, in the reasonable judgment of such Lender, be otherwise disadvantageous to it.  Any Lender claiming compensation under this Section 2.10 shall furnish to the Borrower Representative and the Administrative Agent a statement setting forth the additional amount or amounts to be paid to it hereunder which shall be determined by such Lender in good faith and which shall be conclusive in the absence of manifest error. In determining such amount, such Lender may use any reasonable averaging and attribution methods. The Borrowers shall pay such Lender the amount shown as due on any such certificate within three Business Days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section 2.10 for any increased costs incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower Representative and the Administrative Agent of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof).

Section 2.11     Payments and Computations.

(a)     Payments.  All payments of principal, interest, and other amounts to be made by the Borrowers under this Agreement and other Credit Documents shall be made to the Administrative Agent in immediately available funds, without setoff, deduction, or counterclaim in Dollars.

(b)     Payment Procedures. The Borrowers shall make each payment under this Agreement and under the Notes not later than 12:00 noon (Central time) on the day when due in Dollars to the Administrative Agent at the location the Administrative Agent shall designate in writing to the Borrowers in Same Day Funds.  The Administrative Agent will promptly thereafter, and in any event prior to the close of business on the day any timely payment is made, cause to be distributed like funds relating to the payment of principal, interest or fees ratably (other than amounts payable solely to the Administrative Agent, or a specific Lender pursuant to Sections 2.10, 2.12, 2.13, and 9.2 and such other provisions herein which expressly provide for payments to a specific Lender, but after taking into account payments effected pursuant to Section 9.1) in accordance with each Lender's applicable Pro Rata Share to the Lenders for the account of their respective applicable Lending Offices, and like funds relating to the payment of any other amount payable to any Lender to such Lender for the account of its applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement.  Upon receipt of other amounts due solely to the Administrative Agent or a specific Lender, the Administrative Agent

shall distribute such amounts to the appropriate party to be applied in accordance with the terms of this Agreement.

(c) <u>Non-Business Day Payments</u>. Whenever any payment shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest or fees, as the case may be.

(d) <u>Computations</u>. All computations of interest and fees shall be made by the Administrative Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day, but excluding the last day) occurring in the period for which such interest or fees are payable. Each determination by the Administrative Agent of an amount of interest or fees shall be conclusive and binding for all purposes, absent manifest error.

(e) <u>Sharing of Payments by Lenders</u>. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Advances or other Obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Advances and accrued interest thereon or other such Obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Advances and such other Obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Advances and other amounts owing them; <u>provided</u> that:

(i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this paragraph (e) shall not be construed to apply to (x) any payment made by any Credit Party pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Advances to any assignee or participant, other than to the Borrowers or any of their respective Subsidiaries or any Affiliate of any of the foregoing (as to which the provisions of this paragraph shall apply).

Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Legal Requirement, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against each Credit Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of each Credit Party in the amount of such participation.

Section 2.12    <u>Taxes</u>.

(a) <u>[Reserved]</u>.

(b) <u>Payments Free of Taxes</u>. Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable Legal Requirement. If any applicable Legal Requirement (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be

-25-

entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Legal Requirement and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c)     Payment of Other Taxes by Credit Parties.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Legal Requirement, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)     Indemnification by Credit Parties.  The Credit Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower Representative by a Recipient (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Recipient, shall be conclusive absent manifest error.

(e)     Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.7(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 2.12, the Borrower Representative shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment satisfactory to the Administrative Agent.

(g)     Status of Lenders.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrower Representative and the Administrative Agent, at the time or times reasonably requested by the Borrower Representative or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower Representative or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower Representative or the Administrative Agent, shall deliver such other documentation

prescribed by applicable Legal Requirement or reasonably requested by the Borrower Representative or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.12(g)(ii)(A), and (ii)(B) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

        (ii)        Without limiting the generality of the foregoing,

        (A)        any Lender that is a U.S. Person shall deliver to the Borrower Representative and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

        (B)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), whichever of the following is applicable: (i) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Credit Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Credit Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty; (ii) executed originals of IRS Form W-8ECI; (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN; or (iv) to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

        (C)        any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower Representative and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower Representative or the Administrative Agent), executed originals of any other form prescribed by applicable Legal Requirement as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Legal Requirement to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Recipient under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Recipient were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Recipient shall deliver to the Borrower Representative and the Administrative Agent at the time or times prescribed by Legal Requirement and at such time or times reasonably requested by the Borrower Representative or the Administrative Agent such documentation prescribed by applicable Legal Requirement (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower Representative or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Recipient has complied with such Recipient's obligations under FATCA or to determine the amount to deduct and withhold from such payment.   Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.   Notwithstanding anything to the contrary in this clause (D), the completion, execution and submission of such documentation by a Foreign Lender shall not be required if in such Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower Representative and the Administrative Agent in writing of its legal inability to do so.

(h)    <u>Treatment of Certain Refunds</u>.   If any party determines, in its sole discretion, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this <u>Section 2.12</u> (including by the payment of additional amounts pursuant to this <u>Section 2.12</u>), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).   Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.   Notwithstanding anything to the contrary in this paragraph (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid.   This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i)    <u>Survival</u>.   Each party's obligations under this <u>Section 2.12</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

Section 2.13    <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)    <u>Designation of a Different Lending Office</u>.   If any Lender requests compensation under <u>Section 2.10</u>, or requires the Borrowers to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.12</u>, then such Lender shall (at the request of the Borrower Representative) use reasonable efforts to designate a different

lending office for funding or booking its Advances hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.12, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      Replacement Lender.  If any Lender requests compensation under Section 2.10, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.12 and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 2.13(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort (and in the case of a Defaulting Lender, the Administrative Agent may) upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.7), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.10 or Section 2.12) and obligations under this Agreement and the related Credit Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i)      as to assignments required by the Borrowers, the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.7, unless such fee has been waived by the Administrative Agent;

(ii)      such Lender shall have received payment of an amount equal to the outstanding principal of its applicable Advances, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Credit Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)      in the case of any such assignment resulting from a claim for compensation under Section 2.10 or payments required to be made pursuant to Section 2.12, such assignment will result in a reduction in such compensation or payments thereafter;

(iv)      such assignment does not conflict with applicable Legal Requirement;

(v)      with respect to a Non-Consenting Lender, the proposed amendment, modification, waiver, consent or release with respect to this Agreement or any other Credit Document has been approved by the Majority Lenders and such agreement, amendment, waiver, consent or release can be effected as a result of such assignment (and, if applicable, one or more other assignments) contemplated by this Section; and

(vi)      no Lender may be replaced solely as a result of it being a Defaulting Lender if its Commitment is fully funded.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers or the Administrative Agent to require such assignment and delegation cease to apply.  Solely for purposes of effecting any assignment involving a Defaulting Lender under this Section 2.13 and to the extent permitted under applicable Legal Requirements, each Lender hereby designates and **appoints the Administrative Agent as true and lawful agent and attorney-in-fact, with full power and authority**, for and on behalf of and

in the name of such Lender to execute, acknowledge and deliver the Assignment and Acceptance required hereunder if such Lender is a Defaulting Lender and such Lender shall be bound thereby as fully and effectively as if such Lender had personally executed, acknowledged and delivered the same.

Section 2.14    Defaulting Lender.

(a)    Defaulting Lender Adjustments. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable Legal Requirement:

(i)    Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Majority Lenders.

(ii)    Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article 7 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 7.4 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower Representative may request (so long as no Default or Event of Default exists), to the funding of any Advance hereunder in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower Representative, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's current or potential future funding obligations with respect to Advances under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrowers as a result of any judgment of a court of competent jurisdiction obtained by the Borrowers against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.14(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.15    [Reserved].

Section 2.16    Status of Obligations; Perfection and Priority of Security Interests.

(a)    Superpriority Claims. The Obligations are, subject to the Carve-Out and the DIP Order, pursuant to section 364(c)(1) of the Bankruptcy Code, entitled (without the need to file a proof of claim or other request for payment) to a joint and several superpriority claim against the Debtors, with priority over any and all other obligations, liabilities, and indebtedness against the Debtors, now existing or hereafter arising, of any kind whatsoever, including on the proceeds of Avoidance Actions following entry of the Final DIP Order (but not the actions themselves), and including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of the Debtors, each Debtor's estate and any successor trustee, estate representative, or any creditor, in any of the Cases or any subsequent cases or

proceedings under the Bankruptcy Code (the "Lender Superpriority Claim"), and the Lender Superpriority Claim shall have recourse to and be payable from all prepetition and postpetition Properties of the Debtors, including, but not limited to, the Collateral.

(b) **Liens on Unencumbered Assets**. The Obligations are, subject to the Carve-Out and the DIP Order, pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first priority Lien on all Collateral that is not subject to valid, perfected, and non-avoidable Liens as of the Petition Date and such Liens securing the Obligations are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

(c) **Junior Lien on Certain Encumbered Assets**. The Obligations are, subject to the Carve-Out and the DIP Order, pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected Lien ("Junior Lien") on all Collateral (other than Collateral described in Section 2.16(b) or Section 2.16(d), as to which the Liens in favor of the Administrative Agent are entitled to the priority as described in such Sections) that is subject to valid and non-avoidable Liens as of the Petition Date that were permitted pursuant to (i) the terms of the Prepetition Credit Agreement (including the real estate securing the HMC Leasing/Iberia Loan Documents and the JPM/Knight Family Loan Documents, but excluding the Liens securing the Prepetition Credit Agreement) or (ii) with respect to statutory liens, applicable laws and which were senior to the Liens under the Prepetition Credit Agreement, in each case which were either perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code. The Junior Liens are junior to such valid, perfected, and non-avoidable Liens described in clauses (i) and (ii) above and are perfected without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing agreements, or other agreements.

(d) **Priming Lien on Certain Encumbered Assets**. The Obligations are, subject to the Carve-Out and the DIP Order, pursuant to section 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming Lien (the "Priming Lien") on all the Collateral on which (i) Liens were granted as security for the obligations under or in connection with the Prepetition Credit Agreement, or (ii) Liens were granted as of the Petition Date that were not permitted pursuant to the terms of the Prepetition Credit Agreement or (with respect to statutory liens) applicable law, all of which existing Liens (such Liens in clauses (i) and (ii) above, collectively, the "Primed Liens") shall be primed by and made subject and subordinate to the Priming Lien to be granted to the Administrative Agent for its and the Lenders' benefit, which Priming Lien also primes any Liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens. Such Priming Liens are perfected without necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements. For the avoidance of doubt, notwithstanding Section 2.16(c), the Priming Lien primes and is senior to the Primed Liens.

Section 2.17 **Carve-Out**. The priorities set forth in Section 2.16 are subject, in each case, only to the Carve-Out. All of the Liens and security interests granted to secure the Obligations and described in Section 2.16 shall be effective and perfected as of the Petition Date, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. The Debtors shall execute and deliver to the Administrative Agent (for recordation or filing, as appropriate) such mortgages, security agreements and pledges (and other security instruments), and be authorized pursuant to the DIP Order to file such financing statements and other instruments and documents, as shall be advisable (as determined by the Majority Lenders) to evidence and secure the Obligations. The cost of such recordation and filing shall be set forth in the DIP Budget.

Section 2.18 **Conversion to Exit Facility**. Upon the satisfaction or waiver of the conditions precedent to effectiveness set forth in the Exit Credit Agreement, automatically and without any further consent or action required by the Administrative Agent or any Lender, (a) each Loan hereunder shall be

deemed refunded, refinanced, replaced and issued as a loan under the Exit Credit Agreement, (b) in connection therewith the Borrowers, in their capacity as reorganized Borrowers, and each Guarantor, in its capacity as a reorganized Debtor, to the extent such Person is required under the Exit Credit Agreement to continue to be a guarantor in respect thereof, shall assume all obligations in respect of the Loans hereunder and all other obligations in respect hereof, (c) each Lender hereunder shall be a Lender under the Exit Credit Agreement and (d) this Agreement shall terminate and be superseded, refunded, refinanced and replaced by, and deemed amended and restated in its entirety substantially in the form of, the Exit Credit Agreement, and the Commitments hereunder shall terminate. Notwithstanding the foregoing, all obligations of the Borrowers and the other Credit Parties to the Administrative Agent and the Lenders under this Agreement and any other Credit Document (except, for the avoidance of doubt, the Exit Credit Agreement) which are expressly stated in this Agreement or such other Credit Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect. Each of the Credit Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent (at the direction of the Majority Lenders) may reasonably request to give effect to the provisions of this Section 2.18.

## ARTICLE 3
## CONDITIONS OF LENDING

Section 3.1    Conditions Precedent to Initial Borrowing.  The obligations of each Lender to make Loans hereunder on the Closing Date shall be subject to the conditions precedent that (or waiver thereof in accordance with Section 9.3):

(a)    Documentation.  The Administrative Agent (for further distribution to the Lenders) shall have received the following, duly executed by all the parties thereto, in form and substance satisfactory to the Administrative Agent and the Lenders:

(i)    this Agreement and all attached Exhibits and Schedules;

(ii)    [Reserved];

(iii)    certificates of insurance naming the Administrative Agent as loss payee with respect to property insurance, or additional insured with respect to liability insurance, and covering each Credit Parties' Properties with such insurance carriers, for such amounts and covering such risks that are acceptable to the Majority Lenders;

(iv)    a certificate from an authorized officer of the Borrower Representative dated as of the Closing Date stating that as of such date (A) all representations and warranties of each respective Borrower set forth in this Agreement and the other Credit Documents are true and correct, (B) no Default has occurred and is continuing; and (C) all conditions precedent set forth in this Section 3.1 have been met (or waived in accordance with Section 9.3);

(v)    a secretary's certificate from each Credit Party certifying to and attaching such Person's (A) officers' incumbency certificate, (B) authorizing resolutions, (C) organizational documents, and (D) governmental approvals, if any, with respect to the Credit Documents to which such Person is a party;

(vi)    [Reserved];

(vii)    a legal opinion of Heller, Draper, Patrick, Horn & Dabney, LLC as outside counsel to the Credit Parties, in form and substance acceptable to the Majority Lenders and addressed to the Secured Parties; and

(viii)    such other documents, governmental certificates, agreements, and lien searches as the Administrative Agent or any Lender may request;

(b)    Consents; Authorization; Conflicts. Each Credit Party shall have received any consents, permits, licenses and approvals required in accordance with applicable Legal Requirement, or in accordance with any document, agreement, instrument or arrangement to which any Credit Party is a party, in connection with the execution, delivery, performance, validity and enforceability of this Agreement and the other Credit Documents, each in form and substance satisfactory to the Majority Lenders;

(c)    Representations and Warranties. The representations and warranties contained in Article 4 and in each other Credit Document shall be true and correct on and as of the date of the Initial Borrowing (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(d)    Payment of Fees. Borrowers shall have paid the fees and expenses required to be paid as of the Closing Date in the DIP Agency Fee Letter and such fees and expenses required to be paid as of the Closing Date pursuant to Sections 2.6(c) and 9.1 or any other provision of a Credit Document;

(e)    Other Proceedings. Except for the Cases, no action, suit, investigation or other proceeding (including without limitation, the enactment or promulgation of a statute or rule) by or before any arbitrator or any Governmental Authority shall be threatened or pending and no preliminary or permanent injunction or order by a state or federal court shall have been entered (i) in connection with this Agreement, any other Credit Document, or any transaction contemplated hereby or thereby or (ii) which, in the judgment of the Majority Lenders, could reasonably be expected to result in a Material Adverse Change;

(f)    Material Adverse Change. Since December 31, 2016, there shall not have occurred any event, development or circumstance that has or could reasonably be expected to result in a Material Adverse Change;

(g)    No Default. No Default or Event of Default shall have occurred and be continuing;

(h)    Notice of Borrowing. The Administrative Agent shall have received a Notice of Borrowing from the Borrower Representative, with appropriate insertions and executed by a duly appointed Responsible Officer of the Borrower Representative;

(i)    USA Patriot Act. The Administrative Agent shall have received all documentation and other information that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(j)    Loan Limit. The amount of such Advance shall not exceed the Loan Limit then in effect;

(k)    Due Diligence. The Majority Lenders shall have completed and be satisfied in their sole discretion with the corporate (or other organizational) and financial due diligence of the Restricted Entities;

(l)     [Reserved];

(m)     [Reserved];

(n)     [Reserved];

(o)     DIP Budget. The Administrative Agent and the Lenders shall have received a 13-week debtor-in-possession operating budget and cash flow forecast broken down by week, containing line items of sufficient detail to reflect projected receipts and disbursements for such 13-week period, including estimated costs and expenses of a voluntary case pursuant to Chapter 11 of the Bankruptcy Code, substantially in the form of Exhibit G hereto and otherwise in form and substance satisfactory to the Majority Lenders in their sole discretion (the "Initial DIP Budget");

(p)     [Reserved];

(q)     Restructuring Support Agreement. The Restructuring Support Agreement shall have been duly executed by the Debtors and each other party thereto, all conditions to the effectiveness of the Restructuring Support Agreement shall have been satisfied or waived and the Restructuring Support Agreement shall be in full force and effect, subject to any necessary Bankruptcy Court approvals;

(r)     [Reserved];

(s)     Interim DIP Order. The Interim DIP Order shall have been entered by the Bankruptcy Court in the Cases within two days of the Petition Date and shall have been in form and substance satisfactory to the Majority Lenders, and shall be in full force and effect and shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the Majority Lenders;

(t)     [Reserved];

(u)     Petition Date. The Petition Date with respect to each Debtor shall have occurred, and the First Day Orders sought by the Debtors shall have been entered by the Bankruptcy Court and shall have been in form and substance satisfactory to the Majority Lenders;

(v)     Cash Management. All orders entered by the Bankruptcy Court pertaining to cash management (including the Cash Management Order), and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance satisfactory to the Majority Lenders; and

(w)     Chief Restructuring Officer. The Debtors shall have retained a chief restructuring officer acceptable to the Majority Lenders.

Section 3.2     Conditions Precedent to the Second Funding Availability Period.     The obligations of the Lenders to make Advances to the Borrowers hereunder during the Second Funding Availability Period are subject to the satisfaction of the following additional conditions precedent (or waiver thereof in accordance with Section 9.3):

(a)     the conditions precedent set forth in Section 3.1 have been satisfied (or waived in accordance with Section 9.3);

(b)      each of the representations and warranties contained in this Agreement and the other Credit Documents shall be true and correct in all material respects (provided that to the extent any representation and warranty is qualified as to "Material Adverse Effect" or otherwise as to "materiality", such representation and warranty is true and correct in all respects) on and as of the date of such Borrowing (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(c)      [Reserved];

(d)      no Default or Event of Default shall have occurred and be continuing or would result from such Borrowing;

(e)      the Restructuring Support Agreement shall be in full force and effect;

(f)      the making of such Advances shall not violate any material requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

(g)      all motions filed and orders entered after the Petition Date and prior to or on the date of the entry of the Final DIP Order shall be satisfactory in form and substance to the Majority Lenders;

(h)      the Final DIP Order shall be in form and substance satisfactory to the Majority Lenders authorizing and approving the DIP Facility and the transactions contemplated hereby, shall have been entered by the Bankruptcy Court on or before September 1, 2017, such Final DIP Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Lenders, and the Debtors shall be in compliance in all material respects with the DIP Order;

(i)      the amount of such Advance shall not exceed the Loan Limit then in effect; and

(j)      the Borrower shall have delivered to the Administrative Agent a Notice of Borrowing; and each statement or certification made in such Notice of Borrowing shall be true and correct in all material respects as of the date of such Borrowing.

Section 3.3      Conditions Precedent to the Third Funding Availability Period.  The obligations of the Lenders to make Advances to the Borrowers hereunder during the Third Funding Availability Period are subject to the satisfaction of the following additional conditions precedent (or waiver thereof in accordance with Section 9.3):

(a)      the conditions precedent set forth in Section 3.2 have been satisfied (or waived in accordance with Section 9.3);

(b)      each of the representations and warranties contained in this Agreement and the other Credit Documents shall be true and correct in all material respects (provided that to the extent any representation and warranty is qualified as to "Material Adverse Effect" or otherwise as to "materiality", such representation and warranty is true and correct in all respects) on and as of the date of such Borrowing (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(c)      [Reserved];

(d)      no Default or Event of Default shall have occurred and be continuing or would result from such Borrowing;

(e)      the Restructuring Support Agreement shall be in full force and effect;

(f)      the making of such Advances shall not violate any material requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently;

(g)      the amount of such Advance shall not exceed the Loan Limit then in effect;

(h)      the Disclosure Statement, in form and substance satisfactory to the Majority Lenders, shall have been approved by the Bankruptcy Court on or before October 23, 2017;

(i)      the Final DIP Order shall be in full force and effect and such Final DIP Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Majority Lenders, and the Debtors shall be in compliance in all material respects with the Final DIP Order; and

(j)      the Borrowers shall have delivered to the Administrative Agent a Notice of Borrowing; and each statement or certification made in such Notice of Borrowing shall be true and correct in all material respects as of the date of such Borrowing.

Section 3.4      <u>Pre-Petition Date Property Tax Loans</u>. The Lenders severally, but not jointly, may agree in their sole discretion to make Advances to the Borrowers under <u>Section 2.1(b)</u> subject to the satisfaction of the following additional conditions precedent (or waiver thereof in accordance with <u>Section 9.3</u>):

(a)      The Borrowers shall have previously proposed in writing to the Lenders an amount to be borrowed by the Borrowers under <u>Section 2.1(b)</u> to be used for the sole purpose of making payments in respect of pre-Petition Date property and ad valorem tax amounts, which amount has been subsequently approved by the Lenders for the advance of Loan in their sole discretion;

(b)      the conditions precedent set forth in <u>Sections 3.1</u> and <u>3.2</u> have been satisfied (or waived in accordance with Section 9.3);

(c)      each of the representations and warranties contained in this Agreement and the other Credit Documents shall be true and correct in all material respects (<u>provided</u> that to the extent any representation and warranty is qualified as to "Material Adverse Effect" or otherwise as to "materiality", such representation and warranty is true and correct in all respects) on and as of the date of such Borrowing (or as of such earlier date if the representation or warranty specifically relates to an earlier date);

(d)      [Reserved];

(e)      no Default or Event of Default shall have occurred and be continuing or would result from such Borrowing;

(f)      the Restructuring Support Agreement shall be in full force and effect;

(g)      the amount of such Advance shall not exceed the total amount determined by the Lenders in their sole discretion pursuant to subclause (a);

(h)     the making of such Advances shall not violate any material requirement of Law and shall not be enjoined, temporarily, preliminarily or permanently; and

(i)     the Borrower shall have delivered to the Administrative Agent a Notice of Borrowing, which among other things, shall certify that the proceeds of such Borrowing shall be used by the Borrowers for the sole purpose of making payments in respect of pre-Petition Date property and ad valorem tax amounts; and each statement or certification made in such Notice of Borrowing shall be true and correct in all material respects as of the date of such Borrowing.

Section 3.5     <u>Determinations Under Sections 3.1, 3.2, 3.3 and 3.4</u>. For purposes of determining compliance with the conditions specified in <u>Sections 3.1</u>, <u>3.2</u>, <u>3.3</u> and <u>3.4</u> each Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the Lenders unless an officer of the Administrative Agent responsible for the transactions contemplated by the Credit Documents shall have received written notice from such Lender prior to the Borrowings hereunder specifying its objection thereto and such Lender shall not have made available to the Administrative Agent such Lender's ratable portion of such Borrowings.

# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES

Each Credit Party hereto represents and warrants as follows:

Section 4.1     <u>Organization</u>.  Each Restricted Entity is duly and validly organized and existing and in good standing under the laws of its jurisdiction of incorporation or formation.  Each Restricted Entity is authorized to do business and is in good standing in all jurisdictions in which such qualifications or authorizations are necessary except where the failure to be so qualified or authorized could not reasonably be expected to result in a Material Adverse Change.  As of the Closing Date, each Restricted Entity's type of organization and jurisdiction of incorporation or formation are set forth on <u>Schedule 4.1</u>. As of the Closing Date, each Existing Equity Holder is set forth on <u>Schedule 1.1(a)</u>.

Section 4.2     <u>Authorization</u>.  Subject to entry of the DIP Order, the execution, delivery, and performance by each Credit Party of each Credit Document to which such Credit Party is a party and the consummation of the transactions contemplated thereby (a) are within such Credit Party's powers, (b) have been duly authorized by all necessary corporate, limited liability company or partnership action, (c) do not contravene any articles or certificate of incorporation or formation or bylaws, partnership or limited liability company agreement binding on or affecting such Credit Party, (d) do not contravene any law or any contractual restriction binding on or affecting such Credit Party, (e) do not result in or require the creation or imposition of any Lien prohibited by this Agreement, and (f) do not require any authorization or approval or other action by, or any notice or filing with, any Governmental Authority other than those that have been obtained.  At the time of each Advance, such Advance and the use of the proceeds of such Advance are within each Borrower's corporate, limited liability company or partnership powers, have been duly authorized by all necessary action and do not contravene (i) any Borrower's certificate of incorporation or formation, by-laws, limited liability company agreement or partnership agreement, or (ii) any Legal Requirement or any contractual restriction binding on or affecting any Borrower, will not result in or require the creation or imposition of any Lien prohibited by this Agreement, and do not require any authorization or approval or other action by, or any notice or filing with, any Governmental Authority other than those that have been obtained or provided.

Section 4.3     <u>Enforceability</u>.  The Credit Documents have each been duly executed and delivered by each Credit Party that is a party thereto and, upon entry of the DIP Order, each Credit

Document constitutes the legal, valid, and binding obligation of each Credit Party that is a party thereto enforceable against such Credit Party in accordance with its terms.

Section 4.4    <u>Financial Condition</u>.

(a)    The financial statements delivered to the Administrative Agent fairly present, in all material respects, the financial condition of the Borrowers and their respective Subsidiaries on a consolidated basis on the date thereof and the results of their operations and cash flows for the periods then ended, have been prepared in accordance with GAAP and do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading.  As of the date of the aforementioned financial statements, there were no material contingent obligations, liabilities for taxes, unusual forward or long-term commitments, or unrealized or anticipated losses of the applicable Persons, except as disclosed therein and adequate reserves for such items have been made in accordance with GAAP.

(b)    Since December 31, 2016, no event or circumstance that could reasonably be expected to cause a Material Adverse Change has occurred.

Section 4.5    <u>Ownership and Liens; Real Property</u>.  Each Restricted Entity (a) has good and marketable title to, or a valid and subsisting leasehold interest in, all real property, and good title to all personal Property, used in its business, and (b) none of the Property owned by any Borrower or any Subsidiary is subject to any Lien except Permitted Liens and the Carve-Out.  As of the Closing Date, no Borrower or any Subsidiary owns or leases any real property other than as previously disclosed to the Majority Lenders and all equipment (other than office equipment and equipment located on jobsites, in transit or off location for servicing, repairs or modifications) owned by any Borrower or any Subsidiary is located at the fee owned or leased real property previously disclosed to the Majority Lenders.

Section 4.6    <u>True and Complete Disclosure</u>.  All written factual information (other than projections or forward-looking statements) (whether delivered before or after the date of this Agreement) prepared by or on behalf of any Borrower or any Subsidiary and furnished to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement, any other Credit Document or any transaction contemplated hereby or thereby does not contain any material misstatement of fact or omits to state any material fact necessary to make the statements therein not misleading.  There is no fact known to any officer of any Restricted Entity on the date of this Agreement that has not been disclosed to the Administrative Agent and the Lenders that could reasonably be expected to result in a Material Adverse Change.

Section 4.7    <u>Litigation</u>.  Except for the Cases, there are no actions, suits, or proceedings pending or, to any Restricted Entity's knowledge, threatened against any Restricted Entity, at law, in equity, or in admiralty, or by or before any Governmental Authority, which could reasonably be expected to result in a Material Adverse Change.

Section 4.8    <u>Compliance with Agreements</u>.

(a)    No Borrower nor any Subsidiary is a party to any indenture, loan or credit agreement or any lease or any other types of agreement or instrument or subject to any charter or corporate restriction or provision of applicable Legal Requirement the performance of or compliance with which could reasonably be expected to cause a Material Adverse Change.

(b)    No Default has occurred and is continuing.

Section 4.9    Benefit Plans.

(a)    Pension Plans.  Except to the extent excused by the Bankruptcy Code or as a result of the filing of the Cases, (i) all Plans are in compliance in all material respects with all applicable provisions of ERISA, (ii) no Termination Event has occurred with respect to any Plan that would result in an Event of Default under Section 7.1(i), and, except for matters that could not reasonably be expected to result in a Material Adverse Change, each Plan has complied with and been administered in accordance with applicable provisions of ERISA and the Code, (iii) no "accumulated funding deficiency" (as defined in Section 302 of ERISA) has occurred, and for plan years after December 31, 2007, no unpaid minimum required contribution exists, and there has been no excise tax imposed under Section 4971 of the Code, (iv) to the knowledge of Restricted Entities, no Reportable Event has occurred with respect to any Multiemployer Plan, and each Multiemployer Plan has complied with and been administered in accordance with applicable provisions of ERISA and the Code, (v) the present value of all benefits vested under each Plan (based on the assumptions used to fund such Plan) did not, as of the last annual valuation date applicable thereto, exceed the value of the assets of such Plan allocable to such vested benefits in an amount that could reasonably be expected to  result in a Material Adverse Change, (vi) no Borrower nor any member of the Controlled Group has had a complete or partial withdrawal from any Multiemployer Plan for which there is any unsatisfied withdrawal liability that could reasonably be expected to result in a Material Adverse Change or an Event of Default under Section 7.1(j), and (vii) except for matters that could not reasonably result in a Material Adverse Change, as of the most recent valuation date applicable thereto, no Borrower nor any member of the Controlled Group would become subject to any liability under ERISA if such Borrower or any Subsidiary has received notice that any Multiemployer Plan is insolvent or in reorganization.

(b)    Welfare Plans.  Based upon GAAP existing as of the date of this Agreement and current factual circumstances, no Restricted Entity has any reason to believe that the annual cost during the term of this Agreement to any Borrower or any Subsidiary for post-retirement benefits to be provided to the current and former employees of any Borrower or any Subsidiary under welfare benefit plans (as defined in Section 3(1) of ERISA) could, in the aggregate, reasonably be expected to cause a Material Adverse Change.

Section 4.10    Environmental Condition.

(a)    Permits, Etc.  Each Restricted Entity (i) has obtained all material Environmental Permits necessary for the ownership and operation of its Properties and the conduct of its businesses; (ii)  has at all times been and is in material compliance with all terms and conditions of such Environmental Permits and with all other material requirements of applicable Environmental Laws; (iii) has not received written notice of any material violation or alleged material violation of any Environmental Law or Environmental Permit; and (iv)  is not subject to any actual or contingent Environmental Claim which could reasonably be expected to (individually or in the aggregate) result in a Material Adverse Change.

(b)    Certain Liabilities.  To each Restricted Entity's best knowledge, none of the present or previously owned or operated Property of any Borrower or any Subsidiary, wherever located, (i) has been placed on or proposed to be placed on the National Priorities List, the Comprehensive Environmental Response Compensation Liability Information System list, or their state or local analogs, or have been otherwise investigated, designated, listed, or identified as a potential site for removal, remediation, cleanup, closure, restoration, reclamation, or other Response activity under any Environmental Laws; (ii) is subject to a Lien, arising under or in connection with any Environmental Laws, that attaches to any revenues or to any Property owned or operated by any Restricted Entity, wherever located, which could reasonably be expected to (individually or in the aggregate) cause a Material Adverse Change; or (iii) has been the site of any Release of Hazardous Substances or Hazardous Wastes from present or past

operations which has caused at the site or at any third-party site any condition that (individually or in the aggregate) has resulted in or could reasonably be expected to result in the need for Response that could cause a Material Adverse Change.

(c)    Certain Actions.  Without limiting the foregoing, (i) all necessary material notices have been properly filed, and no further action is required under current applicable Environmental Law as to each Response or other restoration or remedial project undertaken by any Borrower, any Subsidiary or any of such Borrower's or such Subsidiary's former Subsidiaries on any of their presently or formerly owned or operated Property and (ii) the present and, to the Restricted Entities' best knowledge, future liability, if any, of any Borrower or of any Subsidiary which could reasonably be expected to arise in connection with requirements under Environmental Laws will not (individually or in the aggregate) result in a Material Adverse Change.

Section 4.11    Subsidiaries.  As of the Closing Date, no Borrower has any Subsidiary other than those listed on Schedule 4.11.

Section 4.12    Investment Company Act.  No Borrower nor any Subsidiary is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended.  No Borrower nor any Subsidiary is subject to regulation under any Federal or state statute, regulation or other Legal Requirement which limits its ability to incur Debt.

Section 4.13    Taxes.  Proper and accurate (in all material respects), federal, state, local and foreign tax returns, reports and statements required to be filed (after giving effect to any extension granted in the time for filing) by each Borrower and each Subsidiary or any member of the Affiliated Group as defined under Section 1504 of the Code (hereafter collectively called the "Tax Group") have been filed with the appropriate Governmental Authorities.  No Borrower nor any member of the Tax Group has given, or been requested to give, a waiver of the statute of limitations relating to the payment of any federal, state, local or foreign taxes or other impositions.  None of the Property owned by any Borrower or any other member of the Tax Group is Property which any Borrower or any member of the Tax Group is required to treat as being owned by any other Person pursuant to the provisions of Section 168(f)(8) of the Code.  Proper and accurate amounts have been withheld by the Borrowers and all other members of the Tax Group from their employees for all periods to comply in all material respects with the tax, social security and unemployment withholding provisions of applicable federal, state, local and foreign law.

Section 4.14    Permits, Licenses, etc.  Each Borrower and each Subsidiary possesses all permits, licenses, patents, patent rights or licenses, trademarks, trademark rights, trade names rights, and copyrights which are material to the conduct of its business.  Each Borrower and each Subsidiary manages and operates its business in accordance with all applicable Legal Requirements except where the failure to so manage or operate could not reasonably be expected to result in a Material Adverse Change; provided that this Section 4.14 does not apply with respect to Environmental Permits.

Section 4.15    Use of Proceeds.

(a)    The Borrowers will use the proceeds of the Advances to (i) pay reasonable costs, fees and expenses, including fees of the Administrative Agent and the Lenders, associated with the transactions contemplated by this Agreement and the other Credit Documents, (ii) pay for fees, costs, and expenses incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code, (iii) provide ongoing working capital requirements of the Debtors and to pay for fees, costs, and expenses relating to the Cases (other than fees, costs, and expenses referred to in clause (ii)), and (iv) in the case of Advances made under Section 2.1(b), make payments in respect of pre-Petition

Date property and ad valorem tax amounts (subject to the approval of the Lenders), each in accordance with the DIP Budget (subject to Permitted Variances).

(b)      No Restricted Entity is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U).

(c)      No proceeds of any Advance will be used to purchase or carry any margin stock in violation of Regulation T, U or X.

Section 4.16      Condition of Property; Casualties.  The material Properties used or to be used in the continuing operations of each Borrower and each Subsidiary, are in good working order and condition, normal wear and tear excepted.  Neither the business nor the material Properties of any Borrower nor any Subsidiary has been affected as a result of any fire, explosion, earthquake, flood, drought, windstorm, accident, strike or other labor disturbance, embargo, requisition or taking of such Property or cancellation of contracts, permits or concessions by a Governmental Authority, riot, activities of armed forces or acts of God or of any public enemy, which effect could reasonably be expected to cause a Material Adverse Change.

Section 4.17      Insurance.  Each Borrower and each Subsidiary carries insurance (which may be carried by Holdings on a consolidated basis) with reputable insurers in respect of its respective Properties, in such amounts and against such risks as is customarily maintained by other Persons of similar size engaged in similar businesses.

Section 4.18      [Reserved].

Section 4.19      Foreign Assets Control Regulations, etc.

(a)      No part of the proceeds of the Advances will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.

(b)      No Borrower nor any Subsidiary, nor to the knowledge of any Borrower or Subsidiary, any director, officer, employee, agent, Affiliate or representative thereof is an individual or entity that is, or is owned or controlled by Persons that are (i) the target of any sanctions administered or enforced by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") or  the U.S. Department of State (collectively, "Sanctions");  (ii) located, organized or resident in a country or territory that is, or whose government is, the subject of Sanctions, including, without limitation Cuba, Iran, North Korea, Sudan and Syria); or (iii) engages or will engage in any dealings or transactions, or is or will be otherwise associated, with any such Person other than to the extent permitted under all applicable law.  Each Borrower and each Subsidiary is in compliance, in all material respects, with the USA Patriot Act.

(c)      Each Borrower and each Subsidiary is in compliance with any United States laws or regulations relating to money laundering or terrorist financing, including, without limitation, the Bank Secrecy Act, 31 U.S.C. sections 5301 et seq.; the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56 (a/k/a the USA Patriot Act); Laundering of Monetary Instruments, 18 U.S.C. section 1956; Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. section 1957; the Financial Recordkeeping and Reporting of Currency and Foreign Transactions Regulations, 31 C.F.R. Part 103; and any similar laws or regulations currently in force or hereafter enacted.

(d)      No part of the proceeds of the Advances will be used, lent, contributed, or otherwise made available, directly or indirectly, to fund: (i) any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions; (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise); or (iii) any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to a Restricted Entity.

Section 4.20      Compliance with Laws.  Each Borrower and each of its respective Subsidiaries is in compliance with all federal, state and local laws and regulations (including Environmental Laws and the Patriot Act) that are applicable to the operations and Property of any Restricted Entity and has maintained all related permits necessary for the ownership and operation of each Restricted Entity's Property and business, except in any case where the failure to so comply could not reasonably be expected to result in a Material Adverse Change.

Section 4.21      [Reserved]

Section 4.22      Budgets and Forward-Looking Statements.   The DIP Budget and any forward-looking statements, estimates, and pro forma financial information contained in this Agreement, any other Credit Document, or any other document, certificate, or statement furnished to the Administrative Agent or the Lenders are based upon good faith estimates and assumptions believed by the Debtors to be reasonable at the time made, it being recognized by the Administrative Agent and the Lenders that the any such forward-looking statements, estimates, and pro forma financial information are not to be viewed as facts and are subject to material contingencies and assumptions, many of which are beyond the control of the Debtors, and that actual results during the period or periods covered by any such forward-looking statements, estimates, and pro forma financial information may differ materially from the projected results.

Section 4.23      Orders.

(a)      The Interim DIP Order is (and the Final DIP Order when entered will be) in full force and effect, and has not been reversed, vacated, stayed or modified without the prior written consent of the Majority Lenders.

(b)      The Interim DIP Order is (and the Final DIP Order when entered will be) effective to create, in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid, binding and enforceable perfected security interest in and Lien on the Collateral and the proceeds and products thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents.

(c)      No order has been entered in the Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code or (iii) to convert any of the Cases to a Chapter 7 case or to dismiss any Case, in each case, without the prior written consent of the Majority Lenders.

# ARTICLE 5
# AFFIRMATIVE COVENANTS

So long as any Obligation shall remain unpaid or any Lender shall have any Commitment hereunder, each Credit Party agrees to comply with the following covenants.

Section 5.1    <u>Organization</u>.  Each Credit Party shall, and shall cause each of its respective Subsidiaries to, preserve and maintain its partnership, limited liability company or corporate existence, rights, franchises and privileges in the jurisdiction of its organization, and qualify and remain qualified as a foreign business entity in each jurisdiction in which qualification is necessary in view of its business and operations or the ownership of its Properties and where failure to qualify could reasonably be expected to  cause a Material Adverse Change; <u>provided</u>, however, that nothing herein contained shall prevent any transaction permitted by <u>Section 6.7</u> or <u>Section 6.8</u>.

Section 5.2    <u>Reporting</u>.

(a)    [<u>Reserved</u>].

(b)    [<u>Reserved</u>].

(c)    [<u>Reserved</u>].

(d)    [<u>Reserved</u>].

(e)    <u>Defaults</u>.  The Borrowers shall provide to the Administrative Agent promptly, but in any event within three Business Days after the occurrence thereof, a notice of each Default or Event of Default known to the Responsible Officer of any Borrower or any Subsidiary, together with a statement of a Responsible Officer of such Borrower or Borrowers setting forth the details of such Default or Event of Default and the actions which the Restricted Entities have taken and propose to take with respect thereto;

(f)    <u>Other Creditors</u>.  The Borrowers shall provide to the Administrative Agent promptly after the giving or receipt thereof, copies of any default notices given or received by any Borrower or any Subsidiary pursuant to the terms of any indenture, loan agreement, credit agreement, or similar agreement;

(g)    <u>Material Agreements</u>.   The Borrowers shall provide to the Administrative Agent promptly after the giving or receipt thereof, copies of any default notices, demand for payment, termination notices or other material notices given or received by any Borrower or any Subsidiary pursuant to the terms of any material agreement;

(h)    <u>Litigation</u>.  The Borrowers shall provide to the Administrative Agent promptly after the commencement thereof, notice of all actions, suits, and proceedings before any Governmental Authority, affecting any Borrower or any Subsidiary or any of their respective Properties (other than the Cases) that has a claim for damages in excess of $100,000 (other than claims as to which the relevant insurance companies have affirmatively confirmed coverage) or that could otherwise result in a cost, expense or loss to any Borrower or any Subsidiary in excess of $100,000 (other than claims as to which the relevant insurance companies have affirmatively confirmed coverage);

(i)    <u>Environmental Notices</u>.  Promptly upon, and in any event no later than 15 days after, the receipt thereof, or the acquisition of knowledge thereof, by any Borrower or any Subsidiary, the

17-51014 - #87  File 08/11/17  Enter 08/11/17 16:36:13  Main Document  Pg 131 of 216

Borrowers shall provide the Administrative Agent with a copy of any form of request, claim, complaint, order, notice, summons or citation received from any Governmental Authority or any other Person, (i) concerning violations or alleged violations of Environmental Laws, which seeks to impose liability therefore in excess of $100,000, (ii) concerning any action or omission on the part of any Borrower, any Subsidiary, or any of their respective former Subsidiaries in connection with Hazardous Waste or Hazardous Substances which could reasonably result in the imposition of liability in excess of $100,000, or requiring that action be taken to respond to or clean up a Release of Hazardous Substances or Hazardous Waste into the environment and such action or clean-up could reasonably be expected to exceed $100,000, including without limitation any information request related to, or notice of, potential responsibility under CERCLA, or (iii) concerning the filing of a Lien upon, against or in connection with any Borrower, any Subsidiary, or any of their respective former Subsidiaries, or any of their respective material leased or owned Property, wherever located;

(j)   <u>Material Changes</u>.  The Borrowers shall provide to the Administrative Agent prompt written notice of any event, development or circumstance that has had or could reasonably be expected to have a Material Adverse Change;

(k)   <u>Termination Events</u>.  As soon as possible and in any event (i) within 30 days after any Borrower, any Subsidiary or any member of the Controlled Group knows or has reason to know that any Termination Event described in clause (a) of the definition of Termination Event with respect to any Plan has occurred, and (ii) within 10 days after any Restricted Entity or any member of the Controlled Group knows or has reason to know that any other Termination Event with respect to any Plan has occurred, the Borrowers shall provide to the Administrative Agent a statement of an authorized officer of the Borrower Representative describing such Termination Event and the action, if any, which the Borrowers or any Affiliate of the Borrowers proposes to take with respect thereto;

(l)   <u>Termination of Plans</u>.  Promptly and in any event within five Business Days after receipt by any Borrower, any Subsidiary or any member of the Controlled Group of a notice from the PBGC of the PBGC's intention to terminate any Plan or to have a trustee appointed to administer any Plan, the Borrowers shall provide to the Administrative Agent a copy of such notices;

(m)   <u>Other ERISA Notices</u>.  Promptly and in any event within five Business Days after receipt by any Borrower, any Subsidiary or any member of the Controlled Group of a notice from a Multiemployer Plan sponsor concerning the imposition or amount of withdrawal liability imposed on any Restricted Entity or any member of the Controlled Group pursuant to Section 4202 of ERISA, the Borrower Representative shall provide the Administrative Agent a copy of such notice;

(n)   <u>Other Governmental Notices</u>.  Promptly and in any event within five Business Days after receipt thereof by any Borrower or Subsidiary, the Borrowers shall provide to the Administrative Agent a copy of any notice, summons, citation, or proceeding seeking to modify in any material respect, revoke, or suspend any material contract, license, permit, or agreement with any Governmental Authority;

(o)   <u>Disputes; etc</u>.  The Borrowers shall provide to the Administrative Agent prompt written notice of (i) any claims, legal or arbitration proceedings, proceedings (other than the Cases) before any Governmental Authority, or disputes, or to the knowledge of any Borrower or Subsidiary, any such actions threatened, or affecting any Restricted Entity, which, if adversely determined, could reasonably be expected to cause a Material Adverse Change, or any material labor controversy of which any Borrower or Subsidiary has knowledge resulting in or reasonably considered to be likely to result in a strike against any Borrower or Subsidiary, and (ii) any claim, judgment, Lien or other encumbrance (other than a Permitted Lien) affecting any Property of a Restricted Entity (other than the Cases), if the value of the claim, judgment, Lien, or other encumbrance affecting such Property shall exceed $100,000 and which is

not subject to the automatic stay in the Cases (other than claims, judgments, Liens, or other encumbrances as to which the relevant insurance companies have affirmatively confirmed coverage);

(p)     Management Letters; Other Accounting Reports.  Promptly upon receipt thereof by any Borrower or any Subsidiary, the Borrowers shall provide to the Administrative Agent a copy of each other report or letter submitted to any Borrower or any Subsidiary by independent accountants in connection with any annual, interim or special audit made by them of the books of any Borrower or any Subsidiary, and a copy of any response by any Borrower or any Subsidiary, or the board of directors or managers (or other applicable governing body) of any Borrower or any Subsidiary, to such letter;

(q)     Other Information.  Subject to the confidentiality provisions of Section 9.8, the Borrowers shall provide to the Administrative Agent such other information respecting the business, operations, or Property of any Borrower or any Subsidiary, financial or otherwise, as any Lender through the Administrative Agent may request;

(r)     Monthly Financials.  The Borrowers shall provide, or shall cause to be provided, to the Administrative Agent, as soon as available, but in any event within 30 days after the end of each calendar month (commencing with the month ended July 31, 2017), (i) consolidated and consolidating balance sheet of the Borrowers and their respective Subsidiaries as of the end of such month, (ii) the related consolidated and consolidating statements of income or operations, shareholder's equity and cash flows (provided that Holdings, Leasing and Enterprises shall each be required to provide only a consolidated statement of cash flows with respect to itself and its respective Subsidiaries, if any) for such month, all in reasonable detail, such consolidated statements to be certified by the chief executive officer or the chief financial officer of the Borrower Representative as (A) fairly presenting, in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Borrowers and their respective Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, and do not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading, and (B) showing that there were no material contingent obligations, liabilities for taxes, unusual forward or long term commitments, or unrealized or anticipated losses of the Borrowers and their respective Subsidiaries, except as disclosed therein and adequate reserves for such items have been made in accordance with GAAP, and (iii) a report showing consolidated EBITDA as of the end of such month for each of Holdings, Leasing and Enterprises and its respective Subsidiaries, if any;

(s)     DIP Budget; Variance Reports; Accounts Payable Aging; Accounts Receivable Aging. The Borrowers shall provide, or shall cause to be provided, to the Administrative Agent and the Lenders, (i) on or before September 4, 2017 and at four-week intervals thereafter, an updated DIP Budget substantially in the form of the Initial DIP Budget and otherwise in form and substance satisfactory to the Majority Lenders that shall include actual receipts and expenditures for (A) the prior two weeks for the first of such updated DIP Budget provided after the Petition Date and (B) thereafter, the prior three weeks, which proposed updated DIP Budget, upon written approval by the Administrative Agent, at the direction of the Majority Lenders, shall become the DIP Budget effective as of the first day of the next week, (ii) on each Testing Date, a Variance Report and (iii) on each Testing Date, an accounts payable aging and an account receivable aging through the Friday of the prior week;

(t)     Cash Balances. On the second Business Day of each week, the Borrowers shall provide the Administrative Agent with a report in form and substance reasonably acceptable to the Administrative Agent which shall reflect the cash balances of the Borrowers and their respective Subsidiaries for each deposit account, securities account and commodity account as of the end of each Business Day of the prior week;

17-51014 - #87  File 08/11/17  Enter 08/11/17 16:36:13  Main Document  Pg 133 of 216

(u)     Weekly Lender Calls. On the last Business Day of each week (unless waived by the Majority Lenders), the Borrowers (including key management) shall host a weekly conference call for Lenders during which time the Borrowers will review the financial performance of the previous week and the Borrowers' and their Subsidiaries' financial condition; and

(v)     Sale Offers of Debtors' Properties. Promptly upon receipt thereof, copies of any proposals, term sheets or any other indications of interest received by the Debtors for the purchase of any Properties of the Debtors (including, without limitation, with respect to the real property located at (i) 2288 E. County Rd. 30-A, Santa Rosa Beach, FL, (ii) the SE Corner of Interstate Hwy. 40 and N. Cimarron Rd., Oklahoma City, OK; and (iii) 507 Park Road, Frierson, LA).

Section 5.3     Insurance.

(a)     Each Borrower shall, and shall cause each Subsidiary to, carry and maintain all such other insurance in such amounts and against such risks as is customarily maintained by other Persons of similar size engaged in similar businesses and acceptable to the Majority Lenders and with reputable insurers acceptable to the Majority Lenders.

(b)     Copies of all policies of insurance or certificates thereof covering the property or business of each Borrower and each of its respective Subsidiaries, and endorsements and renewals thereof, certified as true and correct copies of such documents by a Responsible Officer of each respective Borrower shall be delivered by the Borrower Representative to and retained by the Administrative Agent. All policies of property insurance with respect to the Collateral either shall have attached thereto a lender's loss payable endorsement in favor of the Administrative Agent for its benefit and the ratable benefit of the Secured Parties or name the Administrative Agent as loss payee for its benefit and the ratable benefit of the Secured Parties, in either case, in form and substance satisfactory to the Majority Lenders, and all policies of liability insurance shall name the Administrative Agent for its benefit and the ratable benefit of the Secured Parties as an additional insured and shall provide for a waiver of subrogation in favor of the Administrative Agent for its benefit and the ratable benefit of the Secured Parties. All policies or certificates of insurance shall set forth the coverage, the limits of liability, the name of the carrier, the policy number, and the period of coverage. All such policies held by the Credit Parties shall contain a provision that notwithstanding any contrary agreements between any Borrower, any Subsidiary, and the applicable insurance company, such policies will not be canceled or allowed to lapse without renewal without at least 30 days' (or such shorter period as may be accepted by the Majority Lenders) prior written notice to the Administrative Agent. Each Borrower shall, and shall cause each other Credit Party to ensure that each of its respective policies of liability or hazard insurance (i) extends coverage to the Administrative Agent (for the benefit of the Secured Parties) for bodily injury, property damage, or personal injury, and (ii) waives the right of the insurance carrier to recover against the Administrative Agent or any Secured Party. Each Borrower shall, and shall cause each other Credit Party to, cause the insurers under each of its policies of property insurance to waive their subrogation rights in connection with such policies.

(c)     [Reserved].

(d)     All proceeds of insurance, including any casualty insurance proceeds, property insurance proceeds, proceeds from actions, and any other proceeds, shall be paid directly to the Administrative Agent and if necessary, assigned to the Administrative Agent, to be applied in accordance with Section 7.6 of this Agreement, whether or not the Obligations are then due and payable.

(e)     In the event that any insurance proceeds are paid to any Borrower or any Subsidiary in violation of clause (d), such Borrower shall, or shall cause the applicable Subsidiary to, hold the proceeds

in trust for the Administrative Agent, segregate the proceeds from the other funds of such Credit Party, and promptly pay the proceeds to the Administrative Agent with any necessary endorsement. Upon the request of the Administrative Agent, each Credit Party shall execute and deliver to the Administrative Agent any additional assignments and other documents as may be necessary or desirable to enable the Administrative Agent to directly collect the proceeds as set forth herein.

Section 5.4    Compliance with Laws.  Each Borrower shall, and shall cause each of its Subsidiaries to, comply with all federal, state, and local laws and regulations (including Environmental Laws and the Patriot Act) that are applicable to the operations and Property of any Restricted Entity and to maintain all related permits necessary for the ownership and operation of each Restricted Entity's Property and business, except in any case where the failure to so comply could not reasonably be expected to result in a Material Adverse Change.

Section 5.5    Taxes.  Each Borrower shall, and shall cause each of its Subsidiaries to pay and discharge all material taxes, assessments, and other charges and claims related thereto imposed on any Borrower or Subsidiary prior to the date on which penalties attach other than any tax, assessment, charge, or claim which is being contested in good faith and for which adequate reserves have been established in compliance with GAAP.

Section 5.6    [Reserved].

Section 5.7    Security.  Each Credit Party agrees that at all times before the termination of this Agreement, payment in full of the Obligations and termination in full of the Commitments, the Administrative Agent shall have a security interest in the Collateral to secure the performance and payment of the Obligations with the status and priority described in Section 2.16.

Section 5.8    [Reserved].

Section 5.9    Records; Inspection.  Each Borrower shall, and shall cause each of its Subsidiaries to maintain proper, complete and consistent books of record with respect to such Person's operations, affairs, and financial condition.  From time to time upon reasonable prior notice, each Borrower shall permit any Lender and shall cause each of its Subsidiaries to permit any Lender, at such reasonable times and intervals and to a reasonable extent and under the reasonable guidance of officers of or employees delegated by officers of such Borrower or such Subsidiary, to, subject to any applicable confidentiality considerations, examine and copy the books and records of such Borrower or such Subsidiary, to visit and inspect the Property of such Borrower or such Subsidiary, and to discuss the business operations and Property of such Borrower or such Subsidiary with the officers and directors thereof.

Section 5.10    Maintenance and Operation of Property.  Subject to any necessary order or authorization of the Bankruptcy Court, each Borrower shall, and shall cause each of its Subsidiaries to, maintain their owned, leased, or operated Property in good condition and repair in accordance with prudent industry standards, normal wear and tear excepted; and shall abstain from, and cause each of its Subsidiaries to abstain from, knowingly or willfully permitting the commission of waste or other injury, destruction, or loss of natural resources, or the occurrence of pollution, contamination, or any other condition in, on or about the owned or operated Property involving the Environment that could reasonably be expected to result in Response activities and that could reasonably be expected to result in a Material Adverse Change.

Section 5.11    [Reserved].

Section 5.12    [Reserved].

Section 5.13    <u>Material Contracts</u>.    Subject to the DIP Budget covenant in <u>Section 6.18</u>, including Permitted Variances and any necessary Bankruptcy Court approval and except to the extent excused by the applicable provisions of the Bankruptcy Code or order of the Bankruptcy Court, each Borrower shall, and shall cause each of its Subsidiaries to (a) perform and observe all the terms and provisions of each material contract to be performed or observed by it, (b) maintain each such agreement in full force and effect, (c) enforce each such agreement in accordance with its terms, and (d) upon request of the Administrative Agent, make to each other party to each such agreement such demands and requests for information and reports or for action as such Credit Party is entitled to make under such agreement.

Section 5.14    <u>Further Assurances</u>.    The Borrowers shall, and shall cause each of their respective Subsidiaries to, cure promptly any defects in the creation and issuance of the Notes and the execution and delivery of the Credit Documents and this Agreement. Each Borrower hereby authorizes the Lenders or the Administrative Agent to file any financing statements without the signature of such Borrower to the extent permitted by applicable Legal Requirement in order to perfect or maintain the perfection of any security interest granted under any of the Credit Documents. In the event that, after the Petition Date, (i) any Borrower or any other Credit Party creates or acquires a Domestic Subsidiary, or (ii) any Domestic Subsidiary of any Borrower files a voluntary petition for relief under the Bankruptcy Code, the Borrowers, at the Borrowers' expense, shall promptly cause such Domestic Subsidiary to become a Guarantor hereunder by executing and delivering the Guaranty Agreement. The Borrowers, at the Borrowers' expense, will, and will cause each of their respective Subsidiaries to, promptly execute and deliver to the Administrative Agent upon request all such other documents, agreements and instruments to comply with or accomplish the covenants and agreements of any Borrower or any Subsidiary, as the case may be, in the Credit Documents and this Agreement, or to make any recordings, to file any notices or obtain any consents, all as may be necessary or appropriate in connection therewith or to enable the Administrative Agent to exercise and enforce its rights and remedies with respect to any Collateral.

Section 5.15    <u>Bankruptcy Filings</u>.    Not less than two Business Days prior to the filing thereof, Borrowers shall deliver to the Administrative Agent and the Lenders and their counsel copies of all material pleadings, motions and other documents to be filed with the Bankruptcy Court on behalf of the Debtors in the Cases.

Section 5.16    [Reserved].

Section 5.17    <u>Cash Management</u>.    The Borrowers and the other Debtors shall use a cash management system as approved by the Bankruptcy Court in form and substance satisfactory to the Majority Lenders.

Section 5.18    <u>First and Second Day Orders</u>.    The Borrowers shall cause all proposed First Day Orders, "second day" orders, and all other orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and acceptable to the Majority Lenders in all respects; it being understood and agreed that the forms of orders approved by the Majority Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement in all respects and are acceptable.

# ARTICLE 6
# NEGATIVE COVENANTS

So long as any Obligation shall remain unpaid or any Lender shall have any Commitment hereunder, each Credit Party agrees to comply with the following covenants.

Section 6.1    Debt.  No Borrower shall, nor shall it permit any of its Subsidiaries to, create, assume, incur, suffer to exist, or in any manner become liable, directly, indirectly, or contingently in respect of, any Debt other than the following (collectively, the "Permitted Debt"):

(a)    the Obligations;

(b)    Debt in the form of accounts payable to trade creditors of Restricted Entities for goods or services and current operating liabilities (other than for borrowed money) which, in each case, is incurred in the ordinary course of business, as presently conducted and is not more than 90 days past due unless contested in good faith by appropriate proceedings and adequate reserves for such items have been made in accordance with GAAP regardless of whether such reserves are required thereunder;

(c)    purchase money indebtedness or Capital Leases incurred by any Restricted Entity for equipment prior to the Petition Date and existing on the Closing Date;

(d)    Debt arising from the endorsement of instruments for collection in the ordinary course of business;

(e)    the Permitted Iberia Debt and the Permitted JPMorgan Debt;

(f)    other Debt not described above that was incurred prior to the Petition Date and is existing on the Closing Date (including Debt incurred or arising under the Prepetition Credit Agreement) and has been identified to the Majority Lenders; and

(g)    other Debt permitted under the Restructuring Support Agreement.

Section 6.2    Liens.  No Borrower shall, nor shall it permit any of its Subsidiaries to, create, assume, incur, or suffer to exist any Lien on the Property of any Restricted Entity, whether now owned or hereafter acquired, or assign any right to receive any income, other than the following (collectively, the "Permitted Liens"):

(a)    Liens securing the Obligations;

(b)    Liens imposed by law, such as materialmen's, mechanics', carriers', workmen's and repairmen's liens, and other similar liens arising in the ordinary course of business or incident to the exploration, development, operation and maintenance of oil and gas Properties each of which is securing obligations of a Restricted Entity which are not overdue for a period of more than 30 days or are being actively contested in good faith by appropriate procedures or proceedings and for which adequate reserves have been established in accordance with GAAP;

(c)    Liens arising in the ordinary course of business out of pledges or deposits under workers compensation laws, unemployment insurance, old age pensions, or other social security or retirement benefits, or similar legislation to secure public or statutory obligations of a Restricted Entity;

(d) Liens for taxes, assessment, or other governmental charges owing by a Restricted Entity which are not yet due and payable or which are being actively contested in good faith by appropriate proceedings and adequate reserves for such items have been made in accordance with GAAP;

(e) Liens existing on the Closing Date and securing purchase money debt or Capital Lease obligations permitted under Section 6.1(c); provided that each such Lien encumbers only the Property purchased in connection with the creation of any such purchase money debt or the subject of any such Capital Lease, and all proceeds thereof (including insurance proceeds), and the amount secured thereby is not increased;

(f) encumbrances consisting of minor easements, zoning restrictions, or other restrictions on the use of real property that do not (individually or in the aggregate) materially affect the value of the Properties encumbered thereby or materially impair the ability of any Restricted Entity to use such Properties in its business, and none of which is violated in any material aspect by existing or proposed structures or land use;

(g) contractual Liens encumbering the Properties of Knight Resources, LLC, a Louisiana limited liability company, or El Caballero which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, royalty agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the oil and gas business and are for claims which are not delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP, provided that any such Lien referred to in this clause does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by such Restricted Entity or materially impair the value of such Property subject thereto;

(h) Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies and burdening only deposit accounts or other funds maintained by a Restricted Entity with a depositary institution and which are within the general parameters customary in the banking industry;

(i) Liens on cash or securities pledged to secure performance of tenders, surety and appeal bonds, government contracts, performance and return of money bonds, bids, trade contracts, leases, statutory obligations, regulatory obligations and other obligations of a like nature incurred by a Restricted Entity in the ordinary course of business;

(j) judgment and attachment Liens that secure judgments or other obligations not in excess of $100,000, provided that (i) any appropriate legal proceedings which may have been duly initiated for the review of such judgment shall not have been finally terminated or the period within which such proceeding may be initiated shall not have expired and (ii) no action to enforce such Lien has been commenced;

(k) Liens not described above arising prior to the Petition Date and existing on the Closing Date which secure the Debt arising under the Prepetition Credit Agreement, the Permitted Iberia Debt or the Permitted JPMorgan Debt; and

(l)     other Liens not described above that are permitted under the Restructuring Support Agreement.

Section 6.3     Investments.  No Borrower shall, nor shall it permit any of its Subsidiaries to, make or hold any direct or indirect Investment, other than the following (collectively, the "Permitted Investments"):

(a)     Investments by a Restricted Entity in the form of trade credit to customers of such Restricted Entity arising in the ordinary course of business and represented by accounts from such customers;

(b)     Investments existing on the Closing Date in Subsidiaries as of the Closing Date; provided that, the respective amounts of such loans, advances, capital contributions, investments, purchases and commitments shall not be increased (other than appreciation); and

(c)     Capital Expenditures permitted under Section 6.18.

Section 6.4     Acquisitions.  No Borrower shall, nor shall it permit any of its Subsidiaries to, make any Acquisition in a single transaction or related series of transactions.

Section 6.5     Agreements Restricting Liens.  No Borrower shall, nor shall it permit any of its Subsidiaries to, create, incur, assume or permit to exist any contract, agreement or understanding (other than (i) this Agreement, (ii) the DIP Order, (iii) the Prepetition Credit Agreement and the loan documents related thereto, (iv) the HMC Leasing/Iberia Loan Documents as in effect on the date hereof, (v) the JPM/Knight Family Loan Documents as in effect on the date hereof, (vi) agreements governing Debt permitted by Section 6.1(c) to the extent such restrictions govern only the Property (and the proceeds thereof) financed pursuant to such Debt, (vii) any prohibition or limitation that exists pursuant to applicable requirements of a Governmental Authority, (viii) any prohibition or limitation that restricts subletting or assignment of leasehold interests contained in any lease governing a leasehold interest of a Borrower or a Subsidiary and customary provisions in other contracts restricting assignment thereof, and (ix) any prohibition or limitation that exists in any contract to which a Restricted Entity is a party on the date hereof so long as (a) such prohibition or limitation is generally applicable and does not specifically address any of the Obligations or the Liens securing the Obligations, and (b) the noncompliance of such prohibition or limitation would not reasonably be expected to be adverse to the Administrative Agent or the Lenders) which in any way prohibits or restricts the granting, conveying, creation or imposition of any Lien on any of its Property, whether now owned or hereafter acquired, to secure the Obligations or restricts any Subsidiary from paying Restricted Payments to its parent company that is a Restricted Entity, or which requires the consent of or notice to other Persons in connection therewith.

Section 6.6     Use of Proceeds.  No Borrower shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Advances in any manner or for any purpose other than as set forth in Section 4.15. No Borrower shall, nor shall it permit any of its Subsidiaries to, use the proceeds of the Advances to fund the allowed fees and expenses of legal counsel and financial advisors to the Debtors and any official committee in excess of $4,625,000 in the aggregate without the consent of the Majority Lenders. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, use any part of the proceeds of Advances for any purpose which violates, or is inconsistent with, Regulations T, U, or X.  No proceeds of any Advance shall be used in any manner that would, after giving effect to such use, prevent the Borrowers from making the representations and warranties provided in Section 4.19. No Borrower shall, nor shall it permit any of its Subsidiaries to, use, lend, contribute or otherwise make available any part of the proceeds of the Advances, to fund: (i)  any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of

Sanctions; (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Loans, whether as underwriter, advisor, investor, or otherwise); or (iii) any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to a Restricted Entity. Notwithstanding anything to the contrary, no portion of the Advances or the Collateral (including any cash collateral) shall be used (A) to challenge the validity, perfection, priority, extent or enforceability of the Obligations under the DIP Facility or the obligations under the Prepetition Credit Agreement, (B) to investigate or assert any other claims or causes of action against the Administrative Agent, any Lender or any other agent or holder of any such obligations, except as agreed by the Administrative Agent and the Majority Lenders or (C) for any act which has the effect of materially or adversely modifying or compromising the rights and remedies of the Administrative Agent or the Lenders or any such party with respect to the DIP Facility or any Credit Document (as defined in the Prepetition Credit Agreement).

Section 6.7    Corporate Actions; Accounting Changes.

(a)    Except pursuant to an Acceptable Plan of Reorganization, no Borrower shall, nor shall it permit any of its respective Subsidiaries to, merge or consolidate with or into any other Person.

(b)    Except pursuant to an Acceptable Plan of Reorganization, no Borrower shall, nor shall it permit any of its Subsidiaries to, (i) change its name, change its state of incorporation, formation or organization, change its organizational identification number or reorganize in another jurisdiction, (ii) create or suffer to exist any Subsidiary not existing on the date of this Agreement, (iii) without prior written notice to, and prior consent of, the Administrative Agent and the Majority Lenders, amend, supplement, modify or restate their articles or certificate of incorporation or formation, limited partnership agreement, bylaws, limited liability company agreements, or other equivalent organizational documents, (v) change its method of accounting employed in the preparation of the financial statements referred to in Section 4.4 or change the fiscal year end of the Borrowers unless required to conform to GAAP or approved in writing by the Majority Lenders, or (vi) without 30 days prior written notice to the Administrative Agent, discontinue or change its address of its place of business, chief executive office, or office where it keeps records concerning accounts, contract rights, and general intangibles.

Section 6.8    Sale of Assets.  No Borrower shall, nor shall it permit any of its Subsidiaries to, make a Disposition, other than the following:

(a)    any Restricted Entity may sell or lease inventory and rental equipment in the ordinary course of business;

(b)    any Restricted Entity may Dispose of equipment that is in need of replacement to third parties if (i) such Restricted Entity receives fair market value for such equipment and (ii) 100% of the consideration received for such equipment is cash; and

(c)    any other Disposition approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the Majority Lenders.

Section 6.9    Restricted Payments.  No Borrower shall make, nor shall it permit any of its Subsidiaries to make any Restricted Payments except that so long as no Default exists or would result from the making of such Restricted Payment, (i) any Credit Party may make Restricted Payments to any other Credit Party and (ii) any Restricted Entity may make Restricted Payments to any Credit Party.

Section 6.10    Affiliate Transactions.    No Borrower shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction or series of transactions (including, but not limited to, the purchase, Disposition, lease or exchange of Property, the making of any investment, the giving of any guaranty, the assumption of any obligation or the rendering of any service) with any of their Affiliates which are not Credit Parties unless such transaction or series of transactions is on terms no less favorable to such Credit Party than those that could be obtained in a comparable arm's length transaction with a Person that is not such an Affiliate except the restrictions in this Section 6.10 shall not apply to: (a) the Restricted Payments permitted under Section 6.9, (b) Investments by a Credit Party in the form of Equity Interests of another Credit Party and (c) reasonable and customary director, officer and employee compensation (including bonuses), indemnification and other benefits (including retirement, health, stock option and other benefit plans). Notwithstanding anything herein to the contrary, no Borrower shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into any transaction or series of transactions (including, but not limited to, the purchase, Disposition, lease or exchange of Property, the making of any investment, the giving of any guaranty, the assumption of any obligation or the rendering of any service) with any of their Affiliates which are not Credit Parties including any transaction that would otherwise be permitted under the above terms of this Section 6.10 unless approved by the Bankruptcy Court pursuant to an order in form and substance satisfactory to the Majority Lenders.

Section 6.11    Line of Business.    No Borrower shall, and shall not permit any of its Subsidiaries to, change the character of the Borrowers' and their Subsidiaries' collective business as conducted on the Closing Date, or engage in any type of business not reasonably related to the Borrowers' and their Subsidiaries' collective business as presently and normally conducted.

Section 6.12    Hazardous Materials.    No Borrower (a) shall, nor shall it permit any of its Subsidiaries to, create, handle, transport, use, or dispose of any Hazardous Substance or Hazardous Waste, except in the ordinary course of its business and except in compliance with Environmental Law other than to the extent that such non-compliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change or in any liability to the Lenders or the Administrative Agent, and (b) shall, nor shall it permit any of its Subsidiaries to, release any Hazardous Substance or Hazardous Waste into the environment and shall not permit any Credit Party's or any Subsidiary's Property to be subjected to any release of Hazardous Substance or Hazardous Waste, except in compliance with Environmental Law other than to the extent that such non-compliance could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change or in any liability on the Lenders or the Administrative Agent.

Section 6.13    Compliance with ERISA.    Except for matters that individually or in the aggregate could not reasonably be expected to cause a Material Adverse Change, no Borrower shall, nor shall it permit any of its Subsidiaries to, directly or indirectly: (a) engage in any transaction in connection with which any Credit Party or any Subsidiary could be subjected to either a civil penalty assessed pursuant to Section 502(c), (i) or (l) of ERISA or a tax imposed by Chapter 43 of Subtitle D of the Code; (b) terminate, or permit any member of the Controlled Group to terminate, any Plan in a manner, or take any other action with respect to any Plan, which could result in any liability to any Credit Party, any Subsidiary or any member of the Controlled Group to the PBGC; (c) fail to make, or permit any member of the Controlled Group to fail to make, full payment when due of all amounts which, under the provisions of any Plan, agreement relating thereto or applicable Legal Requirement, a Credit Party, a Subsidiary or member of the Controlled Group is required to pay as contributions thereto; (d) permit to exist, or allow any Subsidiary or any member of the Controlled Group to permit to exist, any accumulated funding deficiency (or unpaid minimum required contribution for plan years after December 31, 2007) within the meaning of Section 302 of ERISA or section 412 of the Code, whether or not waived, with respect to any Plan; (e) permit, or allow any member of the Controlled Group to permit, the actuarial

present value of the benefit liabilities (as "actuarial present value of the benefit liabilities" shall have the meaning specified in section 4041 of ERISA) under any Plan that is regulated under Title IV of ERISA to exceed the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities; (f) contribute to or assume an obligation to contribute to, or permit any member of the Controlled Group to contribute to or assume an obligation to contribute to, any Multiemployer Plan; (g) acquire, or permit any member of the Controlled Group to acquire, an interest in any Person that causes such Person to become a member of the Controlled Group if such Person sponsors, maintains or contributes to, or at any time in the six-year period preceding such acquisition has sponsored, maintained, or contributed to, (1) any Multiemployer Plan, or (2) any other Plan that is subject to Title IV of ERISA under which the actuarial present value of the benefit liabilities under such Plan exceeds the current value of the assets (computed on a plan termination basis in accordance with Title IV of ERISA) of such Plan allocable to such benefit liabilities; (h) incur, or permit any member of the Controlled Group to incur, a liability to or on account of a Plan under sections 515, 4062, 4063, 4064, 4201 or 4204 of ERISA; or (i) contribute to or assume an obligation to contribute to any employee welfare benefit plan, as defined in section 3(1) of ERISA, including, without limitation, any such plan maintained to provide benefits to former employees of such entities, that may not be terminated by such entities in their sole discretion at any time without any liability.

Section 6.14     <u>Sale and Leaseback Transactions</u>.  No Borrower shall, nor shall it permit any of its Subsidiaries to, Dispose to a Person any Property, whether now owned or hereafter acquired, if at the time or thereafter a Credit Party or a Subsidiary shall lease as lessee such Property or any part thereof or other Property which a Credit Party or a Subsidiary intends to use for substantially the same purpose as the Property Disposed of.

Section 6.15     [Reserved].

Section 6.16     [Reserved].

Section 6.17     [Reserved].

Section 6.18     <u>Budged Variance and Capital Expenditures</u>.

(a)     As of any Testing Date, for the Testing Period prior to the week of such Testing Date, the Borrowers and their Subsidiaries shall not allow (i) the amount of actual receipts for any receipt line item in the DIP Budget during such Testing Period to be less than 85% of the amount of projected receipts for such line item set forth in the DIP Budget during such Testing Period, (ii) the amount of actual operating disbursements for all operating disbursements in the DIP Budget during such Testing Period to be greater than 110% of the amount of all projected operating disbursements in the DIP Budget during such Testing Period (the allowed variances described in the foregoing clauses (i) and (ii), the "<u>Permitted Variances</u>"); <u>provided</u>, that, with respect to clause (ii), (A) there shall be no limit on the variances in the amount of actual and necessary expenditures for the line items that set forth self-insured medical program payments and the Agent Costs (as defined below), which amounts shall be disregarded for purposes of the calculations under clause (ii), and (B) unused capacity for a disbursement line item of the DIP Budget may be carried forward and used in the next four weeks under the same line item for determining such compliance, and (iii) the amount of actual professional fees in the DIP Budget related to the Cases during such Testing Period to exceed the amount of projected professional fees in the DIP Budget related to the Cases during such Testing Period (notwithstanding the Permitted Variances). As used in this Section, "Agent Costs" means all fees, costs and expenses, including attorneys' fees and expenses, due at any time to the Administrative Agent and the administrative agent under the Prepetition Credit Agreement under the Credit Documents and the Prepetition Credit Agreement, as applicable, that are incurred as a result of the Cases.

(b)     The Borrowers and their Subsidiaries shall not make Capital Expenditures from and after the Closing Date without the prior written consent of the Majority Lenders and in any event other than in compliance with the DIP Budget covenant in Section 6.18(a).

Section 6.19     [Reserved].

Section 6.20     [Reserved].

Section 6.21     Operating Leases.  No Borrower shall, nor shall it permit any of its Subsidiaries to, become liable directly, indirectly, or contingently in respect of any lease that constitutes an operating lease under GAAP other than operating leases entered into prior to the Petition Date and existing on the Closing Date and which are permitted pursuant to the Restructuring Support Agreement.

Section 6.22     Prepayment of Certain Debt and Other Obligations.  No Borrower shall, nor shall it permit any of its Subsidiaries to, prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of the subordination terms of, any Debt, except the prepayment of the Obligations in accordance with the terms of this Agreement or the prepayment of other Debt in accordance with the Restructuring Support Agreement.

Section 6.23     Contracts and Leases.  No Borrower shall, nor shall it permit any of its Subsidiaries to, except as otherwise permitted pursuant to the DIP Order, any Acceptable Plan of Reorganization or a motion filed by or after consultation of the Majority Lenders or a motion to assume the Restructuring Support Agreement, assume, assume and assign or reject any executory contract or unexpired lease not assumed, assumed and assigned or rejected on or before the date hereof.

Section 6.24     Additional Bankruptcy Matters.  Without the prior written consent of the Majority Lenders, no Borrower shall, nor shall it permit any of its Subsidiaries to, do any of the following:

(a)     Certain Payments.  Except as expressly provided or permitted hereunder (including, without limitation, to the extent pursuant to any First Day Order or "second day" order complying with the terms of this Agreement) or, with the prior consent of the Majority Lenders, as provided pursuant to any other order of the Bankruptcy Court, make any payment or distribution to any non-Debtor affiliate or corporate insider outside of the ordinary course of business.

(b)     Alternative Plan of Reorganization.     File or support the confirmation of any Plan of Reorganization or liquidation other than the Acceptable Plan of Reorganization.

(c)     Material Contracts.  Enter into a material contractual obligation without the consent of the Majority Lenders.

(d)     Superpriority Claims.  Incur, create, assume, suffer to exist or permit any other superpriority claim that is *pari passu* with or senior to the claims of the Secured Parties against the Debtors except with respect to the Carve-Out.

## ARTICLE 7
## DEFAULT AND REMEDIES

Section 7.1     Events of Default.  The occurrence of any of the following events shall constitute an "Event of Default" under this Agreement and any other Credit Document:

(a)     Payment Failure.  Any Credit Party fails to pay when due or, following notice to the Credit Parties, within two Business Days thereafter, any principal or interest or any other amount due under this Agreement or any other Credit Document, including payments of fees, reimbursements, and indemnifications;

(b)     False Representation or Warranties.  Any representation or warranty made or deemed to be made by any Credit Party or any officer thereof in this Agreement, in any other Credit Document or in any certificate delivered in connection with this Agreement or any other Credit Document is incorrect, false or otherwise misleading in any material respect (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) at the time it was made or deemed made;

(c)     Breach of Covenant.  (i) Any breach by any Credit Party of any of the covenants in Sections 5.1 (as to its existence), 5.2 (and such breach shall remain unremedied for a period of two Business Days after notice thereof to the Credit Parties), 5.3, 5.7, 5.15, 5.17, 5.18 or Article 6 of this Agreement or the corresponding covenants in any Guaranty or (ii) any breach by any Credit Party of any other covenant contained in this Agreement or any other Credit Document and such breach shall remain unremedied for a period of 10 days following the earlier of (A) the date on which Administrative Agent gives notice of such failure to any Borrower and (B) the date any officer of any Borrower or any Subsidiary acquires knowledge of such failure (such grace period to be applicable only in the event such Default can be remedied by corrective action of any Borrower or any Subsidiary);

(d)     Guaranties.  Any provision in any Guaranty shall at any time (before its expiration according to its terms) and for any reason cease to be in full force and effect and valid and binding on the Guarantors party thereto or shall be contested by any party thereto; any Guarantor shall deny it has any liability or obligation under such Guaranty; or any Guarantor shall cease to exist other than as expressly permitted by the terms of this Agreement;

(e)     Lack of Security Interest.  Any lien created under the Interim DIP Order or the Final DIP Order, as applicable, shall cease to be, or shall be asserted by any Debtor not to be, a valid and perfected Lien, with the priority required by the Interim DIP Order or the Final DIP Order, as the case may be, except as a result of a disposition of the applicable Collateral in a transaction permitted under this Agreement;

(f)     Cross-Default. (i) Any Restricted Entity shall fail to pay any principal of or premium or interest on its Debt which is outstanding in a principal amount of at least $200,000 individually or when aggregated with all such Debt of the Restricted Entities so in default (other than the Obligations) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to Debt which is outstanding in a principal amount of at least $200,000 individually or when aggregated with all such Debt of the Restricted Entities so in default (other than the Obligations), and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such Debt prior to the stated maturity thereof; or (iii) any such Debt shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment); provided that, for purposes of this paragraph (f), the "principal amount" of the obligations in respect of Hedging Arrangements at any time shall be Swap Termination Value that would be required to be paid by a Restricted Entity if such Hedging Arrangements were terminated at such time;

(g)     [Reserved];

(h)    Settlements; Adverse Judgment.  Any Restricted Entity enters into a settlement of any claim against any of them when a suit has been filed or suffers final judgments against any of them since the date of this Agreement in an aggregate amount, less any insurance proceeds covering such settlements or judgments which are received or as to which the insurance carriers admit liability, greater than $200,000;

(i)    Termination Events.  Any Termination Event with respect to a Plan shall have occurred, and, 30 days after notice thereof shall have been given to any Credit Party by the Administrative Agent, such Termination Event shall not have been corrected and shall have created and caused to be continuing a material risk of Plan termination or liability for withdrawal from the Plan as a "substantial employer" (as defined in Section 4001(a)(2) of ERISA), which termination could reasonably be expect to result in a liability of, or liability for withdrawal could reasonably be expected to be, greater than $200,000;

(j)    Plan Withdrawals.  Any Credit Party or any member of the Controlled Group as employer under a Multiemployer Plan shall have made a complete or partial withdrawal from such Multiemployer Plan and such withdrawing employer shall have incurred a withdrawal liability in an annual amount exceeding $200,000;

(k)    Credit Documents.  Any material provision of any Credit Document shall for any reason cease to be valid and binding on any Credit Party or any such Person shall so state in writing;

(l)    Change in Control.  The occurrence of a Change in Control;

(m)    Material Adverse Change.  The occurrence of a Material Adverse Change;

(n)    Casualty.  Loss, theft, substantial damage or destruction of a material portion of the Collateral shall have occurred and such loss, theft, substantial damage or destruction is not fully covered by insurance (except for deductibles and allowing for the depreciated value of such Collateral);

(o)    [Reserved];

(p)    Dismissal of Cases; Appointment of Trustee.  (i) Any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases under Section 1112 of the Bankruptcy Code or otherwise; (ii) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases; or (iii) any order by the Bankruptcy Court shall be entered terminating or modifying the exclusivity right of any Debtor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without prior written consent of the Majority Lenders;

(q)    Superpriority Claims. An order of the Bankruptcy Court shall be entered granting any superpriority claim (other than the Carve-Out) in any of the Cases, which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against any Debtor hereunder or any Lien or security interest that is pari passu with or senior to the Liens and security interest securing the Obligations, or any Debtor takes any action seeking or supporting the grant of any such claim, Lien or security interest, in each case except as expressly permitted hereunder;

(r)    Final DIP Order. The Final DIP Order shall not have been entered by the Bankruptcy Court on or before September 1, 2017;

(s)     Challenge to Order. The Interim DIP Order or the Final DIP Order, as applicable, shall fail to be in full force and effect, including by the entry of an order (i) reversing or vacating the Interim DIP Order or the Final DIP Order, (ii) amending or modifying the Interim DIP Order or the Final DIP Order in a manner that is adverse to the Administrative Agent and the Lenders without the consent of the Majority Lenders or (iii) staying for a period in excess of seven days the Interim DIP Order or the Final DIP Order (as applicable);

(t)     Relief from the Automatic Stay. The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to allow any one or more creditors to execute upon or enforce Liens on or security interests in any Properties of any of the Debtors which have a fair market value in excess of $25,000 in the aggregate or permit other actions that could reasonably be expected to result in a Material Adverse Change;

(u)     Compliance with DIP Order. (i) The Debtors shall fail to comply, in any material respect, with the terms of the DIP Order, or (ii) the occurrence of an "Event of Default" as defined in the DIP Order;

(v)     Prepetition Payments. The Debtors shall make any Prepetition Payments other than (i) as permitted by the DIP Order, (ii) as otherwise permitted by this Agreement, (iii) as otherwise ordered by the Bankruptcy Court and agreed in writing by Administrative Agent with the consent of the Majority Lenders, or (iv) as authorized by the Bankruptcy Court (A) in accordance with the First Day Orders or any other orders of the Bankruptcy Court entered with the consent of, or without any objection by, the Majority Lenders, (B) in connection with the assumption of executory contracts and unexpired leases with the consent of, or without any objection by, the Majority Lenders, (C) in respect of accrued payroll and related expenses and employee benefits as of the Petition Date, or (D) in respect of other Prepetition Payments not to exceed $5,000 individually or $10,000 in the aggregate, in each case to the extent such payments are otherwise in compliance with the DIP Budget;

(w)     [Reserved];

(x)     [Reserved];

(y)     Plan of Reorganization. If a Plan of Reorganization that is not an Acceptable Plan of Reorganization shall be filed by a Debtor in the Cases, or the Debtors shall propose or support, or fail to oppose, any such plan or motion filed by a person, other than a Debtor;

(z)     Restructuring Support Agreement.   The Restructuring Support Agreement shall cease to be in full force and effect; or

(aa)     Actions in Support of Breach. Any Debtor shall file any application or pleading with the Bankruptcy Court or otherwise consents to any matters set forth above that would constitute an Event of Default (unless the Majority Lenders consent to such filing or consent).

Section 7.2     Optional Acceleration of Maturity.  If any Event of Default shall have occurred and be continuing, then, and in any such event, the Administrative Agent shall (subject to the terms hereof) at the direction of the Majority Lenders, take any or all of the following actions:

(a)     by notice to any Borrower, declare that the Commitments and obligation of each Lender to make Advances shall be terminated, whereupon the same shall forthwith terminate;

(b)     by notice to any Borrower, declare the Obligations, all interest thereon and all other amounts payable under this Agreement and the other Credit Documents to be forthwith due and payable, whereupon the Obligations, all such interest, and all such amounts shall become and be forthwith due and payable in full, without presentment, demand, protest or further notice of any kind (including, without limitation, any notice of intent to accelerate or notice of acceleration), all of which are hereby expressly waived by each of the Credit Parties,

(c)     terminate any Debtor's ability to use the cash collateral provided for by the Interim DIP Order or the Final DIP Order (provided that the Debtors shall, so long as no funds are otherwise available, at all times be permitted to pay professional fees out of amounts on deposit in the Professional Fee Escrow in accordance with the Interim DIP Order and the Final DIP Order, as applicable); and/or,

(d)     exercise on behalf of itself and the Secured Parties all rights and remedies available to it and the Secured Parties under the Credit Documents, the Interim DIP Order, and upon entry of the Final DIP Order, the Final DIP Order, or applicable law, in each case, without further order of or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under Sections 362 or 105 of the Bankruptcy Code.

The Debtors shall not seek to enjoin, hinder, delay, or object to the Administrative Agent's exercise of rights and remedies in accordance with this Agreement, and at any proceeding with respect to the Administrative Agent's exercise of rights and remedies, the Debtors cannot raise any substantive objections, other than to challenge the occurrence of the relevant Event of Default.

Section 7.3     [Reserved].

Section 7.4     Set-off.  If an Event of Default shall have occurred and be continuing, the Administrative Agent, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Legal Requirement, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Administrative Agent, such Lender or any such Affiliate to or for the credit or the account of any Credit Party against any and all of the obligations of such Credit Party now or hereafter existing under this Agreement or any other Credit Document to the Administrative Agent or such Lender, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand under this Agreement or any other Credit Document and although such obligations of any Credit Party may be contingent or unmatured or are owed to a branch or office of the Administrative Agent or such Lender different from the branch or office holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.14 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender Party and its Affiliates under this Section 7.4 are in addition to other rights and remedies (including other rights of setoff) that such Lender or Affiliates may have.  Each Lender Party agrees to notify the Borrower Representative and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent, each Lender and their respective Affiliates under this Section 7.4 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent, such Lender or their respective Affiliates may have.

Section 7.5    Remedies Cumulative, No Waiver.  No right, power, or remedy conferred to any Lender in this Agreement or the other Credit Documents, or now or hereafter existing at law, in equity, by statute, or otherwise shall be exclusive, and each such right, power, or remedy shall to the full extent permitted by law be cumulative and in addition to every other such right, power or remedy.  No course of dealing and no delay in exercising any right, power, or remedy conferred to any Lender in this Agreement and the other Credit Documents or now or hereafter existing at law, in equity, by statute, or otherwise shall operate as a waiver of or otherwise prejudice any such right, power, or remedy.  Any Lender may cure any Event of Default without waiving the Event of Default.  No notice to or demand upon any Borrower or any other Credit Party shall entitle such Borrower or any other Credit Party to similar notices or demands in the future.

Section 7.6    Application of Payments.  Prior to an Event of Default, all payments made hereunder shall be applied by the Administrative Agent as directed by the Borrower Representative, but subject to the terms of this Agreement, including the application of prepayments according to <u>Section 2.11</u>.  During the existence of an Event of Default, all payments and collections received by the Administrative Agent shall be applied in accordance with <u>Section 2.11</u> and to the Obligations in such manner as determined by the Administrative Agent, or at the direction of the Majority Lenders, in the following order:

FIRST, to the payment of all costs and expenses incurred by the Administrative Agent (in its capacity as such hereunder or under any other Credit Document) in connection with this Agreement or any of the Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent as secured party hereunder or under any other Credit Document on behalf of any Credit Party and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Credit Document;

SECOND, to the payment of all costs and expenses incurred by the Lenders pro rata in connection with this Agreement or any of the Obligations, including all court costs and the fees and expenses of their respective agents and legal counsel, and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Credit Document;

THIRD, to the payment of all accrued interest and fees constituting part of the Obligations (the amounts so applied to be distributed ratably among the Secured Parties in accordance with the amounts of the Obligations owed to them on the date of any such distribution);

FOURTH, to the payment of any then due and owing principal constituting part of the Obligations (the amounts so applied to be distributed ratably among the Secured Parties in accordance with the principal amounts of the Obligations owed to them on the date of any such distribution);

FIFTH, to the payment of any then due and owing other amounts (including expenses) constituting part of the Obligations, the amounts so applied to be distributed ratably among the Secured Parties in accordance with such amounts owed to them on the date of any such distribution; and

SIXTH, to the Credit Parties, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

# ARTICLE 8
## THE ADMINISTRATIVE AGENT

Section 8.1    Appointment and Authority.  Each Lender hereby irrevocably (a) appoints Cantor Fitzgerald Securities to act on its behalf as the Administrative Agent hereunder and under the other Credit Documents and (b) authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto or as may be directed by the Majority Lenders.  The provisions of this Article 8 are solely for the benefit of the Lender Parties, and no Borrower or any Affiliate thereof shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Credit Document (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Legal Requirement.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

Section 8.2    Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.  Cantor Fitzgerald Securities (and any successor acting as Administrative Agent) and its Affiliates may accept fees and other consideration from any Borrower or any Affiliate of any Borrower for services in connection with this Agreement or otherwise without having to account for the same to the Lenders.

Section 8.3    Exculpatory Provisions.  The Administrative Agent (which term as used in this Section 8.3 shall include its Related Parties) shall not have any duties or obligations except those expressly set forth herein and in the other Credit Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Administrative Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable Legal Requirement, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)    shall not, except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to any

Borrower, any other Credit Party or any of their respective Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 9.3</u> and <u>7.1</u>), which may (in the Administrative Agent's sole discretion) be delivered by electronic transmission from such Lenders or counsel to the Majority Lenders, and shall be accompanied by indemnity satisfactory to the Administrative Agent against loss, liability or expense or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default or Event of Default unless and until notice describing such Default or Event of Default is given to the Administrative Agent in writing by the Borrower Representative or a Lender. In the event that the Administrative Agent receives such a notice of the occurrence of a Default or Event of Default, the Administrative Agent shall (subject to <u>Section 9.3</u>) take such action with respect to such Default or Event of Default as shall reasonably be directed by the Majority Lenders, <u>provided</u> that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action) with respect to such Default or Event of Default as it shall deem advisable in the best interest of the Lender Parties.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any recital, statement, warranty or representation (whether written or oral) made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the value, validity, enforceability, effectiveness, enforceability, sufficiency or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document or the creation, perfection or priority of any Lien purported to be created by the Loan Documents, (v) the inspection of, or to inspect, the Property (including the books and records) of any Credit Party or any Subsidiary or Affiliate thereof, (vi) the satisfaction of any condition set forth in Article 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent, or (vii) any litigation or collection proceedings (or to initiate or conduct any such litigation or proceedings) under any Credit Document unless requested by the Majority Lenders in writing and its receives indemnification satisfactory to it from the Lenders. The Administrative Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. In no event shall the Administrative Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that the Administrative Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 8.4    <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document, writing or other communication (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely

upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of an Advance that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Advance. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.5    Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Credit Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article 8 shall apply to any such sub-agent and to the Related Parties of the Administrative Agent, if any, and of any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 8.6    Resignation of Administrative Agent.

(a)    The Administrative Agent may at any time give notice of its resignation to the other Lender Parties and the Borrower Representative. Upon receipt of any such notice of resignation, the Majority Lenders shall have the right to appoint a successor Administrative Agent. If no such successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the applicable Majority Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor agent. Whether or not a successor has been appointed, such resignation by the Administrative Agent shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Majority Lenders may, to the extent permitted by applicable Legal Requirement, by notice in writing such Person remove such Person as Administrative Agent and appoint a successor. If no such successor shall have been so appointed by Majority Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the applicable Majority Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations as Administrative Agent hereunder and under the other Credit Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Credit Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through the retiring or removed Administrative Agent shall instead be made by or to the Lenders, until such time as the Majority Lenders appoint a successor Administrative Agent as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with

all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Credit Documents, the provisions of this Article 8 and Sections 9.2(a) and (b) and Section 8.9 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Administrative Agent was acting as Administrative Agent.

Section 8.7    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender Party acknowledges and agrees that it has, independently and without reliance upon the Administrative Agent or any other Lender Party or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender Party also acknowledges and agrees that it will, independently and without reliance upon the Administrative Agent or any other Lender Party or any of their Related Parties, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Credit Document or any related agreement or any document furnished hereunder or thereunder.  Except for notices, reports, and other documents and information expressly required to be furnished to the Lenders by the Administrative Agent hereunder and for other information in the Administrative Agent's possession which has been requested by a Lender and for which such Lender pays the Administrative Agent's expenses in connection therewith, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the affairs, financial condition, or business of any Credit Party or any of its Subsidiaries or Affiliates that may come into the possession of the Administrative Agent or any of its Affiliates.

Section 8.8    [Reserved].

Section 8.9    Indemnification.

(a)    INDEMNITY OF ADMINISTRATIVE AGENT.    THE LENDERS SEVERALLY AGREE TO INDEMNIFY THE ADMINISTRATIVE AGENT AND EACH AFFILIATE THEREOF AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AND AGENTS (IN EACH CASE, TO THE EXTENT NOT REIMBURSED BY THE BORROWERS), RATABLY ACCORDING TO THE RESPECTIVE PRINCIPAL AMOUNTS OF THE ADVANCES THEN HELD BY EACH OF THEM (OR IF NO PRINCIPAL OF THE ADVANCES IS AT THE TIME OUTSTANDING, RATABLY ACCORDING TO THE RESPECTIVE COMMITMENTS HELD BY EACH OF THEM IMMEDIATELY PRIOR TO THE TERMINATION, EXPIRATION OR FULL REDUCTION OF EACH SUCH COMMITMENT), FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES, OR DISBURSEMENTS OF ANY KIND OR NATURE WHATSOEVER WHICH MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN ANY WAY RELATING TO OR ARISING OUT OF THIS AGREEMENT OR ANY ACTION TAKEN OR OMITTED BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES UNDER THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT (**IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES**), AND INCLUDING, WITHOUT LIMITATION, ENVIRONMENTAL LIABILITIES, PROVIDED THAT NO LENDER SHALL BE LIABLE FOR ANY PORTION OF SUCH LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, ACTIONS, JUDGMENTS, SUITS, COSTS, EXPENSES, OR

DISBURSEMENTS RESULTING FROM THE ADMINISTRATIVE AGENT'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. WITHOUT LIMITATION OF THE FOREGOING, EACH LENDER AGREES TO REIMBURSE THE ADMINISTRATIVE AGENT PROMPTLY UPON DEMAND FOR ITS RATABLE SHARE (DETERMINED AS SET FORTH ABOVE IN THIS PARAGRAPH) OF ANY OUT-OF-POCKET EXPENSES (INCLUDING COUNSEL FEES) INCURRED BY THE ADMINISTRATIVE AGENT IN CONNECTION WITH THE PREPARATION, EXECUTION, DELIVERY, ADMINISTRATION, MODIFICATION, AMENDMENT, OR ENFORCEMENT (WHETHER THROUGH NEGOTIATIONS, LEGAL PROCEEDINGS, OR OTHERWISE) OF, OR LEGAL ADVICE IN RESPECT OF RIGHTS OR RESPONSIBILITIES UNDER, THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT, TO THE EXTENT THAT THE ADMINISTRATIVE AGENT IS NOT REIMBURSED FOR SUCH BY THE BORROWERS. THE OBLIGATIONS UNDER THIS SECTION 8.9(A) SHALL SURVIVE THE PAYMENT IN FULL OF ALL OBLIGATIONS AND THE TERMINATION OF THIS AGREEMENT OR THE EARLIER RESIGNATION OR REMOVAL OF THE ADMINISTRATIVE AGENT.

(b)     [Reserved].

Section 8.10     <u>Administrative Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Restricted Entity, the Administrative Agent (irrespective of whether the principal of any Advance shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Advances and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel) allowed in such judicial proceeding; and

(b)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 2.6</u>.

Section 8.11     <u>Collateral and Guaranty Matters</u>.

(a)     The Administrative Agent is authorized on behalf of the Secured Parties, without the necessity of any notice to or further consent from such Secured Parties, from time to time, to take any actions with respect to any Collateral which may be necessary to perfect and maintain the Liens upon the Collateral.  The Administrative Agent is further authorized (but not obligated) on behalf of the Secured Parties, without the necessity of any notice to or further consent from the Secured Parties, from time to time, to take any action in exigent circumstances as may be reasonably necessary to preserve any rights or privileges of the Secured Parties under the Credit Documents or applicable Legal Requirements.  By accepting the benefit of the Liens granted to the Administrative Agent as security for the Obligations, each Secured Party hereby agrees to the terms of this paragraph (a). The Administrative Agent shall have no obligation whatsoever to any Lender or to any other Person to assure that the Collateral exists or is

owned by any Credit Party or is cared for, protected or insured or has been encumbered or that the Liens granted to the Administrative Agent herein or pursuant to the Loan Documents have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of its rights, authorities and powers granted or available to the Administrative Agent pursuant to this <u>Section 8.11</u> or in any of the Loan Documents; *it being understood* and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Administrative Agent may act in any manner it may deem appropriate, in its reasonable discretion, but consistent with the provisions of this Agreement and the other Loan Documents, including given the Administrative Agent's own interest in the Collateral as a Lender, if any, and that the Administrative Agent shall have no duty or liability whatsoever to any Lender.

(b)     The Lenders hereby, and any other Secured Party by accepting the benefit of the Liens securing the Obligations, irrevocably authorize the Administrative Agent to (i) release any Lien granted to or held by the Administrative Agent upon any Collateral (A) upon termination of this Agreement and the payment in full of all outstanding Advances and all other Obligations payable under this Agreement and under any other Credit Document; (B) constituting Property sold or to be sold or disposed of as part of or in connection with any Disposition permitted under this Agreement or any other Credit Document; (C) constituting Property in which no Credit Party owned an interest at the time the Lien was granted or at any time thereafter; or (D) constituting Property leased to any Credit Party under a lease which has expired or has been terminated in a transaction permitted under this Agreement or is about to expire and which has not been, and is not intended by such Credit Party to be, renewed or extended; and (ii) release a Guarantor from its obligations under a Guaranty and any other applicable Credit Document if such Person ceases to be a Subsidiary as a result of a transaction permitted under this Agreement.  Upon the request of the Administrative Agent at any time, the Secured Parties will confirm in writing the Administrative Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 8.11</u>.

(c)     Notwithstanding anything contained in any of the Credit Documents to the contrary, the Credit Parties, the Administrative Agent, and each Secured Party hereby agree that no Secured Party other than the Administrative Agent shall have any right individually to realize upon any of the Collateral or to enforce the Guaranties, it being understood and agreed that all powers, rights and remedies hereunder and under the other Credit Documents may be exercised solely by Administrative Agent on behalf of the Secured Parties in accordance with the terms hereof and the other Credit Documents.  By accepting the benefit of the Liens granted to secure the Obligations, each Secured Party not party hereto hereby agrees to the terms of this paragraph (c).

Section 8.12     <u>Credit Bidding</u>.  The Administrative Agent or, subject to the limitations below, any Lender may purchase, in any public or private sale conducted under the provisions of the Uniform Commercial Code (including pursuant to sections 9-610 and 9-620 of the Uniform Commercial Code), the provisions of the Bankruptcy Code (including pursuant to sections 363, 1123, or 1129 of the Bankruptcy Code), or at any sale or foreclosure conducted by the Administrative Agent (whether by judicial action or otherwise) in accordance with applicable law, all or any portion of the Collateral. The Lenders hereby irrevocably authorize the Administrative Agent, upon the written consent of the Majority Lenders, to Credit Bid (in an amount and on such terms as may be directed by the Majority Lenders) and purchase at any such sale (either directly or through one or more acquisition vehicles) all or any portion of the Collateral on behalf of and for the benefit of the Lenders. Each Lender hereby agrees that, except as otherwise provided in the Credit Documents or with the written consent of the Administrative Agent and the Majority Lenders, it will not exercise any right that it might otherwise have to Credit Bid at any sales of all or any portion of the Collateral conducted under the provisions of the Uniform Commercial Code or the Bankruptcy Code, foreclosure sales or other similar Dispositions of Collateral.

## ARTICLE 9
## MISCELLANEOUS

Section 9.1    Costs and Expenses.  The Borrowers agree to pay on demand all out-of-pocket costs and expenses of Administrative Agent and the Lenders (including outside counsel fees, charges and disbursements and costs of financial advisors) in connection with (a) the preparation, execution, delivery, administration, modification, and amendment of this Agreement, the Notes, and the other Credit Documents (b) the enforcement (whether through negotiations, legal proceedings, or otherwise) of this Agreement, the Notes, and the other Credit Documents.

Section 9.2    Indemnification; Waiver of Damages.

(a)    INDEMNIFICATION.  EACH CREDIT PARTY HERETO AGREES TO, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD HARMLESS THE ADMINISTRATIVE AGENT AND EACH LENDER AND EACH OF THEIR AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, PARTNERS, REPRESENTATIVES AND ADVISORS (EACH, AN "INDEMNITEE") FROM AND AGAINST ANY AND ALL ACTIONS, SUITS, CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS, AND EXPENSES OF ANY KIND OR NATURE (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES) THAT MAY BE INCURRED BY OR ASSERTED OR AWARDED AGAINST ANY INDEMNITEE, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH OR BY REASON OF (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH ANY INVESTIGATION, LITIGATION, OR PROCEEDING OR PREPARATION OF DEFENSE IN CONNECTION THEREWITH) THE CREDIT DOCUMENTS, ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE ADVANCES, **IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL NEGLIGENCE OF THE APPLICABLE INDEMNITEE,** EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. IN THE CASE OF AN INVESTIGATION, LITIGATION OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS SECTION 9.2 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION OR PROCEEDING IS BROUGHT BY ANY CREDIT PARTY, ITS DIRECTORS, SHAREHOLDERS OR CREDITORS OR AN INDEMNITEE OR ANY OTHER PERSON OR ANY INDEMNITEE IS OTHERWISE A PARTY THERETO.  No Affiliate, equityholder or creditor of any Credit Party (other than a Credit Party) is intended to be, and none of such Persons or entities shall be, third party beneficiaries of this Agreement or the other Credit Documents, and therefore no Indemnitee will have any liability (whether direct or indirect, in contract or tort, or otherwise) to any such respective Affiliate that is not a party hereto or to their respective equityholders or creditors arising out of, related to or in connection with this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance or the use of the proceeds thereof.  No Credit Party shall, without the prior written consent of each Indemnitee affected thereby (which consent will not be unreasonably withheld), settle any threatened or pending claim or action that would give rise to the right of any Indemnitee to claim indemnification hereunder unless such settlement (x) includes a full and unconditional release of all liabilities arising out of such claim or action against such Indemnitee and (y) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of any Indemnitee.

(b)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Legal Requirement, no Credit Party shall assert, agrees not to assert, and hereby waives, any claim against any Indemnitee on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance or the use of the proceeds thereof.  To the fullest extent permitted by applicable Legal Requirement, no Lender Party shall assert, agrees not to assert, and hereby waives, any claim against any Credit Party on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Credit Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance or the use of the proceeds thereof; provided that nothing contained in this sentence shall limit any Credit Party's indemnification obligations to the extent set forth in Section 9.2(a) above to the extent such special, indirect, consequential or punitive damages are included in any third party claim in connection with which such Indemnitee is otherwise entitled to indemnification hereunder.  No Indemnitee referred to in subsection (a) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(c)     Payments.  All payments required to be made under this Section 9.2 shall be made within 10 days of demand therefor.

(d)     Survival.  Without prejudice to the survival of any other agreement of the Credit Parties hereunder, the agreements and obligations of the Credit Parties contained in this Section 9.2 shall survive the termination of this Agreement, the termination of all Commitments, and the payment in full of the Advances and all other amounts payable under this Agreement.

Section 9.3     Waivers and Amendments.  No amendment or waiver of any provision of this Agreement, the Notes, or any other Credit Document, nor consent to any departure by any Borrower or any Guarantor therefrom, shall in any event be effective unless the same shall be in writing and signed by the Majority Lenders and the Borrowers, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that:

(a)     no amendment, waiver, or consent shall, unless in writing and signed by all the Lenders and the Borrowers, do any of the following: (i)  reduce the principal of, or interest on, the Advances, (ii) postpone or extend any date fixed for any payment of principal of, or interest on, the Advances, including, without limitation, the Termination Date or (iii) change the number of Lenders which shall be required for the Lenders to take any action hereunder or under any other Credit Document;

(b)     [Reserved];

(c)     no amendment, waiver, or consent shall, unless in writing and signed by all the Lenders and the Borrowers, do any of the following: (i) waive any of the conditions specified in Sections 3.1, 3.2 3.3 and 3.4 (ii) reduce any fees or other amounts payable hereunder or under any other Credit Document (other than those specifically addressed above in this Section 9.3), (iii) postpone or extend any date fixed for any payment of any fees or other amounts payable hereunder (other than those otherwise specifically addressed in this Section 9.3), (iv) amend Section 2.11(e), Section 7.6, this Section 9.3 or any other provision in any Credit Document which expressly requires the consent of, or action or waiver by, all of

the Lenders, (v) release any Guarantor from its obligation under any Guaranty or, except as specifically provided in the Credit Documents and as a result of transactions permitted by the terms of this Agreement, release all or a material portion of the Collateral, in each case except as permitted under Section 8.11(b) or 8.12; (vi) amend the definition of "Majority Lenders"; or (vii) amend the definitions of "Secured Parties", "Obligations" or "Collateral" in a manner adverse to any Secured Party;

(d)     no Commitment of a Lender or any obligations of a Lender may be increased or extended without such Lender's written consent;

(e)     [Reserved];

(f)     [Reserved];

(g)     no amendment, waiver, or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any other Credit Document;

(h)     [Reserved]; and

(i)     [Reserved].

Notwithstanding anything to the contrary contained in this Section 9.3, (a) the Borrowers and the Administrative Agent may (but are not obligated to), without the input or consent of any other Lender, effect amendments to correct any jointly identified obvious error or any error or omission of a technical nature, in each case, in any provision of the Credit Documents and (b) guarantees, collateral security documents and related documents executed by any Borrower or any Subsidiary in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and the Borrowers and the Administrative Agent may (but is not obligated to) amend, supplement or waive any provision thereof without the consent of any Lender if such amendment, supplement or waiver is delivered in order to (x) comply with local law or advice of local counsel, (y) cure ambiguities, omissions, mistakes or defects as determined by the Administrative Agent and the Borrowers or (z) cause such guarantee, collateral security document or other document to be not inconsistent or not in conflict with this Agreement and the other Credit Documents as determined by the Administrative Agent and the Borrowers; provided that, the inclusion in such other Credit Document of terms and provisions, rights or remedies in favor of a Lender Party and not addressed in this Agreement shall not be deemed to be in conflict or inconsistent with this Agreement.

Section 9.4     Severability.  In case one or more provisions of this Agreement or the other Credit Documents shall be invalid, illegal or unenforceable in any respect under any applicable Legal Requirement, the validity, legality, and enforceability of the remaining provisions contained herein or therein shall not be affected or impaired thereby.

Section 9.5     Survival of Representations and Obligations.  All representations and warranties contained in this Agreement or made in writing by or on behalf of the Credit Parties in connection herewith shall survive the execution and delivery of this Agreement and the other Credit Documents, the making of the Advances and any investigation made by or on behalf of the Lenders, none of which investigations shall diminish any Lender's right to rely on such representations and warranties.  All obligations of the Borrowers or any other Credit Party provided for in Sections 2.10, 2.12(c), 9.1 and 9.2 and all of the obligations of the Lenders in Section 8.5 shall survive any termination of this Agreement and repayment in full of the Obligations.

Section 9.6    Binding Effect.  This Agreement shall become effective when it shall have been executed by the Borrowers and the Administrative Agent, and when the Administrative Agent shall have, as to each Lender, either received a counterpart hereof executed by such Lender or been notified by such Lender that such Lender has executed it and thereafter shall be binding upon and inure to the benefit of the Borrowers, the Administrative Agent, and each Lender and their respective successors and assigns, except that neither the Borrowers nor any other Credit Party shall have the right to assign its rights or delegate its duties under this Agreement or any interest in this Agreement without the prior written consent of each Lender.

Section 9.7    Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower nor any other Credit Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of paragraph (b) of this Section, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Assignment by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Advances at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)    Minimum Amounts.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Advances at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in paragraph (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Advances outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Advances of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Acceptance, as of the Trade Date) shall not be less than $1,000,000, unless each of the Administrative Agent and, so long as no as no Default or Event of Default has occurred and is continuing, the Borrowers otherwise consents (each such consent not to be unreasonably withheld or delayed).

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with

17-51014 - #87  File 08/11/17  Enter 08/11/17 16:36:13  Main Document   Pg 158 of 216

respect to the Advance or the Commitment assigned. Assignments of Commitments and Advances must be made on a pro rata basis.

(iii)     Required Consents. No consent shall be required for any assignment except to the extent required by paragraph (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Borrower Representative (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a Default or an Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender or an Affiliate of a Lender; provided that the Borrower Representative shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 days after having received notice thereof; and

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments to a Person who is not a Lender or an Affiliate of a Lender.

(iv)     Assignment and Acceptance. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall (A) deliver to the Administrative Agent an Administrative Questionnaire and any required tax documents and (B) become a party to the Restructuring Support Agreement pursuant to the terms thereof. Notwithstanding anything set forth herein to the contrary, the effectiveness of any assignment hereunder is conditioned upon the assignee concurrently becoming a party to the Restructuring Support Agreement in accordance with the terms and conditions thereof (and any purported assignment that does not satisfy such condition shall be null and void *ab initio*).

(v)     No Assignment to Certain Persons. No such assignment shall be made to (A) any Credit Party or any of the Credit Parties' Affiliates or Subsidiaries or (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B).

(vi)     No Assignment to Natural Persons. No such assignment shall be made to a natural Person.

(vii)     Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower Representative and the Administrative Agent, the applicable pro rata share of Advances previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Advances in accordance with its Pro Rata Share or such Advances. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Legal Requirement without compliance with the provisions of this paragraph, then the assignee

of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.10, 9.1, 9.2 and 9.3 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section.

(c)     Register.  The Administrative Agent, acting solely for this purpose as the non-fiduciary agent of the Borrowers, shall maintain at its address referred to in Section 9.9 a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Advances owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.  Each Borrower hereby agrees that the Administrative Agent acting as its agent solely for the purpose set forth above in this clause (c), shall not subject the Administrative Agent to any fiduciary or other implied duties, all of which are hereby waived by each Borrower.

(d)     Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural Person or any Borrower or any of the Borrowers' Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Advances owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.   For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 9.2(a) with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (a), (b), (c) or (d) of this Section 9.7 (that adversely affects such Participant). The Borrowers agrees that each Participant shall be entitled to the benefits of Sections 2.10 and 2.12 (subject to the requirements and limitations therein, including the requirements under Section 2.12(g) (it

being understood that the documentation required under Section 2.12(g) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 2.13 as if it were an assignee under paragraph (b) of this Section; and (B) shall not be entitled to receive any greater payment under Sections 2.10 or 2.12, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.13 with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 7.4 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.11(e) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Advances or other obligations under the Credit Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. Each Borrower hereby agrees that each Lender acting as its agent solely for the purpose set forth above in this clause (d), shall not subject such Lender to any fiduciary or other implied duties, all of which are hereby waived by each Borrower.

(e)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)     Information. Any Lender may furnish any information concerning any Borrower or any Subsidiary in the possession of such Lender from time to time to permitted assignees and Participants (including prospective permitted assignees and participants), subject, however, to the provisions of Section 9.8.

Section 9.8     Confidentiality. Each of the Lender Parties agrees to keep confidential any information furnished or made available to it by any Credit Party pursuant to this Agreement and identified by such Credit Party as proprietary or confidential; provided that nothing herein shall prevent any Lender Party from disclosing such information (a) to any other Lender Party or any Affiliate of any Lender Party, or any officer, director, employee, agent, or advisor of any Lender Party or Affiliate of any Lender Party for purposes of administering, negotiating, considering, processing, implementing, syndicating, assigning, or evaluating the credit facilities provided herein and the transactions contemplated hereby, (b) to any other Person if directly incidental to the administration of the credit facilities provided herein, (c) as required by any Legal Requirement, (d) upon the order of any court or administrative agency, (e) upon the request or demand of any regulatory agency or authority, (f) that is or becomes available to the public or that is or becomes available to any Lender Party other than as a result of a disclosure by any other Lender Party prohibited by this Agreement, (g) in connection with any

litigation relating to this Agreement or any other Credit Document to which such Lender Party or any of its Affiliates may be a party, (h) to the extent necessary in connection with the exercise of any right or remedy under this Agreement or any other Credit Document, and (i) to any actual or proposed participant or assignee, in each case, subject to provisions similar to those contained in this Section 9.8. **NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, nothing in this Agreement shall (i) restrict any Lender Party from providing information to any bank or other regulatory or governmental authorities, including the Federal Reserve Board and its supervisory staff; (ii) require or permit any Lender Party to disclose to any Credit Party that any information will be or was provided to the Federal Reserve Board or any of its supervisory staff; or (iii) require or permit any Lender Party to inform any Credit Party of a current or upcoming Federal Reserve Board examination or any nonpublic Federal Reserve Board supervisory initiative or action.**

Section 9.9    Notices, Etc.

(a)    All notices and other communications (other than Notices of Borrowing which are governed by Article 2 of this Agreement) shall be in writing and hand delivered with written receipt, telecopied, sent by facsimile (with a hard copy sent as otherwise permitted in this Section 9.9), sent by a nationally recognized overnight courier, or sent by certified mail, return receipt requested as follows: if to a Credit Party, as specified on Annex I, if to the Administrative Agent, at its credit contact specified under its name on Annex I, and if to any Lender at is credit contact specified in its Administrative Questionnaire. Each party may change its notice address by written notification to the other parties. All such notices and communications shall be effective when delivered, except that notices and communications to any Lender pursuant to Article 2 shall not be effective until received and, in the case of facsimile, such receipt is confirmed by such Lender verbally or in writing.

(b)    Platform.

(i)    Each Credit Party agrees that the Administrative Agent may, but shall not be obligated to, make the Communications (as defined below) available to the Lenders by posting the Communications on Debt Domain, Intralinks, Syndtrak or a substantially similar electronic transmission system (the "Platform").

(ii)    The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Platform and expressly disclaim liability for errors or omissions in the Communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrowers or the other Credit Parties, any Lender or any other Person or entity for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's, any other Credit Party's or the Administrative Agent's transmission of communications through the Platform. "Communications" means, collectively, any notice, demand, communication, information, document or other material provided by or on behalf of any Credit Party pursuant to any Credit Document or the transactions contemplated therein which is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to this Section, including through the Platform.

(iii)    Each Lender agrees that notice to it specifying that any Communication has been posted to the Platform (a "Notice") shall for purposes of this Agreement constitute effective delivery to such Lender of such information, documents or other materials comprising such Communication. Each

Lender agrees (i) to notify, on or before the date such Lender becomes a party to this Agreement, the Administrative Agent in writing of such Lender's e-mail address to which a Notice may be sent (and from time to time thereafter to ensure that the Agent has on record an effective e-mail address for such Lender) and (ii) that any Notice may be sent to such e-mail address.

Section 9.10    Usury Not Intended.    It is the intent of each Credit Party and each Lender in the execution and performance of this Agreement and the other Credit Documents to contract in strict compliance with applicable usury laws, including conflicts of law concepts, governing the Advances of each Lender including such applicable Legal Requirements of the State of New York, if any, and the United States of America from time to time in effect.  In furtherance thereof, the Lenders and the Credit Parties stipulate and agree that none of the terms and provisions contained in this Agreement or the other Credit Documents shall ever be construed to create a contract to pay, as consideration for the use, forbearance or detention of money, interest at a rate in excess of the Maximum Rate and that for purposes of this Agreement "interest" shall include the aggregate of all charges which constitute interest under such laws that are contracted for, charged or received under this Agreement; and in the event that, notwithstanding the foregoing, under any circumstances the aggregate amounts taken, reserved, charged, received or paid on the Advances, include amounts which by applicable Legal Requirement are deemed interest which would exceed the Maximum Rate, then such excess shall be deemed to be a mistake and each Lender receiving same shall credit the same on the principal of the Obligations (or if such Obligations shall have been paid in full, refund said excess to the Borrowers).  In the event that the maturity of the Obligations are accelerated by reason of any election of the holder thereof resulting from any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest may never include more than the Maximum Rate, and excess interest, if any, provided for in this Agreement or otherwise shall be canceled automatically as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited on the applicable Obligations (or, if the applicable Obligations shall have been paid in full, refunded to the Borrowers of such interest).  In determining whether or not the interest paid or payable under any specific contingencies exceeds the Maximum Rate, the Credit Parties and the Lenders shall to the maximum extent permitted under applicable Legal Requirement amortize, prorate, allocate and spread in equal parts during the period of the full stated term of the Obligations all amounts considered to be interest under applicable Legal Requirement at any time contracted for, charged, received or reserved in connection with the Obligations.  The provisions of this Section shall control over all other provisions of this Agreement or the other Credit Documents which may be in apparent conflict herewith.

Section 9.11    Usury Recapture.    In the event the rate of interest chargeable under this Agreement at any time is greater than the Maximum Rate, the unpaid principal amount of the Advances shall bear interest at the Maximum Rate until the total amount of interest paid or accrued on the Advances equals the amount of interest which would have been paid or accrued on the Advances if the stated rates of interest set forth in this Agreement had at all times been in effect. In the event, upon payment in full of the Advances, the total amount of interest paid or accrued under the terms of this Agreement and the Advances is less than the total amount of interest which would have been paid or accrued if the rates of interest set forth in this Agreement had, at all times, been in effect, then the Borrowers shall, to the extent permitted by applicable Legal Requirement, pay the Administrative Agent for the account of the Lenders an amount equal to the difference between (i) the lesser of (A) the amount of interest which would have been charged on its Advances if the Maximum Rate had, at all times, been in effect and (B) the amount of interest which would have accrued on its Advances if the rates of interest set forth in this Agreement had at all times been in effect and (ii) the amount of interest actually paid under this Agreement on its Advances.  In the event the Lenders ever receive, collect or apply as interest any sum in excess of the Maximum Rate, such excess amount shall, to the extent permitted by law, be applied to the reduction of the principal balance of the Advances, and if no such principal is then outstanding, such excess or part thereof remaining shall be paid to the Borrowers.

Section 9.12    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrowers is made to any Lender Party, or any Lender Party exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any Lender Party in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender Party severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate in effect from time to time, in the applicable currency of such recovery or payment.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 9.13    Governing Law; Service of Process.  This Agreement, the Notes and the other Credit Documents (unless otherwise expressly provided therein) shall be deemed a contract under, and shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to conflicts of laws principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).  Each Borrower hereby agrees that service of copies of the summons and complaint and any other process which may be served in any such action or proceeding may be made by mailing or delivering a copy of such process to the Borrowers at the address set forth for the Borrowers in this Agreement.  Nothing in this Section shall affect the rights of any Lender to serve legal process in any other manner permitted by the law or affect the right of any Lender to bring any action or proceeding against any Borrower or its Property in the courts of any other jurisdiction.

Section 9.14    Submission to Jurisdiction.  The parties hereto hereby agree that any suit or proceeding arising in respect of this Agreement or any other Credit Document, or any of the matters contemplated hereby or thereby will be tried exclusively in the following jurisdictions (the "Chosen Courts"): (i) in the Bankruptcy Court to the extent that it has jurisdiction and (ii) to the extent the Bankruptcy Court does not have jurisdiction, in the U.S. District Court for the Southern District of New York or, if such court does not have subject matter jurisdiction, in any state court located in the City and County of New York.  The parties hereto hereby agree to submit to the exclusive jurisdiction of, and venue in, the Chosen Courts.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirement.  The parties hereto hereby agree that service of any process, summons, notice or document by registered mail addressed to the applicable parties will be effective service of process against such party for any action or proceeding relating to any such dispute.  Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirement, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any Chosen Court.  Each of the parties hereto hereby agrees that Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York shall apply to this Agreement and irrevocably waives, to the fullest extent permitted by applicable Legal Requirement, the defense of any inconvenient forum to the maintenance of such action or proceeding in any Chosen Court.

Section 9.15    Electronic Execution of Assignments.  Electronic Execution of Assignments.  The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in

any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 9.16    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

Section 9.17    Waiver of Jury.  THE BORROWERS, THE LENDERS AND THE ADMINISTRATIVE AGENT HEREBY ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED BY AND HAVE CONSULTED WITH COUNSEL OF THEIR CHOICE, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER CREDIT DOCUMENT, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 9.18    USA Patriot Act.  Each Lender that is subject to the Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Credit Party, which information includes the name and address of such Credit Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Credit Party in accordance with the Patriot Act.

Section 9.19    [Reserved].

Section 9.20    No Fiduciary Duty.  Notwithstanding anything herein or in any other Credit Document to the contrary, in connection with, or in any way related to, this Agreement and the transactions contemplated hereby (including the transactions contemplated hereby), the Borrowers hereby acknowledge and agree that: (a) each Secured Party is, has been, and will be acting solely as a principal and not as a financial advisor, agent or fiduciary, for the Borrowers or any of the Borrowers' affiliates, equity holders, directors, officers, employees, creditors or any other Person except as to maintaining a register as provided in herein as a non-fiduciary agent of the Borrowers for that limited purpose, (b) no Secured Party or any Affiliate thereof has assumed or will assume an advisory, agency or fiduciary responsibility in the Borrowers' or the Borrowers' Affiliates' favor with respect to this Agreement or any of the transactions contemplated hereby (including the Transactions) or the process leading thereto (irrespective of whether any Secured Party or any of its Affiliates has advised or is currently advising the Borrowers or the Borrowers' Affiliates on other matters) and (c) no Secured Party has provided any legal, accounting, regulatory or tax advice with respect to this Agreement or any of the transactions contemplated hereby (including the Transactions) and the Borrowers have consulted with their own legal, accounting, regulatory and tax advisors to the extent the Borrowers have deemed appropriate.  Each Borrower hereby waives and releases, to the fullest extent permitted by Legal Requirement, any claims that each Borrower may have against any Secured Party and their respective Affiliates with respect to any breach or alleged breach of agency or fiduciary duty.

Section 9.21    [Reserved]

Section 9.22    Multiple Borrowers.

(a)    Obligations Joint and Several and Unconditional.  The obligations of each Borrower under this Agreement, the Notes and each other Credit Document are joint and several and absolute and

unconditional irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of the other Borrowers under this Agreement, the Notes or any other Credit Document (collectively, the "Other Borrower Obligations"), or any substitution, release or exchange of any other guarantee of or security for any of the Other Borrower Obligations, and, to the fullest extent permitted by applicable Legal Requirement, irrespective of any other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 9.22 that the obligations of each Borrower under this Agreement shall be absolute and unconditional under any and all circumstances. Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not affect the liability of any Borrower under this Agreement, the Notes, any other Credit Document or any other agreement referred to herein or therein:

(i) at any time or from time to time, without notice to any Borrower, the time for any performance of or compliance with any of the Other Borrower Obligations shall be extended, or such performance or compliance shall be waived;

(ii) any of the acts mentioned in any of the provisions of this Agreement or the Notes or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii) the maturity of any of the Other Borrower Obligations shall be accelerated, or any of the Other Borrower Obligations shall be modified, supplemented or amended in any respect, or any right under this Agreement or the Notes or any other Credit Document shall be waived or any other guarantee of any of the Other Borrower Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(iv) any lien or security interest granted to, or in favor of, the Administrative Agent or any Lender or Lenders as security for any of the Other Borrower Obligations shall fail to be perfected.

Each Borrower hereby expressly waives, with respect to the Other Borrower Obligations diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any Lender exhaust any right, power or remedy or proceed against the other Borrowers under this Agreement or the Notes or any other Credit Document, or against any other Person under any other guarantee of, or security for, any of the Other Borrower Obligations.

(b) Reinstatement. The obligations of any Borrower under this Agreement, the Notes, the Credit Documents or any other agreement or instrument referred to herein or therein, shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the other Borrowers in respect of the Other Borrower Obligations is rescinded or must be otherwise restored by any holder of any of the Other Borrower Obligations, whether as a result of any proceedings in a bankruptcy or reorganization or otherwise, and each Borrower agrees that it will indemnify the Administrative Agent and each Lender on demand for all reasonable costs and expenses (including fees of counsel) incurred by the Administrative Agent or such Lender in connection with such rescission or restoration.

(c) Subrogation. Each Borrower hereby agrees that until the termination of this Agreement, payment in full of the Obligations and termination in full of the Commitments, it shall not exercise any right or remedy arising by reason of any performance by it of any of its obligations hereunder, whether by subrogation or otherwise, against the Other Borrower Obligations or any security for any of the Other Borrower Obligations.

(d) Remedies. Each Borrower agrees that, as between such Borrower and the Administrative Agent and the Lenders, (i) the obligations of the other Borrowers under this Agreement and the Notes

may be declared to be forthwith due and payable as provided in <u>Article 7</u> hereof (and shall be deemed to have become automatically due and payable in the circumstances provided in <u>Article 7</u>) notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from being deemed to have become automatically due and payable) and (ii) such obligations (whether or not due and payable by such other Borrowers) shall forthwith become due and payable by such Borrower.

(e)     <u>Limitation on Obligations</u>.  Notwithstanding any provision to the contrary contained herein, in any of the Notes or any other Credit Document, to the extent the joint obligations of the Borrowers would be adjudicated to be invalid or unenforceable for any reason (including because of applicable state or federal law relating to fraudulent conveyances or transfers) then the aggregate obligations of each Borrower hereunder and under the Notes and all other agreements and instruments referred to herein or therein shall be limited to the maximum amount that is permissible under applicable Legal Requirement (whether federal or state and including, with limitation, any bankruptcy, insolvency, reorganization, moratorium, or similar law affecting creditors' rights generally).

(f)     <u>Borrowers' Representative; Binding on All Borrowers</u>.  Each Borrower hereby designates Holdings as its representative and agent on its behalf (the "<u>Borrower Representative</u>") for the purposes of issuing Notices of Borrowing, notices of Optional Prepayments, delivering DIP Budgets, Variance Reports, giving instructions with respect to the disbursement of the proceeds of the Advances, approving Eligible Assignees, and for the purposes of giving and receiving all other notices and consents hereunder or under any of the other Credit Documents and taking all other actions on behalf of any Borrower or Borrowers under the Credit Documents.  Borrower Representative hereby accepts such appointments. Unless otherwise expressly required hereunder, the Administrative Agent and each Lender may regard any notice or other communication pursuant to any Credit Document from the Borrower Representative or from an individual Borrower as a notice or communication from all Borrowers, and may give any notice or communication required or permitted to be given to any Borrower or Borrowers hereunder to the Borrower Representative or to a single Borrower on behalf of all Borrowers; <u>provided</u> that, the failure to give such notice to the Borrower Representative or any Borrower shall not release or diminish or otherwise affect in any way the Borrowers' obligation to pay any amounts owing under this Agreement or any other Credit Agreement or to otherwise comply with terms hereof or thereof.  Each Borrower agrees that each action taken or omitted to be taken by, and any notices and consents received by the Borrower Representative or any Borrower, and any notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative or any other Borrower shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

Section 9.23     **Integration**.  **THIS WRITTEN AGREEMENT AND THE CREDIT DOCUMENTS, AS DEFINED IN THIS AGREEMENT, REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND SUPERSEDE ALL PRIOR UNDERSTANDINGS AND AGREEMENTS, WHETHER WRITTEN OR ORAL, RELATING TO THE TRANSACTIONS PROVIDED FOR HEREIN AND THEREIN.  ADDITIONALLY, THIS AGREEMENT AND THE CREDIT DOCUMENTS MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

**IN EXECUTING THIS AGREEMENT, EACH CREDIT PARTY HERETO HEREBY WARRANTS AND REPRESENTS IT IS NOT RELYING ON ANY STATEMENT OR REPRESENTATION OTHER THAN THOSE IN THIS AGREEMENT AND IS RELYING UPON ITS OWN JUDGMENT AND ADVICE OF ITS ATTORNEYS.**

[Remainder of this page intentionally left blank.  Signature pages follow.]

EXECUTED as of the date first above written.

**BORROWERS:**

**KNIGHT ENERGY HOLDINGS, LLC**


By: _____
Name:
Title:

**HMC  LEASING, LLC**


By: _____
Name:
Title:

**KNIGHT FAMILY ENTERPRISES, L.L.C.**


By: _____
Name:
Title:

**KNIGHT OIL TOOLS, LLC**
**KNIGHT MANUFACTURING, LLC**
**KDCC, LLC**
**TRI-DRILL, LLC**
**ADVANCED SAFETY & TRAINING MANAGEMENT, LLC**
**KNIGHT SECURITY, LLC**
**KNIGHT INFORMATION SYSTEMS, L.L.C.**
**RAYNE PROPERTIES, L.L.C.**
**KNIGHT AVIATION, L.L.C.**
**KNIGHT RESEARCH & DEVELOPMENT, LLC**

By:     Knight Energy Holdings, LLC
          Its sole member


By: _____
Name:
Title:

**EL CABALLERO RANCH, INC.**


By: _____
Name:
Title:

**ADMINISTRATIVE AGENT/LENDERS:**

**CANTOR FITZGERALD SECURITIES**
as Administrative Agent


By: _____
Name:
Title:

**CLEARLAKE CAPITAL PARTNERS IV FINANCE, L.P.**
as a Lender

By: Clearlake Capital Partners IV GP, L.P, its general partner

By: Clearlake Capital Partners, LLC, its general partner


By: _____
Name:
Title:

## ANNEX I
### Commitments, Contact Information

| ADMINISTRATIVE AGENT | | |
|---|---|---|
| **Cantor Fitzgerald Securities** | **Address:** | 1801 N. Military Trail, Suite 202 |
| | | Boca Raton, FL 33431 |
| | **Attn:** | Niles Horning |
| | **Telephone:** | (212) 829-4889 |
| | **Facsimile:** | (646) 219-1180 |
| | **E-mail:** | nhorning@cantor.com |
| CREDIT PARTIES | | |
| **Borrower/Guarantors** | **Address**: | 2727 SE Evangeline Thruway |
| | | Lafayette, LA 70508 |
| | **Attn:** | Mark Comeaux |
| | **Telephone**: | (337) 233-0464 |
| | **Facsimile**: | (337) 233-0438 |

| Lender | Initial Funding Commitment | Second Funding Commitment | Third Funding Commitment | Total Commitment |
|---|---|---|---|---|
| Clearlake Capital Partners IV Finance, L.P. | $6,000,000 | $1,000,000 | $3,000,000 | $10,000,000 |
| **Total:** | $6,000,000 | $1,000,000 | $3,000,000 | $10,000,000 |

## SCHEDULE 1.1(A)
## Existing Equity Holders

### KNIGHT ENERGY HOLDINGS, LLC

| | Class A | Class B |
|---|---|---|
| Mark E. Knight | 25,658.14 | 103,336 |
| Bryan R. Knight | 25,658.14 | 227,270 |
| Kelley Knight Sobiesk | 25,658.14 | 227,270 |
| Mark E. Knight 2010 Trust No. 1 | 0 | 966 |
| Bryan R. Knight 2010 Trust No. 1 | 0 | 966 |
| Kelley Knight Sobiesk 2010 Trust No. 1 | 0 | 966 |
| MEK 2012 Family Trust No. 1 | 14,130(1) | 114,026.33(2) |
| BRK 2012 Family Trust No. 1 | 14,130(1) | 114,026.33(2) |
| KKS 2012 Family Trust No. 1 | 14,130(1) | 114,026.33(2) |
| Mark Knight Family 2012 Trust No. 1 | 0 | 123,934(3) |
| Total | 119,364.42 | 1,026,787 |

### HMC LEASING, LLC

| | |
|---|---|
| Mark Knight | 33 1/3% |
| Bryan Knight | 33 1/3% |
| Kelley Sobiesk | 33 1/3% |
| Total | 100% |

### KNIGHT FAMILY ENTERPRISES, LLC

| | |
|---|---|
| Ann Knight | 10% |
| Mark Knight | 6.41% |
| Bryan Knight | 6.41% |
| Kelley Sobiesk | 6.41% |
| Mark E Knight 2010 Trust No 1 | 23.59% |
| Kelley Knight Sobiesk 2010 Trust  No 1 | 23.59% |
| Bryan Knight 2010 Trust  No 1 | 23.59% |
| Total | 100% |

## SCHEDULE 4.1
## Organizational Information

| Restricted Entity | Formation/ Organization |
|---|---|
| Knight Energy Holdings, LLC | Louisiana |
| Knight Oil Tools, LLC | Louisiana |
| Knight Manufacturing, LLC | Louisiana |
| KDCC, LLC | Louisiana |
| Tri-Drill, LLC | Louisiana |
| Advanced Safety and Training Management, LLC | Louisiana |
| Knight Information Systems, L.L.C. | Louisiana |
| HMC Leasing, LLC | Louisiana |
| Knight Family Enterprises, L.L.C. | Louisiana |
| Knight International, L.L.C. | Louisiana |
| Knight Dutch Holdings, L.L.C. | Louisiana |
| Knight Resources, LLC | Louisiana |
| Knight Aviation, L.L.C. | Louisiana |
| Rayne Properties, L.L.C. | Louisiana |
| El Caballero Ranch, Inc. | Texas |
| HMC Investments, L.L.C. | Louisiana |
| Knight International Acquisitions, LLC | Louisiana |
| Knight Security, LLC | Louisiana |
| Knight Research & Development, LLC | Louisiana |
| Knight Oil Tools Netherlands Cooperatief U.A. | Netherlands |
| Knight Oil Tools (Dutch Holdings) B.V. | Netherlands |
| Knight Oil Tools do Brasil Serviços Ltda | Brazil |
| Knight Oil Tools Colombia SAS | Colombia |
| Knight Oil Tools Middle East DMCC | Dubai, UAE |
| Knight Oil Tools (Australia) PTY LTD | Western Australia |
| Cool Group Limited | United Kingdom |
| KOT Knight Oil Tools International for Oilfield Services Limited | Kurdistan/Iraq |
| Global Rentals UK Limited | United Kingdom |
| Pedem Limited | United Kingdom |
| Pedem, Inc. | United Kingdom |
| Knight Oil Tools UK Acquisitions Company Limited | United Kingdom |
| Pedem Norway AS | Norway |
| Knight Oil Tools Norway AS | Norway |
| Knight Oil Tools Holland BV | Netherlands |
| Knight Oil Tools Switzerland GmbH | Switzerland |

## SCHEDULE 4.11

### Subsidiaries

| Company | Owner(s) |
|---|---|
| Knight Oil Tools, LLC | Knight Energy Holdings, LLC (100%) |
| Knight Manufacturing, LLC | Knight Energy Holdings, LLC (100%) |
| KDCC, LLC | Knight Energy Holdings, LLC (100%) |
| Tri-Drill, LLC | Knight Energy Holdings, LLC (100%) |
| Advanced Safety and Training Management, LLC | Knight Energy Holdings, LLC (100%) |
| Knight Resources, LLC | Knight Energy Holdings, LLC (100%) |
| Knight Security, LLC | Knight Energy Holdings, LLC (100%) |
| Knight Information Systems, L.L.C. | Knight Energy Holdings, LLC (100%) |
| El Caballero Ranch, Inc. | Knight Energy Holdings, LLC (100%) |
| Rayne Properties, L.L.C. | Knight Energy Holdings, LLC (100%) |
| Knight Aviation, L.L.C. | Knight Energy Holdings, LLC (100%) |
| Knight International, L.L.C. | Knight Energy Holdings, LLC (100%) |
| Knight Research & Development, LLC | Knight Energy Holdings, LLC (100%) |
| Knight Dutch Holdings, L.L.C. | Knight International, L.L.C. (100%) |
| HMC Investments, L.L.C. | HMC Leasing, LLC (100%) |
| Knight Oil Tools Netherlands Cooperatief U.A. | Knight International, L.L.C. (99%)<br>Knight Dutch Holdings, L.L.C. (1%) |
| Knight Oil Tools (Dutch Holdings) B.V. | Knight Oil Tools Netherlands Cooperatief U.A. (100%) |
| Knight Oil Tools do Brasil Serviços Ltda | Knight Oil Tools (Dutch Holdings) B.V. (99%)<br>Knight International Acquisitions, LLC (1%) |
| Knight Oil Tools Switzerland GmbH | Knight Oil Tools (Dutch Holdings) B.V. (100%) |
| Knight Oil Tools Colombia SAS | Knight Oil Tools (Dutch Holdings) B.V. (100%) |
| Knight Oil Tools Middle East DMCC | Knight Oil Tools (Dutch Holdings) B.V. (100%) |
| Knight Oil Tools (Australia) PTY LTD | Knight Oil Tools (Dutch Holdings) B.V. (100%) |
| Knight Oil Tools UK Acquisition Company Limited | Knight Oil Tools (Dutch Holdings) B.V. (100%) |
| Cool Group Limited | Knight Oil Tools UK Acquisition Company Limited (100%) |
| KOT Knight Oil Tools International for Oilfield Services Limited | Knight Oil Tools (Dutch Holdings) B.V. (100%) |
| Knight Oil Tools Norway AS | Cool Group Limited (100%) |
| Knight Oil Tools Holland BV | Knight Oil Tools Norway AS (100%) |
| Global Rentals UK Limited | Cool Group Limited (100%) |
| Pedem Limited | Cool Group Limited (100%) |
| Pedem, Inc. | Cool Group Limited (100%) |
| Pedem Norway AS | Cool Group Limited (100%) |

# EXHIBIT A
## FORM OF ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (this "<u>Assignment and Acceptance</u>") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "<u>Assignor</u>") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "<u>Assignee</u>").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented, restated or otherwise modified from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee.  The Standard Terms and Conditions for Assignment and Acceptance set forth in <u>Annex 1</u> attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions for Assignment and Acceptance and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] under the respective facilities identified below (including without limitation any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to <u>clause (i)</u> above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to <u>clauses (i)</u> and <u>(ii)</u> above being referred to herein collectively as [the][an] "<u>Assigned Interest</u>").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by [the][any] Assignor.

1.  Assignor[s]: _____

_____

[Assignor [is] [is not] a Defaulting Lender]

2.  Assignee[s]: _____

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

_____
[for each Assignee, indicate [Affiliate] of [*identify Lender*]

3.      Borrowers:

Knight Energy Holdings, LLC,
Knight Oil Tools, LLC,
Knight Manufacturing, LLC,
KDCC, LLC,
Tri-Drill, LLC,
Advanced Safety and Training Management, LLC,
Knight Information Systems, L.L.C.,
HMC Leasing, LLC,
Knight Family Enterprises, L.L.C.,
Knight Aviation, L.L.C.,
Rayne Properties, L.L.C.,
El Caballero Ranch, Inc.,
Hmc Investments, L.L.C.,
Knight Security, LLC, and
Knight Research & Development, LLC

4.      Administrative Agent:  CANTOR FITZGERALD SECURITIES, as administrative agent under the Credit Agreement.

5.      Credit Agreement:     Credit Agreement dated August 9, 2017 among the Borrowers, the Lenders party thereto from time to time, and Cantor Fitzgerald Securities, as Administrative Agent.

6.      Assigned Interest[s]:

| Assignor[s] | Assignee[s] | Aggregate Amount of Commitments /Advances for all Lenders | Amount of Commitment / Advances Assigned[5] | Percentage Assigned of Commitment / Advances[6] | CUSIP Number |
|---|---|---|---|---|---|
| | | $ | $ | % | |
| | | $ | $ | % | |
| | | $ | $ | % | |

7.      Trade Date:         _____[7]

Effective Date: _____ ___, 20___  [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

_____

[5] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[6] Set forth, to at least 9 decimals, as a percentage of the Commitment / Advances of all Lenders thereunder.

[7] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR[S][8]
[NAME OF ASSIGNOR]


By: _____
Name: _____
Title: _____


ASSIGNEE[S]
[NAME OF ASSIGNEE]


By: _____
Name: _____
Title: _____

---

[8] Add additional signature blocks as needed.

[Consented to and] [9] Accepted:

**CANTOR FITZGERALD SECURITIES,**
as Administrative Agent


By: _____
Name: _____
Title: _____


[Consented to:] [10]

**KNIGHT ENERGY HOLDINGS, LLC**

By: _____
Name: _____
Title: _____

---

[9] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.
[10] To be added only if the consent of the Borrower Representative is required by the terms of the Credit Agreement.

## STANDARD TERMS AND CONDITIONS FOR
## ASSIGNMENT AND ACCEPTANCE

1. <u>Representations and Warranties</u>.

1.1 <u>Assignor[s]</u>. [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any Subsidiary or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by any Borrower, any Subsidiary or any other Person of any of its obligations under any Credit Document.

1.2. <u>Assignee[s]</u>. [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all the requirements to be an assignee under Section 9.7 of the Credit Agreement (subject to such consents, if any, as may be required under Section 9.7 of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.2 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase [the][such] Assigned Interest, and (vii) if it is not incorporated under the laws of the United States of America or a state thereof, attached to this Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the][such] Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignee whether such amounts have accrued prior to, on or after the Effective Date. The Assignor[s] and the Assignee[s] shall make all appropriate adjustments in payments by the Administrative Agent for periods prior to the Effective Date or with respect to the making of this assignment directly between themselves.

3.  <u>General Provisions</u>.  This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.  This Assignment and Acceptance shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflicts of laws principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

# EXHIBIT B
# FORM OF GUARANTY AGREEMENT

This Guaranty Agreement dated as of [___] (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Guaranty") is executed by each of the undersigned (individually a "Guarantor" and collectively, the "Guarantors"), in favor of Cantor Fitzgerald Securities, as Administrative Agent (as defined below) for the ratable benefit of the Secured Parties.

## INTRODUCTION

A.   This Guaranty is given in connection with that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders.

B.   Each Guarantor (other than the Borrowers) is a Subsidiary (as defined in the Credit Agreement) of a Borrower and each of the transactions contemplated by the Credit Agreement and the other Credit Documents is (a) in furtherance of such Subsidiary's corporate, limited liability company or partnership purposes, (b) necessary or convenient to the conduct, promotion or attainment of such Subsidiary's business, and (c) for such Subsidiary's direct or indirect benefit.

C.   Each Borrower is a party to this Guaranty in order to guarantee the Obligations to the extent that the Obligations were directly incurred by a Credit Party other than such Borrower.

D.   Each Guarantor is executing and delivering this Guaranty (i) to induce the Lenders to provide and to continue to provide Advances under the Credit Agreement and (ii) intending it to be a legal, valid, binding, enforceable and continuing obligation of such Guarantor.

NOW, THEREFORE, in consideration of the premises, each Guarantor hereby agrees as follows:

Section 1.      Definitions.   All capitalized terms not otherwise defined in this Guaranty, including those in the preamble and recitals above, that are defined in the Credit Agreement shall have the meanings assigned to such terms by the Credit Agreement.

Section 2.      Guaranty.

(a)  Each Guarantor hereby absolutely, unconditionally and irrevocably guarantees the punctual payment and performance, when due, whether at stated maturity, by acceleration or otherwise, of all Obligations, whether absolute or contingent and whether for principal, interest (including, without limitation, interest that but for the existence of a bankruptcy, reorganization or similar proceeding would accrue), fees, amounts required to be provided as collateral, indemnities, expenses or otherwise (collectively, the "Guaranteed Obligations").  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by any Credit Party to the Administrative Agent or any Lender under the Credit Documents but for the fact that they are unenforceable or not allowable due to insolvency or the existence of a bankruptcy, reorganization or similar proceeding involving such Credit Party.

(b)  If any or all of the Guaranteed Obligations are not duly paid or performed by a Borrower and are not recoverable under Section 2(a) for any reason whatsoever, such Guaranteed Obligations shall, as a separate and distinct obligation, be recoverable by the Secured Parties from each Guarantor as the primary obligor and principal debtor in respect thereof and shall be paid to the Secured Parties forthwith after demand therefor as provided herein.

(c)  In order to provide for just and equitable contribution among the Guarantors, the Guarantors agree that in the event a payment shall be made on any date under this Guaranty by any Guarantor (the "Funding Guarantor"), each other Guarantor (each a "Contributing Guarantor") shall indemnify the Funding Guarantor in an amount equal to the amount of such payment, in each case multiplied by a fraction the numerator of which shall be the net worth of the Contributing Guarantor as of such date and the denominator of which shall be the aggregate net worth of all the Contributing Guarantors together with the net worth of the Funding Guarantor as of such date.  Any Contributing Guarantor making any payment to a Funding Guarantor pursuant to this Section 2(b) shall be subrogated to the rights of such Funding Guarantor to the extent of such payment.

(d)  [Reserved].

(e)  Anything contained in this Guaranty to the contrary notwithstanding, the obligations of each Guarantor under this Guaranty on any date shall be limited to a maximum aggregate amount equal to the largest amount that would not, on such date, render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the United States Bankruptcy Code (11 U.S.C. §§ 101 *et. seq*) or any applicable provisions of comparable laws relating to bankruptcy, insolvency, or reorganization, or relief of debtors (collectively, the "Fraudulent Transfer Laws"), but only to the extent that any Fraudulent Transfer Law has been found in a final non-appealable judgment of a court of competent jurisdiction to be applicable to such obligations as of such date, in each case:

(i)  after giving effect to all liabilities of such Guarantor, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws, but specifically excluding:

(A)  any liabilities of such Guarantor in respect of intercompany indebtedness to any Borrower or other Affiliates of any Borrower to the extent that such indebtedness would be discharged in an amount equal to the amount paid by such Guarantor hereunder;

(B)  any liabilities of such Guarantor under this Guaranty; and

(C)  any liabilities of such Guarantor under each of its other guarantees of and joint and several co-borrowings of Debt, in each case entered into on the date this Guaranty becomes effective, which contain a limitation as to maximum amount substantially similar to that set forth in this Section 2(e) (each such other guaranty and joint and several co-

borrowing entered into on the date this Guaranty becomes effective, a "Competing Guaranty") to the extent such Guarantor's liabilities under such Competing Guaranty exceed an amount equal to (1) the aggregate principal amount of such Guarantor's obligations under such Competing Guaranty (notwithstanding the operation of that limitation contained in such Competing Guaranty that is substantially similar to this Section 2(e)), multiplied by (2) a fraction (i) the numerator of which is the aggregate principal amount of such Guarantor's obligations under such Competing Guaranty (notwithstanding the operation of that limitation contained in such Competing Guaranty that is substantially similar to this Section 2(e)), and (ii) the denominator of which is the sum of (x) the aggregate principal amount of the obligations of such Guarantor under all other Competing Guaranties (notwithstanding the operation of those limitations contained in such other Competing Guaranties that are substantially similar to this Section 2(e)), (y) the aggregate principal amount of the obligations of such Guarantor under this Guaranty (notwithstanding the operation of this Section 2(e)), and (z) the aggregate principal amount of the obligations of such Guarantor under such Competing Guaranty (notwithstanding the operation of that limitation contained in such Competing Guaranty that is substantially similar to this Section 2(e)); and

(ii)     after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation, reimbursement, indemnification or contribution of such Guarantor pursuant to applicable law or pursuant to the terms of any agreement (including any such right of contribution under Section 2(b)).

Section 3.      Guaranty Absolute. Each Guarantor guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Credit Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of any Secured Party with respect thereto but subject to Section 2(e) above.  The obligations of each Guarantor under this Guaranty are independent of the Guaranteed Obligations or any other obligations of any other Person under the Credit Documents, and a separate action or actions may be brought and prosecuted against a Guarantor to enforce this Guaranty, irrespective of whether any action is brought against any Borrower, any Guarantor or any other Person or whether any Borrower, any Guarantor or any other Person is joined in any such action or actions.  The liability of each Guarantor under this Guaranty shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives, to the fullest extent not prohibited by applicable law, any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)     any lack of validity or enforceability of any Credit Document or any agreement or instrument relating thereto or any part of the Guaranteed Obligations being irrecoverable;

(b)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations or any other obligations of any Person under the Credit Documents or any other amendment or waiver of or any consent to departure from any Credit Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to the Borrowers or otherwise;

(c)     any taking, exchange, release or non-perfection of any lien in any collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)     any manner of application of collateral, or proceeds thereof, to all or any of the Guaranteed Obligations, or any manner of sale or other disposition of any collateral for all or any of the

Guaranteed Obligations or any other obligations of any other Person under the Credit Documents or any other assets of any Borrower or any Guarantor;

(e)     any change, restructuring or termination of the corporate, limited liability or partnership structure or existence of any Borrower or any Guarantor;

(f)     any failure of any Secured Party to disclose to any Borrower or any Guarantor any information relating to the business, condition (financial or otherwise), operations, properties or prospects of any Person now or in the future known to the Administrative Agent, any Lender or any other Secured Party (and each Guarantor hereby irrevocably waives any duty on the part of any Secured Party to disclose such information);

(g)     any signature of any officer of any Borrower or any Guarantor being mechanically reproduced in facsimile or otherwise;

(h)     any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by any Borrower, any Guarantor or any other Person against any Secured Party;

(i)     the insolvency, bankruptcy arrangement, reorganization, adjustment, composition, liquidation, disability, dissolution or lack of power of any Borrower, any Guarantor or any other Person at any time liable for the payment of all or part of the Guaranteed Obligations or the failure of the Administrative Agent or any other Secured Party to file or enforce a claim in bankruptcy or other proceeding with respect to any Person;

(j)     any sale, lease or transfer of any or all of the assets of any Borrower, any Guarantor, or any changes in the holders of equity of any Borrower or any Guarantor;

(k)     any failure of the Administrative Agent or any other Secured Party to take any action whatsoever to mitigate or reduce any Borrower's or any Guarantor's liability hereunder or any other Credit Document;

(l)     any Legal Requirement which provides that the obligation of a surety or guarantor must neither be larger in amount nor in other respects more burdensome than that of the principal or which reduces a surety's or guarantor's obligation in proportion to the principal obligation;

(m)     the possibility that the Guaranteed Obligations may at any time and from time to time exceed the aggregate liability of such Guarantor under this Guaranty;

(n)     any defense arising by reason of any failure of any Secured Party to make any presentment, or protest or to give any other notice, including notice of all of the following:  acceptance of this Guaranty, partial payment or non-payment of all or any part of the Guaranteed Obligations and the existence, creation, or incurring of new or additional Guaranteed Obligations;

(o)     any defense arising by reason of any incapacity, lack of authority, or other defense of a Borrower or any other person, or by reason of any limitation, postponement or prohibition on a Secured Party's rights to payment, or the cessation from any cause whatsoever of the liability of a Borrower or any other person with respect to all or any part of the Guaranteed Obligations (other than payment to the Secured Parties in full), or by reason of any act or omission of the Secured Parties or others which directly or indirectly results in the discharge or release of any Borrower or any other person or of all or any part of the

(TS-A-102)
17-51014 - #87  File 08/11/17  Enter 08/11/17 16:36:13  Main Document  Pg 184 of 216

Guaranteed Obligations or any security or guarantee therefor, whether by contract, operation of law or otherwise;

(p)     any defense arising by reason of the failure of the Secured Parties to marshal assets;

(q)     any defense based upon any failure of the Secured Parties to give to any Borrower or Guarantor notice of any sale or other disposition of any property securing any or all of the Guaranteed Obligations or any other guarantee thereof, or any notice that may be given in connection with any sale or other disposition of any such property;  or

(r)     any other circumstance or any existence of or reliance on any representation by any Secured Party that might otherwise constitute an equitable or legal defense available to, or an equitable or legal discharge of, any Borrower, any Guarantor or any other guarantor, surety or other Person.

Section 4.     <u>Continuation and Reinstatement, Etc.</u>  Each Guarantor agrees that, to the extent that payments of any of the Guaranteed Obligations are made, or any Secured Party receives any proceeds of collateral, and such payments or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, or otherwise required to be repaid, then to the extent of such repayment the Guaranteed Obligations shall be reinstated and continued in full force and effect as of the date such initial payment or collection of proceeds occurred.  **EACH GUARANTOR SHALL DEFEND AND INDEMNIFY EACH SECURED PARTY FROM AND AGAINST ANY CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE UNDER THIS <u>SECTION 4</u> (INCLUDING REASONABLE ATTORNEYS' FEES AND EXPENSES) IN THE DEFENSE OF ANY SUCH ACTION OR SUIT, INCLUDING SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE ARISING AS A RESULT OF THE INDEMNIFIED SECURED PARTY'S OWN NEGLIGENCE BUT EXCLUDING SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE THAT IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNIFIED SECURED PARTY'S GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT; PROVIDED, HOWEVER, THAT IT IS THE INTENTION OF EACH GUARANTOR HERETO THAT EACH INDEMNIFIED SECURED PARTY BE INDEMNIFIED IN THE CASE OF ITS OWN NEGLIGENCE (OTHER THAN GROSS NEGLIGENCE), REGARDLESS OF WHETHER SUCH NEGLIGENCE IS SOLE OR CONTRIBUTORY, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL**.

Section 5.     <u>Waivers and Acknowledgments</u>.

(a)     Each Guarantor, to the fullest extent not prohibited by applicable law, hereby waives promptness, diligence, presentment, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Guaranty and any requirement that any Secured Party protect, secure, perfect or insure any Lien or any property or exhaust any right or take any action against any Borrower or any other Person or any collateral.

(b)     Each Guarantor, to the extent not prohibited by applicable law, hereby irrevocably waives any right to revoke this Guaranty, and acknowledges that this Guaranty is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

(c)     Each Guarantor acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements involving the Borrowers or any Guarantor contemplated by the Credit Documents and that the waivers set forth in this Guaranty are knowingly made in contemplation of such benefits.

Section 6.     <u>Subrogation and Subordination</u>.

(a)     No Guarantor will exercise any rights that it may now have or hereafter acquire against any Borrower or any other Person to the extent that such rights arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Guaranty or any other Credit Document, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of any Secured Party against any Borrower or any other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Borrower or any other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the occurrence of the Termination Date (as defined below). If any amount shall be paid to a Guarantor in violation of the preceding sentence at any time prior to or on the Termination Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent to be credited and applied to the Guaranteed Obligations and any and all other amounts payable by the Guarantors under this Guaranty, whether matured or unmatured, in accordance with the terms of the Credit Documents. For purposes of this Guaranty, "Termination Date" means, subject to Section 4, the date on which each of the following shall have occurred: the termination of the Credit Agreement and the payment in full of all outstanding Advances and all other Obligations.

(b)     Each Guarantor agrees that, until two years and one day after the Termination Date, all Subordinated Guarantor Obligations (as hereinafter defined) are and shall be subordinate and inferior in rank, preference and priority to all obligations of such Guarantor in respect of the Guaranteed Obligations hereunder, and such Guarantor shall, if requested by the Administrative Agent, execute a subordination agreement reasonably satisfactory to the Administrative Agent to more fully set out the terms of such subordination. Each Guarantor agrees that none of the Subordinated Guarantor Obligations shall be secured by a lien or security interest on any assets of such Guarantor or any ownership interests in any Subsidiary of such Guarantor. "<u>Subordinated Guarantor Obligations</u>" means any and all obligations and liabilities of a Guarantor owing to any Borrower or any other Guarantor, direct or contingent, due or to become due, now existing or hereafter arising, including, without limitation, all future advances, with interest, attorneys' fees, expenses of collection and costs.

Section 7.     <u>Representations and Warranties</u>. Each Guarantor hereby represents and warrants as follows:

(a)     There are no conditions precedent to the effectiveness of this Guaranty. Such Guarantor benefits from executing this Guaranty.

(b)     Such Guarantor has, independently and without reliance upon the Administrative Agent or any Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Guaranty, and such Guarantor has established adequate means of obtaining from each Borrower and each other relevant Person on a continuing basis information pertaining to, and is now and on a continuing basis will be completely familiar with, the business, condition (financial and otherwise), operations, properties and prospects of each Borrower and each other relevant Person.

(c)     The obligations of such Guarantor under this Guaranty are the valid, binding and legally enforceable obligations of such Guarantor, (except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws at the time in effect affecting the rights of creditors generally and (ii) general principles of equity whether applied by a court of law or equity). The execution, delivery, and performance by each Guarantor of this Guaranty (i) are within such Guarantor's corporate,

B-6

limited liability company or partnership, as applicable, powers, (ii) have been duly authorized by all necessary corporate, limited liability company or partnership action, as applicable, (iii) do not contravene any articles or certificate of incorporation or organization or bylaws or partnership or limited liability company operating agreement, as applicable, binding on or affecting such Guarantor, other than those for which waivers or consents have been obtained, (iv) do not contravene any law or any material contractual obligation binding on or affecting such Guarantor, (v) do not result in or require the creation or imposition of any Lien prohibited by the Credit Agreement, and (vi) do not require any authorization or approval or other action by, or any notice or filing with, any Governmental Authority other than (A) those that have been obtained and (B) filings necessary to perfect Liens created pursuant to the Credit Documents.

Section 8.    <u>Right of Set-Off</u>.  Upon the occurrence and during the continuance of any Event of Default, any Lender or the Administrative Agent, any other Secured Party and each of their respective Affiliates is hereby authorized at any time, to the fullest extent permitted by law, to set-off and apply any deposits (general or special, time or demand, provisional or final) and other indebtedness owing by such Secured Party to the account of any Guarantor against any and all of the obligations of such Guarantor under this Guaranty, irrespective of whether or not such Secured Party shall have made any demand under this Guaranty and although such obligations may be contingent and unmatured or are owed to a branch or office of the Administrative Agent, such Lender, such Affiliate, or such other Secured Party different from the branch or office holding such deposit or obligated on such indebtedness.  Such Secured Party shall promptly notify the affected Guarantor after any such set-off and application is made, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Secured Parties under this <u>Section 8</u> are in addition to other rights and remedies (including, without limitation, other rights of set-off) which any Secured Party may have.

Section 9.    <u>Amendments, Etc</u>.  No amendment or waiver of any provision of this Guaranty and no consent to any departure by any Guarantor therefrom shall in any event be effective unless the same shall be in writing and signed by the affected Guarantor and the Administrative Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.    <u>Notices, Etc</u>.  All notices and other communications provided for hereunder shall be sent in the manner provided for in Section 9.9 of the Credit Agreement, in writing and hand delivered with written receipt, telecopied, sent by facsimile, sent by a nationally recognized overnight courier, or sent by certified mail, return receipt requested, if to a Guarantor, at the address set forth for the Borrower Representative in the Credit Agreement, and if to any Secured Party, at its address specified in or pursuant to the Credit Agreement.  All such notices and communications shall be effective when delivered.

Section 11.    <u>No Waiver: Remedies</u>.  No failure on the part of the Administrative Agent or any other Secured Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 12.    <u>Continuing Guaranty: Assignments under the Credit Agreement.</u>  This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until the Termination Date, (b) be binding upon each Guarantor and its successors and assigns and (c) inure to the benefit of and be enforceable by the Administrative Agent, each Lender, and their respective successors, and, in the case of transfers and assignments made in accordance with the Credit Agreement, transferees and assigns.  Without limiting the generality of the foregoing <u>clause (c)</u>, subject to Section 9.7 of the Credit Agreement, any Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement (including, without limitation, all or any portion of its Commitment, the Advances owing to it and the Note or Notes held by it) to any other Person, and such other Person shall thereupon become vested with all the

benefits in respect thereof granted to such Lender herein or otherwise, subject, however, in all respects to the provisions of the Credit Agreement. Each Guarantor acknowledges that upon any Person becoming a Lender or the Administrative Agent in accordance with the Credit Agreement, such Person shall be entitled to the benefits hereof.

Section 13. <u>Governing Law; Service of Process</u>. This Guaranty shall be deemed a contract under, and shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to conflicts of laws principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York). Each Guarantor hereby agrees that service of copies of the summons and complaint and any other process which may be served in any such action or proceeding may be made by mailing or delivering a copy of such process to such Guarantor at the address set forth for the Borrower Representative in the Credit Agreement. Nothing in this Section shall affect the rights of any Lender to serve legal process in any other manner permitted by the law or affect the right of any Lender to bring any action or proceeding against any Guarantor or its Property in the courts of any other jurisdiction.

Section 14. <u>Submission to Jurisdiction</u>. Each Guarantor hereby agrees that any suit or proceeding arising in respect of this Guaranty, or any of the matters contemplated hereby will be tried exclusively in the following jurisdictions (the "<u>Chosen Courts</u>"): (i) in the Bankruptcy Court to the extent that it has jurisdiction and (ii) to the extent the Bankruptcy Court does not have jurisdiction, in the U.S. District Court for the Southern District of New York or, if such court does not have subject matter jurisdiction, in any state court located in the City and County of New York. Each Guarantor hereby agrees to submit to the exclusive jurisdiction of, and venue in, the Chosen Courts. Each Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirement. Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirement, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Guaranty in any Chosen Court. Each Guarantor hereby agrees that Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York shall apply to this Guaranty and irrevocably waives, to the fullest extent permitted by applicable Legal Requirement, the defense of any inconvenient forum to the maintenance of such action or proceeding in any Chosen Court.

Section 15. <u>Waiver of Jury</u>. EACH GUARANTOR HEREBY ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY AND HAVE CONSULTED WITH COUNSEL OF ITS CHOICE, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 16. **<u>INDEMNIFICATION</u>.** EACH GUARANTOR AGREES TO, JOINTLY AND SEVERALLY, INDEMNIFY AND HOLD HARMLESS THE ADMINISTRATIVE AGENT AND EACH SECURED PARTY AND EACH OF THEIR AFFILIATES AND THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, PARTNERS, REPRESENTATIVES AND ADVISORS (EACH, AN "<u>INDEMNITEE</u>") FROM AND AGAINST ANY AND ALL ACTIONS, SUITS, CLAIMS, DAMAGES, LOSSES, LIABILITIES, COSTS, AND EXPENSES OF ANY KIND OR NATURE (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES) THAT MAY BE INCURRED BY OR ASSERTED OR AWARDED AGAINST ANY INDEMNITEE, IN EACH CASE ARISING OUT OF OR IN CONNECTION WITH OR BY REASON OF (INCLUDING, WITHOUT LIMITATION, IN CONNECTION WITH ANY INVESTIGATION, LITIGATION, OR PROCEEDING OR PREPARATION OF DEFENSE IN CONNECTION THEREWITH) THIS GUARANTY, ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN OR THE ACTUAL OR PROPOSED USE OF THE PROCEEDS OF THE ADVANCES, **<u>IN ALL CASES, WHETHER OR NOT CAUSED BY OR</u>**

**ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE, ACTIVE OR PASSIVE, IMPUTED, JOINT OR TECHNICAL NEGLIGENCE OF THE APPLICABLE INDEMNITEE,** EXCEPT TO THE EXTENT SUCH CLAIM, DAMAGE, LOSS, LIABILITY, COST, OR EXPENSE IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.  IN THE CASE OF AN INVESTIGATION, LITIGATION OR OTHER PROCEEDING TO WHICH THE INDEMNITY IN THIS SECTION 16 APPLIES, SUCH INDEMNITY SHALL BE EFFECTIVE WHETHER OR NOT SUCH INVESTIGATION, LITIGATION OR PROCEEDING IS BROUGHT BY ANY GUARANTOR, ITS DIRECTORS, SHAREHOLDERS OR CREDITORS OR AN INDEMNITEE OR ANY OTHER PERSON OR ANY INDEMNITEE IS OTHERWISE A PARTY THERETO.  No Affiliate, equityholder or creditor of any Credit Party (other than a Credit Party) is intended to be, and none of such Persons or entities shall be, third party beneficiaries of the Credit Documents, and therefore no Indemnitee will have any liability (whether direct or indirect, in contract or tort, or otherwise) to any such respective Affiliate that is not a party hereto or to their respective equityholders or creditors arising out of, related to or in connection with any Credit Document or any agreement or instrument contemplated thereby, the transactions contemplated thereby, any Advance or the use of the proceeds thereof.  No Guarantor shall, without the prior written consent of each Indemnitee affected thereby (which consent will not be unreasonably withheld), settle any threatened or pending claim or action that would give rise to the right of any Indemnitee to claim indemnification hereunder unless such settlement (x) includes a full and unconditional release of all liabilities arising out of such claim or action against such Indemnitee and (y) does not include any statement as to or an admission of fault, culpability or failure to act by or on behalf of any Indemnitee.

Section 17.    Additional Guarantors.   Pursuant to Section 5.14 of the Credit Agreement, Domestic Subsidiaries of any Borrower that were not in existence on the date of the Credit Agreement are required to enter into this Guaranty as a Guarantor upon becoming a Subsidiary.  Upon execution and delivery after the date hereof by such Subsidiary of an instrument in the form of Annex 1, such Subsidiary shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein.  The execution and delivery of any instrument adding an additional Guarantor as a party to this Guaranty shall not require the consent of any other Guarantor hereunder.  The rights and obligations of each Guarantor hereunder shall remain in full force and effect notwithstanding the addition of any new Guarantor as a party to this Guaranty.

Section 18.    USA Patriot Act.   Each Secured Party that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any other Secured Party) hereby notifies each Guarantor that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001))(the "Act"), it is required to obtain, verify and record information that identifies such Guarantor, which information includes the name and address of such Guarantor and other information that will allow such Secured Party or the Administrative Agent, as applicable, to identify such Guarantor in accordance with the Act.  Following a request by any Secured Party, each Guarantor shall promptly furnish all documentation and other information that such Secured Party reasonably requests in order to comply with its ongoing obligations under the applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**THIS GUARANTY AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

[Remainder of this page intentionally left blank.]

The Guarantor has caused this Guaranty to be duly executed as of the date first above written.

**[GUARANTOR]**

By: _____
Name:
Title:

B-10

SUPPLEMENT NO. _____ dated as of _____(the "Supplement"), to the Guaranty Agreement dated as of [___] (as amended, supplemented or otherwise modified from time to time, the "Guaranty Agreement"), executed by [GUARANTORS], and Cantor Fitzgerald Securities, as Administrative Agent (in such capacity, the "Administrative Agent") for the benefit of the Secured Parties (as defined in the Credit Agreement referred to herein).

A. Reference is made to that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders.

B. Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Guaranty Agreement and the Credit Agreement.

C. The Guarantors have entered into the Guaranty Agreement in order to induce the Lenders to make Advances. Section 17 of the Guaranty Agreement provides that additional Domestic Subsidiaries of any Borrower become Guarantors under the Guaranty Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New Guarantor") is executing this Supplement in accordance with the requirements of the Credit Agreement to become a Guarantor under the Guaranty Agreement in order to induce the Lenders to make additional Advances and as consideration for Advances previously made.

Accordingly, the New Guarantor agrees as follows:

SECTION 1. In accordance with Section 17 of the Guaranty Agreement, the New Guarantor by its signature below becomes a Guarantor under the Guaranty Agreement with the same force and effect as if originally named therein as a Guarantor and the New Guarantor hereby (a) agrees to all the terms and provisions of the Guaranty Agreement applicable to it as a Guarantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Guarantor thereunder are true and correct in all material respects on and as of the date hereof. Each reference to a "Guarantor" in the Guaranty Agreement shall be deemed to include the New Guarantor. The Guaranty Agreement is hereby incorporated herein by reference.

SECTION 1.   The New Guarantor represents and warrants to the Administrative Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it by all requisite corporate, limited liability company or partnership action and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

SECTION 2.   This Supplement shall become effective when the Administrative Agent shall have received this Supplement executed by the New Guarantor.  Delivery of an executed Supplement by fax transmission or by e-mail "PDF" copy shall be as effective as manual delivery.

SECTION 3.   Except as expressly supplemented hereby, the Guaranty Agreement shall remain in full force and effect.

SECTION 4.   This Supplement shall be deemed a contract under, and shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without regard to conflicts of laws principles (other than Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).  The New Guarantor hereby agrees that service of copies of the summons and complaint and any other process which may be served in any such action or proceeding may be made by mailing or delivering a copy of such process to the New Guarantor at the address set forth on the signature page to this Supplement.  Nothing in this Section shall affect the rights of any Lender to serve legal process in any other manner permitted by the law or affect the right of any Lender to bring any action or proceeding against the New Guarantor or its Property in the courts of any other jurisdiction.

SECTION 5.   The New Guarantor hereby agrees that any suit or proceeding arising in respect of this Supplement or the Guaranty Agreement, or any of the matters contemplated hereby or thereby will be tried exclusively in the following jurisdictions (the "Chosen Courts"): (i) in the Bankruptcy Court to the extent that it has jurisdiction and (ii) to the extent the Bankruptcy Court does not have jurisdiction, in the U.S. District Court for the Southern District of New York or, if such court does not have subject matter jurisdiction, in any state court located in the City and County of New York.  The New Guarantor hereby agrees to submit to the exclusive jurisdiction of, and venue in, the Chosen Courts.  The New Guarantor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Legal Requirement.  The New Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Legal Requirement, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Supplement or the Guaranty Agreement in any Chosen Court.  The New Guarantor hereby agrees that Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York shall apply to this Supplement and the Guaranty Agreement and irrevocably waives, to the fullest extent permitted by applicable Legal Requirement, the defense of any inconvenient forum to the maintenance of such action or proceeding in any Chosen Court.

SECTION 6.   THE NEW GUARANTOR HEREBY ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED BY AND HAS CONSULTED WITH COUNSEL OF ITS CHOICE, AND HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN RESPECT OF ANY LEGAL PROCEEDING ARISING DIRECTLY OR INDIRECTLY OUT OF OR RELATING TO THIS SUPPLEMENT , THE GUARANTY AGREEMENT, ANY OTHER CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

SECTION 7.   In case any one or more of the provisions contained in this Supplement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and in the Guaranty Agreement shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision hereof in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The New Guarantor shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 8.   All communications and notices hereunder shall be in writing and given as provided in Section 10 of the Guaranty Agreement.

**THIS SUPPLEMENT, THE GUARANTY AGREEMENT AND THE OTHER CREDIT DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.**

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the New Guarantor has duly executed this Supplement to the Guaranty Agreement as of the day and year first above written.

**[New Guarantor]**

By: _____

Name:_____

Title:_____

Address for New Guarantor:

_____

_____

**EXHIBIT C**
**FORM OF INTERIM DIP ORDER**

[attached]

## EXHIBIT E
## FORM OF NOTICE OF BORROWING

[Date]

Cantor Fitzgerald Securities, as Administrative Agent
Address:       1801 N. Military Trail, Suite 202
               Boca Raton, FL 33431
Attn:          Niles Horning
Telephone:     (212) 829-4889
Facsimile:     (646) 219-1180

Ladies and Gentlemen:

1.      Pursuant to Section 2.3(a) of that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders, the undersigned, in its capacity as the Borrower Representative, hereby gives you irrevocable notice that the Borrower(s) identified in clause (d) below hereby requests a Borrowing (the "Proposed Borrowing"), and in connection with that request sets forth below the information relating to the Proposed Borrowing as required by the Credit Agreement:

        (a)     The Business Day of the Proposed Borrowing is _____, 20[__].
        (b)     The aggregate amount of the Proposed Borrowing is $_____.
        (c)     The Borrower(s) requesting the Proposed Borrowing is _____.
        (d)     The Loan Limit as of the date of the Proposed Borrowing is _____.

The undersigned, in its capacity as the Borrower Representative, under and pursuant to the Credit Agreement, hereby certifies that the following statements are true and correct on the date hereof and will be true and correct on the date of the Proposed Borrowing:

        (i)     the representations and warranties contained in the Credit Agreement and each of the other Credit Documents are true and correct, before and after giving effect to the Proposed Borrowing and to the application of the proceeds therefrom, except for those representations and warranties that are made as of a specified date, which shall be true and correct as of such specified date;

(ii)     no Default has occurred and is continuing, or would result from the Proposed Borrowing or from the application of the proceeds therefrom; [and]

(iii)    the conditions precedents set forth in Section [3.1][3.2][3.3][3.4][11] of the Credit Agreement will have been met (or waived in accordance with Section 9.3) immediately prior to the Proposed Borrowing[.][; and]

(iv)     [the Proposed Borrowing and the proceeds thereof will be used by the Borrowers for the sole purpose of making payments in respect of pre-Petition Date property and ad valorem tax amounts.][12]

Very truly yours,

**KNIGHT ENERGY HOLDINGS, LLC**


By:_____
Name:_____
Title:_____

---

[11] Selection to be depending on the appropriate Section.
[12] To be included if Loans are being made under Section 2.1(b) of the Credit Agreement.

## EXHIBIT F-1

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the loan(s) (as well as any Note(s) evidencing such loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower Representative with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower Representative and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____

Name: _____

Title: _____

Date: _____

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a "10-percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, and (iv) it is not a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____
Name: _____
Title: _____
Date: _____

## FORM OF U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("Holdings"), Knight Oil Tools, LLC, a Louisiana limited liability company ("KOT"), Knight Manufacturing, LLC, a Louisiana limited liability company ("Knight Manufacturing"), KDCC, LLC, a Louisiana limited liability company ("KWS"), Tri-Drill, LLC, a Louisiana limited liability company ("Tri-Drill"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("Advanced Safety"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("Knight Information"), HMC Leasing, LLC, a Louisiana limited liability company ("HMC Leasing"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("Knight Family"), Knight Aviation, L.L.C., a Louisiana limited liability company ("Knight Aviation"), Rayne Properties, L.L.C., a Louisiana limited liability company ("Rayne Properties"), El Caballero Ranch, Inc., a Texas corporation ("El Caballero"), HMC Investments, L.L.C., a Louisiana limited liability company ("HMC Investments"), Knight Security, LLC, a Louisiana limited liability company ("Knight Security") and Knight Research & Development, LLC, a Louisiana limited liability company ("Knight R&D"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "Borrowers" and each individually, a "Borrower"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN and an IRS Form W-8ECI from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: _____

| Name: | _____ |
|-------|--------------------------|
| Title: | _____ |
| Date: | _____ |

**EXHIBIT F-4**

**FORM OF U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Credit Agreement dated as of August 9, 2017 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among Knight Energy Holdings, LLC, a Louisiana limited liability company ("<u>Holdings</u>"), Knight Oil Tools, LLC, a Louisiana limited liability company ("<u>KOT</u>"), Knight Manufacturing, LLC, a Louisiana limited liability company ("<u>Knight Manufacturing</u>"), KDCC, LLC, a Louisiana limited liability company ("<u>KWS</u>"), Tri-Drill, LLC, a Louisiana limited liability company ("<u>Tri-Drill</u>"), Advanced Safety and Training Management, LLC, a Louisiana limited liability company ("<u>Advanced Safety</u>"), Knight Information Systems, L.L.C., a Louisiana limited liability company ("<u>Knight Information</u>"), HMC Leasing, LLC, a Louisiana limited liability company ("<u>HMC Leasing</u>"), Knight Family Enterprises, L.L.C., a Louisiana limited liability company ("<u>Knight Family</u>"), Knight Aviation, L.L.C., a Louisiana limited liability company ("<u>Knight Aviation</u>"), Rayne Properties, L.L.C., a Louisiana limited liability company ("<u>Rayne Properties</u>"), El Caballero Ranch, Inc., a Texas corporation ("<u>El Caballero</u>"), HMC Investments, L.L.C., a Louisiana limited liability company ("<u>HMC Investments</u>"), Knight Security, LLC, a Louisiana limited liability company ("<u>Knight Security</u>") and Knight Research & Development, LLC, a Louisiana limited liability company ("<u>Knight R&D</u>"; and collectively with Holdings, KOT, Knight Manufacturing, KWS, Tri-Drill, Advanced Safety, Knight Information, HMC Leasing, Knight Family, Knight Aviation, Rayne Properties, El Caballero, HMC Investments and Knight Security, the "<u>Borrowers</u>" and each individually, a "<u>Borrower</u>"), the Lenders and Cantor Fitzgerald Securities, as Administrative Agent for the Lenders. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.12 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the loan(s) (as well as any Note(s) evidencing such loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such loan(s) (as well as any Note(s) evidencing such loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Credit Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a "10-percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower Representative with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN and an IRS Form W-8ECI from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower Representative and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower Representative and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
Name: _____
Title: _____
Date: _____

**EXHIBIT G**
**FORM OF DIP BUDGET**

[attached]

## EXHIBIT B

## FORM OF JOINDER AGREEMENT

## FORM OF JOINDER

This Joinder to the Restructuring Support Agreement, dated as of [●], 2017, by and among Knight Energy Holdings, LLC, HMC Leasing, LLC, Knight Family Enterprises, LLC, the Consenting Holders and Consenting Lenders signatory thereto, and the Administrative Agent, (the "Agreement"), is executed and delivered by [_____] (the "Joining Party") as of [_____], 2017. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, attached to this Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Consenting [Lender/Holder]" and a "Party" for all purposes under the Agreement.

2. <u>Representations and Warranties</u>. With respect to the [debt/equity interests] set forth below its name on the signature page hereof and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such [debt/equity], the Joining Party hereby makes the representations and warranties of the Consenting [Lenders/Holders] set forth in the Agreement to each other Party to the Agreement.

3. <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

B-2

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[CONSENTING LENDER/HOLDER]**


By: _____

Name: _____

Title: _____

| Security | Amount |
|---|---|
|  |  |

Notice Address:

_____
_____
_____
Fax: _____
E-mail:_____
Attention: _____

With copies to:

[ADDRESS]
Fax: [●]
E-mail: [●]
Attention: [●]

Acknowledged:
**KNIGHT ENERGY HOLDINGS, LLC**

By:_____
Name:
Title:

**HMC LEASING, LLC**

By:_____
Name:
Title:

**KNIGHT FAMILY ENTERPRISES, LLC**

By:_____
Name:
Title:

B-3

## EXHIBIT C

### CONSENTING HOLDERS' INTERESTS AND CLAIMS

# CONSENTING HOLDERS' INTERESTS AND CLAIMS

| Bryan R. Knight | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Energy Holdings LLC** | 252,928.14 units |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

| Kelley Knight Sobiesk | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Energy Holdings LLC** | 252,928.14 units |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

| Mark E. Knight 2010 Trust No. 1 | | | |
|---|---|---|---|
| | Nature of Interest or Claim Held | Company Entity in which Interest or Claim is Held | Amount |
| Equity Interests Held | Common Stock | Knight Energy Holdings LLC | 966 units |
| | Preferred Stock | | |
| Financial Indebtedness Held | Secured Loans: | | |
| | Unsecured Loans: | | |
| Other Claims | Unsecured Claim for Wages | | |

| Bryan R. Knight 2010 Trust No. 1 | | | |
|---|---|---|---|
| | Nature of Interest or Claim Held | Company Entity in which Interest or Claim is Held | Amount |
| Equity Interests Held | Common Stock | Knight Energy Holdings LLC | 966 units |
| | Preferred Stock | | |
| Financial Indebtedness Held | Secured Loans: | | |
| | Unsecured Loans: | | |
| Other Claims | Unsecured Claim for Wages | | |

| Kelley Knight Sobiesk 2010 Trust No. 1 | | | |
|---|---|---|---|
| | Nature of Interest or Claim Held | Company Entity in which Interest or Claim is Held | Amount |
| Equity Interests Held | Common Stock | Knight Energy Holdings LLC | 966 units |
| | Preferred Stock | | |
| Financial Indebtedness Held | Secured Loans: | | |
| | Unsecured Loans: | | |
| Other Claims | Unsecured Claim for Wages | | |

| MEK 2012 Family Trust No. 1 | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Energy Holdings LLC** | 128,156.33 units |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

| BRK 2012 Family Trust No. 1 | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Energy Holdings LLC** | 128,156.33 units |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

| KKS 2012 Family Trust No. 1 | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Energy Holdings LLC** | 128,156.33 units |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

C-7

| Kelley Knight Sobiesk | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | Common Stock | HMC LEASING LLC | 33 1/3% Interest |
| | Preferred Stock | | |
| **Financial Indebtedness Held** | Secured Loans: | | |
| | Unsecured Loans: | | |
| **Other Claims** | Unsecured Claim for Wages | | |

| Bryan R. Knight | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | Common Stock | HMC LEASING LLC | 33 1/3% Interest |
| | Preferred Stock | | |
| **Financial Indebtedness Held** | Secured Loans: | | |
| | Unsecured Loans: | | |
| **Other Claims** | Unsecured Claim for Wages | | |

C-8

| Ann Knight | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Family Enterprises LLC** | **10% Interest** |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

| Kelley Knight Sobiesk | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Family Enterprises LLC** | **6.41% Interest** |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

C-9

| Bryan R. Knight | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | Common Stock | Knight Family Enterprises LLC | 6.41% Interest |
| | Preferred Stock | | |
| **Financial Indebtedness Held** | Secured Loans: | | |
| | Unsecured Loans: | | |
| **Other Claims** | Unsecured Claim for Wages | | |

| Kelley Knight Sobiesk 2010 Trust 1 | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | Common Stock | Knight Family Enterprises LLC | 23.59% Interest |
| | Preferred Stock | | |
| **Financial Indebtedness Held** | Secured Loans: | | |
| | Unsecured Loans: | | |
| **Other Claims** | Unsecured Claim for Wages | | |

| **Bryan R. Knight 2010 Trust 1** | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Family Enterprises LLC** | **23.59% Interest** |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

| **Mark E. Knight 2010 Trust 1** | | | |
|---|---|---|---|
| | **Nature of Interest or Claim Held** | **Company Entity in which Interest or Claim is Held** | **Amount** |
| **Equity Interests Held** | **Common Stock** | **Knight Family Enterprises LLC** | **23.59% Interest** |
| | **Preferred Stock** | | |
| **Financial Indebtedness Held** | **Secured Loans:** | | |
| | **Unsecured Loans:** | | |
| **Other Claims** | **Unsecured Claim for Wages** | | |

C-11

## EXHIBIT D

## CONSENTING LENDERS' CLAIMS

| CANTOR FITZGERALD SECURITIES | | | |
|---|---|---|---|
| | **Nature of Interest or Debt Held** | **Company Entity in which Interest or Debt is Held** | **Amount** |
| **Equity Interests Held** | Common Stock | | |
| | Preferred Stock | | |
| **Financial Indebtedness Held** | Secured Loans: | Knight Energy Holdings, LLC (and obligors under Senior Credit Facility) | $5,000,000 (Senior Credit Facility Term Loan) |
| | Unsecured Loans: | | |

| CLEARLAKE CAPITAL PARTNERS IV FINANCE, L.P. | | | |
|---|---|---|---|
| | **Nature of Interest or Debt Held** | **Company Entity in which Interest or Debt is Held** | **Amount** |
| **Equity Interests Held** | Common Stock | | |
| | Preferred Stock | | |
| **Financial Indebtedness Held** | Secured Loans: | Knight Energy Holdings, LLC (and obligors under Senior Credit Facility) | $59,953,163.81 (Senior Credit Facility - Term Loan) $104,640,000.00 (Senior Credit Facility - Revolving Credit Facility) |
| | Unsecured Loans: | | |

D-1