## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 17-51014 (KLP) |
| | : | |
| KNIGHT ENERGY HOLDINGS, LLC, *et al.*,1 | : | (JOINTLY ADMINISTERED) |
| | : | |
| Debtors. | : | Chapter 11 |
| | : | |
| | : | JUDGE ROBERT SUMMERHAYS |

## DECLARATION OF MARK C. COMEAUX IN SUPPORT OF
## (I) CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN OF
## REORGANIZATION, AND (II) RELATED MOTIONS

**Mark C. Comeaux,** being duly sworn, declare the following under penalty of perjury:

1.     I am the Chief Financial Officer ("CFO") of each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in these bankruptcy cases.

2.     I received a Bachelor of Science in Accounting from Louisiana State University in 1985 and am a Certified Public Accountant. After college, I worked in public accounting for ten (10) years and the private industry for the last twenty-two (22) years. I was hired as CFO of the Debtors in March of 2016.

3.     As CFO, I am principally responsible for all accounting, treasury and financial reporting. Among my responsibilities, I have been responsible for working with the

---

1  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Knight Energy Holdings, LLC (1930) (Case No. 17-51014); Knight Oil Tools, LLC (2667) (Case No. 17-51015); Knight Manufacturing, LLC (0600) (Case No. 17-51016); KDCC, LLC, f/k/a Knight Well Services, LLC (4156) (Case No. 17-51017); Tri-Drill, LLC (4957) (Case No. 17-51018); Advanced Safety & Training Management, LLC, (0510) (Case No. 17-51019); Knight Security, LLC (0923) (Case No. 17-51020); Knight Information Systems, LLC (9787) (Case No. 17-51021); El Caballero Ranch, Inc. (7345) (Case No. 17-51022); Rayne Properties, LLC (7235) (Case No. 17-51023); Knight Aviation, LLC (3329) (Case No. 17-51024); Knight Research & Development, LLC (3760) (Case No. 17-51025); Knight Family Enterprises, LLC (7190) (Case No. 17-51026); HMC Leasing, LLC (0814) (Case No. 17-51027) and HMC Investments, LLC (8254) (Case No. 17-51029).  The Debtors' service address is 2727 SE Evangeline Thruway, Lafayette, Louisiana 70508 other than Knight Manufacturing, LLC and Advanced Safety & Training Management, LLC. Knight Manufacturing, LLC's service address is 2810-A Melancon Road, Broussard, Louisiana 70518 and Advanced Safety & Training Management, LLC's service address is 2725 SE Evangeline Thruway, Lafayette, Louisiana 70508

{00360418-11}

reorganizational professionals retained by the Debtors, including Gary L. Pittman of Opportune, the Debtors' Chief Restructuring Officer, preparing and compiling financial reports, including monthly operating reports, participating in and supervising negotiations with several creditors and parties-in-interest, assisting with the review and resolution of claims against the Debtors, participating in and supervising from a financial standpoint the Debtors' Plan, October Disclosure Statement (defined below) and related financial exhibits.

4.     I am over the age of twenty-one (21) years and am competent to make this declaration ("Declaration"). I have personal knowledge of the facts as stated in this Declaration and based on information made known to me in my capacity as the CFO of the Debtors. I am submitting this Declaration in support of the confirmation of the *Debtors' Joint Chapter 11 Plan of Reorganization as of November [    ], 2017* [P-570-1] (the "Plan")[2] filed by the Debtors on November 28, 2017.

5.     This Declaration is evidence in support of confirmation of the Plan and related motions, including the pending *Motion to Authorize the Debtors to Assume the Restructuring Support Agreement* [P-87] ("RSA Motion"), *Motion for an Order Authorizing the Debtors to Reject the Farm and Ranch Contract Entered Into Between El Caballero Ranch, Inc. and Lasalle River Ranch, LLC and Related Relief* [P-464] ("El Caballero Rejection Motion"), and *Motion for an Order Pursuant to Section 365(a) of the Bankruptcy Code Authorizing Debtors to (A) Reject Certain Executory Contracts and Leases and (B) Set a Bar Date for Any and All Claims Against the Debtors Related to the Executory Contracts and Leases* [P-486] ("Rejection Motion") and is submitted pursuant to Rule 43(c) (allowing hearings on affidavits) of the Federal Rules of Civil Procedure, made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 9017.

---

2 All capitalized terms not defined herein are as defined in the Plan.

6.     Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by other individuals employed or engaged by the Debtors, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtors' operations, financial condition and history.  I have been involved in most aspects of the Chapter 11 Cases. If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this Declaration on behalf of the Debtors.

## I.  BACKGROUND

**Bankruptcy Filing**

7.     On August 8, 2017, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  All of the Debtors' Chapter 11 cases have been consolidated for procedural purposes and are being jointly administered [P-22].

8.     On August 24, 2017, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"), originally consisting of (a) NLB Corp., and (b) EDI Environmental Services, Inc. *See*, *Notice of Appointment of Unsecured Creditors' Committee* [Dkt. No. 154]. On October 2, 2017, the United States Trustee added the following members to the Committee: (a) American Eagle Logistics, LLC, (b) National Oilwell Varco & Affiliates, and (c) Quail Tools, Incorporated.

**Restructuring Support Agreement**

9.     On August 8, 2017, the Debtors entered into the Restructuring Support Agreement (the "RSA") with certain Consenting Lenders under the Senior Credit Facility and Consenting Holders of the Debtors' Interests.  The RSA sets forth a proposed restructuring of the Debtors,

including the provision of debtor-in-possession financing to allow the Debtors to seek to reorganize under chapter 11 of the Bankruptcy Code.

10. The RSA contained a "fiduciary out" which enabled the Debtors to terminate their obligations under the RSA if "continued performance under th[e] [Restructuring Support] Agreement would be inconsistent with the exercise of its fiduciary duties…" *See*, RSA, Section 6(c)(iii).

11. In accordance with Section 6(c)(iii) of the RSA, the Debtors implemented and followed an "Inquiry Protocol" during the Chapter 11 Cases with the assistance of their investment banker, Bayshore Partners, LLC, to ensure the Debtors would at all times be in a position to consider and act on any alternative transactions. A copy of the "Inquiry Protocol" is attached hereto as **Exhibit A**. There were no proposed transactions received (other than the Plan) during the Chapter 11 Cases which would have resolved the Debtors' financial problems and allow a financial restructuring of the Debtors. Therefore, there was no basis upon which the Debtors could possibly have determined to exercise the "fiduciary out" in the RSA.

12. On August 11, 2017, the Debtors filed the RSA Motion, seeking entry of an order authorizing the Debtors to assume the RSA. The RSA Motion has been continued and is set for hearing at the same time as the confirmation of the Plan.

**Plan of Reorganization**

13. On August 25, 2017, the Debtors filed *Debtors' Joint Chapter 11 Plan of Reorganization* [P-162] ("Original Plan") and *Disclosure Statement as of August 25, 2017 for the Debtors' Joint Chapter 11 Plan of Reorganization as of August 25, 2017* [P-163] ("Original Disclosure Statement").

14.     After the filing of the Original Plan and Original Disclosure Statement, the Debtors engaged in good faith negotiations with the Official Committee of Unsecured Creditors ("Committee") and ultimately reached a resolution with the Committee regarding the treatment of unsecured claims in a plan, which treatment was included in the *Debtors' Joint Chapter 11 Plan of Reorganization as of October 17, 2017* [P-417] ("October Plan"). On October 16, 2017, the Committee executed a Plan Support Agreement providing, among other things, that the Committee would support confirmation of the October Plan.

15.     On October 17, 2017, the Debtors filed the October Plan and the *Disclosure Statement as of October 17, 2017 for the Debtors' Joint Chapter 11 Plan of Reorganization as of October 17, 2017* [P-418] ("October Disclosure Statement").

16.     After a hearing held on October 16, 2017, on October 17, 2017, the Bankruptcy Court entered the *Order Approving (I) Disclosure Statement as of October 17, 2017 for the Debtors' Joint Chapter 11 Plan of Reorganization as of October 17, 2017, (II) the Confirmation Hearing Notice, the Contents of the Solicitation Package, and the Manner of Mailing and Service of the Solicitation Package and Confirmation Hearing Notice, (III) the Procedures for Voting and Tabulation of Ballots, and (IV) the Forms of Ballots* [P-422] ("Disclosure Statement Order"), approving, among other thing, the October Disclosure Statement and certain procedures for voting and the tabulation of Ballots for the purpose of voting only, and authorizing the Debtors to distribute the solicitation package. The solicitation package to holders of Class 9 General Unsecured Claims included a letter from the Committee which advised holders of Class 9 General Unsecured Claims of the Committee's support of the confirmation of the Plan and urging Class 9 General Unsecured Claims to vote to accept the Plan. A copy of the letter from

the Committee to Holders of General Unsecured Claims dated October 17, 2017 is attached hereto as **Exhibit B**.

17. In accordance with Article I(A)(124) of the Plan, on November 17, 2017, the Debtors filed *Notice of Filing Plan Supplement to the Joint Chapter 11 Plan of Reorganization as of October 17, 2017* [P-529] as supplemented on November 21, 2017 [P-553]. The Plan Supplement generally consists of the corporate and financial documents (or term sheets thereof) to implement the Plan and the Restructuring Transactions.

18. On November 28, 2017, the Debtors filed a *Notice of Filing Proposed Amended Plan and (II) Redline of Proposed Amended Plan* [P-570] attaching the Plan as Exhibit A which included immaterial modifications to the Plan (which did not change in any respect the negotiated treatment of General Unsecured Claims agreed with the Committee or adversely affect any creditors or any classes of creditors or equity interest holders).

## II.    THE REQUIREMENTS FOR CONFIRMATION UNDER THE BANKRUPTCY CODE

**Section 1129(a)(1) (Plan Compliance With Title 11)**

19. Section 1129(a)(1) requires that a plan comply with the "applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).

A.    Section 1123 (Plan Contents). Section 1123 of the Bankruptcy Code sets forth the mandatory and permissive contents of a plan. The Plan contains each of the mandatory provisions listed in Section 1123(a).

1.    Compliance With Section 1123(a) (Mandatory Plan Provisions).

a.    Section 1123(a)(1) (Designation of Classes of Claims and Interests). Section 1123(a)(1) requires that a plan designate classes of interests and classes of claims, subject to the requirements of Section 1122.

Section 1122(a) provides that a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to other claims or interests in the class. Section 1122(b) allows the creation of an administrative convenience class. Each of the classes consists of Claims or Interests which are substantially similar, and therefore the classification scheme is consistent with Section 1122. Class 8 consists of an administrative convenience class allowed by Section 1122(b). Article III of the Plan satisfies these requirements. **See Plan, Article III.**

The Plan designates the following Classes:

| Class | Claim or Interest | Impaired |
|-------|-------------------|----------|
| 1 | Other Secured Claims | No |
| 2 | Other Priority Claims | No |
| 3 | JPM Commercial Loan Claims | Yes |
| 4 | JPM Consumer Loan Claims | Yes |
| 5 | Iberia Loan Claims | Yes |
| 6 | Secured Senior Credit Facility Claims | Yes |
| 7 | Mineral Contractor Claims | No |
| 8 | Unsecured Convenience Class Claims | No |
| 9 | General Unsecured Claims | Yes |
| 10 | Debtor Intercompany Claims and Intercompany Interests | No |
| 11 | Debtor Interests | Yes |

| Class | Claim or Interest | Impaired |
|:---:|:---:|:---:|
| 12 | Section 510(b) Claims | Yes |

b.     <u>Section 1123(a)(2) (Specification of Classes That are Not Impaired)</u>.    Section 1123(a)(2) requires that a plan "specify any class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).

Article III of the Plan sets forth the treatment and impairment of Claims and Interests under the Plan.  Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Mineral Contractor Claims), Class 8 (Unsecured Convenience Class Claims) and Class 10 (Debtor Intercompany Claims and Intercompany Interests) are not impaired. **See Plan, Article III.**

c.     <u>Section 1123(a)(3) (Specification of Treatment of Impaired Classes)</u>.    Section 1123(a)(3) requires that a plan "specify the treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C. § 1123(a)(3).

In accordance with Section 1123(a)(3), Article III of the Plan specifies the treatment of the impaired classes of Claims and Interests.  Class 3 (JPM Commercial Loan Claims), Class 4 (JPM Consumer Loan Claims), Class 5 (Iberia Loan Claims), Class 6 (Secured Senior Credit Facility Claims), Class 9 (General Unsecured Claims), Class 11 (Debtor Interests), Class 12 (Section 510(b) Claims), and are impaired under the Plan. **See Plan, Article III.**

d.     <u>Section 1123(a)(4) (Same Treatment of Claims Within a Class)</u>.    Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Under Article III of the

Plan, Claims and Interests within each Class are receiving identical treatment. Accordingly, the Plan complies with Section 1123(a)(4). **See Plan, Article III.**

e. <u>Section 1123(a)(5) (Adequate Means for Implementation of Plan)</u>. Section 1123(a)(5) requires that a plan "provide adequate means for the plan's implementation," and sets forth several non-exclusive examples of such adequate means. <u>See</u> 11 U.S.C. § 1123(a)(5)(B) and (J). The means for implementing the Plan are set forth primarily in Article IV of the Plan and in my opinion are adequate. **See Plan, Article IV.** The Plan and the various documents included in the Plan Supplement provide adequate and proper means for implementation of the Plan, including, without limitation: (a) the restructuring of the Debtors' balance sheet and other financial transactions provided for by the Plan; (b) the implementation of the New Organizational Documents; (c) the consummation of the Restructuring Transactions in accordance with the Description of the Transaction Steps; (d) the issuance of the Reorganized Knight Interests and the Equity Warrants; (e) the cancellation of certain existing agreements, obligations, instruments, and Interests; (f) the entrance into the New First Lien Facility and the modification, amendment and restatement, as applicable, of the New Mortgage Loans; (g) the vesting of the property of the Debtors' Estates in the Reorganized Debtors (other than the Non-Vesting Assets); (h) the execution, delivery, filing, or recording of all contracts, instruments, releases, and other agreements or documents in furtherance of the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy Code; and (i) the preservation of the existence of each Debtor after the Effective Date as a separate corporate entity, limited liability company, partnership, or other legal form along with its respective assets and property. The Plan does not provide for or contemplate substantive consolidation. I am also familiar with the Non-Vesting Assets. The Non-Vesting Assets have no value or benefit to the Debtors' Estates.

f.      Section 1123(a)(6) (Charter of Reorganized Debtor).  Section 1123(a)(6) requires that, with respect to a corporate debtor, a plan provide for the inclusion of certain provisions in the debtor's charter prohibiting the issuance of non-voting securities.   The applicable New Organizational Documents prohibit the issuance of non-voting equity securities and provide an appropriate distribution of voting power among the several classes of Reorganized Knight Interests possessing such power.   As such, the Plan satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

g.      Section 1123(a)(7) (Selection of Officers and Directors).   Section 1123(a)(7) requires that a plan contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee. The Plan does not contain any provisions that are inconsistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the Plan and any successor thereto.

2.      Compliance With Section 1123(b) (Permissive Plan Provisions). The Plan also contains permissive plan provisions consistent with section 1123(b).

a.      Section 1123(b)(1) (Impairment or Unimpairment of Classes).  Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."   11 U.S.C. § 1123(b)(1).   As noted, the Plan provides that Class 3 (JPM Commercial Loan Claims), Class 4 (JPM Consumer Loan Claims), Class 5 (Iberia Loan Claims), Class 6 (Secured Senior Credit Facility Claims), Class 9 (General Unsecured Claims), Class 11 (Debtor Interests), and Class 12 (Section 510(b) Claims) are impaired under the Plan. The Plan leaves Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 7 (Mineral

Contractor Claims), Class 8 (Unsecured Convenience Class Claims), and Class 10 (Debtor Intercompany Claims and Intercompany Interests) unimpaired. **See Plan, Article III.**

b.  <u>Section 1123(b)(2) (Assumption or Rejection of Executory Contracts)</u>.  Section 1123(b)(2) permits a plan of reorganization to "provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor…"   11 U.S.C. § 1123(b)(2).   Article V of the Plan provides for the rejection of the Debtors' Executory Contracts and Unexpired Leases as of the Effective Date, other than those Executory Contracts or Unexpired Leases that:  (a) previously have been assumed or rejected by the Debtors in the Chapter 11 Cases; (b) are specifically identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; or (c) are the subject of a separate motion to assume or reject such Executory Contract or Unexpired Lease filed by the Debtors under section 365 of the Bankruptcy Code that is pending as of the Effective Date. **See Plan, Article V.**

c.  <u>Section 1123(b)(3) (Settlement and Retention of Claims of the Debtor)</u>.  Section 1123(b)(3) permits a plan of reorganization to "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate…" 11 U.S.C. § 1123(b)(3)(A).

The Plan provides for a number of compromises, settlements, and releases of Claims or Interests that belong to the Debtors' Estates.

The provisions of the Plan constitute a good-faith compromise of all Claims, Interests, and controversies relating to the contractual, subordination, and other legal rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest, including, the settlements and compromises provided for under the Comprehensive Settlement, the Debtor Releases (as defined below), and the Third-Party Release (as defined below).

The compromise and settlement of such Claims and Interests embodied in the Plan and reinstatement and unimpairment of other Classes identified in the Plan are integral to the restructuring and have been negotiated at arm's length and in good faith, and are in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and are fair, equitable, and reasonable.

Article VIII.B of the Plan describes certain releases granted by the Debtors (the "Debtor Releases"). In exchange for the Debtor Releases, the Consenting Lenders have agreed to (a) convert approximately $205 million of senior secured debt into $25.5 million in senior secured debt and equity in the Reorganized Debtors, (b) provide additional liquidity to the Reorganized Debtors, and (c) forego their right to receive any recovery from the General Unsecured Claims Fund on account of their deficiency claims which, for purposes of voting, equals $128.6 million, which claim will be excluded from the calculation of the *pro rata* recoveries of the other holders of General Unsecured Claims from the General Unsecured Claims Fund.

In exchange for the Debtor Releases, the Consenting Holders have agreed to (a) contribute the Consenting Holders Cash Contribution to the Debtors, and (b) enter into new below market leases on property that is essential to the Debtors' continued operation post-emergence. Further, the release of the Debtors' claims against the Consenting Holders based on notes against Knight family members ("Insider Notes") only impacts the Consenting Lenders who have a lien on the Insider Notes who have agreed to those releases.

Furthermore, no creditors have objected to the Debtor Releases and, in fact, the Committee has endorsed the Plan with the Debtor Releases and the Class 9 (General Unsecured Claims) voted to accept the Plan (which contains the Debtor Releases) by 99% in amount and 90% in number.

The Debtor Releases are an integral component of the Plan and are part of the agreement reached with the Released Parties to provide the consideration set forth above. Without the Debtor Releases, the settlement and compromise between the parties would not have occurred and there would be no Plan. The Debtors have not received any proposed alternative transaction which did not include the Debtor Releases.

In the Debtors' business judgment, under all of these circumstances, the Debtor Releases are proper. Such releases are a necessary and integral element of the Plan, and are fair, reasonable, and in the best interests of the Debtors, the Estates, and the Holders of Claims and Interests. Also, the Debtor Releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good-faith settlement and compromise of the Claims and Causes of Action released by Article VIII.B of the Plan; (c) given, and made, after due notice and opportunity for hearing; and (d) a bar to any of the Debtors or Reorganized Debtors asserting any Claim or Cause of Action released by Article VIII.B of the Plan.

Additionally, the Debtor Releases are "fair and equitable" and "in the best interests of the estate" considering (i) the probability of success in litigation of the released Claims given uncertainty in fact and law with respect to the Claims; (ii) the complexity and likely duration and expense of litigating the released Claims; (iii) the arm's-length negotiations with key constituents which produced the settlement, (iv) the support of the Committee, and (v) the acceptance of the Plan by Class 9 (General Unsecured Claims).

Article VIII.C of the Plan describes certain releases granted by the Releasing Parties (the "Third-Party Release"). Such Third-Party Release is narrowly drawn and a necessary and integral element of the Plan, and is fair, equitable, reasonable, and in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests. The Third-Party Release applies to

a small group of third parties who (1) are major participants in the reorganization, and have negotiated and agreed to the Third-Party Release, or (2) voted to accept the Plan and are thereby Releasing Parties, or (3) are being paid in full under the Plan. These releases – narrowly drawn – are important to resolve many outstanding disputes and allow the Reorganized Debtors to start fresh.

The Third-Party Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims and Causes of Action released by the Third-Party Release; (c) in the best interests of the Debtors and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

The exculpation, described in Article VIII.D of the Plan (the "Exculpation") was proposed in good faith, was formulated following extensive good-faith, arm's-length negotiations with key constituents, and is appropriately limited in scope. Without limiting anything in the Exculpation, each Exculpated Party has participated in the Debtors' restructuring and the Chapter 11 Cases in good faith and is appropriately released and exculpated from any obligation, Claim, Cause of Action, suit, judgment, damage, demand, loss, or liability for any prepetition or postpetition act taken or omitted to be taken in connection with, arising out of, or relating to, the Chapter 11 Cases, the formulating, negotiating, preparing, filing, disseminating, implementing, administering, confirming, effecting or termination of the RSA and related prepetition transactions, the Plan, the Disclosure Statement, the related agreements, instruments, and other documents (including Plan Transaction Documents), the Solicitation Packages, the solicitation of votes with respect to the Plan, any Restructuring Transactions, or any contract,

instrument, release or other agreement or document created or entered into in connection with the forgoing, the pursuit of Confirmation, Consummation, the administration and implementation of the Plan, any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, including the distribution of property under the Plan, including the Reorganized Knight Interests and the Equity Warrants. The Exculpation, including its carve-out for actual fraud, gross negligence or willful misconduct, is consistent with established practice in this jurisdiction and others.

The injunction provision set forth in Article VIII.E of the Plan is necessary to implement, preserve, and enforce the Debtors' discharge, the Debtor Releases, the Third-Party Release, and the Exculpation, and is tailored to achieve this purpose.

Article IV.Q of the Plan appropriately provides that the Reorganized Debtors will retain, and may enforce, all rights to commence and pursue, as appropriate, any and all Causes of Action except for Causes of Action that have been expressly waived, settled, or otherwise released as provided in Article VIII of the Plan, whether arising before or after the Petition Date, including any Claims or Causes of Action specifically enumerated in the *Notice of Filing Amended Exhibit D-4 – Retained Claims and Causes of Action to the Disclosure Statement as of October 17, 2017* [P-518] and the Plan Supplement, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code. The provisions regarding the preservation of Claims and Causes of Action in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

Article VII.B provides that the Debtors have the right to file objections to Claims or Interests. **<u>See</u> Plan, Article VII.B.**

d. _Section 1123(b)(5) (Modification of Holders of Secured Claims or Unsecured Claims)._  Section 1123(b)(5) provides for the right to modify the rights of holders of secured claims and unsecured claims.  Article III provides for the treatment of Holders of Allowed Secured Claims and Allowed General Unsecured Claims. These provisions comply with Section 1123(b)(5).

e. _Section 1123(b)(6) (Provisions Not Inconsistent With the Bankruptcy Code)._ Section 1123(b)(6) permits the Plan to contain other provisions as long as such provisions are not inconsistent with the Bankruptcy Code.  The Plan does not contain provisions inconsistent with the Bankruptcy Code.

C. _Section 1123(d) - Cure of Defaults_

20. Article V.B of the Plan provides for the satisfaction of Cures associated with each Executory Contract and Unexpired Lease to be assumed in accordance with section 365(b)(1) of the Bankruptcy Code.  In connection with the Plan, the Debtors filed notices of assumption [P-488, 489, 523 and 569] ("Assumption Notices") identifying the Executory Contracts and Unexpired Leases they seek to assume under the Plan and the Cures due under those Executory Contracts and Unexpired Leases. The Cures identified in any Assumption Notices, the Schedule of Assumed Executory Contracts and Unexpired Leases, and any amendments thereto, or the Confirmation Order, as applicable, represent the amount, if any, that the applicable Debtor shall pay in full and complete satisfaction of such Cures.  Any disputed Cures will be determined in accordance with the procedures set forth in Article VII.B of the Plan, and applicable bankruptcy and non-bankruptcy law.  As such, the Plan provides that the applicable Debtor will cure, or provide adequate assurance that the applicable Debtor will promptly cure, defaults with respect

to assumed Executory Contracts and Unexpired Leases in compliance with section 365(b)(1) of the Bankruptcy Code. Thus, the Plan complies with section 1123(d) of the Bankruptcy Code.

21.     Further, considering the substantial de-leveraging and re-capitalization of the Debtors under the Plan, I believe that there is adequate assurance of future performance by the Reorganized Debtors under the Executory Contracts and Unexpired Leases the Debtors seek to assume, as required by 11 U.S.C. § 365(b)(1)(C).

**Section 1129(a)(2) (Proponent Compliance With Title 11)**

22.     Section 1129(a)(2) requires that the proponent of a plan comply with the applicable provisions of title 11. One of the principal purposes of Section 1129(a)(2) is to ensure that plan proponents have complied with the disclosure statement requirements of Section 1125 in the solicitation of acceptances of a plan of reorganization.

23.     On October 17, 2017, after amendments to the Original Disclosure Statement, and with the consent of the Committee (which filed the only objection to the Original Disclosure Statement) the Bankruptcy Court approved the October Disclosure Statement as containing "adequate information" within the meaning of Section 1125 of the Bankruptcy Code. *See*, Disclosure Statement Order.

24.     Thereafter, in accordance with the Disclosure Statement Order, Donlin, Recano & Company, the Bankruptcy Court approved voting agent, served copies of the Disclosure Statement Order, *Amended Notice of (I) Hearing to Consider Confirmation of the Debtors' Joint Chapter 11 Plan of Reorganization, (II) Deadline for Counterparties to Executory Contracts and Unexpired Leases to Object to Cure and Assumption, (III) Administrative Claims Bar Date, (IV) Professional Claims Deadline, and (V) Other Relevant Plan Provisions* [P-424], the October Plan, the October Disclosure Statement, and a ballot conforming to Official Form No. 14 or, in

lieu of a ballot, a *Notification of Non-Voting Status* upon all of the Debtors' known creditors and equity holders, the Office of the United States Trustee, all parties who had requested notice pursuant to Bankruptcy Rule 2002 and all parties entitled to notice pursuant to Bankruptcy Rule 2002.  See Affidavit of Service [P-455].  Accordingly, the Debtors have complied with the solicitation requirements set forth in Section 1125 (as well as all of the other applicable requirements under the Bankruptcy Code).

**Section 1129(a)(3) (Good Faith)**

25.    Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  I believe that the Plan meets the good faith requirement of Section 1129(a)(3).

26.    The terms of the Plan were negotiated at arms-length by numerous parties represented by competent counsel and often, financial advisors and other advisors. There was considerable due diligence, investigation, back and forth negotiations, and ultimately, agreements on the treatment of various creditors' Claims and Interests of equity holders, which are reflected in the Plan.

27.    The Disclosure Statement sets forth in detail the circumstances and events which ultimately led to the proposal of the Plan.

28.    The Liquidation Analysis attached as Exhibit D-5 to the October Disclosure Statement reflects that the Debtors' general unsecured creditors are receiving significantly more through the Plan than they would receive in a chapter 7 liquidation, among other things, due to the Senior Credit Facility Lenders' agreement to forego their rights to receive any recovery from the General Unsecured Claims Fund.

29. The Plan that was ultimately created comports with the purposes of the Bankruptcy Code, was fully negotiated with sophisticated parties represented by capable counsel, and is fair to Holders of Claims and Interests. The Plan resolves on a consensual basis virtually all of the Debtors' approximately $240 million of liabilities, and allows for the de-leveraging and re-capitalization of the Debtors so that they can continue to employ hundreds of people, pay for services and supplies, serve their customers, regain their status as national leaders in the industry and major contributors to the economies of Lafayette and surrounding areas, and satisfy their respective ongoing obligations under the Plan with adequate liquidity and capital resources. This Plan accomplishes those goals, and I am unaware of any alternative transaction which would do so.

**Section 1129(a)(4) (Disclosure of Payments)**

30. Section 1129(a)(4) requires that any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable. Any payments made, or to be made, by the Debtors to professional persons retained by the Debtors or the Committee for services or for costs and expenses in, or in connection with, these Chapter 11 Cases have been, or will be, disclosed to the Bankruptcy Court in applications to employ professionals and in final fee applications, or were already approved by the Bankruptcy Court in the Final DIP Financing Order that was entered on September 8, 2017 [P-276] and any extensions thereto, and any other payments of fees and costs within the purview of Section 1129(a)(4) are subject to Court review as reasonable. Any compensation and expenses

to be paid by the Debtors to their own professionals will be subject to final approval by the Bankruptcy Court.

## Section 1129(a)(5) (Disclosure of Officers, Directors and Insiders)

31.     Subparagraph (A) of Section 1129(a)(5) contains two requirements.  First, the proponent of the plan must disclose the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan.  Second, the plan proponent must demonstrate that "the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity holders and with public policy."  Article IV.O of the Plan, in conjunction with Exhibit 9 of the Plan Supplement, discloses the identity and affiliations of the individuals proposed to serve as the initial directors and officers of the Reorganized Debtors, and the identity, title, and nature of any compensation for any insider who will be employed or retained by the Reorganized Debtors on the Effective Date.

32.     In accordance with Article IV.O of the Plan, from and after the Effective Date₁, the initial Reorganized Knight Board will consist of the following five board members:

| Name | Title(s) |
|---|---|
| José E. Feliciano | Chairman and Member |
| Kelley Sobiesk | Chairman Emeritus and Member |
| Behdad Eghbali | Member |
| Colin Leonard | Member |
| Benjamin Garrick | Member |

33. The Debtors' senior officers as of the Petition Date shall continue to occupy such roles in accordance with Article IV.O. of the Plan.

34. Kelley Sobeisk is an "insider" of the Debtors as defined in 11 U.S.C. 11 U.S.C. § 101(31) and will serve as Chairman Emeritus of Reorganized Knight in accordance with the terms of the applicable New Organizational Documents. She is not expected to be an employee of the Reorganized Debtors, and any compensation she might receive will be for her role as Chairman Emeritus and board member and established in accordance with the applicable corporate policies of the Reorganized Debtors.

35. The proposed directors and officers for the Reorganized Debtors are qualified and familiar with the Debtors business affairs, and the appointments to, or continuance in, such offices by the proposed directors and officers is consistent with the interests of the Holders of Claims and Interests and with public policy.

**Section 1129(a)(6) (Rate Change Approved by Regulatory Commission)**

36. Section 1129(a)(6) requires that any regulatory commission with jurisdiction over the rates of the debtor approve any changes in rates provided in the plan. The Plan proposes no rate change subject to the jurisdiction of any governmental regulatory commission.

**Section 1129(a)(7) (Best Interests Test)**

37. The "best interests" test set forth in Section 1129(a)(7) essentially requires that the plan proponent demonstrate that, with respect to each impaired class of claims or interests, each holder of a claim or interest in such class has either accepted the plan or will receive or retain under the plan property of a value not less than the amount such holder would receive in a chapter 7 liquidation. As demonstrated by the liquidation analysis attached to the October Disclosure Statement as Exhibit D-5, the value of property to be distributed to Holders of Claims

in Class 9 who voted against the Plan is not less than the amount of property such creditors would receive in a Chapter 7 liquidation of the Debtors. Therefore, the Plan satisfies the "best interest" of creditors test of section 1129(a)(7).

**Section 1129(a)(8) (Acceptance or Nonimpairment)**

38. Section 1129(a)(8) provides that, with respect to each class of claims or interests, the class has accepted the plan or the class is not impaired under the plan. A class of claims accepts a plan if holders of at least two-thirds in amount and more than one-half in number of the allowed claims of that class vote to accept the plan. See 11 U.S.C. § 1126(c).

39. Classes 1, 2, 7, 8 and 10 constitute Unimpaired Classes, and each of these Classes which is conclusively presumed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

40. According to the *Declaration of Jung W. Song on Behalf of Donlni, Recano & Company, Inc. Regarding Voting and Tabulation of Ballots Accepting and Rejecting Debtors' Joint Chapter 11 Plan of Reorganization as of October 17, 2017* [P-564] ("Voting Certification"), Classes 5, 6, 9, and 11 have voted to accept the Plan in that the holders of Holders of such Classes voted to accept the Plan by two-thirds in amount and more than one-half in number. No ballots for Holders of Claims or Interests in Class 3 (JPM Commercial Loans Claims), Class 4 (JPM Consumer Loans Claims), or Class 12 (Section 510(b) Claims) were received; therefore, each of these Classes is deemed to accept the Plan under the Disclosure Statement Order. See Disclosure Statement Order, pg. 7, ¶ n.

41. As the following chart indicates, as a result of the voting results on the Plan, all Classes of creditors either (1) are unimpaired, or (2) voted to accept the Plan, or (3) are deemed to accept the Plan.

| Class | Claim or Interest | Impaired/Voting Results |
|---|---|---|
| 1 | Other Secured Claims | Unimpaired |
| 2 | Other Priority Claims | Unimpaired |
| 3 | JPM Commercial Loan Claims | Impaired - Deemed to Accept |
| 4 | JPM Consumer Loan Claims | Impaired - Deemed to Accept |
| 5 | Iberia Loan Claims | Impaired - Accepted |
| 6 | Secured Senior Credit Facility Claims | Impaired – Accepted |
| 7 | Mineral Contractor Claims | Unimpaired |
| 8 | Unsecured Convenience Class Claims | Unimpaired |
| 9 | General Unsecured Claims | Impaired - Accepted |
| 10 | Debtor Intercompany Claims and Intercompany Interests | Unimpaired |
| 11 | Debtor Interests | Impaired - Accepted |
| 12 | Section 510(b) Claims | Impaired – Deemed to Accept |

## Section 1129(a)(9) (Administrative and Priority Claims)

42.  Each holder of an allowed Claim specified in Section 507(a)(2) (administrative expense claims) will be paid in full, as provided in Article II of the Plan.  The treatment of Allowed Administrative Claims, Allowed Professional Claims, and Allowed Priority Tax Claims under Article II of the Plan, and the treatment of Allowed Other Priority Claims under Article III

of the Plan, satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code.

**Section 1129(a)(10) (Acceptance By One Impaired Class)**

43.    Section 1129(a)(10) requires that at least one impaired class of claims accept the plan, determined without including any acceptance of the plan by an insider holding a claim in such class.  As evidenced by the Voting Certification, the Voting Classes 3, 4, 5, 6, and 9, each of which is impaired, voted to accept the Plan by the requisite numbers and amounts of Claims or is deemed to have accepted the Plan pursuant to the Disclosure Statement Order. Therefore, at least one class that is impaired under the Plan has accepted the Plan without including any acceptance of the Plan by any insider (as that term is defined in section 101(31) of the Bankruptcy Code).  Pursuant to the Disclosure Statement Order, Classes for which no votes were cast, if any, were deemed to accept the Plan. See Disclosure Statement Order, at pg. 7 ¶ n. Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

**Section 1129(a)(11) (Feasibility)**

44.    Section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

45.    As noted earlier, I believe that the Plan is feasible and is not likely to be followed by liquidation or the need for further financial reorganization. The secured obligations owed by the Debtors are being substantially reduced under the Plan as reflected in the charts set forth

below from the October Disclosure Statement which represent the approximate debt structure at filing and the approximate estimated debt structure at emergence on the Effective Date:



DEBT STRUCTURE: **AT FILING**
AUGUST 8, 2017

**BUSINESS OPERATIONS**

| | |
|---|---|
| Cantor Fitzgerald, Agent First Lien on Substantially All Business Assets / + Miscellaneous Real Estate | $203.7 million[1] |
| Property Taxes | $4.5 million |
| Critical Vendors, 503(b)(9), Mineral Liens Utilities | $2.9 million |
| General Prepetition Unsecured Debt[2] | $14.2 million |
| Total Business Operations Debt at Filing | $225.3 million |

**REAL ESTATE LOANS**

| | |
|---|---|
| JP Morgan Real Estate (Headquarters, Florida House) | $8.6 million |
| Iberia Bank (Various Properties) | $11.2 million |
| Total Real Estate Loans at Filing | $19.8 million |

[1] Including estimated interest on $180 million principal debt.
[2] Excluding First Lien Holders' deficiency claim and certain non-trade debt claims.

17-51014 - #571  File 11/28/17  Enter 11/28/17 19:31:20  Main Document   Pg 25 of 35



## DEBT STRUCTURE: **AT EMERGENCE**
### FALL 2017

#### BUSINESS OPERATIONS

| | |
|---|---|
| Cantor Fitzgerald, Agent<br>First Lien on Substantially All Business Assets<br>Second Lien on Other Real Estate | $25.5 million[1] |
| Property Taxes | $0 |
| Sales and Use Taxes | $0 |
| Critical Vendors<br>Mineral Liens<br>Utilities | $0 |
| General Prepetition<br>Unsecured Debt | $0 |
| Additional New First Lien Term Loans<br>Drawn Amount | $18.1 million[2] |
| Total Business Operations<br>Debt at Emergence | $43.6 million |

#### REAL ESTATE LOANS

| | |
|---|---|
| JP Morgan Real Estate<br>(Headquarters, Florida House) | $8.6 million |
| Iberia Bank<br>(Various Properties) | $11.2 million |
| Total Real Estate Loans at Emergence | $19.8 million |

[1] Subject to adjustment for priority tax claims and other factors.
[2] Amount has not been adjusted for Consenting Holders' Cash Contributions.

46.     As reflected in the charts above, upon emergence from bankruptcy, the Debtors will have approximately $63.4 million in debt rather than the approximately $245.1 million in pre-petition debt the Debtors owed upon filing the Bankruptcy Cases.

47.     Assuming the Plan is confirmed, the Plan provides for a New First Lien Facility under which (1) the Senior Credit Facility Lenders will receive $25.5 million in aggregate

principal amount of Initial New First Lien Term Loans and (2) the New First Lien Facility Lenders will make available to Restructured Knight up to $30 million in aggregate principal amount of advances of Additional New First Lien Term Loans. Advances of Additional New First Lien Term Loans at Consummation of the Plan will be used to implement the Plan as follows: (1) pay off the DIP Financing, (2) pay the $4.5 million in allowed *ad valorem* property taxes, (3) pay any allowed priority sales and use taxes to the extent there is liability for those Claims, (4) pay allowed Unsecured Convenience Class Claims in full, and (4) create the General Unsecured Claims Fund in the amount of $2.6 million minus the aggregate amounts paid to the Unsecured Convenience Class and certain expenses to be incurred in the resolution of Claims, and (5) reimburse the reorganization costs and expenses of the Consenting Lenders.

48. Based on the Financial Projections which are attached as Exhibit D-6 to the October Disclosure Statement, it is my opinion that (a) the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan including, *inter alia*, Cash distributions to fund payments of the General Unsecured Claims Fund, the Allowed Mineral Contractor Claims, the Allowed Unsecured Convenience Claims, the Allowed Administrative Claims, the Allowed Professional Claims, the Allowed Priority Tax Claims, and the Allowed DIP Financing Claims, in each case, in accordance with the Plan, and (b) based on the significant reduction of indebtedness accomplished under the Plan and sufficient Cash to pay Allowed Claims, it is not likely that the confirmation of the Plan will be followed by liquidation or the need for further financial reorganization of the Debtors.

**Section 1129(a)(12) (Section 1930 Fees)**

49. Section 1129(a)(12) requires that a plan provide that all fees payable under 28 U.S.C. § 1930 (consisting primarily of the quarterly fee to the United States Trustee) be paid by

or on the Effective Date of the Plan. Article XII.C of the Plan provides for the payment of all fees payable by the Debtors under 28 U.S.C. § 1930(a).

### Section 1129(a)(13) (Retiree Benefits)

50.    Section 1129(a)(13) requires that the Plan provide for the continuation of payment of all retiree benefits. Article IV.P of the Plan provides that from and after the Effective Date, the payment of all retiree benefits (if any), as defined in section 1114 of the Bankruptcy Code, will continue in accordance with applicable law.

### Section 1129(a)(14) (Domestic Support Obligations)

51.    Section 1129(a)(14) requires that a debtor pay a domestic support obligation. This provision does not apply to the Debtors.

### Section 1129(a)(15) (Individual Debtor)

52.    Section 1129(a)(15) pertains to resolution of an allowed unsecured creditor who objects to the plan of an individual debtor. This provision does not apply to the Debtors.

### Section 1129(a)(16) (Transfers of Property)

53.    Section 1129(a) (16) pertains to the transfers of the property of the plan and such transfers shall be made in accordance with applicable non-bankruptcy law that governs the property of a nonprofit corporation. This provision does not apply to the Debtors.

### Section 1129(b)(1) (Confirmation of the Plan)

54.    Section 1129(b)(1) provides that if all the applicable requirements of section 1129(a) are met except for section 1129(a)(8), a court shall confirm the plan if the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that are impaired under the plan. The Plan satisfies all the applicable requirements of 11 U.S.C. § 1129(a), including subparagraph (a)(8) because all voting Classes have accepted the Plan or are

deemed to have accepted the Plan under the Disclosure Statement Order. Notwithstanding the foregoing, even if 11 U.S.C. 1129(a)(8) were determined not satisfied as to Class 4 (JPM Consumer Loans Claims) because the Holder of the JPM Consumer Claims did not vote to accept the Plan (in such instance, JPM Consumer Claims would constitute a "Rejecting Class"), the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code because it does not discriminate unfairly and is fair and equitable with respect to Class 4 (JPM Consumer Loan Claims).

55.  **Section 1129(b)(2) Cramdown of JPM Consumer Loans Claims**. Assuming for purposes of this Declaration that JPM Consumer Loans Claims (Class 4) constitutes a Rejecting Class, the Plan may still be confirmed under section 1129(b) of the Bankruptcy Code. As a result of the JPM Consumer Loans Claims, JPMorgan Chase Bank, N.A. (Consumer Division) ("J.P. Morgan Consumer") is owed approximately $3.4 million which is secured by a first lien on a 2,772 square-foot house owned by HMC Leasing, LLC located in 2288 E Co Hwy, 30A Santa Rosa Beach, Florida 32459 (the "Seaside Collateral"). The Seaside Collateral, which sits on an approximately 5,000 square foot lot, is a four bedroom, four bath home built in 2005. Each of the first two floors contain a master and guest bedroom with en-suite baths, huge master closets, laundry room and elevator access. The third floor contains the living, dining and kitchen areas complete with bar and additional half bath. Interior finishes include solid plank wood flooring throughout, white shiplap walls, exquisite marble baths, and a chef's kitchen with Sub-Zero, Thermador and Bosch appliances.

56.  The Seaside Collateral is located in an extraordinarily attractive and popular area of Florida which has seen tremendous growth in the last ten years and is presently listed for sale

for $5.5 million dollars. Property values in the area are increasing. The Seaside Collateral is fully insured and J.P. Morgan Consumer is a loss payee on the insurance policy.

57.     The Debtors have valued the Seaside Collateral for purposes of the Plan and the liquidation analysis attached as Exhibit D-5 to the October Disclosure Statement at a low range of $4,735,750 and a high range of $5,483,500. Accordingly, the Debtors believe there is considerable equity in the Seaside Collateral, as the amount owed on account of the JPM Consumer Loans Claims is only $3.4 million.

58.     Since filing the Chapter 11 Cases, the Debtors have made adequate protection payments to J.P. Morgan Consumer in the amount of the interest due on the JPM Consumer Loans secured by a first lien on the Seaside Collateral. The Debtors have made those payments even though (a) J.P. Morgan Consumer has never shown up in the Chapter 11 Cases to request the payments, and (b) J.P. Morgan Consumer has returned and/or failed to deposit the adequate protection payments.

59.     Under the Plan, J.P. Morgan Consumer will retain its Liens on the Seaside Collateral which will continue to secure the obligations of Reorganized Debtors under the JPM Consumer Loans, and such collateral will be sold within a reasonable period of time. Until the Seaside Collateral is sold, however, the Reorganized Debtors will pay interest on JPM Consumer Loan 1 and JPM Consumer Loan 2 at the reinstated contract rates of 6.75% and 6.875% percent per annum, respectively.

60.     By way of comparison of the interest rates, the prime rate of interest as of November 20, 2017, as set forth in the Wall Street Journal, is 4.25% ("Prime Rate"). Furthermore, under the Plan, the Debtors will pay interest on the Iberia Takeback Loans

at Prime Rate plus 200 basis points and the amended JPM Commercial Loans at one-month LIBOR plus 2.5%.

61.     Based on the fact that the interest rates proposed on the JPM Consumer Loans are the reinstated contract rates, and are similar to or more than the interest rate to be paid under the Plan on the amended JPM Commercial Loans and Iberia Takeback Loans, the proposed interest rate on the JPM Consumer Loan Claims under the Plan are reasonable interest rates which are generally consistent with market rates of interest for secured real estate, such as the Seaside Collateral.

62.     Accordingly, the Debtors believe that the Plan's treatment of the JPM Consumer Loans Claims complies with section 1129(b)(2)(A) of the Bankruptcy Code, which provides that a plan is fair and equitable with respect to secured claims if the secured creditor retains its liens securing its claim and receives on account of its claim deferred cash payments having a present value equal to the amount of its allowed secured claim, and therefore, the Plan is fair and equitable with respect to the Class 4 (JPM Consumer Loans Claims) and can be crammed down on J.P. Morgan Consumer.

63.     All of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) (if JPM Consumer is treated as a Rejecting Class) have been met.  Thus, even if J.P. Morgan Consumer were a Rejecting Class, the Plan is fair and equitable to J.P. Morgan Consumer and satisfies the requirements of section 1129(b)(1) and 1129(b)(2)(A) of the Bankruptcy Code.

**Section 1129(c) (Confirmation of only One Plan)**

64.     Section 1129(b)(2)(C) provides that the court may confirm only one plan.  Here, the Debtors are seeking confirmation of their proposed Plan.  There are no competing plans filed.

**Section 1129(d) (Avoidance of Taxes)**

65.     Section 1129(d) provides that on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or certain other laws.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.

**Section 1129(e) (Small Business Case)**

66.     Section 1129(e) provides for confirmation of a small business case.  The Debtors do not qualify as a small business.  This provision does not apply.

### III.     RSA MOTION

67.     It is a condition precedent to the occurrence of the Effective Date of the Plan that the RSA must have been assumed and be in full force and effect. *See,* Plan, Article IX.A.

68.     Based on the above facts, and in order to satisfy the conditions precedent to the effectiveness of the Plan, the RSA Motion should be approved, as the RSA is in the best interest of the Debtors' estates. The Debtors, the Consenting Lenders and the Consenting Holders have all been acting pursuant to the RSA and I believe it is appropriate for the Debtors to formally assume the RSA. There are no objections to the RSA Motion, as the Committee withdrew its objection.

### IV.     EL CABALLERO REJECTION MOTION

69.     El Caballero owns real property located in LaSalle County, Texas, described as 10,247.552 acres and comprised of multiple tracts (the "Property").

70.     Cantor Fitzgerald Securities, as administrative agent on behalf of the Secured Credit Facility Lenders, holds a first priority mortgage against the Property.

71.     On or about January 15, 2016, El Caballero entered into a purported Purchase Agreement with LaSalle River Ranch, LLC ("LaSalle") to sell the Property and improvements thereon to LaSalle. The Purchase Agreement is attached to the El Caballero Rejection Motion as Exhibit "A".

72.     LaSalle is not in possession of the Property. The Purchase Agreement provides that possession of the Property will be delivered at the closing of the sale, which has never occurred.

73.     In connection with the Purchase Agreement, the broker for LaSalle was John Wallace (Republic Ranches) and the broker for El Caballero was Mark Hubbard (collectively with John Wallace, the "Brokers").

74.     In connection with the Purchase Agreement, LaSalle delivered to the title company a check in the amount of $10,000 for the Option Fee (as defined in the Purchase Agreement). El Caballero never negotiated that check.

75.     The Debtors believe (1) the Purchase Agreement was never finalized (the deposit check of $10,000 was never negotiated and the parties have not treated the Purchase Agreement as being in effect), or (2) if the Purchase Agreement was originally effective, it has been terminated or otherwise abandoned by the parties or is subject to termination at will. However, out of an abundance of caution, to the extent the Purchase Agreement is in effect and has not been terminated or abandoned under applicable state law or is not terminable at will (and while reserving all rights and defenses with respect thereto), the Debtors seek to reject the Purchase Agreement under 11 U.S.C. §365.

76. Pursuant to the El Caballero Rejection Motion, to the extent the Purchase Agreement is in effect and has not been terminated or abandoned under applicable state law or is not terminable at will (and while reserving all rights and defenses with respect thereto), the Debtors seek, among other things, entry of an order rejecting the Purchase Agreement under Section 365(a) effective immediately.

77. Based on an August 16, 2017 appraisal of El Caballero, the purchase price of $16,396,083.00 stated in the Purchase Agreement is less than what the Property is worth and the Debtors have exercised their business judgment to reject the El Caballero Purchase Agreement. I believe, as do the holders of the Senior Secured Credit Facility, that it is in the best interests of the estates to reject the Purchase Agreement.

## V. REJECTION MOTION

78. Pursuant to the Plan, any contract or lease that is not specifically assumed is deemed to be rejected. *See* Plan, Art. V(A). However, in an abundance of caution, the Debtors filed the Rejection Motion [Dkt. No. 486] to ensure counterparties received additional notice of the rejection of their Rejected Contract and Lease (defined below).

79. Pursuant to the Rejection Motion, Debtors seek to reject certain Executory Contracts and Unexpired Leases as set forth on Exhibit "A" attached to the Rejection Motion as amended or modified from time to time including any supplements or sub-parts thereto (collectively, the "Rejected Contracts and Leases"), to the extent they are executory contracts or unexpired leases, pursuant to section 365 of the Bankruptcy effective as of immediately prior to the Petition Date.

80. It is the business judgment of the Debtors that the Rejected Contracts and Leases are not beneficial to their Estates and the Debtors' operations and should be rejected.

81.     It is in the best interest of the Debtors and other parties in interest to reject the Rejected Contracts and Leases which are financially burdensome and unnecessary to the Debtors' ongoing operations and business.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

/s/ Mark C. Comeaux
Mark C. Comeaux
Chief Financial Officer of the Debtors